IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB<br>85 Second Street, 2nd Floor<br>San Francisco, CA 94105<br><br>     Plaintiff,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE, RURAL UTILITIES SERVICE<br>1400 Independence Ave., S.W.<br>Washington, D.C. 20250<br><br>CHARLES F. CONNER IN HIS OFFICIAL CAPACITY<br>AS ACTING SECRETARY, UNITED STATES<br>DEPARTMENT OF AGRICULTURE<br>1400 Independence Ave., S.W.<br>Washington, DC 20250<br><br>JAMES M ANDREW, IN HIS OFFICIAL CAPACITY<br>AS ADMINISTRATOR, RURAL UTILITIES SERVICE,<br>UNITED STATES DEPARTMENT OF AGRICULTURE<br>1400 Independence Ave., SW<br>Washington, DC. 20250<br><br>     Defendants. | )<br>)<br>)<br>)<br>)  No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     Plaintiff, Sierra Club, challenges Defendant United States Department of

Agriculture, Rural Utility Service's ("RUS"), approval of a massive coal-fired power plant

expansion project in Western Kansas without first complying with the National Environmental

Policy Act, 42 U.S.C. §§ 4321 – 4370f  ("NEPA").

2.      The proposed project, at the site of Sunflower Electric Power Corporation's ("Sunflower") existing 360 megawatt ("MW") coal-fired power plant in Holcomb, Kansas, includes up to three new 700 MW coal-fired electric-generating units ("Holcomb Expansion Project" or "Project").  It would be one of the nation's largest new sources of greenhouse gas emissions.  If all three units are built, they would emit an estimated 14 million tons of carbon dioxide into the air each year.  The new units will also emit other pollutants, including fine particulate matter, sulfur dioxide and nitrogen oxides, all of which the U.S. Environmental Protection Agency has concluded can cause significant adverse effects on human health and the environment.  The global warming impacts of the proposed Project are so significant that the Project has drawn the objections of the Attorneys General of California, Connecticut, Delaware, Maine, New York, Rhode Island, Vermont and Wisconsin.

3       Despite the Project's significant effects on human health and the environment and the significant public controversy this project has generated both within and outside of Kansas, RUS failed to conduct any environmental analysis under NEPA before approving a number of business agreements that are needed for the Project to be constructed and operated.

4.      The United States Department of Agriculture, initially through the Rural Electrification Administration ("REA"), and, subsequently through RUS, has, since around the time of organization of Sunflower's predecessor in the 1950s, provided financing for Sunflower's electric-generation and transmission facilities.  In providing such financing, the United States acquired extensive control over Sunflower's business, including the right to approve any extensions or additions to Sunflower's electric-generation and transmission facilities.

5.      RUS' approval of the Project without first preparing an environmental impact statement or otherwise analyzing the Project's environmental impacts and alternatives to the Project, including clean energy alternatives, violated NEPA.  RUS' violation of NEPA has deprived RUS, the citizens of Kansas, residents of downwind states and the nation with information that is critical to informed decisions on required government approvals for the proposed coal plant expansion project.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706.

7.      Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e) because Defendants reside in the District, and a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PARTIES

8.      Plaintiff, Sierra Club, is the nation's oldest grassroots environmental organization. The Sierra Club files this lawsuit on behalf of itself and its members.  The Sierra Club has more than 750,000 members nationwide, including approximately 4,675 members in Kansas.  It is dedicated to the protection and preservation of the natural and human environment.  One of the Sierra Club's main priorities, both nationwide and in Kansas, is to address the urgent problems of global warming, air pollution and our dependence on dirty, nonrenewable energy sources such as coal.  The Sierra Club and its members have long-standing interest and expertise in these issues.

9.    The Sierra Club has been actively involved in the permitting process for the Holcomb Expansion Project, and in promoting clean, efficient, economically beneficial alternatives to the Project.  The Sierra Club's Kansas Chapter has distributed tens of thousands of copies of informational documents regarding energy conservation and the benefits of wind power.  The Sierra Club filed extensive comments on proposed air and solid waste permits required for the Project, dozens of its members testified at state-sponsored hearings on the draft permits, and Sierra Club has a pending lawsuit in Kansas state district court to require an evidentiary hearing on the proposed air permit.

10.    Sierra Club members live and work in communities and on farms in portions of Western Kansas where air quality is likely to be adversely impacted by air pollution from the Holcomb Expansion Project.  They include senior citizens, people with asthma, and other individuals who are especially vulnerable to harm from exposure to very fine particulate matter (PM 2.5), sulfur dioxide, and other harmful air pollutants that will be emitted by the Project's new coal-fired electric-generating units.  Sierra Club members, including farmers who live in Western Kansas and elsewhere, will be adversely affected by drought and extreme weather events that are expected to increase due to global warming, to which the Project's massive carbon dioxide emissions will make a significant contribution. RUS' approval of the Holcomb Expansion Project injures the interests of the Sierra Club and its members in breathing clean air and curbing greenhouse gas emissions that cause global warming.

11.    Sierra Club members in Western Kansas will also be adversely affected by the impacts that the Project will have on development of clean energy alternatives, including wind power, in Western Kansas.  The project will flood the market with coal-generated electric power,

substantially impairing opportunities to meet electrical demand with clean energy alternatives, including wind power, which Western Kansas is especially well-suited to develop. The Project will thereby substantially the diminish the opportunity for Sierra Club members in Western Kansas to receive the greater environmental and economic benefits that would result from development of clean energy alternatives, including wind.

12.     The RUS' failure to prepare an environmental impact statement or otherwise comply with NEPA causes procedural injury to Sierra Club and its members by depriving them the protection of NEPA analyses and procedures required to ensure that environmental impacts of, alternatives to, and mitigation measures for the Project are carefully evaluated and considered prior to Project approval.

13.     The RUS' failure to prepare an environmental impact statement or otherwise analyze the Project's environmental impacts and alternatives to the Project also deprives the Sierra Club and its members of the opportunity to participate in the development of such environmental analysis and alternatives, and thereby influence decision-making related to the Project, and further deprives Sierra Club and its members of information about the Project that they would likely use in their advocacy and public education efforts.

14.     The injuries to the Sierra Club and its members resulting from the unlawful and arbitrary actions complained of herein would be redressed by an award of the relief sought in this complaint.

15.     Defendant Rural Utilities Service ("RUS") is a federal agency within the United States Department of Agriculture. The Department of Agriculture established RUS in 1994, in accordance with Congress' mandate set forth in the Federal Crop Insurance Reform and

Department of Agriculture Reorganization Act of 1994, 7 U.S.C. § 6942(a) ("Reorganization Act").

16.     The Reorganization Act charged RUS with carrying out, among other things, an electric loan program under the Rural Electrification Act of 1936, 7 U.S.C. §§ 901 et  seq. Under Section 902(a) of the Rural Electrification Act, RUS is authorized to make loans for the purpose of furnishing and improving electric service in rural areas, and for the purpose of assisting electric borrowers to implement demand side management, energy conservation programs, and on-grid and off-grid renewable energy systems."  7 U.S.C. § 902(a).  Section 904 of the Rural Electrification Act authorizes RUS to make loans for rural electrification to corporations organized for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for furnishing and improving of electric service to rural areas, including by assisting borrowers to implement demand side management, energy conservation programs, and on-grid and off-grid renewable energy systems.

17.     Prior to the Reorganization Act, the Rural Electrification Administration ("REA"), an entity created by executive order in 1935 and subsequently made a federal agency within the United States Department of Agriculture by the Rural Electrification Act, was authorized to administer the electric loan program under the Rural Electrification Act.

18.     Defendant Charles F. Conner is Acting U.S. Secretary of Agriculture and in that capacity has final responsibility for actions taken by RUS.  Mr. Conner is sued in his official capacity.

19.     Defendant James M. Andrew is the Administrator of RUS and in that capacity has management responsibility for actions of RUS, including the agency's compliance with NEPA. Mr. Andrew is sued in his official capacity.

## STATUTORY BACKGROUND

20.     Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4331.

21.     To fulfill this goal, NEPA requires federal agencies to analyze the environmental impacts of a particular action before proceeding with that action.  Id. § 4332(2)(C).  In addition, federal agencies must notify the public of their proposed projects and allow the public to comment on the fully-disclosed environmental impacts of those projects.  40 C.F.R. § 1501.2.

22.     The cornerstone of NEPA is the environmental impact statement ("EIS").  An EIS is required for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

23.     "Major federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility.  40 C.F.R. § 1508.18.

24.     Federal actions include "new and continuing activities, including projects . . . entirely or partly financed, assisted, conducted, regulated or approved by federal agencies."  40 C.F.R. § 1508.18(a).  Federal actions requiring an EIS often occur when a federal agency "[a]pprov[es] . . . specific projects, such as construction or management activities located in a defined geographic area."  40 C.F.R. § 1508.18(b).

25.     In an EIS, the federal agency must (1) explore all reasonable alternatives to an action, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.14, (2) identify and disclose to the public all

impacts of the proposed action and each reasonable alternative, including direct, indirect and cumulative impacts, 42 U.S.C. § 4332(2)(c), 40 C.F.R. §§ 1502.16, 1508.7 – 1508.8, and (3) consider possible mitigation measures to reduce such impacts to the environment, 40 C.F.R. § 1502.14(f).

26.    The goals of an EIS are to "provide a full and fair discussion of significant environmental impacts" associated with a federal decision and to "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

27.    A federal agency must prepare a draft EIS and must request comments on the draft EIS from relevant federal agencies, interested state, local and tribal governments, the public, and other interested parties.  40 C.F.R. § 1503.1.  The federal agency must assess and consider any comments in preparing the final EIS.  40 C.F.R. § 1503.4(a).

## FACTUAL BACKGROUND

### RUS' Loans to and Control Over Sunflower's Predecessor

28.    Sunflower Electric Power Corporation is an electric generation and transmission corporation.  It provides electric power to six electric cooperatives in Western Kansas.

29.    The predecessor to Sunflower Electric Power Corporation was organized as Sunflower Electric Cooperative, Inc., in 1957, and subsequently changed its name, first to Sunflower Electric Power Corporation, and later to Sunflower Electric Holdings, Inc. ("Old Sunflower").

30.    Around the time that it was organized, the United States provided its first loan to Old Sunflower under the Rural Electrification Act.

31.    Over the years, the United States provided a number of direct loans and loan guarantees to Old Sunflower pursuant to the Rural Electrification Act, first through REA, and subsequently through RUS.

32.    Some of the loans guaranteed by the United States, through REA, were made by the Federal Financing Bank, a government corporation created by Congress that is under the supervision of the U.S. Department of Treasury.

33.    In connection with such loans and loan guarantees, Old Sunflower and the United States, first through REA and later through RUS, executed loan documents, including loan agreements and mortgages.

34.    The loan documents, including mortgages, provided the United States a security interest in Old Sunflower's assets.

35.    The loan documents, including loan agreements and mortgages, provided the United States, first through REA and later through RUS, extensive control over Old Sunflower's business.

36.    Mortgages executed and delivered by Old Sunflower to the United States include the following:

a.    Mortgage dated as of June 5, 1958, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 20, 1970;

b.    Supplemental Mortgage dated as of March 2, 1970, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 20, 1970;

c.    Supplemental Mortgage, dated on or about May 24, 1974, which was filed for record with the Registrar of Deeds, Finney County, Kansas on May 28, 1974;

d.      Mortgage and Security Agreement dated as of February 9, 1976, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 26, 1976;

e.      Supplemental Mortgage dated as of July 7, 1976, which was filed for record with the Registrar of Deeds, Finney County, Kansas on July 7, 1976;

f.      Supplemental Mortgage dated as of January 10, 1978, which was filed for record with the Registrar of Deeds, Finney County, Kansas on January 13, 1978;

g.      Supplemental Mortgage dated as of November 3, 1980, which was filed for record with the Registrar of Deeds, Finney County, Kansas on November 4, 1980;

h.      Supplemental Mortgage and Security Agreement, dated as of November 1, 1984, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 21, 1985; and

i.      Consolidated Mortgage, Security Agreement and Financing Statement, dated as of May 5, 1988, which was filed for record with the Registrar of Deeds, Finney County, Kansas on May 5, 1988.

37.     Sunflower's primary resource for supplying electric power to the six electric cooperatives it supplies is Holcomb Station, located in Holcomb, Kansas.  Holcomb Station includes a 360 MW coal-fired electric-generating facility ("Holcomb I").

38.     Old Sunflower commenced site preparation for Holcomb I in May 1980, and the plant became operational on August 16, 1983.  The total cost of plant construction was approximately $ 465 million.

39.     On information and belief, the United States provided Old Sunflower construction financing for Holcomb I.

40.    The United States, through REA, approved the design of Holcomb I.

41.    On information and belief, the United States, through REA, approved the construction of Holcomb I.

## RUS' Approval of Old Sunflower's Restructuring

42.    In November 2002, Old Sunflower underwent a major restructuring.

43.    As part of the November 2002 restructuring, Old Sunflower changed its name to Sunflower Electric Holdings, Inc. ("SEHI").

44.    In connection with the November 2002 restructuring, a new corporation, SEP Corporation was organized.

45.    As part of the November 2002 restructuring, most of the assets of Old Sunflower, including Holcomb I, were transferred to SEP Corporation.

46.    As part of the November 2002 restructuring, SEP Corporation assumed much of Old Sunflower's debt to the United States.

47.    In connection with the 2002 restructuring, a new limited liability company was created named Holcomb Common Facilities, LLC ("HCF").

48.    As part of the 2002 restructuring, Old Sunflower transferred to HCF certain property, including property slated for use in connection with construction of new coal units at the site of the existing Holcomb I plant.

49.    The 2002 restructuring was designed to allow for the construction of one or more additional coal units at the Holcomb site.

50.    RUS participated in and approved the 2002 restructuring.

**RUS' Agreements With and Control Over Sunflower After Its Restructuring**

51.    Subsequent to the November 2002 restructuring, SEP Corporation changed its name to Sunflower Electric Power Corporation, effective March 24, 2003.

52.    As part of and subsequent to the November 2002 restructuring, Sunflower (f/k/a SEP Corporation) entered into additional financing agreements with the United States, through RUS, and other creditors.

53.    In connection with such additional financing agreements, Sunflower executed and delivered additional loan documents to the United States, including the following mortgages:

a.    Mortgage, Security Agreement and Financing Statement dated September 30, 2002, which was filed for record with the Registrar of Deeds, Finney County, Kansas on November 25, 2002;

b.    Amended and Restated Mortgage, Security Agreement and Financing Statement, dated June 1, 2003, which was filed for record with the Registrar of Deeds, Finney County, Kansas on July 25, 2003;

c.    Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, which was filed for record with the Registrar of Deeds, Finney County, Kansas on April 23, 2004; and

d.    Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement, dated as of July 26, 2007, which was filed for record with the Registrar of Deeds, Finney County, Kansas on August 22, 2007.

54.     The mortgages executed and delivered to the United States by both Old Sunflower and Sunflower generally provide the United States a first lien on the respective corporation's assets, including electric-generation and transmission facilities.

55.     On information and belief, the Consolidated Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, remains effective and continues to provide the United States a security interest in property involved in the Holcomb Expansion Project.

56.     The Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, and the Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement, dated as of July 26, 2007, remain effective and continue to provide the United States a security interest in Holcomb I and in property involved in the Holcomb Expansion Project.

57.     Mortgages, and, on information and belief, other loan documents, including loan agreements, executed and delivered by Old Sunflower and Sunflower to the United States, provide the United States substantial control over the conduct of Sunflower's business and the use of Sunflower's property.  On information and belief, the documents providing such control include the Consolidated Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, and the Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement dated as of July 26, 2007.

58.     The Security Agreement and Financing Statement dated as of April 22, 2004 requires the United States to provide written consent before Sunflower may:

       a.        construct, make, lease, purchase or otherwise acquire any extensions or additions to its electric generation and transmission system, or enter into any contract therefore;

       b.        enter into any contract for the operation or maintenance of all or any part of its property;

       c.        enter into any contract for the purchase of electric power or energy;

       d.        enter into any contract for the sale for resale or sale to the ultimate consumer of electric power and energy;

       e.        enter into any contract for any transmission, interconnection or pooling arrangements; or

       f.        enter into any contract for the use by others of any of its property.

       59.      The Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, imposes requirements that are virtually identical, except that they do not apply to sales of electric power and energy that does not exceed 1,000 kilowatts.

       60.      The Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, and the Security Agreement and Financing Statement dated as of April 22, 2004, also provide, among other things:

       a.        subject to contingencies beyond its reasonable control, mortgagor shall at all times keep its plant and properties in necessary continuous operating condition and use all reasonable diligence to furnish the customers served by it with an adequate supply of electric energy;

       b.        Mortgagor shall not pay its directors any salaries for their services except as approved by the Government;

c.      Mortgagor shall not hire a general manager without the approval of the

Government;

d.      Mortgagor may not make certain types of investments without the approval of the

Government.

61.     Section 907 of the Rural Electrification Act, 7 U.S.C. § 907, prohibits any

borrower of funds under Section 904 of the Act, without the approval of the Secretary of

Agriculture, from selling or disposing of its property, rights, or franchises, acquired under the

provisions of the Act, until any loan from the Rural Electrification Administration, including all

interest and charges shall have been repaid.

62.     On information and belief, Sunflower is a borrower of funds under Section 904 of

the Rural Electrification Act, due to it being either a direct borrower or due to its assumption of

obligations to repay loans made to Old Sunflower.

63.     On information and belief, Old Sunflower is a borrower of funds under Section

904 of the Rural Electrification Act.

64.     On information and belief, loans obtained from the Rural Electrification

Administration or RUS to Sunflower have not been fully repaid within the meaning of 7 U.S.C. §

907.

65.     On information and belief, loans from the Rural Electrification Administration or

RUS to Old Sunflower have not been fully repaid within the meaning of 7 U.S.C. § 907.

### RUS' Approval of the Holcomb Expansion Project

66.     Sunflower is moving forward to implement the Holcomb Expansion Project,

which includes up to three new coal-fired electric-generating units.

67.     The Holcomb Expansion Project also includes the expansion of an existing landfill that would allow for disposal of coal combustion wastes from the new coal-fired electric-generating units.

68.     The coal combustion wastes are to be disposed of in an unlined landfill above the Ogallala aquifer.

69.     The Ogallala aquifer is the region's primary source of water for drinking and other purposes.

70.     Electric power from the new coal-fired electric generating units is to be transmitted to customers by a number of transmission lines, including the proposed Eastern Plains Transmission Project.

71.     Sunflower is moving forward to implement plans for the Holcomb Expansion Project in collaboration with Tri-State Generation & Transmission Association, Inc. ("Tri-State"), Golden Spread Generation & Transmission Association, Inc. ("Golden Spread"), and Midwest Energy, Inc. ("Midwest Energy").

72.     Tri-State is an electric generation and transmission corporation that provides electric power to 44 electric cooperatives located in Colorado, New Mexico, Wyoming and Nebraska.

73.     Golden Spread is an electric generation and transmission corporation that provides electric power to 16 electric cooperatives located in Oklahoma and Texas.

74.     Midwest Energy is an electric and natural gas utility with operations in Western and Central Kansas.

75. One of the proposed new coal-fired electric-generating units, known as "SF-2" or the "Eastern Unit," would be owned by Sunflower, Golden Spread, and Midwest Energy, and, on information and belief, one or more private investors.

76. The other two proposed new coal-fired electric-generating units, known as TS-1 and TS-2, would be owned by Tri-State.

77. Sunflower would operate all of the new units.

78. Tri-State intends to transmit power from the coal-fired electric generating units that it acquires via the proposed Eastern Plains Transmission Project to Colorado, where connection would be made to Tri-State's existing electric transmission and generating facilities.

79. On or about September 12, 2006, Sunflower requested the consent of RUS to proceed with execution of a number of business agreements that are required for construction of the Holcomb Expansion Project, including:

a. A Purchase Option and Development Agreement by and among Sunflower, SEHI, Holcomb 2, LLC, HCF, and Tri-State ("Purchase Option and Development Agreement");

b. A TS1 Site Lease Agreement by and between HCF and Tri-State;

c. A TS2 Site Lease Agreement by and between HCF and Tri-State;

d. An Access Easement Agreement by and among HCF, Sunflower, SEHI, and Tri-State;

e. A letter of intent between Sunflower and Golden Spread; and

f. A letter of intent between Sunflower and Midwest Energy.

80.     The Purchase Option and Development Agreement conveys to Tri-State an option to develop, build and own two pulverized coal-fired electric generating units, TS-1 and TS-2, as part of the Holcomb Expansion Project.

81.     The TS1 Site and TS2 Site Lease Agreements lease to Tri-State and convey to Tri-State an option to purchase the sites on which Tri-State proposes to build its coal-fired electric-generating units, TS-1 and TS-2.

82.     The Access Easement Agreement grants Tri-State an access easement over property owned by HCF, Sunflower and SEHI, for use in accessing the properties that are the subject of the TS1 Site and TS-2 Site Lease Agreements.

83.     The Letter of Intent between Sunflower and Golden Spread sets forth the parties' mutual understanding regarding Golden Spread's purchase of a 57.17% interest in the development, construction and operation of the Eastern Unit.

84.     The Letter of Intent between Sunflower and Midwest Energy sets forth the parties' mutual understanding regarding Midwest Energy's purchase of a 10.71% interest in the development, construction and operation of the Eastern Unit.

85.     On or about September 12, 2006, Sunflower also requested RUS's agreement to enter into a Subordination and Non-Disturbance Agreement with Tri-State and other Sunflower lenders, so that if RUS or another Sunflower lender forecloses its security interest, Tri-State's interests in developing TS-1 and TS-2 would not be affected.

86.     On information and belief, the transactions for which Sunflower sought RUS approval in connection with either the Holcomb Expansion Project or the 1982 restructuring, or

both sets of transactions, include the sale or disposition of property, rights or franchises acquired under the provisions of the Rural Electrification Act.

87.    On or about July 26, 2007 RUS provided Sunflower consent to enter into a number of agreements required for construction of the Holcomb Expansion Project to proceed, including the Purchase Option and Development Agreement, TS1 Site and TS2 Site Lease Agreements, Access Easement Agreement, and Subordination, Non-Disturbance and Attornment Agreements for TS1 and TS2.

88.    On information and belief, the Subordination, Non-Disturbance and Attornment Agreements prevent RUS's security interests under its mortgages from attaching to the new coal units to be constructed by Tri-State on the leased sites.

89.    In addition to approving the Project, the United States, through RUS, retains continuing control over the Project.

90.    The United States has a financial interest in the construction and operation of the Project.

### RUS' Failure to Comply With NEPA

91.    RUS did not prepare an environmental impact statement or otherwise comply with NEPA before the July 26, 2007 approvals described above, its agreement to release or modify its security interests, its approval of the 2002 restructuring, and, on information and belief, other approvals related to the Project that it has made, all of which are required for construction of the Holcomb Expansion Project to proceed.

92.    RUS failed to comply with NEPA, which requires, among other things, consideration of alternatives to a proposed project, despite the fact that the Rural Electrification

Act authorizes RUS to provide financing for alternatives to coal plants, including demand-side management, energy conservation programs, and on and off-grid renewable energy systems,

93.     The Holcomb Expansion Project will have significant effects on the quality of the human environment.  The Holcomb Expansion Project is one of the most controversial issues facing Kansas.

94.      The Project's new coal-fired electric-generating units will emit massive amounts of carbon dioxide, contributing to global warming and its devastating consequences, as well as other air pollutants, including fine particulates and sulfur dioxide, which are also harmful to human health and the environment.

95.     The Project's landfill expansion presents the potential for release of toxic metals to the Ogallala aquifer.

96.     The Project will use water from the Ogallala aquifer, contributing to drawdown of the aquifer on which the economy and well-being of the area depend.

97.     The Project's construction will foreclose opportunities to provide Western Kansas the development benefits of clean energy alternatives, including wind power.

## CLAIM FOR RELIEF

98.     The Sierra Club restates and incorporates by reference herein the allegations of Paragraphs 1 - 97, set forth above.

99.     Action undertaken by RUS, which was required for construction of the Holcomb Expansion Project to proceed, including RUS' approval of the agreements relating to the Project described above, its approval of the 1982 restructuring, and its agreement to release or modify security interests in property involved in the Project, is a major federal action significantly

affecting the quality of the human environment within the meaning of NEPA.  42 U.S.C. § 4332(2)(C).

100.    RUS has not prepared an environmental impact statement or other adequate environmental analysis in accordance with NEPA before undertaking such major federal action. RUS' undertaking of such action without complying with NEPA is arbitrary and capricious, an abuse of discretion, not in accordance with law and without observance of law within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(2).  RUS' failure to comply with NEPA is also agency action unlawfully withheld or unreasonably delayed within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against all Defendants and provide the following relief:

1.    Declare that Defendants violated NEPA by approving the Holcomb Expansion Project through undertaking the actions described above without preparing an EIS or otherwise conducting adequate environmental analysis;

2.    Order, through an injunction, the Defendants to rescind their approvals of agreements required for construction of the Holcomb Expansion Project to proceed;

3.    Order, through an injunction, the Defendants to comply with NEPA by preparing an EIS or otherwise analyzing and disclosing to the public all environmental impacts of the Holcomb Expansion Project and all reasonable alternatives to the Project before undertaking any action, including the approval of any agreement or the release of any security interest required for construction of the Project to proceed;

4.    Award Plaintiff its costs and expenses, including reasonable attorneys' fees; and

5.    Award Plaintiff such other and further relief as the Court deems just and proper.


Dated this 16th day of October, 2007.

David S. Baron
DC Bar # 464222
Earthjustice
1625 Massachusetts Ave., NW
Ste. 702
Washington, DC 20036
Tel: (202) 667-4500
Fax: (202) 667-2356
Email: dbaron@earthjustice.org

Nicholas F. Persampieri
NM Bar # 3209
CO Bar # 37802
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
Tel: (303) 623-9466
Fax: (303) 623-8083
Email: npersampieri@earthjustice.org

Attorneys for Plaintiff Sierra Club

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

**I (a) PLAINTIFFS**

Sierra Club

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF San Fran-
**(EXCEPT IN U.S. PLAINTIFF CASES)** cisco, CA

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
(PLEASE SEE SEPARATE SHEET, ATTACHED)

**DEFENDANTS**
(PLEASE SEE SEPARATE SHEET, ATTACHED)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
    Plaintiff

☐ 3 Federal Question
    (U.S. Government Not a Party)

☒ 2 U.S. Government
    Defendant

☐ 4 Diversity
    (Indicate Citizenship of Parties
    in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

☐ **A.** *Antitrust*

☐ 410 Antitrust

☐ **B.** *Personal Injury/
Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C.** *Administrative Agency
Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
    Administrative Agency is Involved)

☐ **D.** *Temporary Restraining
Order/Preliminary
Injunction*

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

---

☒ **E.** *General Civil (Other)* **OR** ☐ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
    defendant
☐ 871 IRS-Third Party 26
    USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
    Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
    Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
    Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt
    Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
    Exchange
☐ 875 Customer Challenge 12 USC
    3410
☐ 900 Appeal of fee determination
    under equal access to Justice
☐ 950 Constitutionality of State
    Statutes
☒ 890 Other Statutory Actions (if not
    administrative agency review or
    Privacy Act

| ☐ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. Sec. 4332; 5 U.S.C. Sec. 706; Failure to conduct environmental analysis before approving power plant.

| VII. REQUESTED IN COMPLAINT | CHECK IF THIS IS A CLASS<br>☐ ACTION UNDER F.R.C.P. 23 | DEMAND $ | Check YES only if demanded in complaint<br>JURY DEMAND: ☐ YES  ☒ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☐ YES  ☒ NO   If yes, please complete related case form.

DATE  10/16/07   SIGNATURE OF ATTORNEY OF RECORD  _(signature)_

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**Attachment to Civil Cover Sheet filed by Sierra Club. October 16, 2007**

1(a)    **Defendants**

**United States Department of Agriculture; Charles F. Conner, in his official capacity as Acting Secretary of the USDA; James M. Andrew, in his official capacity as Administrator, Rural Utilities Service.**

1(c)    **Plaintiff's Attorneys:**

**Nicholas F. Persampieri**
**Earthjustice**
**1400 Glenarm Place, #300**
**Denver, CO 80202**
**(303) 623 – 9466**

**and**

**David S. Baron**
**Earthjustice**
**D.C. Bar # 464222**
**1625 Massachusetts Ave. N.W. Suite 702**
**Washington, D.C. 20036**
**(202) 667-4500**