UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.07-cv-1860-EGS |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | **PLAINTIFF'S RESPONSE** |
| AGRICULTURE, RURAL UTILITIES SERVICE; | ) | **TO MOTION TO DISMISS** |
| EDWARD T. SCHAFER, in his official capacity as | ) | |
| Secretary of Agriculture; JAMES M. ANDREW, in his | ) | |
| official capacity as Administrator, Rural Utilities Service, | ) | |
| United States Department of Agriculture | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ..............................................................................................................1

STANDARD GOVERNING MOTION TO DISMISS ....................................................3

STATUTORY BACKGROUND.........................................................................................4

    I.      THE NATIONAL ENVIRONMENTAL POLICY ACT...........................................4

    II.     THE RURAL ELECTRIFICATION ACT ................................................................7

ARGUMENT ....................................................................................................................13

    I.      THE COMPLAINT STATES A CLAIM FOR VIOLATION OF NEPA.................13

          A.     THE COMPLAINT STATES A CLAIM BASED ON RUS'S
                APPROVAL OF THE SUNFLOWER RESTRUCTURING AND
                HOLCOMB EXPANSION AGREEMENTS ..................................................13

          B.     THE COMPLAINT STATES A CLAIM BASED ON RUS'S
                INVOLVEMENT IN, CONTROL OVER, FINANCIAL INTEREST IN,
                AND ASSISTANCE TO THE HOLCOMB EXPANSION PROJECT ........16

    II.     THE DEFENSES ASSERTED BY RUS DO NOT EXCUSE RUS'S
          MANDATORY DUTY TO COMPLY WITH NEPA..............................................21

          A.     NEPA REQUIRED RUS TO CONSIDER ENVIRONMENTAL
                FACTORS BEFORE APPROVING THE SUNFLOWER
                RESTRUCTURING AND HOLCOMB EXPANSION AGREEMENTS ....22

          B.     7 C.F.R. § 1794.3 DOES NOT EXCUSE RUS'S FAILURE TO
                COMPLY WITH NEPA ...................................................................................27

          C.     RUS'S COMPLIANCE WITH NEPA IS MANDATORY AND NOT
                SUBJECT TO AGENCY DISCRETION......................................................30

CONCLUSION.................................................................................................................33

CERTIFICATE OF SERVICE .........................................................................................34

## TABLE OF AUTHORITIES

### FEDERAL CASES

Adams Fruit Co. v. Barrett,
    494 U.S. 368 (1990)...........................................................................................6

Ala. Power Co. v. Ala. Electric Cooperative , Inc.,
    394 F.2d 672 (1968)..............................................................................18, 32, 33

Andrus v. Sierra Club,
    442 U.S. 347 (1979)...........................................................................................6

Ark. Electric Co-op Corp. v. Ark. Public Serv. Commission,
    461 U.S. 375 (1983).........................................................................................17

Browning v. Clinton,
    292 F.3d 235 (D.C. Cir. 2002) ...........................................................................4

In re Cajun Electric Power Co-Op, Inc.,
    109 F.3d 248 (1997)...............................................................................7, 23, 33

Calvert Cliffs Coordinating Committee, Inc. v. U.S. Atomic Energy Commission,
    449 F.2d 1109 (D.C. Cir. 1971) ................................................................ passim

Chevron, U.S.A. Inc. v. NRDC,
    467 U.S. 837 (1984)...........................................................................................6

Citizens Against Rails-To-Trails v. Surface Transportation Board,
    267 F.3d 1144 (D.C. Cir. 2001) ...........................................................7, 14, 15, 29

Citizens Alert Regarding the Environment v. EPA,
    259 F. Supp. 2d 9 (D.D.C. 2003) .................................................................16, 21

City of Morgan City v. S. La. Electric Co-Op Association,
    31 F.3d 319 (5th Cir 1994) ................................................................................7

Conley v. Gibson,
    355 U.S. 41 (1957)............................................................................................4

Dairyland Power Coop., 67 P.U.R. 3d, 37 F.P.C. 12, 1967 WL 113475 (Jan. 5, 1967)............18

Davis v. Morton,
    469 F.2d 593 (10th Cir. 1972) ..........................................................................14

Doe v. U.S. Department of Justice,
    753 F.2d 1092 (D.C. Cir. 1985) ....................................................................3

Environmental Defense Fund v. Matthews,
    410 F. Supp. 336 (D.D.C. 1976) ........................................................... passim

Erickson v. Pardus,
    127 S. Ct. 2197 (2007) .............................................................................3, 4

Flint Ridge Development Co. v. Scenic Rivers Association of Okla.,
    426 U.S. 776 (1976) ...............................................................................26, 27

Grand Canyon Trust v. Federal Aviation Admin.,
    290 F.3d 339 (D.C. Cir. 2002) ...................................................................6, 7

Henthorn v. Navy,
    29 F.3d 682 (D.C. Cir. 1994) ...................................................................4, 21

Hishon v. King & Spaulding,
    467 U.S. 69 (1984) ......................................................................................4

Izaak Walton League of America v. Marsh,
    655 F.2d 346 (D.C. Cir. 1981) ....................................................................24

Kansas City Power & Light Co. v. McKay,
    115 F. Supp. 402 (1953) ............................................................................33

Karst Environmental Education & Prot., Inc. v. EPA,
    475 F.3d 1291 (D.C. Cir. 2007) ..................................................................14

Laub v. U.S. Department of the Interior,
    342 F.3d 1080 (9th Cir. 2003) ....................................................................17

Macht v. Skinner,
    916 F.2d 13 (1990) ..............................................................................16, 20

Marsh v. Oregon Natural Resource Council,
    490 U.S. 360 (1979) ....................................................................................5

Md. Conservation Council v. Gilchrist,
    808 F.2d 1039 (4th Cir. 1986) ................................................................14, 16

Methow Valley Citizens Association v. Regional Forester,
    833 F.2d 810 (9th Cir. 1987) ......................................................................33

Mineral Policy Ctr. v. Norton,
    292 F. Supp. 2d 30 (2003) ...................................................................................7, 28, 29

Minn. Public Interest Research Group v. Butz,
    498 F.2d 1314 (8th Cir. 1974) ...................................................................................20, 31

NAACP v. Medical Ctr., Inc.,
    584 F.2d 619 (3rd Cir. 1978) ...................................................................................14, 21

Natural Resources Defense Council v. S.E.C.,
    606 F.2d 1031 (D.C. Cir. 1979) ...................................................................................31, 33

P & V Enterprises v. U.S. Army Corps of Eng'rs,
    No. 07-5060, 2008 WL 425523 (D.C. Cir. Feb. 19, 2008)...............................................28

PUD Number 1 of Franklin County v. Big Bend Electric Cooperative, Inc.,
    618 F.2d 601 (9th Cir. 1980) ...................................................................................33

Professional Reactor Operating Society v. U.S. Nuclear Regulatory Commission,
    939 F.2d 1047 (D.C. Cir. 1991) ...................................................................................6

Rattlesnake Coal. v. EPA,
    509 F.3d 1095 (9th Cir. 2007) ...................................................................................17

Raymond Proffitt Foundation v. U.S. Army Corps of Engineers,
    343 F.3d 199 (3rd Cir. 2003) ...................................................................................33

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989)...................................................................................5, 6

Salt River Project Agricultural Improvement & Power District v. Federal Power
    Commission, 391 F.2d 470 (D.C. Cir. 1968)...........................................................7, 8, 17

Save Barton Creek Association v. Federal Highway Administration,
    950 F.2d 1129 (5th Cir. 1992) ...................................................................................16

Serv. Employees International Union Health & Welfare Fund v. Philip Morris, Inc.,
    83 F. Supp. 2d 70 (D.D.C. 1999) ...................................................................................3

Sierra Club v. Hodel,
    848 F.2d at 1068 (10th Cir. 1988)...................................................................................17

Sierra Club v. Morton,
    514 F.2d 856 (D.C. Cir. 1975) ...................................................................................14

State of Missouri v. Craig,
    978 F. Supp. 902 (W.D. Mo. 1997) ..............................................................31, 32

Swierkiewicz v. Sorema,
    534 U.S. 506 (2002).......................................................................................4

Trudeau v. Federal Trade Commission,
    456 F.3d 178 (D.C. Cir. 2006) ......................................................................4

United States v. Larionoff,
    431 U.S. 864 (1977)......................................................................................28

United States v. S. Fla. Water Management District,
    28 F.3d 1563 (11th Cir. 1994) ......................................................................16

Wabash Valley Power Association v. Rural Electrification Admin.,
    988 F.2d 1480 (7th Cir. 1993) ................................................................7, 8, 24

Wyo. Outdoor Coordinating Council v. Butz,
    484 F.2d 1244 (10th Cir. 1973) ...................................................................32

Young v. General Services Admin.,
    99 F. Supp. 2d 59 (D.D.C. 2000) .........................................................5, 13, 15

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 701(a)(2).................................................................................30, 31,32, 33

7 U.S.C. § 736 .........................................................................................29

7 U.S.C. §§ 901- 950b ..............................................................................7

7 U.S.C. §§ 902(a) ...................................................................................8

7 U.S.C. § 904 .........................................................................................8

7 U.S.C. § 907 .................................................................................1, 9, 17, 30

7 U.S.C. § 916 .....................................................................................9, 26

7 U.S.C. § 936 ..................................................................................8, 21, 29

42 U.S.C. §§ 4321- 4370f.......................................................................1, 4

42 U.S.C. § 4332.....................................................................................22

42 U.S.C. § 4332(1) ................................................................................................4

42 U.S.C. § 4332(2)(C) ......................................................................................5, 13

42 U.S.C. § 4335 ..............................................................................................22

7 C.F.R. § 1710.25(a) ........................................................................................11

7 C.F.R. § 1710.100 ...........................................................................................8

7 C.F.R. § 1710.103(a) .......................................................................................11

7 C.F.R. § 1710.104 ..........................................................................................10

7 C.F.R. § 1710.105(a) .......................................................................................10

7 C.F.R. § 1710.112 ..........................................................................................10

7 C.F.R. § 1710.113(e) .......................................................................................18

7 C.F.R. § 1710.114 .......................................................................................10, 11

7 C.F.R. § 1710.150 ..........................................................................................10

7 C.F.R. § 1710.151 ..........................................................................................10

7 C.F.R. § 1710.152(a) ........................................................................................9

7 C.F.R. § 1710.152(b) ........................................................................................9

7 C.F.R. § 1710.152(b) ........................................................................................9

7 C.F.R. § 1710.152(d) ........................................................................................9

7 C.F.R. § 1710.202 ........................................................................................9, 11

7 C.F.R. § 1710.204 ..........................................................................................11

7 C.F.R. § 1710.250(e) ........................................................................................9

7 C.F.R. § 1710.254(a)(2) ....................................................................................10

7 C.F.R. § 1710.254(b) .......................................................................................10

7 C.F.R. § 1710.254(c) .......................................................................................10

7 C.F.R. § 1710.300 .................................................................................................10

7 C.F.R. § 1717(c) ...................................................................................................11

7 C.F.R. § 1717(e) ...................................................................................................11

7 C.F.R. § 1717.301(a) .............................................................................................12

7 C.F.R. § 1717.650-659 ...........................................................................................11

7 C.F.R. § 1717.850 .............................................................................................10, 29

7 C.F.R. § 1717.850(d) .............................................................................................30

7 C.F.R. Part 1767 ...................................................................................................11

7 C.F.R. Part 1794 .........................................................................................12, 27, 30

7 C.F.R. § 1794.2(a) .................................................................................................12

7 C.F.R. § 1794.3 ............................................................................................... passim

7 C.F.R. § 1794.25 ...................................................................................................12

40 C.F.R. § 1500.1(a) .................................................................................................4

40 C.F.R. § 1507.1 .....................................................................................................6

40 C.F.R. § 1507.3(a) .................................................................................................6

40 C.F.R. § 1507.3(a)(b) .............................................................................................6

40 C.F.R. § 1508.14 .............................................................................................13, 25

40 C.F.R. § 1508.18(a) ...............................................................................................13

40 C.F.R. § 1508.18(b) ...............................................................................................14

**OTHER**

62 Fed. Reg. 62527 (November 24, 1997).........................................................................13

63 Fed. Reg. 68648 (December 11, 1998).........................................................................13

Exec. Ord. No. 11991, 42 Fed. Reg. 26,967 (May 25, 1977).........................................7

S.Rep. 95-164...................................................................................................................9

## INTRODUCTION

Plaintiff Sierra Club challenges Defendant United States Department of Agriculture, Rural Utility Service's ("RUS") failure to comply with the National Environment Policy Act, 42 U.S.C. §§ 4321– 4370f ("NEPA"), before approving an expansion of Sunflower Electric Power Corporation's ("Sunflower") existing coal-fired power plant in Western Kansas ("Holcomb Expansion Project" or "Project").

Under a Rural Electrification Act ("RE Act") program, RUS, and its predecessor, the Rural Electrification Administration ("REA"), have provided a number of direct and guaranteed loans to Sunflower.  Complaint, Dkt. # 1 ¶¶ 28-39.  In providing financing to Sunflower, RUS acquired control over many aspects of Sunflower's business.  Dkt. # 1 ¶¶  35, 57-60, 89.  Under the RE Act, RUS regulations, loan agreements and mortgages, RUS has decisonmaking authority over extensions or additions to Sunflower's electric generation and transmission system; purchase and sale of electric power; operation, maintenance, sale and lease of property; investments; hiring of a general manager; and payment of salaries to its directors.   Dkt. # 1 ¶¶ 58-61; 7 U.S.C. § 907; see also Regulations cited at Pages 11-12, below.  RUS exercised this authority in 2002, when it approved a restructuring of Sunflower ("Sunflower Restructuring"), and again in July 2007, when it approved a number of agreements ("Holcomb Expansion Agreements"), all of which are required for the Holcomb Expansion Project.  Dkt. # 1 ¶¶ 42-50, 79-89; Dkt. # 12-17 to 12-27; Dkt. # 12-39 to 12-41.

The Holcomb Expansion Project will likely emit 14 million tons of carbon dioxide into the air each year.  Dkt. # 1 ¶ 2.  The anticipated global warming impacts of these emissions are so significant that the Project drew the objection of the Attorneys General of California, Connecticut, Delaware, Maine, New York, Rhode Island, Vermont, and Wisconsin.  Ex. 1.  In

addition to contributing to global warming, the plant's carbon dioxide emissions pose a financial risk due to the likely need to comply with anticipated federal legislation or regulation to cap greenhouse gas emissions. Concern about this financial risk recently prompted the House Committee on Oversight and Government Reform to request from RUS information regarding its consideration of this risk in approving the agreements required for the Holcomb Expansion Project. Ex. 2.

The Holcomb Expansion Project will also emit massive quantities of other pollutants, including particulate matter, sulfur dioxide, and nitrogen oxides, all of which the U.S. Environmental Protection Agency has concluded can cause significant adverse effects on human health and the environment. Dkt. # 1 ¶ 2. Despite the Project's significant impact on human health and the environment and the public controversy the Project has generated both within and outside Kansas, RUS failed to conduct any environmental analysis under NEPA before exercising its authority under the RE Act, RUS Regulations, loan agreements, and mortgages to approve agreements required for construction and operation of the Holcomb Expansion Project.

For the reasons discussed below, the Complaint states a claim upon which relief can be granted based on RUS's approval of the Sunflower Restructuring and Holcomb Expansion Agreements, and based on RUS's continuing involvement in, control over, financial interest in, and assistance to the Project. RUS's Motion to Dismiss, filed January 31, 2008 (Dkt. # 12), does not challenge the sufficiency of the Complaint's allegations in providing notice of Sierra Club's claim. Rather, the Motion asserts three defenses, each of which seeks to avoid RUS' mandatory duty to comply with NEPA. The motion to dismiss should be denied because it presents no lawful basis for evasion of NEPA's mandatory requirements. In the alternative, if the Court declines to deny the motion at this time, it should defer consideration of the issues raised by RUS

for further consideration following  RUS's submission of the administrative record,[1] any

discovery that may be appropriate,[2] and supplemental briefing.

**STANDARD GOVERNING MOTION TO DISMISS**

A motion to dismiss for failure to state a claim upon which relief can be granted is

generally viewed with disfavor and rarely granted.  Serv. Employees Int'l Union Health &

Welfare Fund v. Philip Morris, Inc., 83 F. Supp. 2d 70, 74 (D.D.C. 1999) (citing, Doe v. U.S.

Department of Justice, 753 F.2d 1092, 1102 (D.C. Cir. 1985), rev'd in part on other grounds, 249

F.3d 1068 (D.C. Cir  2001).  The motion tests the sufficiency of the complaint, which must only

include "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8 (a)(2).  Specific facts are not necessary.  Erickson v. Pardus, 127 S. Ct. 2197,

---

[1] RUS filed its Motion to Dismiss after obtaining an unopposed extension of the 60-day period
for it to respond to the Complaint.  RUS submitted with its motion numerous transactional and
other documents, some of which are not specifically referenced in the Complaint, which it asserts
the Court may consider in ruling on its 12(b)(6) motion.  However, despite the passage of more
than four months since the Complaint was filed, RUS has not filed the administrative record.
RUS refuses to file the administrative record, to which it contends the Court's review is limited,
unless and until the Court denies its motion to dismiss.  Sierra Club asserts that the Court should
require RUS to file the administrative record by March 14, 2008.  Dkt. # 11.  RUS has not been
forthcoming in responding to Sierra Club's repeated efforts to obtain documents relevant to this
case.  Sierra Club filed an initial FOIA request on August 17, 2006.  Ex. 5.  Nearly 10 months
later in June 2007, RUS provided two notebooks of documents in response, but refused to
provide other documents based on an objection that the request was overbroad.  Ex. 5. Sierra
Club filed a more particularized FOIA request on August 13, 2007.  Ex.6.  On or about January
30, 2008, RUS provided some documents responsive to the request.  Ex. 7.  However, RUS still
has not provided documents responsive to many of Sierra Club's requests.  Id.  Without the
administrative record, Sierra Club is at a disadvantage relative to RUS regarding the ability to
fully evaluate the transactions at issue in this case, and the application of specific RUS
regulations and NEPA requirements to those transactions.  In addition, Sierra Club, cannot
evaluate whether it may need to request additional documents not included in the administrative
record.  Furthermore, Sunflower recently obtained a solid waste permit from the State of Kansas.
If Sunflower succeeds in obtaining its air quality permit from the State, delays in this case may
prejudice Sierra Club.

[2] Sierra Club asserts that discovery may be appropriate in this case because, among other things,
Sierra Club seeks to compel agency action unlawfully withheld under 5 U.S.C. § 706(1).  In their
Rule 26(f) Report, the parties agreed to revisit any remaining discovery issues following RUS's
submission of the administrative record.  Dkt. # 11.

2220 (2007). The statement need only "'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" <u>Swierkiewicz v. Sorema</u>, 534 U.S. 506, 514 (2002) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957).

In ruling on a motion to dismiss for failure to state a claim, the Court must accept as true all of the factual allegations in the complaint. <u>Erickson,</u> 127 S. Ct. at 2200. The Court must construe the complaint liberally, <u>Browning v. Clinton</u>, 292 F.3d 235, 242 (D.C. Cir. 2002), granting plaintiff the benefit of all reasonable inferences from the facts alleged. <u>Trudeau v. Federal Trade Comm'n</u>, 456 F.3d 178, 193 (D.C. Cir. 2006). The court should disregard factual allegations contained only in the parties' briefs. <u>See</u> <u>Henthorn v. Navy</u>, 29 F.3d 682, 688 (D.C. Cir. 1994). A case may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" of the Complaint. <u>Swierkiewicz</u>, 534 U.S. at 514 (quoting <u>Hishon v. King & Spaulding</u>, 467 U.S. 69, 73 (1984)).

## STATUTORY BACKGROUND

## I.    <u>THE NATIONAL ENVIRONMENTAL POLICY ACT.</u>

The National Environmental Policy Act, 42 U.S.C. §§ 4321–4370f is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It makes environmental protection a part of the mandate of every federal agency and department. <u>Calvert Cliffs Coordinating Comm'n v. United States Atomic Energy Comm'n</u>, 449 F.2d at 1112 (D.C. Cir. 1971). 42 U.S.C. § 4332(1). It requires federal agencies to take environmental considerations into account in their decisionmaking "to the fullest extent possible." 42 U.S.C. § 4332; <u>Envtl. Def. Fund v. Matthews</u>, 410 F. Supp. 336, 338 (D.D.C. 1976). It also supplements the existing authority of agencies to allow them to act based on environmental considerations. <u>Id.</u> at 337-38; <u>see</u> 42 U.S.C. § 4335.

4

NEPA does not require particular substantive results, but rather sets forth procedural safeguards to ensure that an agency takes a "hard look" at and properly considers environmental concerns.  Young v. Gen. Servs. Admin., 99 F. Supp. 2d 59, 67 (D.D.C. 2000).  One of NEPA's primary purposes is to ensure that an agency "'in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'"  Id. (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).  NEPA also "'guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience,"  including the public, "that may also play a role in the decisionmaking process and the implementation of the decision.'"  Young, 99 F. Supp. 2d at  67 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. at 349.

The cornerstone of NEPA's procedural protections is the environmental impact statement ("EIS").  Young, 99 F. Supp. 2d at  67.  NEPA requires federal agencies to prepare an EIS before undertaking "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C);  Young v. General Services Administration, 99 F. Supp. 2d at  68.  The EIS is a detailed statement on, inter alia, the environmental impact of and alternatives to the proposed action.  42 U.S.C. § 4332(2)(C); Young, 99 F. Supp.2d at  68.  In the EIS, agencies must take a hard look at the potential environmental impacts of their proposed actions and disseminate their analyses to the public.  Robertson, 490 U.S. at 350.  The EIS serves to ensure informed decisionmaking to the end that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct."  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1979).  Through complying with NEPA's procedural requirements, agencies "consider environmental issues just as they consider other issues within their mandates."  Calvert

Cliffs, 449 F.2d at 1112 (emphasis in original).  Further, compliance with NEPA's procedure is "almost certain to affect the agency's substantive decision."  Robertson, 490 U.S. at 350.

NEPA established the Council on Environmental Quality ("CEQ"), and a subsequent Executive Order directed CEQ to issue a uniform set of regulations implementing NEPA.  Exec. Ord. No. 11991, 42 Fed. Reg. 26,967 (May 25, 1977).  The Executive Order directs all federal agencies to comply with  CEQ's regulations "except where such compliance would be inconsistent with statutory requirements."  Id.; see also 40 C.F.R. § 1507.1 ("[a]ll agencies of the Federal Government shall comply with these regulations").  Both the Supreme Court and the D.C. Circuit Court of Appeals have consistently held that the CEQ regulations are entitled to substantial deference.  Robertson, 490 U.S. 332 at 355-56; Andrus v. Sierra Club, 442 U.S. 347, 358 (1979); Grand Canyon Trust v. Fed. Aviation Admin., 290 F.3d 339, 341 (D.C. Cir. 2002).

The CEQ Regulations require each agency "as necessary" to "adopt procedures to supplement [the CEQ Regulations]."  40 C.F.R. § 1507.3(a).  The procedures to be adopted by individual agencies must "confine themselves to implementing procedures."  Id.  Further, the individual agency procedures must comply with the CEQ Regulations except where compliance would be inconsistent with statutory requirements."  Id. § 1507.3(a), (b).

The courts provide substantial deference to an agency's interpretation of a statute that Congress has authorized the agency to administer.  Professional Reactor Operating Soc'y v. U.S. Nuclear Regulatory Comm'n, 939 F.2d 1047, 1051 (D.C. Cir. 1991) (citing Chevron, U.S.A. Inc. v. NRDC, 467 U.S. 837, 842 (1984)).  However, the courts do not provide the same deference to an agency's interpretation of statutes that are "outside the agency's particular expertise and special charge to administer."  Id. (citing Adams Fruit Co. v. Barrett, 494 U.S. 368 (1990)).  In accordance with this principle, the D.C. Circuit has held that individual agency NEPA

regulations prescribing implementing procedures that supplement the CEQ regulations are "not entitled to the deference that the court must accord to an agency's interpretation of it governing statute." Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 53 n.26 (2003) (quoting Citizens Against Rails-To-Trails v. Surface Transportation Board, 267 F.3d 1144, 1150-51 (D.C. Cir. 2001); see Grand Canyon Trust, 290 F.3d 339, 342 (D.C. Cir. 2002) ("the court owes no deference to the FAA's interpretation of NEPA or the CEQ regulations"). The D.C. Circuit withholds such deference because NEPA's mandate is addressed to all federal agencies and Congress did not entrust administration of NEPA to any single agency alone. Grand Canyon Trust, 290 F.3d at 342 ; Citizens Against Rails-To-Trails, 267 F.3d at 1150.

## II.     THE RURAL ELECTRIFICATION ACT.

Congress enacted the RE Act , 7 U.S.C. §§ 901– 950b, in 1936. The fundamental goal of the RE Act is to ensure that electric service is provided to rural parts of the country. City of Morgan City v. S. La. Elec. Co-Op Ass'n, 31 F.3d 319, 327 (5th Cir 1994); Wabash Valley Power Ass'n v. Rural Electrification Admin., 988 F.2d 1480, 1490 (7th Cir. 1993) (rural electrification remains the fundamental goal of the RE Act); Salt River Project Agric. Improvement & Power Dist. v. Federal Power Comm'n, 391 F.2d 470 (D.C. Cir. 1968) ("[t]he objective was to provide electricity to those sparsely settled areas which the investor-owned utilities had not found it profitable to service."); see In re Cajun Elec. Power Co-Op, Inc., 109 F.3d 248 (1997) (primary purpose is to provide rural America with low cost electricity). In order to accomplish this purpose, the RE Act authorizes the Secretary of Agriculture-- through RUS-- to issue subsidized, low-interest loans and loan guarantees to cooperatives for the construction and operation of electric-generating, transmission and distribution facilities that serve rural

areas.[3]  7 U.S.C. §§  902(a), 904, 936; 7 C.F.R. § 1710.100; see also Wabash Valley Power

Ass'n, 988 F.2d at 1483-85;  Salt River Project Agric. Improvement & Power Dist., 391 F.2d at

473.   The purposes for which RUS may issue such loans and loan guaranties include  "assisting

electric borrowers to implement demand side management, energy conservation programs, and

on-grid and off-grid renewable energy systems."  7 U.S.C. §§ 902(a), 904.  The RE Act also

authorizes RUS to provide financial assistance to borrowers for the purposes set forth in the Act

through accommodating or subordinating liens or mortgages it holds on a borrower's property.  7

U.S.C. § 936.

        The RE Act places no limits on RUS' consideration of environmental factors in

considering whether to issue a loan or guarantee, setting the terms and conditions of a loan or

guarantee, or making approvals pursuant to a loan or security agreement.  The Act authorizes

RUS to make loans:

        on such terms and conditions relating to the expenditure of the moneys loaned and the
        security therefore as the Secretary shall determine and [which] may be made payable in
        whole or in part out of the income, except that no loan for the construction, operation, or
        enlargement of any generating plant shall be made unless the consent of the State
        authority having jurisdiction in the premises is first obtained.

7 U.S.C. § 904.  The RE Act expressly requires RUS to coordinate the financing it provides with

national energy policy:

        In order to insure coordination of electric generation and transmission financing under
        this chapter with the national energy policy, the Secretary in making and guaranteeing
        loans for the construction, operation, or enlargement of generating plants or electric
        transmission lines or systems, shall consider such general criteria consistent with the
        provisions of this chapter as may be published by the Secretary of Energy.

---

[3] As RUS notes, prior to 1994, the "electric program" currently administered by RUS was
administered by RUS'S predecessor, the Rural Electrification Administration ("REA").  Dkt. #
12, at 8.

7 U.S.C. § 916.  This mandate necessarily requires RUS to take environmental considerations

into account in its decisions on loans and guarantees because protection of  environmental

quality is an integral element of national energy policy, and the programs, including RUS's

Electric loan and guarantee program, that implement that policy.  As the Senate Report

accompanying the Department of Energy Organization Act, PL 95-91, noted:

> The Secretary of Energy will also have the responsibility to promulgate guidelines which must be followed by the Rural Electrification Administration in its approval of loans for the generation or transmission of electricity under the REA program. This combination of authorities will provide the necessary base from which a comprehensive national energy conservation program can be developed and implemented.  It is the intent of this legislation that every effort of the new Department to conserve, produce, regulate, or manage energy must be tempered by the realities of the potential impact on the environment. The Secretary of Energy must have the benefit of continuous and reliable advice in this area to assure that protection of environmental quality as an  integral element of national energy policy and the programs which implement that policy.

Ex. 3, S. Rep. 95-164.  President Bush has recently emphasized that environmental concerns,

including the need to reduce the global warming impacts of coal-plant carbon dioxide emissions,

remain an integral component of national energy policy today.  Ex. 4.

The RE Act specifically prohibits borrowers from selling or disposing of their property,

rights or franchises, acquired under the provisions of the RE Act without the written consent of

RUS, until any loan obtained from RUS is repaid.  7 U.S.C. § 907.

RUS has issued a substantial body of regulations relating to its electric loan program

under the RE Act.  See 7 C.F.R. Parts 1709-10, 1714, 1717-18, 1720-21, 1724, 1726, 1728,

1730, 1767, 1773, 1785-86,  1788-89, 1792 & 1794.  A number of the regulations establish

procedures for processing and standards governing the approval of loans and other forms of

financial assistance.  For example, the regulations require applicants to submit for RUS approval

an environmental report (§ 1710.152(d)), load forecast (§§ 1710.152(a), 1710.202), construction

work plan (§§ 1710.152(b), 1710.250(e)), and long range financial forecast (§§ 1710.152(c),

1710.300). The long range financial forecast must cover a period of at least 10 years and include an analysis of the borrower's ability to compete with neighboring utilities and other energy sources. § 1710.300. The regulations require applicants for loans for additions to generating capacity to coordinate investigations of alternative sources of power with RUS in advance (§ 1710.254(b)), provide that RUS may require applicants to seek and utilize capacity available from RUS borrowers and other organizations before developing plans for additional generating capacity (§ 1710.254(c)), and provide that RUS may require a borrower to obtain approval of a state regulatory authority before making certain types of loans, including loans requiring an EIS (§ 1710.105(a)). The regulations prohibit loans that provide service to non-rural areas unless the primary purpose is to serve rural areas and the service to non-rural areas is incidental.

§ 1710.104. The regulations set forth a number of criteria that must be considered by RUS in evaluating loan feasibility (§ 1710.112), require borrowers to demonstrate that they will comply with certain financial "coverage ratio requirements" (§ 1710.114), and provide that an applicant who already owns the types of facilities for which a loan is requested show that its proposed facilities will constitute an effective and economical means of meeting the power needs of consumers (§ 1710.254(a)(2)). The regulations require RUS, in considering applications for lien accommodations and subordinations "in connection with 100 percent private sector financing of facilities and other purposes," to consider effects on the achievement of the purposes of the RE Act, the repayment and security of RUS loans and other specified factors." § 1717.850. The regulations also require RUS to make specified findings before approving any loan or guaranty, including:

(a) a finding that adequate electric service will be made available to the widest practical number of rural users in the borrower's service area during the life of the loan;

(b) a finding that the loan is feasible and will be repaid on time according to the terms of the mortgage, note, and loan contract;

(c) a finding that adequate financial and managerial controls will be included in the loan documents; and

(d) in states that regulate rates, a finding that the borrower has provided satisfactory evidence that the state regulatory authority will not exclude form the borrower's rate base any facilities included in the loan request regarding area coverage, feasibility, and security, including a finding that adequate financial and managerial controls will be included in loan documents. § 1710.150 – 51.

Other regulations impose requirements and restrictions on borrowers that remain in effect until all of the borrower's loans are repaid in full.  The regulations require borrowers to make a diligent effort to extend electric service to unserved persons within their service area (§ 1710.103(a)); continue to meet financial "coverage ratio requirements" and design and implement rates sufficient to meet those requirements  (§ 1710.114); maintain an approved load forecast by periodically submitting a new load forecast to RUS for review and approval (§§ 1710.202, 204); and maintain long-range engineering plans identifying plant investments required over a period of 10 years or more. § 1710.250(a).  The regulations require borrowers to keep books, records and accounts in which full and true entries will be made of all of the borrower's dealings, business and affairs in accordance with detailed prescribed accounting methods (7 C.F.R. Part 1767); require RUS approval of rates that are not subject to regulation of a state regulatory authority; purport to pre-empt a state regulatory authority's jurisdiction over rates where RUS has determined that such jurisdiction has compromised federal interests (§ 1717(c) & (e)); and require RUS approval of certain investments.  §§ 1717.650 – 659.  The

regulations also require borrowers to enter into wholesale power contracts with their members to whom they supply power and to assign the contracts to RUS as security for its loans. § 1717.301(a). The contracts must provide for rates sufficient to ensure that the borrower's debt to RUS will be repaid. Id.

RUS's policies and procedures for implementing the requirements of NEPA and the CEQ Regulations are set forth at 7 C.F.R. Part 1794. The regulations state that they derive their authority from and are intended to be compliant with NEPA, the CEQ Regulations and other RUS regulations. 7 C.F.R. § 1794.2(a). The regulations apply to "actions by RUS including the approval of financial assistance," pursuant to RUS's Electric Program. The regulations provide that an EIS will normally be required for proposed actions involving new electric generating facilities of more than 50 MW. 7 C.F.R. § 1794.25. However, the regulations purport to provide an exemption from the regulation's environmental review requirements for approvals provided by RUS pursuant to loan contracts and security agreements. Section 1794.3, 7 C.F.R., provides:

> Approvals provided by RUS pursuant to loan contracts and security instruments, including approvals of lien accommodations, are not actions for the purposes of this part and the provisions of this part shall not apply to the exercise of such approvals.

The preamble to the final rule issued by RUS in 1998 indicates that RUS intended for this exemption to apply to "ministerial," actions of RUS:

> Environmental reviews will continue to be required in connection with the approval of financial assistance for applicants . . . . However, no reviews will be required in connection with approval by RUS pursuant to its loan contracts and security instruments with applicants such as the approval of lien accommodations or the use of general funds by applicants. These approvals are not major federal actions significantly affecting the quality of the human environment. The preamble explained that these approvals are 'ministerial' and not major Federal actions for purposes of NEPA.

63 Fed. Reg. 68648, 68650 (December 11, 1998); see also 62 Fed. Reg. 62527, 6259 (November 24, 1997) (preamble to proposed rule).

**ARGUMENT**

I.      **THE COMPLAINT STATES A CLAIM FOR VIOLATION OF NEPA.**

NEPA requires an agency to prepare an environmental impact statement before undertaking major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C);  Young, 99 F. Supp. 2d at 68.  The allegations of the Complaint, which the Court must accept as true for purposes of RUS' Motion, state a claim for violation of NEPA on which relief may be granted under the APA based on two legal theories: (1) RUS's approval of agreements required for the Holcomb Expansion Project; and (2) RUS's involvement in, control over, financial interest in, and provision of assistance to the Project.

A.      **THE COMPLAINT STATES A CLAIM BASED ON RUS'S APPROVAL OF  THE SUNFLOWER RESTRUCTURING AND HOLCOMB EXPANSION AGREEMENTS.**

Both the CEQ Regulations and the District of Columbia Circuit recognize that a federal agency's approval of a project, or a permit or agreement required for a project, is "federal action."  The CEQ Regulations provide that "'major federal action'" includes actions with effects that may be major and which are potentially subject to Federal Control and responsibility." 40 C.F.R. § 1508.14.  The Regulations further provide that "[a]ctions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies.  Id.  § 1508.18(a) (emphasis added).  The Regulations set forth four categories of activities within which "[fe]deral actions tend to fall," including:

> Approval of specific projects, such as construction or management activities located in a defined geographic area.  Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

13

Id. § 1508.18(b) (emphasis added).  Consistent with the CEQ Regulations, the District of

Columbia Circuit has long recognized that "there is "Federal Action within the meaning of

[NEPA] not only when a facility proposes to build a facility itself, but also whenever an agency

makes a decision which permits action by other parties which will affect the quality of the human

environment."   Scientists Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n, 481 F.2d 1079,

1088 (D.C. Cir. 1973) ("SIPI"); see Sierra Club v. Morton, 514  F.2d 856, 875  (D.C. Cir. 1975)

(federal action includes "not only action undertaken by the agency itself, but also action

permitted or approved by the agency"); see also Karst Envtl. Educ. & Prot., Inc. v. EPA,  475

F.3d 1291, 1296 (D.C. Cir. 2007) (quoting Md. Conservation Council v. Gilchrist, 808 F.2d

1039, 1049 (4th Cir. 1986) ("a non-federal project is considered a federal action if it cannot begin

or continue without prior approval of a federal agency"); Davis v. Morton, 469 F.2d 593 (10th

Cir. 1972) (approval of lease on Indian land is major federal action requiring an EIS).

In order for an agency approval to trigger NEPA the agency must exercise discretion.  In

other words, its role must not be "ministerial."  Citizens Against Rails to Trails v. Surface

Transp. Bd., 267 F.3d 1144, 1151 (D.C. Cir. 2001); NAACP v. Med. Ctr., Inc., 584 F.2d 619,

629-30 (3rd Cir. 1978).  "If . . . the agency does not have sufficient discretion to affect the

outcome of its actions, and its role is merely ministerial, the information that NEPA provides can

have no affect on the agency's actions and therefore NEPA is inapplicable. "  Citizens Against

Rails to Trails, 367 F.3d at 1151.

The Complaint in this case asserts that RUS approved:  (1) a restructuring of Sunflower

in 2002; (2) a number of agreements in July 2007, including a Purchase Option and Development

Agreement, two Site Lease Agreements, two Access Easement Agreements, two Subordination,

Non-Disturbance and Attornment Agreements; and (3) releases or modifications of RUS'

security interests, all of which are required for the Holcomb Expansion Project to proceed.  Dkt.

# 1 ¶¶  42 -50, 79-88, 99.  The documents submitted by RUS with its Motion to Dismiss confirm

that RUS made the approvals alleged in the Complaint, along with approvals of a Construction

Coordination and Management Agreement, Common Facilities Agreement, Common Facilities

Operation and Maintenance Agreement, two plant site Operation and Maintenance Agreements,

a Rail Services Coordination Agreement, and a Site Participation and Coordination Agreement.

Dkt. #s 12-39, 12-41. The documents submitted by RUS also confirm that RUS's approval is

required for the Holcomb Expansion to proceed, and that such approval required RUS to exercise

discretion and was not ministerial.  For example, the 2003 Amended and Restated Loan Contract

provides:

> Borrower shall not enter into any agreement or arrangements, whether or not in writing,
> (1) for Holcomb Site Development or use of Holcomb,; or (2) for other use of the
> Holcomb Unit 1 site, the fair market value of which would exceed $ 1 million annually;
> without the prior written approval of RUS.  Any RUS approval will be on such terms and
> conditions as RUS, in its sole discretion, may require at such time.  RUS, in its sole
> discretion, may require an additional form of consideration at the time of any such
> approval. . . .

Dkt. # 12-32 § 5.15; see also Dkt. # 12-39  (July 26, 2007 "Additional Consideration" Letter

stating that "RUS must give prior written approval," and that RUS's approvals are "given in its

sole discretion . . . and may require "an additional form of consideration").  RUS's exercise of its

discretion to review, demand additional consideration for, and approve the numerous Holcomb

Expansion Agreements was wholly unlike the Surface Transportation Board's issuance of a

Certificate of Interim Trail Use that the D.C. Circuit found to be "ministerial" in Citizens

Against Rails-to-Trails, 267 F.3d at 1152-53 (cited RUS Motion, Dkt. #  12, at 10, 33-34).   In

that case, the court held that issuance of a Certificate of Interim Trail Use was a ministerial act

for which compliance with NEPA was not required because the Board lacked any significant

discretion.  Id. at 1152.  The Board was required to issue the Certificate where the Board had

previously approved the abandonment of a rail-line, the railroad negotiated a trail use agreement

with the applicant, and the applicant submitted a required statement.  Id. at 1152 – 53.  RUS's

approval of the Holcomb Expansion Agreements was also entirely unlike the U.S. Army Corps

of Engineers Approval of a Clean Water Act § 404 permit that the DC. Circuit held did not

require NEPA compliance in Macht v. Skinner, 916 F.2d 13, 18-19  (1990) (cited RUS Motion

Dkt. # 12, at 3, 36).  The permit in that case covered "a negligible portion of the entire project," a

"maximum of 3.58 acres of the 22.5 mile project." Id. at 19.  The Sunflower Restructuring and

Holcomb Expansion Agreements that RUS  approved relate to the entire Holcomb Expansion

Project.  The Complaint states a claim for violation of NEPA based on RUS's approval of the

Sunflower Restructuring and Holcomb Expansion Agreements.

### B.    THE COMPLAINT STATES A CLAIM BASED ON RUS'S INVOLVEMENT IN, CONTROL OVER, FINANCIAL INTEREST IN, AND ASSISTANCE TO THE HOLCOMB EXPANSION PROJECT.

In addition, to stating a claim for violation of NEPA based on RUS's approval of a

number of agreements required for the Holcomb Expansion Project, the Complaint states a claim

based on RUS's substantial involvement in, control over, financial interest in, and assistance to

the Project.  Where a federal agency has sufficient involvement in and control over a nominally

non-federal project, the project in effect becomes federalized, and may constitute major federal

action.  Save Barton Creek Ass'n v. Federal Highway Administration, 950 F.2d 1129, 1135 (5th

Cir. 1992); Maryland Conservation Council v. Gilchrist, 808 F.2d 1039, 1043 (4th Cir. 1986);

Citizens Alert Regarding the Environment v. EPA, 259 F. Supp. 2d 9, 20 (D.D.C. 2003).

Whether the degree of control is sufficient to require NEPA compliance is a question of law

subject to de novo review.  United States v. S. Fla. Water Mgmt. Dist., 28 F.3d 1563, 1572 (11th

Cir. 1994) (citing <u>Sierra Club v. Hodel</u>, 848 F.2d at 1068, 1089 (10th Cir. 1988). This requires a fact-intensive analysis. <u>See</u> <u>Rattlesnake Coal. v. EPA</u>, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007) (citing <u>Laub v. U.S. Dep't of the Interior</u>, 342 F.3d 1080, 1092 (9th Cir. 2003)).

The Complaint in this case alleges that RUS has provided direct and guaranteed loans to Sunflower, including financing for construction of the existing coal-fired electric-generating facility that Sunflower now seeks to expand, and that Sunflower has remaining unpaid obligations to RUS. Complaint ¶¶ 31–32, 39, 64-65. Documents submitted by RUS with its motion to dismiss indicate the current outstanding principal balance of the debt exceeds $ 200 million. Dkt. # 12-34, at Ex. A, P. 24.

Under RUS's regulations, RUS acquires substantial control over the business of its borrowers. This control continues until a borrower fully repays it loans. See Pages 11-12, above. RUS exercises control over its borrower's customers, rates, power supply contracts, and investments; prescribes a system of accounting; requires maintenance of load forecasts and long range engineering plans; and requires compliance with financial "coverage ratios" and environmental requirements. <u>See</u> Pages 11-12, above. The RE Act itself prohibits RUS borrowers from selling or disposing of assets without the prior written consent of RUS. 7 U.S.C. § 907. Indeed, RUS's regulation and supervision of cooperatives is far more comprehensive than the Government's regulation of investor-owned utilities. <u>Salt River Project Agric. Improvement</u> <u>& Power Dist.</u>, 391 F.2d 470 at 473. The United States has admitted that RUS's predecessor, REA, had "pervasive involvement in the management of the rural power cooperatives to which it loaned funds." <u>Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n</u>, 461 U.S. 375, 385 (1983). Similarly, the Federal Power Commission observed that:

> Under the Rural Electrification Act, the Administrator has virtually absolute discretion and exercises extensive and rigid supervision and control over its cooperative borrowers.

The cooperative's books and records must be kept in accordance with the REA Uniform System of Accounts.  Appointments of its manager, counsel, and other key personnel are subject to approval by REA.  It cannot merge or consolidate, or sell or encumber any of its property without REA approval.  The government's mortgage lien attaches to each of its extensions, and it cannot build extensions except with additional REA financing, or with REA approval of other financing.  Thus, it cannot grow without REA approval.  All of its contracts, including those for the purchase and sale of electric energy, must be approved by REA, and by this means REA controls the rates the cooperative pays and the rates it charges. . . .

The thousands of pages of directives and instructions testify to the intimate relationship between the cooperatives and REA, a federal agency, and the extensive controls and guidance which it exercises.

Dairyland Power Coop., 67 P.U.R. 3d, 37 F.P.C. 12, 1967 WL 113475 (Jan. 5, 1967); accord

Ala. Power Co. v. Ala. Elec. Coop., Inc., 394 F.2d 672, 677 (1968) ("[w]e agree with the recent

decision of the Federal Power Commission in Dairyland . . . that rural electric cooperatives are

something more than public utilities; they are instrumentalities of the United States.").

Consistent with the allegations of the Complaint, Sierra Club can show that not much has

changed over the years, at least with respect to the Government's supervision and control over a

"financially troubled borrower" like Sunflower.  Dkt. # 12, at 3; see also Dkt. # 12 at 15 n.5

(stating that RE Act was amended in 1993 to require RUS to issue regulations that would

minimize approval rights for borrowers with a reduced credit risk).

In addition to restrictions directly imposed by the RE Act and Regulations, "[a]dditional

controls on the borrower's financial, investment and managerial activities appear in the loan

contract and mortgage required by RUS."  7 C.F.R. § 1710.113(e).  The Complaint alleges that

loan documents, including loan agreements and mortgages, provide RUS extensive control over

Sunflower's business, and specifies a number of controls and restrictions imposed by loan

documents.  Dkt # 1, ¶¶ 35, 57-61.  The Amended and Restated Loan Contract dated June 1,

2003 submitted with the Government's Motion, enumerates a number of requirements, restrictions, and controls. Dkt. # 12-32. The Loan Contract requires Sunflower to:

(1) maintain books, records and accounts, prepare and use power requirements studies of its electric loads and future energy and capacity requirements, maintain and use up-to-date long range engineering plans and construction work plans in accordance with RUS regulations (Id. §§ 4.10, 4.12 - .13);

(2) deliver to RUS on no less than a bi-monthly basis a list of contracts and arrangements for the development of the first new coal-fired electric generating unit planned as part of the Holcomb Expansion Project (Holcomb 2) (Id. § 4.19(e)); and

(3) periodically submit a proposed annual operating budget, a 12 month cash flow projection, and a proposed capital expenditures budget to RUS, including estimates for transmission generation and construction requirements on a project-by-project basis and any proposed long term borrowing requirements (Id. § 4.22(c)).

The Loan Contract prohibits Sunflower from taking a number of actions without RUS's prior written approval, including constructing, making leasing, purchasing or otherwise acquiring any extensions or additions to its system or entering into any contract therefore; purchasing, leasing or otherwise acquiring any land or entering into any contract therefore; and entering into power purchase or sale arrangements, power supply and delivery arrangements, power marketing contracts, and contracts for the operation, maintenance or management of all or any portion of its property or electric system. Id. § 5.5. The Loan Contract specifically prohibits Sunflower from entering into arrangements or agreements regarding the development or use of the Holcomb 1 Site and development of the Holcomb 2 site without RUS's written approval. Id. §§ 5.14 - .15.

Mortgages submitted by RUS with its Motion (Dkt. #s 12-15, 12-16 & 12-35), also impose requirements and restrictions, including a number of requirements and restrictions that appear to track those set forth in the loan contract (<u>See, eg.</u>, Dkt. # 12-35 § 4.10), a requirement that Sunflower keep its plant and properties in necessary continuous operating condition and use all reasonable diligence to furnish its customers with an adequate supply of electricity (<u>Id</u>. § 4.06(a)), and a prohibition on paying salaries to directors without the government's approval (<u>Id</u>. § 4.11).

In determining whether a federal agency's involvement in and control over a project is sufficient to require compliance with NEPA, the courts have considered whether the federal agency has a financial interest in the project or has entered into a sort of partnership with a private party. <u>Macht v. Skinner</u>, 916 F.2d 13, 19 (D.C Cir. 1990) (holding that there was no major federal action based in part on finding that there was no financial "partnership" or "joint venture" with the government); <u>Minn. Pub. Interest Research Group v. Butz</u>, 498 F.2d 1314, 1322-23 (8th Cir. 1974) (Forest Service had extended logging contracts, modified contracts, and had a financial interest in the lumber acquired).

The Complaint alleges that the United States has a financial interest in the Project. Dkt # 1, ¶ 90. Attachments to the July 27, 2007 Additional Consideration Letter submitted by the Government (Dkt. # 12-39) confirm this. The attachments include three promissory notes executed and delivered by Sunflower to RUS on July 26, 2007 in the original principal amounts of $52,000,002, $ 23,000,000, and $ 16 million. Dkt. # 12-39, Exs. A–C. The notes provide that they are to be repaid in full on the date of commercial operation of H2, H3, and H4, respectively. H2, H3 and H4 are the new electric-generating units RUS has approved as part of the Holcomb Expansion Project. Dkt. # 12-39. <u>Id.</u> Each of the notes provides that it shall be cancelled and of

no further force and effect if commercial operation does not occur by December 31, 2021.  Id. The facts here may well show that the Government and Sunflower have entered into a sort of partnership or joint venture, or that Sunflower is effectively an instrumentality of the United States.  See Page 18, above.

The courts also consider whether the federal agency has provided assistance to the project, financial or otherwise.  See NAACP, 584 F.2d at 634 (3rd Cir. 1978);  Citizens Alert Regarding the Environment v. EPA, 259 F. Supp. 2d 9, 20–21 (D.D.C. 2003); see also 40 C.F.R. § 1508.18(a) ("major federal action" includes "projects or programs entirely or partly financed, assisted, conducted, regulated or approved by federal agencies").

RUS has provided assistance, including financial assistance, to the Holcomb Expansion Project.  In addition to the three promissory notes, the Complaint alleges and the documents attached to the Motion to Dismiss confirm that the parties executed two agreements subordinating RUS's lien position.  Dkt. # 1, ¶ 85, 87-88; Dkt. # 12-41.  Under the REA Act, agreements accommodating or subordinating RUS's lien position are a form of financial assistance.  7 U.S.C. § 936.[4]  Further, Sierra Club can show, consistent with the allegations of the Complaint, that portions of the original Holcomb Plant Facility constructed with RUS funding will be utilized by the proposed new units, including coal receiving and handling, water treatment, solid waste handling, access road and rail spur facilities.  This is an additional form of assistance.

## II.    THE DEFENSES ASSERTED BY RUS DO NOT EXCUSE RUS'S MANDATORY DUTY TO COMPLY WITH NEPA.

---

[4] The Court should disregard a number of bald assertions made in RUS's Motion, including the repeated assertion that no federal financing is being provided for the Project (Dkt. # 12, at 3, 14 n.7, 22, 31, 33, 36), and the assertion that RUS did not review "project plans and specifications" (Dkt. # 12,at 4).  To the extent RUS suggests that its involvement in the Project is over, the Court should ignore that also.  See Henthron v. Navy, 29 F.3d 682, 688 (D.C. Cir. 1994).

**A.    NEPA REQUIRED RUS TO CONSIDER ENVIRONMENTAL FACTORS BEFORE APPROVING THE SUNFLOWER RESTRUCTURING AND HOLCOMB EXPANSION AGREEMENTS.**

RUS asserts its approval of the Sunflower Restructuring and Holcomb Expansion Agreements was not "major federal action," for which compliance with NEPA is required, because RUS, in approving the agreements, lacked the authority to take environmental considerations into account and impose environmental restrictions on the Project. Dkt # 12, at 31-37.  According to RUS, it lacks such authority because its consideration was limited to determining whether the agreements would adversely affect its security interest in Sunflower's assets or the ability of Sunflower to repay its debt to RUS.  Dkt. # 12, at 31. This defense fails as a matter of law because there is no statute that expressly prohibits RUS's consideration of environmental factors.

NEPA makes environmental protection part of the mandate of every federal agency. Calvert Cliffs, 449 F.2d at 1112.  It requires all federal agencies to comply with NEPA's procedural requirements "to the fullest extent possible."  42 U.S.C. § 4332.   It supplements the authority of  agencies under their governing statutes.  42 U.S.C. § 4335.  It not only authorizes, but in fact requires agencies to consider environmental factors along with matters they are required to consider by their governing statutes in making decisions that may have a significant impact on the human environment.  Calvert Cliffs, 449 F.2d at 1112.  It further authorizes agencies to take action based on their NEPA analysis.  Envtl. Def. Fund, 410 F. Supp. at 337-38.

In order to give effect to NEPA's supplemental grant of authority and its mandate that agencies comply with NEPA's procedural requirements "to the fullest extent possible," the Courts require compliance with NEPA "unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of NEPA's mandates

22

impossible." Calvert Cliffs, 449 at 1114 (emphasis added); Envtl. Def. Fund, 410 F. Supp. at

337-38. NEPA's mandate is not "discretionary" or "inherently flexible." Calvert Cliffs, 449

F.2d at 1115. Considerations of administrative difficulty, delay or economic cost are not

sufficient to excuse compliance with NEPA's procedural requirements. See id. at 1115. Nor is

an agency's desire to take action it deems urgent to address issues within the scope of its

governing statute sufficient to excuse compliance with NEPA. See Id. at 1122 (the "spectre of

a national power crisis" cannot be relied on by Nuclear Regulatory Commission "to create a

blackout of environmental consideration in the agency review process"). Rather, NEPA's

procedural requirements "must be complied with to the fullest extent, unless there is a clear

conflict of statutory authority." Id. at 1115.

  In this case, RUS was required to take environmental considerations into account in its

decision to approve the Sunflower Restructuring and Holcomb Expansion Agreements because

no provision of the RE Act or any other statute expressly prohibited RUS from doing so, and the

RE Act imposes no requirements on RUS that make it impossible for RUS to do so. See Id. at

1114.

  In support of its contention that it is not authorized to take environmental considerations

into account, RUS relies on Sections 904 and 907 of the RE Act. Dkt. # 12, at 34-36. RUS

asserts these provisions authorize it to consider only the adequacy of the Government's security

interest and the ability of Sunflower to repay its existing debt in determining whether to approve

the Sunflower Restructuring and Holcomb Expansion Agreements.[5] These statutory provisions,

---

[5] Throughout its brief RUS repeatedly ignores the primary purpose of the RE Act and repeatedly mischaracterizes its interest as only protecting its security interest and getting its money back. The courts in fact have invalidated RUS action pursued only for those purposes where RUS has ignored the primary purpose of the Act to provide rural electrification. See In re Cajun Electric Power Coop., 109 F.3d at 257 (invalidating rule pre-empting state ratemaking "taken solely for

however, contain no express exemption from NEPA's requirements.  Indeed, they do not even

mention NEPA.[6]  Nor does the RE Act specify a list of factors that RUS must consider, and state

that no other factors may be considered.  See Envtl. Def. Fund, 410 F. Supp. at 338 (noting in

finding that NEPA applies under the Food Drug and Cosmetic Act that "[t]he FDCA does not

state that the listed considerations are the only ones which the Commissioner may take into

account in reaching a decision.").  Section 904 does state that RUS loans "shall be made on such

terms and conditions relating to the expenditure of moneys loaned and the security therefore as

the Secretary shall determine."  It also states that loans "shall not be made unless the Secretary

finds and certifies that in his judgment the security therefore is reasonably adequate and such

loan will be repaid within the time agreed."  While these provisions required the Secretary to

consider the adequacy of security and the ability to obtain repayment, they do not expressly

preclude the Secretary from considering other factors such as environmental impacts.

Even if the statutory language could be read to exclude consideration of matters other

than adequacy of security and repayment, RUS's assertion that it lacks authority to consider

environmental factors is without merit.  Environmental considerations are integral to an

evaluation of the adequacy of security and a borrower's ability to repay.  This has been

acknowledged by some of the nation's largest banks, who now carefully consider carbon dioxide

emissions from power plants and weigh the costs of complying with anticipated regulation of

---

debt collection purposes and without any consideration of their impact on the goals of affording
low cost electricity to the consumer or of balancing his interest with that of the investor or
creditor to establish a just and reasonable rate"); Wabash Valley Power Ass'n, 988 F.2d at 1490
("the purpose of the RE Act cannot be reduced to a single overriding concern for the welfare of
the federal treasury").

[6] Exemptions from NEPA are disfavored.  Izaak Walton League of Am. v. Marsh, 655 F.2d 346,
366-67 (D.C. Cir. 1981).  Moreover, Congress has shown that it is fully capable of providing
exemptions from NEPA in clearly expressed language where it desires to do so.  See id. at 367
(citing Trans-Alaska Pipeline Act provision stating that "actions . . . shall be taken without
further action under the National Environmental Policy Act").

those emissions in determining whether to provide financing for new coal fired power plants. Ex. 2. It has also been acknowledged by the House Oversight Committee. In a recent information request, the Committee asserted that if RUS has failed to consider such costs in approving loans for new power plants and in granting the approvals that are the subject of this case, it is placing taxpayer dollars and ratepayers at risk. Id. Indeed, RUS itself acknowledges that it must prepare an EIS when it makes loans under section 904 of the RE Act (Dkt. # 12, at 14 n.7), and RUS includes extensive provisions regarding compliance with environmental requirements in its own loan documents. For example, the 1987 Debt Restructure and Override Agreement requires Sunflower to keep all environmental permits related to its business in full force and effect, to comply with all directives that [RUS] may deem necessary to comply with NEPA and other environmental laws, and to "cause any part of the construction and operation of an electric system which is the subject of an Environmental Impact Statement to be constructed and operated in a manner consistent with said Environmental Impact Statement." Dkt. # 12-13, at 73, 77. The 1988 mortgage contains a similar requirement regarding compliance with NEPA and other environmental laws. Dkt. # 12-16 § 4.27. Similarly, the 2003 Amended and Restated Loan Contract, requires that Sunflower "with respect to all requirements that may be part of the system, comply with water and air pollution control standards and other environmental requirements. . . ." Dkt. # 12-32 § 4.4. Even assuming that RUS's consideration of the Holcomb Project Agreements was limited to considerations of the adequacy of RUS's security and its ability to obtain repayment as RUS suggests, RUS must consider environmental factors, including the potential costs of coming into compliance with anticipated regulation of carbon dioxide emissions, as part of those considerations. See 40 C.F.R. § 1508.14. The information about the Project's environmental impacts and possible alternatives thereto that would be

25

provided in an EIS would inform those considerations.  Sunflower remains indebted to RUS.  If environmental requirements increase the costs to construct the Holcomb Expansion Project or render it unprofitable, RUS may never get its money back.

In addition to being an integral component of RUS's required consideration of the adequacy of its security and its ability to secure repayment, 7 U.S.C § 916 requires RUS to consider environmental factors.  This section requires RUS to coordinate its electric generating and transmission financing with "the national energy policy."  As the Senate Report accompanying this provision, which was added to the Act in 1977 indicates, "protection of environmental quality is an integral element of national energy policy and the programs which implement that policy."  Ex. 3.  This was true in 1977 and remains true today.  See Ex. 4. The RE Act not only fails to expressly exclude consideration of environmental factors in RUS's decisions regarding electric loans, it requires such consideration.

The RE Act also does not impose any mandate on RUS, compliance with which would render RUS'S compliance with NEPA before approving the Sunflower Restructuring and Holcomb Expansion Agreements impossible.  See Calvert Cliffs, 449 F.2d at 1114.

A good example of the type of statutory conflict between NEPA and an agency's governing statute that would render compliance with NEPA impossible was addressed by the Supreme Court in Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776 (1976). In Flint Ridge, the Supreme Court held that the Department of Housing and Urban Development need not prepare an EIS before allowing a disclosure statement filed by a real estate developer under the Interstate Land Sales Full Disclosure Act to go into effect.  The Disclosure Act provided that disclosure statements automatically go into effect on the 30th day after filing unless HUD determines that a statement is incomplete on its face or materially incomplete.  426 U.S. at

781. The court noted that an EIS could not possibly be prepared within the prescribed 30- day period and determined that under the provisions of the statute, HUD had no authority to suspend the 30- day period in the absence of a determination that it was incomplete on its face or inaccurate.  The court found a "clear and fundamental conflict of statutory duty" that excused compliance with NEPA, because HUD "cannot comply with its statutory duty to allow statements of record to go into effect within 30 days of filing, absent inaccurate or incomplete disclosure, and simultaneously prepare impact statements on proposed developments."  Id. at 791.

RUS points to no such conflict between the RE Act and NEPA that would excuse its compliance with NEPA here.  The RE Act contains no time limitation of the type that presented the conflict in Flint Ridge.  RUS can fully comply with its obligations under the RE Act while complying with NEPA.

**B.    7 C.F.R. § 1794.3 DOES NOT EXCUSE RUS'S FAILURE TO COMPLY WITH NEPA.**

RUS asserts Sierra Club's Complaint is barred by 7 C.F.R. § 1794.3, which purports to exclude "approvals provided by RUS pursuant to loan contracts and security instruments, including approvals of lien accommodations," from the definition of "actions" for purposes of the Environmental Policies and Procedures set forth in 7 C.F.R. Part 1794.  It further provides that the Environmental Policies and Procedures set forth in 7 C.F.R. Part 1794 "shall not apply to the exercise of such approvals."[7]  RUS asserts Sierra Club's Complaint should be dismissed

---

[7] Though Section 1794.3 by its terms only exempts RUS approvals pursuant to loan contracts from the definition of actions for purposes of RUS's implementing regulations, which supplement and must comply with the CEQ Regulations, RUS asserts that the regulation exempts such approvals from the requirements of NEPA and apparently the CEQ Regulations.  That the Regulation by it terms only affects the RUS implementing regulations is not surprising given that RUS has no authority to vary or interpret the requirements of NEPA or the CEQ Regulations,

because the regulation exempts all approvals made by RUS pursuant to loan contracts and security instruments from compliance with NEPA.

This argument fails.  No agency can pass a regulation that it exempts itself from NEPA where it takes major federal action.  For the reasons discussed above, Sierra Club can show that RUS's approval of the Sunflower Restructuring and Holcomb Expansion Agreements is major federal action under NEPA and the CEQ regulations.

It is well-established that if a regulation unreasonably interprets a statute or is inconsistent with the statute under which it is promulgated, the regulation may not be sustained. Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d  at 37 (citing United States v. Larionoff, 431 U.S. 864, 873 (1977)).  The courts have not hesitated to invalidate agency implementing regulations that are inconsistent with NEPA.  Calvert Cliffs Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109 (D.C. Cir. 1971) (invalidating Atomic Energy Commission Rule precluding consideration of non-radiological environmental considerations in certain agency proceedings); Envtl. Def. Fund v. Matthews, 410 F. Supp. 36 (1976) (invalidating Food and Drug Administration regulation allowing agency to act on the basis of environmental considerations only where independently authorized to do so by the laws it administers). Because RUS's approvals of the Holcomb Expansion Agreements is "major federal action" under NEPA and the CEQ Regulations, application of Section 1794.3 to Sierra Club's claim is inconsistent with NEPA and the CEQ regulations, and unlawful.[8]

Another way to view this issue is to consider the implications of the absence of deference provided by the courts to the CEQ Regulations.  As an interpretation of  NEPA and the CEQ

and may only prescribe implementing procedures that supplement and comply with the CEQ Regulations.  See Page 6, above.
[8] There is no time bar to an as applied challenge to 7 C.F.R. § 1794.3.  P & V Enters. v. U.S. Army Corps of Eng'rs, No. 07-5060, 2008 WL 425523 (D.C. Cir. Feb. 19, 2008).

Regulations, Section 1794.3 is not entitled to deference.  See Pages 6-7, above.  Whether the Holcomb Expansion approvals are subject to NEPA is a question of law subject to de novo review by this Court.  See  Citizens Against Rails to Trails,  267 F.3d at 1150-51; Mineral Policy Ctr. v. Norton, 292 F. Supp.2d at 54.  In resolving this legal issue, the Court should apply the language of NEPA and the CEQ regulations, rather than the regulations which are not entitled to deference.  See  Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d at 54.  Again, the Complaint should not be dismissed because, consistent with the allegations of the Complaint,  Sierra Club, can show that RUS failed to meet the applicable standards of NEPA and the CEQ regulations.

In addition to being contrary to NEPA and the CEQ regulations, application of § 1794.3 would be contrary to RUS's intent in adopting the rule.  RUS made it clear in the preambles to its proposed rule and final rule adopting § 1794.3 that the regulation was intended to bar ministerial approvals.  See Page 12, above.  For the reasons discussed above, RUS's approval of the Sunflower Restructuring and Holcomb Expansion Agreements was not ministerial.  See Page 15, above.  Section 1794.3 therefore does not apply to RUS's approvals of the Sunflower Restructuring and Holcomb Expansion Agreements.

Even if the regulation could lawfully be applied to exempt some of the approvals from NEPA, other approvals are not be subject to the regulation.  The Complaint alleges RUS entered into two agreements that subordinated an RUS lien.  Dkt. # 1 ¶ 85, 87-88.  The RE Act provides that subordinating a lien is a type of financial assistance.  7 U.S.C. § 736.  Both the preamble to the 1998 rule adopting the provision of 7 C.F.R. 1794.3 on which RUS relies, and a separate RUS Regulation, 7 C.F.R. § 1717.850 state that RUS's Environmental Policies and Procedures may apply to lien subordinations.  The Preamble to the 1998 Rule states:

> RUS believes that, while it is principally the approval of loans and loan guarantees to which environmental reviews attach, it is possible that other types of financial assistance

> could be available under the RUS program, which would trigger environmental reviews. Examples include lien subordinations under § 306 of the RE Act (7 U.S.C. 936). The regulatory text should not limit those actions requiring environmental review to the approval of loans and loan guaranties.

63 Fed. Reg. at 68650. Section 1717.850(d), 7 C.F.R., states:

> Under certain circumstances, such as when the project does not qualify for a categorical exclusion, the environmental requirements of 7 C.F.R. Part 1794 may apply to applications for lien accommodations, subordinations, and releases.

Therefore, lien subordinations are not subject to 7 C.F.R. § 1794.3, but rather are subject to the more directly applicable § 1717.850(d), which states that compliance with NEPA may be required.

The Complaint also alleges that RUS has agreed to provide releases of liens. Dkt. # 1 ¶ 99. Section 1717.850(d) also indicates that releases are not be subject to 7 C.F.R. 1794.3.

Finally, the Complaint also alleges that RUS approved Sunflower's disposition of certain assets. Dkt. # 1 ¶¶ 45, 48, 61-64. Disposition of assets by an RUS borrower prior to repayment of all debt is prohibited by the RE Act itself. 7 U.S.C. § 907. Therefore, the alleged asset dispositions are not subject to 7 C.F.R. § 1794.3. For these reasons, 7 C.F.R. § 1794.3 does not support dismissal of Sierra Club's claim.

## C.    RUS'S COMPLIANCE WITH NEPA IS MANDATORY AND NOT SUBJECT TO AGENCY DISCRETION.

RUS's assertion that the Complaint should be dismissed because RUS's exercise of approval rights pursuant to its loan contracts and mortgage agreements is committed to agency discretion under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), misses the mark, and is contrary to controlling precedent of the District of Columbia Circuit. Sierra Club does not assert a substantive challenge to the merits of RUS's approvals, but rather challenges RUS's failure to comply with NEPA's procedural requirements before granting the approvals. NEPA and the

CEQ Regulations provide the law applicable to Sierra Club's challenge. RUS's compliance with the applicable procedural requirements is mandatory and not subject to agency discretion. Rather, NEPA is designed to guide an agency's exercise of discretion.

As an initial matter, there is no question that a claim for violation of NEPA's procedural requirements is distinct from a substantive challenge to the validity of an agency action. The District of Columbia Circuit distinguished these two types of challenges in Natural Resources Defense Council v. S.E.C., 606 F. 2d 1031 (D.C. Cir. 1979). That case involved a challenge to the SEC's alleged failure to promulgate rules requiring corporate disclosure of environmental and equal employment opportunity related matters. The court distinguished between a claim that SEC failed to comply with procedures mandated by NEPA and a substantive challenge to the SEC's decision not to adopt the requested rules. 606 F.2d at 1044; accord State of Missouri v. Craig, 978 F. Supp. 902, 911 (W.D. Mo. 1997).

Further, the DC Circuit in Natural Resources Defense Council v. S.E.C. had "little difficulty" rejecting the assertion that the procedural NEPA challenge was exempt from review as action "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). 606 F.3d at 1043-44. The court stated that "Congress, in NEPA, has commanded federal agencies, 'to the fullest extent possible'" . . . to comply with the relevant procedural requirements of NEPA. Id. at 1044. "NEPA made environmental considerations part of the SEC's mandate . . . and judicial review should serve to ensure that this aspect of the SEC's statutory duties is fully implemented." Id. Other courts considering this issue have reached the same result. See Minn. Pub. Interest Research Group, 498 F.2d 1314 (8th Cir. 1974) ("[a]n agency decision concerning NEPA requirements is not one committed to the agency's discretion by law within the meaning

of the APA"); Wyo. Outdoor Coordinating Council v. Butz, 484 F.2d 1244 (10th Cir. 1973); State of Missouri v. Craig, 978 F. Supp. 902, 911 (W.D. Mo. 1997).

Because Sierra Club challenges RUS's failure to comply with NEPA's procedural requirements and not the substance of RUS's approvals themselves, RUS'S reliance on Alabama Power Co. v. Alabama Electric Cooperative, Inc., 394 F.2d 672 (1968) is misplaced. In Alabama Power Co., which predated NEPA, the court stated that the making of RUS loans and the adequacy of the security for the loans are committed to agency discretion.[9] It said nothing about whether RUS'S compliance with NEPA is subject to judicial review.

NEPA does apply to RUS's approvals that are the subject of this case for the reasons stated above. See Pages 23-27, above. Therefore, NEPA and the CEQ Regulations provide the law that the court should apply to Sierra Clubs claim, and the claim is not exempt from NEPA under 5 U.S.C. § 701(a)(2).

Further, RUS's admission that "RUS's action of making a direct loan or loan guarantee is final agency action subject to the NEPA process," does not square with its assertion that the terms and conditions of such loans and decisions made under such loans are exempt from NEPA Dkt. # 12, at 17. RUS's attempt to distinguish between its making of a loan and the setting of the loans terms and conditions position is nonsensical and fails, because the setting of direct loan or loan guarantee terms and conditions and approvals made pursuant to such loan documents are subject to NEPA for the reasons described above. Further, exempting the setting of terms and conditions of loans and guaranties from the NEPA review that RUS admits is required for the action of making a loan or guaranty would eviscerate such NEPA review by precluding any

adjustment in terms and conditions based on the NEPA review, and by effectively precluding

consideration of impacts that are required to be considered through the NEPA process.[10]

## **CONCLUSION**

For these reasons, RUS's Motion to Dismiss should be denied.

.

---

[10] Even if it were appropriate for the Court to consider the reviewability of a substantive challenge to an agency action in determining whether to review Sierra Club's NEPA claim, RUS's sweeping contention that all substantive challenges to RUS's setting of the terms and conditions of loans  and approvals given by RUS pursuant to loan and security agreements is without merit.  The pre-NEPA case on which RUS relies does not address whether terms and conditions of a loan other than terms and conditions related to the adequacy of security are committed to agency discretion.  See Alabama Power Co. v. Alabama Electric Cooperative, Inc., 394 F.2d 672 (1972).  In Kansas City Power & Light Co. v. McKay, 115 F. Supp. 402, 407 (1953), this Court when presented with a competitor's challenge to REA loans to a group of cooperatives reserved ruling on a motion to dismiss alleging that there was no justiciable claim and considered the merits of the claims.  Further, a number of courts have in fact reviewed claims challenging RUS's actions under the RE Act.  See In re Cajun Electric Power Cooperative, Inc., 109 F.3d 248 (5th Cir. 1997) (applying arbitrary and capricious standard in rejecting REA regulation purporting to pre-empt state ratemaking order);  PUD No. 1 of Franklin County v. Big Bend Electric Cooperative, Inc., 618 F.2d 601 (9th Cir. 1980) (applying arbitrary and capricious standard to RUS refusal to approve condemnation of cooperative's assets in which RUS held a security interest).

Further, RUS fails to acknowledge that broad discretionary powers are merely a predicate to nonreviewability.  Raymond Proffitt Foundation v. U.S. Army Corps of Engineers, 343 F.3d 199, 205 (3rd Cir. 2003).  An agency's self-imposed practices and regulations may be read into the statute to provide a basis for review.  Id. at 206; see Methow Valley Citizens Ass'n v. Regional Forester, 833 F.2d 810, 813 (9th Cir. 1987).  RUS's lengthy and detailed regulations prescribing procedures and substantive standards to be applied to applications for RUS financial assistance, including loan accommodations and subordinations (see Pages 9-10, above), provide adequate standards for the court to review determinations by RUS under the RE Act.  Even if this issue were relevant to this case, further consideration of how 5 U.S.C. § 701(a)(2) applies to each of the many approvals at issue in this case would be required following submission of the administrative record.  See Natural Resources Def. Council v. Securities & Exchange Comm'n, 606 F.2d at 1044.  (court must "first identify as precisely as possible the aspect's of the agency's action against which challenge is brought").

Dated:  February 28, 2008

Respectfully submitted,

/s/ Nicholas F. Persampieri
NICHOLAS F. PERSAMPIERI (*Pro Hac Vice*)
Earthjustice
1400 Glenarm Place, Ste. 300
Denver, CO 80202
Tel: (303) 623-9466
Fax: (303) 623-8083
Email: npersampieri@earthjustice.org

/s/ David S. Baron
DAVID S.  BARON
DC Bar #464222
Earthjustice
1625 Massachusetts Ave., NW
Ste. 702
Washington, DC 20036
Tel: (202) 667-4500
Fax: (202) 667-2356
Email: dbaron@earthjustice.org

CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2008, I electronically filed the foregoing Response to Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Brian C. Toth
brian.toth@usdoj.gov

Julie S. Thrower
julie.thrower@usdoj.gov

/s/ Nicholas F. Persampieri
Nicholas F. Persampieri

# EXHIBIT 1

**Office of California Attorney General Bill Lockyer**
**Office of Connecticut Attorney General Richard Blumenthal**
**Office of Delaware Attorney General Carl C. Danberg**
**Office of Maine Attorney General G. Steven Rowe**
**Office of New York State Attorney General Eliot Spitzer**
**Office of Rhode Island Attorney General Patrick C. Lynch**
**Office of Vermont Attorney General William H. Sorrell**
**Office of Wisconsin Attorney General Peggy A. Lautenschlager**

December 15, 2006

**VIA FACSIMILE & U.S. MAIL**
**(785) 296-7455**

Kansas Department of Health
  and Environment
Attn: Rick Bolfing, Project Engineer
Bureau of Air and Radiation
1000 SW Jackson, Suite 310
Topeka, KS 66612-1366

> Re:    **Comments Regarding Proposed Holcomb Station Expansion Air Quality**
>        **Construction Permit**

Dear Mr. Bolfing:

The Attorney Generals of the States of California, Connecticut, Delaware, Maine, New York, Rhode Island, Vermont, and Wisconsin jointly submit these comments to the Kansas Department of Health and Environment (KDHE) to voice concerns regarding the proposed issuance of an air quality construction permit to Sunflower Electric Power Corporation (Sunflower) for the construction of three new 700 MW conventional coal-fired steam generating units in Holcomb, Kansas. As explained below, we request KDHE not to issue a permit for the proposed plant unless Sunflower designs the plant in a way that minimizes the generation of carbon dioxide ($CO_2$) emissions and/or allows the capture of such emissions.

Climate change is the single greatest environmental challenge facing the world today. Scientists overwhelmingly agree that the global community must reduce emissions of greenhouse gases, including $CO_2$, to well below 1990 levels within a few decades, if we are to stabilize the climate at acceptable levels. Although climate change is a global problem, effective action at the national, regional, and state level is needed to achieve the necessary reductions in $CO_2$ emissions.

KDHE
December 15, 2006
Page 2

To that end, all of the states listed on this letter have made the reduction of $CO_2$ emissions a priority. For example, eight northeastern states (Connecticut, Delaware, Maine, Maryland, New Hampshire, New Jersey, New York, and Vermont) have developed the Regional Greenhouse Gas Initiative (RGGI), a mandatory cap-and-trade program to reduce carbon dioxide ($CO_2$) emissions from power plants, which collectively represent a major contributor to global warming. By 2020, the RGGI states will achieve a 10% reduction in $CO_2$ emissions, totaling approximately 12 million tons annually. Similarly, California this year passed the Global Warming Solutions Act, A.B. 32, which requires the state's utilities, oil refiners, cement makers, and other large industrial greenhouse gas emitters to reduce their $CO_2$ emissions to 1990 levels by 2020. In addition, and directly relevant to the proposed plants in Kansas, California also enacted this year California Public Utilities Code § 8340 et seq., which precludes California utilities from entering contracts for electricity from sources, both inside and outside of California, that emit high levels of $CO_2$, including those like the proposed plants.

In contrast to these efforts, the proposed Holcomb plant would substantially increase $CO_2$ emissions from Kansas sources. As proposed, the three new 700 MW coal-fired units would utilize traditional coal-burning technology, which emits massive amounts of $CO_2$. In addition, the units are proposing to burn Powder River Basin sub-bituminous coal, which produces more $CO_2$ per unit of energy than other types of coal. The proposed Holcomb units are projected to increase emissions of $CO_2$ by 15.4 million tons or more per year,[1] thereby seriously undermining the concerted efforts being undertaken by multiple states to address global warming. In fact, the annual emissions from the Holcomb plant extension would cancel out all the emission reductions resulting from the RGGI. With a lifetime of more than 60 years, the Holcomb units, if built as proposed, might well emit more than one billion tons of $CO_2$ in total, thus significantly contributing to the public health and environmental damage associated with global warming.

We encourage Kansas to explore alternatives that will allow Kansas to satisfy its need for energy without exacerbating global warming. As an initial matter, implementation of energy conservation measures and construction of non-polluting renewable energy sources could reduce, or even ultimately obviate, the need for new coal-fired power in Kansas. If the proposed plant's power is still needed, Integrated Gasification Combined Cycle (IGCC) technology provides a viable alternative for Kansas to meet its energy needs while minimizing the proposed plant's contribution to global warming. IGCC technology not only prevents emissions of regulated pollutants, mercury and other heavy metals, it also improves the efficiency of the production process, thereby reducing $CO_2$ emissions, and, even more importantly, it enables the economically feasible capture and storage of all such emissions.

---

[1] Based upon a capacity factor of at least 85%, which is likely to be greater given technology improvements.

KDHE
December 15, 2006
Page 3

State and federal laws require issuance of a Prevention of Significant Deterioration (PSD) air quality permit by KDHE to Sunflower prior to construction of the Holcomb expansion units. To obtain a PSD permit, Sunflower must demonstrate that the proposed Holcomb expansion units comply with the best available control technology (BACT). The BACT standard requires PSD applicants to consider other "production processes or available methods, systems, and techniques" including "innovative fuel combustion techniques" to achieve the "maximum degree of reduction for each pollutant subject to regulation" under the Clean Air Act (CAA). The legislative history of the CAA makes clear that Congress intended that the full range of production methodologies, including coal gasification, would be considered in a BACT analysis. See, e.g., 123 Cong. Rec. 18472 (1977). Thus, a BACT analysis for the Holcomb extension units must consider IGCC technology, an established and available production process.

Furthermore, KDHE must consider the "energy, environmental, and economic impacts" of each unit as part of the BACT analysis. This analysis extends to the overall environmental impacts of the units. See, e.g., In re North Country Resource Recovery Associates, 2 E.A.D. 229, 230, 1986 EPA App. LEXIS 14 (Adm'r 1986). Although the increased $CO_2$ emissions resulting from the proposed new units at Holcomb might not require their own BACT analysis as regulated pollutants under EPA's current interpretation,[2] the detrimental environmental effects of these emissions must be considered under the "environmental impacts" prong of BACT, which in turn informs the selection of control technology.

We recognize the need for additional sources of energy, but urge KDHE to consider whether efficiency improvements or non-polluting sources of electricity can meet increased demand for the next few years. If increased electricity-generating capacity is needed nonetheless, we urge KDHE to deny the issuance of the proposed permit and require that the plant be constructed instead with IGCC or other currently available technologies that will minimize the plant's $CO_2$ emissions.

We thank you for considering our views on this important matter.

---

[2] This interpretation is at issue in Massachusetts v. EPA, No. 05-1120 (U.S. Sup. Ct.).

KDHE
December 15, 2006
Page 4

Sincerely,

ELIOT SPITZER
NEW YORK ATTORNEY GENERAL

By: _____

Peter Lehner
Chief, Environmental Protection Bureau
Office of the Attorney General
The Capitol
Albany, NY 12224
(518) 486-4550


BILL LOCKYER
CALIFORNIA ATTORNEY GENERAL

By: _____Lisa Trankley_ by MRC___

Lisa Trankley
Deputy Attorney General
Environment Section
California Department of Justice
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 327-7877


RICHARD BLUMENTHAL
CONNECTICUT ATTORNEY GENERAL

By: _____Matthew Levine_ by MRC___

Matthew Levine
Assistant Attorney General
P.O. Box 120
55 Elm Street
Hartford, CT  06141-0120
(860) 808-5250

KDHE
December 15, 2006
Page 5


CARL DANBERG
DELAWARE ATTORNEY GENERAL

By: _Valerie Csizmadia by MTC_
Valerie S. Csizmadia
Deputy Attorney General
Department of Justice
Environmental Unit
102 W. Water Street
Dover, DE 19904
(302) 739-4636


G. STEVEN ROWE
MAINE ATTORNEY GENERAL

By: _Gerald Reid by MTC_
Gerald D. Reid
Assistant Attorney General
Office of the Attorney General
State House Station
Augusta, ME 04333-0006
(207) 626-8800


PATRICK C. LYNCH
RHODE ISLAND ATTORNEY GENERAL

By: _Tricia Jedele by MTC_
Tricia K. Jedele
Special Assistant Attorney General
Department of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

KDHE
December 15, 2006
Page 6

WILLIAM H. SORRELL
VERMONT ATTORNEY GENERAL

By: _Kevin Leske by mtc_

Kevin O. Leske
Assistant Attorney General
Environmental Division
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-6902


PEGGY A. LAUTENSCHLAGER
WISCONSIN ATTORNEY GENERAL

By: _Thomas Dawson by mtc_

Thomas J. Dawson
Assistant Attorney General
Director - Environmental Protection Unit
Wisconsin Department of Justice
17 West Main Street
Madison, Wisconsin 53707-7857
(608) 266-8987

# EXHIBIT 2

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
    DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT .
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5051
FACSIMILE  (202) 225–4784
MINORITY  (202) 225–5074

www.oversight.house.gov

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
JIM JORDAN, OHIO

February 14, 2008

The Honorable James M. Andrew
Administrator
Rural Development Utilities Programs
United States Department of Agriculture
1400 Independence Avenue, SW
Washington, DC 20250-0747

Dear Administrator Andrew:

I am writing to request information regarding how the Rural Development Utilities Programs/Rural Utilities Service (RUS) is addressing the financial risks associated with the construction of new coal-fired power plants without emissions controls for greenhouse gases, when RUS provides taxpayer-subsidized loans and loan guarantees for such plants. I am concerned that financing these huge new sources of greenhouse gas emissions puts taxpayer dollars at risk, as well as undermines the United States government's efforts to address global climate change by reducing greenhouse gas emissions.

RUS makes direct loans and provides loan guarantees to rural electric cooperatives and others to develop electricity generation and transmission capacity. RUS issued several billion dollars of new loans for generation and transmission in 2006 and 2007, and is authorized to provide $7 billion of such loans in FY 2008.[1] According to the Congressional Research Service, RUS currently has approximately $36 billion in outstanding loans and another roughly $400 million in loan guarantees for the electricity sector.[2] Some substantial portion of this total has financed coal-fired power plants.[3] RUS has the responsibility to ensure that there is a solid

---

[1] *See* National Rural Electric Cooperative Association, Generation Update Rural Utilities Service Presentation by John Holt, Sr. Manager Generation and Fuels (Aug. 28, 2006) (powerpoint presentation); E-mail communication from Tadlock Cowan, Congressional Research Service, to Committee staff (Feb. 8, 2008).

[2] Telephone communication from Tadlock Cowan, Congressional Research Service, to Committee staff (Feb. 7, 2008).

[3] *See Federal Loans for Coal Plants Clash With Carbon Cuts*, Washington Post (May 14, 2007).

The Honorable James M. Andrew
February 14, 2008
Page 2

financial basis for these loans and loan guarantees and taxpayer dollars are not put at unnecessary risk.[4]

Private sector investment banks, among others, have become increasingly concerned about the financial risks of investments in new coal-fired power plants that are built without emissions controls for greenhouse gases. Such plants will produce hundreds of millions or even a billion tons of carbon dioxide emissions over their lifetimes, ranking them among the largest individual sources of greenhouse gas emissions in the U.S. economy.[5] There is an increasingly widely held expectation that the federal government will adopt legislation or regulation to cap greenhouse gas emissions from power plants within the next few years. If a carbon cap is adopted during a plant's lifetime, a coal-fired power plant with uncontrolled carbon dioxide emissions would likely face substantially higher operating costs. Such a plant would probably either have to buy emissions allowances equal to its emissions or install costly retrofit control technology, assuming that such technology is commercially available and economically viable.

Just last week, three leading financial institutions announced that they have adopted climate change guidelines to guide their investments in the power sector and address the financial risks associated with the uncertainties regarding climate change regulatory policy.[6] Citigroup, JP Morgan Chase, and Morgan Stanley adopted "Carbon Principles" and an "Enhanced Diligence" framework "to help lenders better understand and evaluate the potential carbon risks associated with coal plant investments."[7] Under this framework, before providing financing for a coal-fired power plant, these investment banks will apply conservative assumptions regarding future regulation, examine opportunities to use carbon capture technologies, and assess the plant's ability to recover future costs through rate increases, as well

---

[4] *See* Rural Electrification Act of 1936, 7 U.S.C. §904.

[5] *See, e.g.,* Desert Rock, Carbon Dioxide Facts (2007) (online at www.desertrockenergy project.com/carbon_facts.htm) (website) (emissions estimates for the proposed Desert Rock coal-fired power plant); U.S. EPA, *Detailed Comments on the Scoping Notice for the Draft Environmental Impact Statement (DEIS) for the White Pine Energy Station Project, White Pine County, Nevada,* 14 (June 22, 2007) (emissions estimates for the proposed White Pine coal-fired power plant).

[6] Citigroup Inc., *Leading Wall Street Banks Establish the Carbon Principles* (Feb. 4, 2008) (press release).

[7] *Id.* Citi, JP Morgan Chase, Morgan Stanley, *The Carbon Principles* (undated); Citi, JP Morgan Chase, Morgan Stanley, *The Carbon Principles: Fossil Fuel Generation Financing Enhanced Environmental Diligence Process* (undated).

The Honorable James M. Andrew
February 14, 2008
Page 3

as consider energy efficiency and renewable energy alternatives to the proposed project.[8] This will allow the investors to factor the financial risks of future climate change control costs into their initial assessment of the projects' financial viability.

Specifically, the banks will "use conservative base assumptions in financial models of the proposed plant, including a mandatory declining cap with zero allocation of allowances or other similarly financially conservative regulatory scenarios."[9] The banks will examine the "carbon capture capability of the technology, including economic evaluation of carbon capture installation or retrofit," as well as the potential for geologic storage of the carbon dioxide.[10] They will also evaluate whether the plant owner would be able to raise its rates sufficiently to cover the cost of buying emissions allowances to the extent necessary.[11]

Private sector investment banks and many electric power providers are recognizing that significant regulatory carbon controls are highly likely to be imposed in the near future, and they are accounting for those costs in their financial calculations. I am concerned, however, that RUS may not be applying similar safeguards when it loans out taxpayer dollars. Encouraging new uncontrolled coal-fired power plants to be built without adequately accounting for future carbon control costs raises the risks of both loan defaults and large and unanticipated rate increases for rate-payers. Obviously, recouping carbon-related costs through large rate increases would harm economic development, which is the central purpose of the RUS program, while extensive defaults would threaten RUS's ability to continue providing these loans.

In addition to these broader issues, I have particular concerns regarding RUS's role in the development of the Sunflower Electric Power Corporation's proposed new coal-fired power plant units at Holcomb Station. The Department of Justice recognizes that Sunflower is "a financially troubled borrower," which owes the federal government roughly $200 million in loans for an existing plant at Holcomb Station.[12] Sunflower and its partners are now proposing

---

[8] Citi, JP Morgan Chase, Morgan Stanley, *The Carbon Principles: Fossil Fuel Generation Financing Enhanced Environmental Diligence Process*, 7-9 (undated). *See also Wall Street Shows Skepticism Over Coal*, Wall Street Journal (Feb. 4, 2008).

[9] Citi, JP Morgan Chase, Morgan Stanley, *The Carbon Principles: Fossil Fuel Generation Financing Enhanced Environmental Diligence Process*, 7, 9 (undated).

[10] *Id.* at 8-9.

[11] *Id.* at 7, 9. *See also Wall Street Shows Skepticism Over Coal*, Wall Street Journal (Feb. 4, 2008).

[12] Defendants' Motion to Dismiss, 3 and attachment 4, part J, 3 (Jan. 31, 2007) *Sierra Club v. U.S. Dept. of Agriculture, Rural Utilities Service; Edward T. Shafer and James Andrew*, D.D.C. (No. 07-1860). After the initial loan was provided in 1980, Sunflower was unable to pay

The Honorable James M. Andrew
February 14, 2008
Page 4

to take on billions of dollars in additional private sector debt to construct a huge new $3.6 billion coal-fired power plant at Holcomb, comprised of two new units.[13]  The expanded plant is projected to release 11 million tons of carbon dioxide annually, which would amount to over 500 million tons of carbon dioxide over its lifetime.[14]

According to the terms of the original loan, Sunflower is not allowed to take on new debt without RUS's permission.[15]  This condition is intended to allow RUS to protect the government's interest in having the original loan repaid.[16]  RUS granted Sunflower permission to take on this much larger additional debt in July 2007.[17]  Prior to granting its permission, RUS presumably analyzed the increased risk of default on the loans it holds.  I am concerned, however, that RUS may not have accounted for the risk of substantial additional costs associated with the new plant's massive greenhouse gas emissions.  If RUS failed to take this into account, it has put both taxpayer funds and Kansas ratepayers in jeopardy.  If this plant is built, Kansas ratepayers may be stuck with billions of dollars in stranded assets and sky-rocketing costs for power.

To help the Committee evaluate RUS's actions in this area, please provide the following information:

1.    Identify the total amount of RUS's outstanding loans and loan guarantees for electric power.  Please provide separate figures with respect to:  (a) loans; and (b) loan guarantees for this response and each of the following questions that requests information about loans and loan guarantees.

2.    Identify RUS's total amount of outstanding loans and loan guarantees for coal-fired power plants with uncontrolled greenhouse gas emissions.

---

its debt to the government and had to have its loan restructured in 1987.  The loan was restructured again in 2002.  *Id.*

[13] *See Sunflower Pushes to Expand Coal Plants*, Associated Press (Feb. 4, 2008) (http://news.moneycentral.msn.com/category/topicarticle.aspx?feed=AP&Date=20080204&ID=8117719&topic=TOPIC_ECONOMIC_INDICATORS&isub=3).

[14] Kansas Department of Health and Environment, KDHE Denies Sunflower Electric Air Quality Permit (Oct. 18, 2007) (online at www.kdheks.gov/news/web_archives/2007/10182007a.htm) (press release).

[15] *Supra* note 10 at 3.

[16] *Id.*

[17] *Supra* note 10 at 7 (citing RUS Consent Letter) (July 26, 2007).

The Honorable James M. Andrew
February 14, 2008
Page 5

3. Identify the number and amount of new loans and loan guarantees that RUS provided each year for electric power, starting in 2001.

4. Identify the number and amount of new loans and loan guarantees that RUS provided each year, starting in 2001, for coal-fired power plants with uncontrolled greenhouse gas emissions. Identify each specific coal-fired power plant that received such a loan, the size of each plant, when the plant began operation or will begin operation, and the estimated quantity of annual greenhouse gas emissions from each plant.

5. Identify the amount of new loans and loan guarantees that RUS projects it will provide each year for electric power over the next 10 years (or for whatever period for which RUS has made such projections).

6. Identify the amount of new loans and loan guarantees that RUS projects it will provide each year for coal-fired power plants with uncontrolled greenhouse gas emissions over the next 10 years (or for whatever period for which RUS has made such projections).

7. Identify each specific coal-fired power plant project for which RUS is currently considering providing financial support. For each plant, please include the name, location, size, total cost, projected schedule for construction and beginning operation, quantity of loans or loan guarantees requested, status of RUS's consideration of the loan request, whether the plant will include technology to control greenhouse gas emissions, and its projected quantity of annual and lifetime greenhouse gas emissions.

8. Explain whether prior to providing a loan or loan guarantee for the construction of a new coal-fired power plant without greenhouse gas emission controls, RUS routinely analyzes the financial risks associated with the potential for regulation of greenhouse gas emissions.
   a. If RUS routinely conducts such an analysis, describe the analysis. Include details on the following:
      I. The assumptions RUS makes about the likelihood, timing and stringency of such regulation;
      II. The assumptions RUS makes about the quantity of emission allowances, if any, that the government might provide to each plant free of charge; and
      III. The assumptions RUS makes about the price per ton of carbon.
   b. If RUS does not routinely conduct such analysis, explain why not. Please state whether you will commit to conduct such analysis for all loans and loan guarantees that have not yet been finalized. If you will not make such a commitment, please explain why not.

The Honorable James M. Andrew
February 14, 2008
Page 6

9.    Indicate whether RUS analyzed the financial risks associated with the potential for
      regulation of greenhouse gas emissions with respect to the proposed new Sunflower
      plant.
      a.    If RUS conducted such analysis, please provide that analysis.
      b.    If RUS did not conduct such analysis, I request that you do so now to provide a
            better understanding of the security of the government's outstanding loans to
            Sunflower.  Please provide that analysis to the Committee when it is completed.

10.   Indicate whether RUS analyzed the possible electricity rate impacts for Sunflower's
      customers associated with the potential for regulation of greenhouse gas emissions with
      respect to the proposed new Sunflower plant.
      a.    If RUS conducted such analysis, please provide that analysis.
      b.    If RUS did not conduct such analysis, I request that you do so now to provide a
            better understanding of the rate impacts of Sunflower's proposal to invest in new
            coal plants.  Please provide that analysis to the Committee when it is completed.

11.   State whether RUS has considered or analyzed the potential effects of providing
      financing for new coal-fired power plants with uncontrolled greenhouse gas emissions on
      the Administration's overall climate policies, efforts, and goals.
      a.    If RUS has considered such effects, please explain the results of such
            consideration and analysis.
      b.    If RUS has not considered such effects, please explain why not.

      Please provide the requested information by February 28, 2008.  If you have any
questions concerning this request, please have your staff contact Alexandra Teitz of the
Committee staff at (202) 225-4407.  Thank you for your assistance in this matter.

                                    Sincerely,


Henry A. Waxman                                Jim Cooper
Chairman                                       Member of Congress

cc:    Tom Davis
       Ranking Minority Member

# EXHIBIT 3



S. REP. 95-164, S. Rep. No. 164, 95TH Cong., 1ST Sess. 1977, 1977 U.S.C.C.A.N. 854, 1977 WL 16026
(Leg.Hist.)
**(Cite as: S. REP. 95-164, 1977 U.S.C.C.A.N. 854)**

**\*\*854** P.L. 95-91, DEPARTMENT OF ENERGY ORGANIZATION ACT
Senate Report (Governmental Affairs Committee) No. 95-164,
May 14, 1977 (To accompany S. 826)
House Report (Government Operations Committee) No. 95-346, (Part I)
May 16, 1977 (To accompany H.R. 6804)
House Report (Post Office and Civil Service Committee) No. 95-346, (Part II)
May 24, 1977 (To accompany H.R. 6804)
Senate Conference Report No. 95-367,
July 27, 1977 (To accompany S. 826)
House Conference Report No. 95-539,
July 26, 1977 (To accompany S. 826)
Cong. Record Vol. 123 (1977)
DATES OF CONSIDERATION AND PASSAGE
Senate May 18, August 2, 1977
House June 3, August 2, 1977
The Senate bill was passed in lieu of the House bill.  The Senate Report and
the House Conference Report are set out.


(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

SENATE REPORT NO. 95-164
May 14, 1977


CONTENTS

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
  **\*1** The Committee on Governmental Affairs, to which was referred the bill  (S.
826) to establish a Department of Energy in the executive branch by the
reorganization of energy functions within the Federal Government in order to secure
effective management to assure a coordinated national energy policy, and for other
purposes, having considered the same, reports favorably thereon with an amendment (
) and recommends that the bill (as amended) do pass.


**\*\*855** PURPOSE OF THE LEGISLATION

  The basic purpose of S. 826 is to establish a permanent, Cabinet-level Department
of Energy in the executive branch and to bring together in the Department of Energy
all of the major energy programs in the Federal Government, including those
programs relating to economic regulation of energy supply systems.
  The legislation achieves the following additional purposes:
  The provision of an appropriate organizational framework for the implementation
of energy programs;
  The provision of an effective permanent mechanism for the development and
implementation of a comprehensive national energy policy;
  The creation and implementation of a comprehensive national energy policy;
  The creation and implementation of a comprehensive national energy conservation

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 95-164                                                                                      Page 4
S. REP. 95-164, S. Rep. No. 164, 95TH Cong., 1ST Sess. 1977, 1977 U.S.C.C.A.N. 854, 1977 WL 16026
(Leg.Hist.)
**(Cite as: S. REP. 95-164, 1977 U.S.C.C.A.N. 854)**


### Energy research and development

   Energy research and development goals and allocation of resources among various
research and development programs have too often been undertaken independently of
national energy priorities. Coal research and development has been fragmented, with
the Bureau of Mines, **\*4** FEA, ERDA, and EPA separately handling major parts of a
single fuel cycle.  Nuclear energy has received relatively more attention than
other potential energy options in large part because a single agency, the former
Atomic Energy Commission, promoted its use without regard to other research and
development strategies.  Conservation research and development for too long was an
afterthought, with FEA-ERDA fragmentation impeding progress.  Longer term research
and development efforts were supported at the expense of shorter range
possibilities reflecting ERDA's policy focus on 1985 and beyond.

### Economic regulation of energy supplies

   The FPC regulates the price and allocation of interstate natural gas,
electricity, and hydroelectric power.  The FEA regulates oil prices.  The Energy
Research and Development Administration determines the price of enriched uranium.
The price and availability of each of these energy sources is determined
independently of the others, even though these sources compete to meet our national
energy demands, and often are substitutes for one another. The need to coordinate
the pricing of these primary sources of energy is one of the purposes of the
creation of this Department.

### Resource development

   Federal activities relating to the development and supply of known domestic
energy resources have been spread among almost all of the Government's energy
agencies.  As a result, individual programs for development of coal, oil, natural
gas, and uranium, as well as geothermal and solar energy, have suffered from a lack
of overall focus and sense of urgency.  The fragmentation of responsibility has
effectively **\*\*858** precluded establishment of priorities among these programs.
Federal coal reserves which have already been leased for development have not been
produced at capacity.  Speculative bidding on other federally owned energy
resources has not promoted development of those resources in an environmentally
acceptable manner.  Leasing and bidding policies have not always served the
national interest effectively.  The Nation's domestic fossil fuel production has
dwindled since the early 1970's, in part because of a lack of organizational
coherence capable of relating resources to the most efficient commercialization
processes.

### Benefits of the reorganization

   The creation of a Department of Energy will have wide-ranging benefits for both
the executive branch and the American people.  It will provide a comprehensive
overview of and national perspective on energy matters.  It will insure a more
stabilized energy policy framework with a single Cabinet-level energy spokesperson.
It will provide a clear focus within the executive branch on energy policy and
programs and the necessary central staff capability to analyze a wide range of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 95-164                                                                                                          Page 5
S. REP. 95-164, S. Rep. No. 164, 95TH Cong., 1ST Sess. 1977, 1977 U.S.C.C.A.N. 854, 1977 WL 16026
(Leg.Hist.)
**(Cite as: S. REP. 95-164, 1977 U.S.C.C.A.N. 854)**

energy issues.  The Department of Energy will, in this integrated organizational structure, provide for the reduction of overlap and unnecessary duplication, leading to more effective policy formulation, data collection and analysis, conservation, financial incentives, energy resource development, and economic regulation.

This Nation critically needs comprehensive, balanced national energy policies to guide the public and private sectors in working **5 together to put energy supply and demand back into balance-- both now and for the years ahead.  Under the Department of Energy, responsibility for the formulation of energy policy will be vested in a single official, the Secretary of Energy, who will be supported by a unified organization with the authority to direct Federal actions needed to implement that policy.  An Undersecretary for Policy and Evaluation will support the Secretary by providing continuous attention to the task of analyzing policy alternatives, formulating responses to key issues, recommending choices, developing associated programs, and evaluating results.

The tasks now performed by FEA, ERDA, the FPC, and the Interior Department's Bureau of Mines with respect to data collection and analysis will be carried out in the new Energy Department by an Energy Information Administration, statutorily established and headed by an Administrator appointed by the President and confirmed by the Senate. To rationalize data gathering by the Federal Government, the Department of Energy will consolidate the information, data, and analysis functions of FEA's office of energy information and analysis; the electric power and natural gas industry analytical systems; and the hydroelectric, electric utility, and natural gas data systems of the Federal Power Commission; the fuel supply/demand analysis and data gathering functions, related thereto of the Bureau of Mines, and the data gathering functions of ERDA.  Together these units will be able to provide comprehensive and coordinated data gathering and analysis.

In order to conserve increasingly scarce energy resources and cut down on unnecessary consumption and waste, the Department of **859 Energy is to be given the authorities and programs necessary to foster, encourage, and-- where appropriate-- require energy conservation. In addition to the consolidation of conservation programs from FEA and ERDA, which together expend more than 80 percent of the funds appropriated for conservation programs, the Department will acquire authorities from the Department of Housing and Urban Development (establishment of thermal efficiency standards for commercial and residential buildings and authority to undertake a national energy conservation demonstration program designed to test various forms of financial assistance to encourage energy conservation in existing residences), and from the Department of Commerce (the existing Commerce Department program to promote voluntary industrial energy conservation).  Also, the Secretary of Energy will have a significant role in recommending goals in the automobile fuel efficiency standards program to the Secretary of Transportation.  The Secretary of Energy will also have the responsibility to promulgate guidelines which must be followed by the Rural Electrification Administration in its approval of loans for the generation or transmission of electricity under the REA program.  This combination of authorities will provide the necessary base from which a comprehensive national energy conservation program can be developed and implemented.

It is the intent of this legislation that every effort of the new Department to conserve, produce, regulate, or manage energy must be tempered by the realities of the potential impact on the environment. The Secretary of Energy must have the benefit of continuous and reliable advice in this area to assure that protection of environmental *6 quality as an integral element of national energy policy and the programs which implement that policy.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 95-164                                                                     Page 6
S. REP. 95-164, S. Rep. No. 164, 95TH Cong., 1ST Sess. 1977, 1977 U.S.C.C.A.N. 854, 1977 WL 16026
(Leg.Hist.)
**(Cite as: S. REP. 95-164, 1977 U.S.C.C.A.N. 854)**

   It is the purpose of this legislation that research and development play an
essential role in developing supply and conservation options to solve the Nation's
energy problem.  Creation of a Department of Energy will, by joining policy
planning and research and development, permit a more appropriate assignment of
priorities between long-term and short-term R. & D. efforts.
   A central focus for these responsibilities will enable the policy planners to
better determine the pace and scope of long-term programs in consonance with the
best possible projections of energy demand, giving full account to the effects of
conservation and near-term resource development. This integrated program operation
will enable the Department to concentrate on vital research and development
priorities such as the use of geothermal energy, generation of electricity from
solar energy, safe and environmentally acceptable use of fission and fusion power
for electrical generation; use of plentiful coal resources in more efficient,
environmentally clean forms; and continuing programs of basic and applied energy
sciences.
   Merger of the economic regulatory activities of the Federal Energy Administration
and the Federal Power Commission into the Department of Energy to carry out pricing
and allocation decisions in the context of national energy policies, will serve to
coordinate these pricing policies with the development of national energy policy
goals.
   It is the purpose of the committee's provisions with regard to the economic
regulatory activities to assure coordination with national **860 energy planning
and implementation and to assure protection of due process by retaining the
benefits of impartial decision making. It is the further purpose of the committee's
provisions in this area to expedite the decisions by providing that some decisions
should be made through rulemaking rather than adjudicatory procedures.
   It is the purpose of this legislation to consolidate into one department the
supply development responsibilities with respect to energy.  These responsibilities
include:  electric power supply; the strategic stockpile program; the assurance of
adequate supply of enriched uranium; evaluation of uranium resources and reserves;
the setting of production goals for federally owned fossil fuel resources, and the
setting of economic terms and conditions of leasing and production of fuel
resources in the Federal domain; the demonstration of new technologies to bring
solar energy, clean coal, geothermal, and other environmentally acceptable sources
of energy quickly into the commercial mainstream.


                              HISTORY AND BACKGROUND


   The current proposal to create a comprehensive energy department in order to
improve management of energy issues can be traced in a direct evolutionary line to
origins in the 1971 proposals of the Nixon administration for a Department of
Energy and Natural Resources. Although reorganization has been a constant theme in
most administrations since well before the turn of the century, the use of natural
resources or energy as a key organizing concept emerged in those 1971 proposals,
and has been continually narrowed since then toward the current central focus on
energy embodied in S. 826.
   **7 In March 1971, President Nixon introduced a sweeping reorganization proposal
for the consolidation of seven major departments into four departments organized
around major national purposes.  These followed from the recommendations of the
President's Advisory Council on Executive Reorganization, known popularly as the
'Ash Council' after its director, Roy Ash.  One of the four major departments was
to be a Department of Natural Resources (DNR), composed of five administrations for

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 4



Home > News & Policies > Policies in Focus > Energy



## Energy for America's Future



**President George W. Bush tours the control room at Browns Ferry Nuclear Plant Thursday, June 21, 2007, in Athens, Ala. White House photo by Chris Greenberg**

### President Bush Delivers State of the Union Address

"To build a future of energy security, we must trust in the creative genius of American researchers and entrepreneurs and empower them to pioneer a new generation of clean energy technology. Our security, our prosperity, and our environment all require reducing our dependence on oil. Last year, I asked you to pass legislation to reduce oil consumption over the next decade, and you responded. Together we should take the next steps: Let us fund new technologies that can generate coal power while capturing carbon emissions. Let us increase the use of renewable power and emissions-free nuclear power. Let us continue investing in advanced battery technology and renewable fuels to power the cars and trucks of the future. Let us create a new international clean technology fund, which will help developing nations like India and China make greater use of clean energy sources. And let us complete an international agreement that has the potential to slow, stop, and eventually reverse the growth of greenhouse gases.

### SPEECHES & NEWS RELEASES

**December 20, 2007**
Fact Sheet: Year in Review: 2007

**December 19, 2007**
President Bush Signs H.R. 6, the Energy Independence and Security Act of 2007

Fact Sheet: Energy Independence and Security Act of 2007

**December 18, 2007**
Fact Sheet: Energy Bill Responds to President's "Twenty in Ten" Vision

**November 28, 2007**
Statement by the President on Energy Security and Climate Change

More News »

### ASK THE WHITE HOUSE

**March 27, 2007**
Andy Karsner
Assistant Secretary for Energy Efficiency and Renewable Energy



**Secretary of Energy Sam Bodman**
February 23, 2007
January 24, 2007
October 2, 2006
August 8, 2006
May 12, 2006
April 25, 2006
February 21, 2006
September 28, 2005
August 8, 2005
June 15, 2005
April 20, 2005
March 9, 2005



**October 11, 2006**
Michael Johanns
Former Secretary of



This agreement will be effective only if it includes commitments by every major economy and gives none a free ride. The United States is committed to strengthening our energy security and confronting global climate change. And the best way to meet these goals is for America to continue leading the way toward the development of cleaner and more energy-efficient technology.

To keep America competitive into the future, we must trust in the skill of our scientists and engineers and empower them to pursue the breakthroughs of tomorrow. Last year, Congress passed legislation supporting the American Competitiveness Initiative, but never followed through with the funding. This funding is essential to keeping our scientific edge. So I ask Congress to double federal support for critical basic research in the physical sciences and ensure America remains the most dynamic nation on Earth."

--President George W. Bush, January 28, 2008

Full Transcript

### Increasing Our Energy Security And Confronting Climate Change

*The Administration Is Taking Steps To Reduce U.S. Dependence On Oil, And To Advance U.S. Leadership In Developing A Global Response To Climate Change*

**On January 28, 2008, during his State of the Union address, President Bush called on Congress to work with him on the next steps to improve our energy security and confront the challenge of climate change without undermining economic growth.** Last month, the President signed an energy bill that will help cut greenhouse gas emissions and reduce U.S. dependence on oil, which harms America economically through high prices at the gas pump. As world demand for energy continues to increase, the President urges Congress to act on the remaining proposals from his energy security agenda:

- **We must continue changing the way America generates electric power through even greater use of clean coal technology, solar and wind energy, and clean, safe nuclear power.**

- **We must increase our domestic supply of oil in a prudent and environmentally sensitive way.** The President urges Congress to pass legislation that opens access to domestic energy sources in the Outer Continental Shelf and Alaska and that protects America against supply disruptions by doubling the Strategic Petroleum Reserve.

- **President Bush is committing $2 billion over the next three years to create a new international clean energy technology fund to help confront climate change worldwide.** Along with contributions from other countries, this fund will increase and accelerate the deployment of all forms of cleaner, more efficient technologies in developing nations like India and China, and help leverage substantial private-sector capital by making clean energy projects more financially attractive.

**The President Calls On Congress To Work With Him To Take Advantage Of New Clean Energy Technologies**

**President Bush supports an increase in the use of nuclear power**

Agriculture

**October 4, 2006**
Stephen L. Johnson
EPA Administrator


**May 25, 2005**
Deputy Secretary of Energy
Clay Sell discusses
President's Energy Policy


**March 12, 2004**
Assistant Secretary of Energy David Garman Discusses Energy and Transportation


RADIO

**Energy Secretary Bodman**
July 18, 2005
🔊 AUDIO
July 13, 2005
🔊 AUDIO


**Vice President on Social Security and Energy**
April 28, 2005
🔊 AUDIO


**Deputy Secretary of Energy Clay Sell**
April 28, 2005
🔊 AUDIO


DOCUMENTS

Advanced Energy Initiative


Reliable, Affordable, and Environmentally-Sound Energy for America's Future


RELATED LINKS

U.S. Department of Agriculture

U.S. Department of Energy

Environmental Protection Agency

U.S. Department of Interior

**as a clean, safe, and affordable alternative energy source to meet America's growing needs for electricity.** Nuclear power produces no greenhouse gases, and a growing number of people believe it is an environmentally necessary choice. Without its use, power sector CO2 emissions would have been 28 percent greater in the electricity industry in 2005 – nearly equal to the annual emissions from all 136 million passenger cars in the U.S.

**President Bush seeks to fund new technologies that can produce power from coal with significantly lower carbon emissions.** Coal is America's most abundant and affordable energy resource, responsible for generating about 50 percent of America's electric power. We are now cutting harmful air pollution from coal, and we have to learn to cut CO2.

**President Bush is dedicated to strong growth in renewable electricity generation.** Since 2001, wind power in the U.S. has grown 550 percent and photovoltaic solar power grown by 525 percent; overall, renewable power has nearly doubled. The U.S. led the world in new wind capacity in 2006 and 2007. The President's Solar America Initiative – launched in 2006 – doubled U.S. investment in solar energy. The U.S. leads the world in geothermal electricity generation, with almost 3,000 megawatts of new capacity planned for development in the West.

**The United States will continue to lead the way in developing the clean and efficient technologies critical to reducing greenhouse gas emissions while fostering economic growth.** Since the President took office, the Federal government has committed nearly $18 billion to research, develop, and promote clean and efficient technologies and help get them to market. The private sector has responded with significant investments, ranging from corporate research and development to the venture capital markets.

**To complement the new international clean technology fund, the United States and the European Union have jointly proposed in the WTO to eliminate tariff and non-tariff barriers to clean energy and environmental technologies and services.** Global trade in the goods covered by the proposal totaled $613 billion in 2006 and could increase by an additional 7-14 percent annually according to the World Bank.

The Administration Continues To Lead The Effort To Reach A New, Post-2012 Global Agreement

**The President will reaffirm the United States' commitment to work with major economies and through the UN to complete an international agreement that will slow, stop, and eventually reverse the growth of greenhouse gases.** This agreement will be effective only if it includes commitments by every major economy and gives none a free ride.

**This week, the United States will host the second Major Economies Meeting on Energy Security and Climate Change.** President Bush announced this initiative in May 2007 to work with all of the world's largest energy users, including both developed and developing nations, to produce a detailed contribution from the leaders of these countries to help establish an international agreement by 2009 under the United Nations Framework Convention on Climate Change. In September, the U.S. hosted representatives of 17 world leaders plus the United Nations.

**In December, the United States joined the global consensus at the UN Climate Conference in Bali to launch a comprehensive "roadmap" for global climate negotiations.** The Bali Action Plan is a

critical first step in moving the UN negotiation process forward toward a comprehensive and effective post-2012 arrangement by 2009.  The United States looks forward to participating in the negotiations envisioned in the Bali Action Plan, including through the Major Economies Process and other appropriate channels to achieve an effective outcome.

**The Energy Independence And Security Act Of 2007 Will Reduce U.S. Gasoline Consumption And Help Diversify America's Energy Sources, And Produce Some Of The Largest Greenhouse Gas Reductions In U.S. History**

**In December, President Bush signed the Energy Independence and Security Act of 2007, which responded to his "Twenty in Ten" challenge in last year's State of the Union Address to improve vehicle fuel economy and increase alternative fuels.**  This bill will help reduce America's dependence on oil, improve efficiency, and cut emissions by:

- **Mandating that fuel producers use at least 36 billion gallons of biofuel by 2022.**  Although on a longer timeline than the President proposed last year, the new requirement represents a nearly five-fold increase over previously required levels.

- **Mandating a national fuel economy standard of 35 miles per gallon by 2020 – which will increase fuel economy by 40 percent and save billions of gallons of fuel.**  This requirement represents the first statutory increase in automobile fuel economy standards since 1975 and includes an important "attribute-based" reform the President called for that will ensure that increased fuel efficiency does not come at the expense of automotive safety.

- **Mandating increases in energy efficiency of light bulbs by 30 percent.**  This will effectively phase out most common types of incandescent light bulbs by 2012.

- **Mandating new efficiency standards for nine appliances and encouraging the development of more efficient commercial buildings, in addition to work already underway to update dozens of existing standards.**

- **Mandating that Federal government operations reduce total energy use in Federal buildings by 30 percent by 2015, reduce annual petroleum consumption by 20 percent by 2015, and increase use of alternative fuels by 10 percent by 2015.** These new provisions effectively adopted key requirements of an Executive Order that President Bush issued last year.  Because the Federal government is one of the world's largest consumers of energy, these steps will not only have significant energy security and climate benefits, but will also help boost markets for cleaner, more efficient technologies.

**Taken together, these programs will cumulatively reduce projected greenhouse gas emissions by more than six billion metric tons by 2030, according to preliminary estimates.**

# EXHIBIT 5

USDA
Rural
Development

**United States Department of Agriculture**
**Rural Development**

June 11, 2007

Kristen Henry, Esquire
Sierra Club Environmental Law Program
85 Second Street, 2nd Floor
San Francisco, CA 94105

RE: FOIA No. U06-131

Dear Ms. Henry:

This is a follow-up to my letter to you acknowledging receipt of your request
dated August 17, 2006, for documents relating to the Holcomb Power Plant
Expansion Project, submitted pursuant to the provisions of the Freedom of
Information Act (FOIA) (5 U.S.C. § 552). I apologize for the delayed response to
your request.

Specifically requested were the following:

1. All records maintained by United States Department of Agriculture
   (USDA)- Rural Development Utilities Programs relating to the existing
   Holcomb Power Station.

2. All records relating to the proposed expansion of the Holcomb Power
   Station.

3. All records relating to USDA –Rural Development Utilities Program
   involvement in the Holcomb Power Station expansion.

Item 1 of your request as submitted is considered overly broad. Although your
request mentions a project of a USDA borrower, it fails to identify with any
specificity or a context, the type of information or the time-frame of the
documents desired, and as worded would place an inordinate burden on program
resources to perform a search for responsive records. Therefore we are denying
this portion of your request based on the procedural requirements of the FOIA.

1400 Independence Ave, S.W. · Washington DC 20250-0700
Web: http://www.rurdev.usda.gov

Committed to the future of rural communities.

"USDA is an equal opportunity provider, employer and lender."
To file a complaint of discrimination, write USDA, Director, Office of Civil Rights,
1400 Independence Avenue, S.W., Washington, DC 20250-9410 or call (800) 795-3272 (Voice) or (202) 720-6382 (TDD).

Kristen Henry, Esquire                                           Page 2.
Sierra Club Environmental Law Program
FOIA No. U06-131


In reference to item 2 of your request, as indicated in my previous letter to you, pursuant to USDA-Rural Development FOIA regulations and Executive Order 12600, both Sunflower Electric Corporation (Sunflower) and Tri-State Transmission Association (Tri State) were informed of your request and given an opportunity to object to the release of information supplied to this agency by them pertaining to the Holcomb Power Plant Expansion project (Holcomb Project).

Enclosed are two redacted volumes of materials totaling 886 pages submitted by Sunflower. Documents consisting of financial data related to outstanding loans, debts etc., load forecasts, negotiation strategies, draft and final contracts for goods and services, trade secrets, project plans, and schedules related to the Holcomb Project have been redacted pursuant to FOIA exemption (b)4, which protects from disclosure confidential, financial and commercial information which if released would subject the submitter to competitive harm.

Also enclosed also, are 63 pages of presentation materials submitted to Rural Development Utilities Program by Tri State. Only the materials relating to the Holcomb Project are released. Pages withheld in their entirety contained information unrelated to the Holcomb Project and therefore were not considered responsive to your request.

In reference to item 3 of your request, there have been no loan applications or funding requests submitted to Rural Development Utilities Program for the proposed expansion project, the only documents maintained by the Rural Development Utilities Program relate to outstanding Rural Development Utilities Program loans of each borrower (Sunflower and Tri State) and unrelated to the Holcomb Expansion Project therefore, we consider there to be no records responsive to your request under item 3.

As we have granted your request in part, and have also denied your request for access to materials considered exempt, we are required to inform you that you may administratively appeal this partial denial of your request by writing to the

Kristen Henry, Esquire                                          Page 3.
Sierra Club Environmental Law Program
FOIA No. U06-131


Administrator, Rural Development Utilities Program Utilities Service, USDA, 1400
Independence Avenue, S.W., STOP 1522, Washington, DC 20250-1522, within
45 days from the date of this letter.  A copy of this letter along with an
explanation why you believe you have been wrongfully denied access to
available records should be enclosed with your appeal, and also the phrase
**FOIA APPEAL** should appear on the outside of the envelope.

Sincerely,

Adrienne Stinnett
FOIA Specialist
USDA RD Utilities Programs

# EXHIBIT 6



BOZEMAN, MONTANA   DENVER, COLORADO   HONOLULU, HAWAII
INTERNATIONAL   JUNEAU, ALASKA   OAKLAND, CALIFORNIA
SEATTLE, WASHINGTON   TALLAHASSEE, FLORIDA   WASHINGTON, D.C.

August 13, 2007

Ms. Darla Buckman
FOIA/PA Coordinator
US Department of Agriculture
1303 Southwest First American Place Suite 100
Topeka, KS 66604
(785) 271-2708 fax

**RE: <u>Freedom of Information Act Request – Holcomb Power Plant Expansion Project</u>**

     Dear Ms. Buckman:

     On behalf of the Sierra Club, I write to request that the United States Department of Agriculture ("USDA") provide copies of the records described below pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the regulations of the Department of Agriculture set forth at 7 C.F.R. §§ 1.1 – 1.25.

     The Sierra Club is the nation's oldest grassroots organization. It has more than 750,000 members nationwide and is dedicated to the protection and preservation of the natural and human environment. One of the Sierra Club's main national priorities, the Smart Energy Solutions Conservation Initiative, tackles the pressing problems of global warming, air pollution, and our national dependence on dirty, non-renewable energy sources such as nuclear power, oil and coal. A central part of this initiative is to promote the use of clean energy sources by encouraging individuals and businesses nationwide to develop, invest in, and use clean energy sources. This FOIA request is part of this initiative.

     The Sierra Club seeks records concerning the role of USDA in providing financial assistance to or otherwise participating in or facilitating Sunflower Electric Power Corporation's proposed expansion of facilities at the location of its existing Holcomb Power Station, approximately four miles south of Holcomb Kansas. The proposed expansion includes construction of at least two additional 700MW coal-fired electric generating units, ancillary facilities including coal handling, water treatment and waste disposal facilities, and other facilities including an algae plant, ethanol plant and dairy, which comprise an "Integrated Bioenergy Center." The proposed expansion also includes construction of power transmission lines and facilities, including the Eastern Plains Transmission Project, which are required to get power from the Holcomb Expansion Project to power users.

     Coal fired power plants are the nation's largest source of emissions of carbon dioxide, the primary greenhouse gas that contributes to global warming. "The harms associated with climate change are serious and well recognized." <u>Massachusetts v. Environmental Protection Agency</u>, 127 S. Ct. 1438, 1455 (2007). It is anticipated that the proposed Holcomb Expansion Project will result in the release of more than 10 million tons of carbon dioxide into the air each year. The expansion project will also spew massive quantities of mercury, nitrogen oxides, sulfur

dioxide and other harmful pollutants into the air. The role of the USDA in providing financial assistance to or otherwise participating in or facilitating the construction of new coal-fired power plants such as the Holcomb Expansion Project is unquestionably a subject of significant public interest. This is especially true, where, as here, the project site is ideally situated for generation of cleaner forms of energy such as wind power.

We are submitting this request to obtain documents that will allow for a better understanding of the proposed expansion project, its environmental impacts, and the role of USDA's Rural Utility Service ("RUS") in the expansion project.

**Definitions**

For Purposes of these requests, the following words have the meanings indicated:

"Sunflower" means Sunflower Electric Power Corporation, Sunflower Electric Holdings Inc., Holcomb Common Facilities, LLC, Holcomb 2 LLC, Sunflower Rail Company, LLC, SEPC, LLC, Holcomb 3, LLC, Holcomb 4, LLC, and any other entity that is a predecessor, successor, parent or subsidiary of, or is otherwise affiliated with one of those entities.

"Tri-State" means Tri-State Generation and Transmission Association, Inc., and any entity that is a predecessor, successor, subsidiary or parent of, or is otherwise affiliated with Tri-State Generation and Transmission Association, Inc.

"Golden Spread" means Golden Spread Electric Cooperative, Inc., and any entity that is a predecessor, successor, subsidiary or parent of, or is otherwise affiliated with Golden Spread Electric Cooperative. Inc.

"Holcomb Expansion Project" means the proposed additional coal-fired electric generating units in Holcomb Kansas; related and ancillary facilities such as coal handling, water treatment and waste disposal facilities, including the proposed landfill expansion to accommodate coal combustion waste from the proposed electric generating units; other components of the Integrated Bioenergy Center proposed for the site, including the algae plant, ethanol plant and dairy; and transmission lines and facilities that will transmit power from the site, including the Eastern Plains Transmission Project.

"Records" means information of any kind, including writings (handwritten, typed, electronic or otherwise produced, reproduced or stored), letters, memoranda, correspondence, notes, applications, completed forms, studies, reports, reviews, guidance documents, policies, telephone conversations, telefaxes, e-mails, documents, databases, drawings, graphs, charts, photographs, minutes of meetings, electronic and magnetic recordings of meetings, and any other compilation of data from which information can be obtained. Without limitation, the records requested include records relating to the topics described below at any stage of development, whether proposed, draft, pending, interim, final or otherwise. All of the foregoing are included in this request if they are in the possession of or otherwise under the control of the USDA or any of its offices.

"Transactional Documents" means the documents setting forth the terms of an agreement under which financing is provided or other agreement, including but not limited to loan agreements, promissory notes, guarantees, security agreements, financing statements, mortgages, other documents evidencing security interests, all documents modifying, extending, restructuring, replacing, releasing, subordinating, selling or assigning such financing and security arrangements, and all documents evidencing RUS' consent or approval of such transactions.

### Exempt Records

Should you decide to invoke a FOIA exemption with regard to any of the requested records, please include in your full or partial denial letter sufficient information for the Sierra Club to appeal the denial. To comply with legal requirements, the following information must be included:

1. Basic factual material about each withheld item, including the originator, date, length, general subject matter, and location of each item; and

2. Explanations and justifications for denial, including the identification of the category within the governing statutory provision under which the document (or portion thereof) was withheld and a full explanation of how each exemption fits the withheld material.

If you determine that portions of a record requested are exempt from disclosure, please redact the exempt portions and provide the remainder of the record to the Sierra Club.

### Records Requested

1.      The Transactional Documents for all loans to Sunflower that RUS has made, insured or guaranteed, provided in whole or in part for planning, design, construction, modification or operation of the existing Holcomb Generating Station or the proposed Holcomb Expansion Project, including but not limited to:

a. The "1987 mortgage in favor of RUS, CFC and CoBank" referred to on Page SFHS0040010, attached;

b. The 2002 mortgage placed on Sunflower's properties at the time of the restructuring referred to on Page SFHS0040011, attached;

c. The "2002 Agreement and Consent to Sunflower Restructuring" and other documents embodying the "November 2002 arrangements" referred to on Page SFHS0040010, attached;

d. The 2004 mortgage (successor to the 2002 mortgage placed on Sunflower's properties at the time of the 2002 restructuring), referred to on  Page SFHS0040011, attached;

e. The Debt Restructure, Override Agreement and Amended and Restated Credit Agreement and related mortgage (June 30, 1987), referred to on Page SFHS0040011, attached;

f. The HCF Assignment Agreement, referred to on Page SFHS0040011, attached; and

g. The SEP Purchase and Agreement, the Amended and Restated RUS loan Contract (June 30, 2003), the Note Purchase Agreement (April 22, 2004) and the CoBank Credit Agreement (September 30, 2002 as amended June 1, 2003), referred to on Page SFHSA0040011, attached.

2.      The Transactional Documents for all other loans to Sunflower that RUS has made, insured or guaranteed, which at any time from January 1, 2006 to the present had not been fully repaid and remained outstanding.

3.      The Transactional Documents evidencing the $10,000.000 hybrid facility with CFC referenced on the attached Page 25 of Sunflower's 2006 annual report, all documents evidencing Sunflower's request to renew the facility for $ 20,000,000 referenced on the attached Page 25 of the 2006 annual report, the Transactional Documents evidencing any renewal or extension of that facility, and the documents evidencing requests for RUS approval and RUS' approval of the hybrid facility and the renewal.

4.      The Transactional Documents evidencing the $18,000,000 line of credit, and  documents evidencing RUS and CFC's approval of that line of credit, referred to on the attached Page 30 of Sunflower's 2006 annual report.

5.      The Transactional Documents for all loans to Golden Spread that RUS has made, insured or guaranteed, which at any time from January 1, 2006 to the present had not been fully repaid and remained outstanding.

6.      All environmental impact statements, environmental assessments and other records prepared for the purpose of complying with the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. with respect to loans to Sunflower that RUS has made, insured or guaranteed.

7.      Complete, executed copies of any agreements, dated from January 1, 2005 to the present, to which Sunflower, Tri-State, Golden Spread, Midwest Energy, Inc., or Mid-Kansas Electric Company are a party that pertain to the Holcomb Expansion Project.

8.      To the extent complete, executed copies of the records requested in Request No. 7 are not in your possession, custody or control, unexecuted copies or drafts of such documents other than documents you provided to the Sierra Club in response to its August 17, 2006 FOIA request.

9.      All records not provided to the Sierra Club in response to its August 17, 2006 FOIA request, that relate to any request by Sunflower, Tri-State or Golden Spread for RUS consent or approval of any transaction, arrangement or other action related to the Holcomb Expansion Project or the construction, modification or operation of the existing Holcomb Generating Station, including but not limiting to:

A.  The following transactions for which Sunflower requested RUS consent in the attached September 12, 2006 letter, Document Nos. SFHS0020001- SFHS0020004:

1.  Letters of intent for the Eastern Unit with Golden Spread and Midwest Energy Inc.;

2. A Purchase Option and Development Agreement with Tri-State;

3. Arrangements with Tri-State that deal with real estate;

4. Any arrangements referenced on Page SFHS0020002, references to which have been redacted;

5. "Subordination and Non-Disturbance Agreement with Tri-State and the existing Sunflower senior lenders";

6. Development agreement with Bechtel Power Corporation;

7.  The amendment to Sunflower's development agreement with International Energy Partners, LP;

8. Equity Funding and Participation Agreements with Golden Spread and Other Eastern Unit participants; and

9. Project agreements, including an Operation and Maintenance Agreement;

B.  The Site Lease, Easement, Indemnity, Cost Sharing Agreements, Letters of Intent and Term Sheets referred to on Page SFHS0030028 attached; the Site Participation and Coordination Agreement, Common Facilities Agreement, Unit O & M Agreement, Common Facilities O & M Agreement, Construction Coordination and Management Agreement referred to on Page SFHS0030029, attached; and the Ancillary Site Leases, referenced on Page SFHS0020044, attached.

We specifically request all records relating to such requests for consent or approval and, where consent or approval has been provided, the document or documents evidencing the consent or approval.

10.    All records that relate to any request that RUS acknowledge and execute consents requested by lenders related to the Holcomb Expansion Project.

11.    All records relating to any attempt by Sunflower, Tri-State, Golden Spread, Midwest Energy, Inc., or Mid-Kansas Electric Company to obtain financing for any aspect of the Holcomb Expansion Project, including but not limited to requests for RUS loans, RUS insurance of loans and RUS guarantees of loans, and requests for financing from CoBank, the National Rural Utilities Cooperative Finance Corp., and other financial institutions.  The records requested include but are not limited to all documents relating to the financing plan described on Pages SFHS0040002, attached.

12.    All records relating to efforts to obtain environmental permits for the Holcomb Expansion Project, including but not limited to permits under the Kansas Air Quality and Solid Waste Acts.

13.    All records evidencing acquisition, transfer or ownership of water rights and existing or proposed water supply contracts to be used in connection with the Holcomb Expansion Project.

14.    All records regarding the existing Holcomb Generating Station's compliance with or failure to comply with environmental laws of the United States, the State of Kansas or any local government, including all environmental audits.

15.    All environmental assessments of any real property currently used in connection with the existing Holcomb Power plant or to be used for any aspect of the Holcomb Expansion Project, included the site of the proposed coal-fired electric generating units, the existing coal ash landfill and the proposed landfill expansion area, including but not limited to the Final Phase I Environmental Site Assessment: Sunflower Holcomb Station Expansion, Holcomb Kansas, dated April 2006, and the Phase I Environmental Site Assessment- Sunflower Core Area, dated June 2006, referred to on Page SFHS0060057, attached.

16.    All records regarding the participation of RUS in preparing, reviewing or commenting on documents prepared for the purpose of complying with the National Environmental Policy Act with respect to the Eastern Plains Transmission Project.

17.    All records relating to the negotiation of a construction contract with Bechtel for the Holcomb Expansion Project.

18.    All records dated from January 1, 2006 to the present setting forth a timetable or schedule for construction of any aspect of the Holcomb Expansion Project.

19.    All records evidencing the Southwest Power Pool's offer of "Network Service" transmission to Golden Spread referred to on Page SFHS0030010, attached.

20.    All records evidencing the release of funds referred to on Page SFHS0030019, attached.

21.    All records relating to discussions, negotiations or requests related to efforts by Sunflower, Tri-State, or Golden Spread to "buy out" of their RUS debt.

22.    All studies regarding alleged economic benefits of the Holcomb Expansion Project, including the studies completed by Dr. Ralph Gamble, referred to on Page SFHS0030056, attached.

23.    All studies regarding the alleged need for power from the Holcomb Expansion Project.

24.    All records reflecting proposals or plans to sell power generated by the Holcomb Expansion Project to "a passive financial investor, in order to facilitate power sales to cooperatives that are not equity owners of the project," referred to on Page SFHS0040001.

25.     All agreements providing for transmission of power to be generated by the Holcomb Expansion Project.

26.     All documents prepared by any agency or department of the federal government or the State of Kansas relating to the Holcomb Expansion Project.

27.     All studies of energy that may be saved by Sunflower through implementation of energy efficiency measures.

28.     To the extent not produced in response to one of the prior requests or in response to the Sierra Club's August 17, 2006 FOIA request, all documents related to the proposed Holcomb Expansion Project.

Fee Waiver Request

I respectfully request that you waive all fees in connection with this request as provided by 5 U.S.C. § 552(a)(4)(A)(iii) and 5 C.F.R. § 1303.70.  The Sierra Club has spent years promoting the public interest through the development of policies that provide enhanced environmental protection, and has routinely received fee waivers under FOIA.

The Sierra Club is a national, non-profit, environmental organization with no commercial interest in obtaining the requested information.  Instead, our organization intends to use the requested information to inform the public, so the public can meaningfully participate in the development of energy resources.

As explained more fully below, the above referenced FOIA request satisfies the factors listed in the USDA's governing regulations for "Waiver or Reduction of Fees" as well as the requirements of fee waiver under the FOIA statute- that disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(iii), *see also* 7 C.F.R. § Pt. 1, Subpt. A, App. A.

1.     The subject matter of the requested records must specifically concern identifiable "operations and activities of the government."

The requested records relate to USDA determinations regarding its participation in and funding of the Holcomb Power Station and its proposed expansion.  These determinations and the policies and procedures on which they are based, define which energy projects the federal government will help to move forward. These determinations are unquestionably "identifiable operations or activities of the government.".

The Department of Justice Freedom of Information Act Guide expressly concedes that "in most cases records possessed by federal agency will meet this threshold" of identifiable operations or activities of the government.  There can be no question that this is such a case.

2.     The disclosure of the requested documents must have an informative value and be "likely to contribute to an understanding of Federal government operations or activities"

The Freedom of Information Act Guide makes it clear that, in the Department of Justice's view, the "likely to contribute" determination hinges in substantial part on whether the requested documents provide information that is not already in the public domain. The requested records are "likely to contribute" to an understanding of USDA's decisions because they are not otherwise in the public domain and are not accessible other than through a FOIA request. As the Holcomb Power Plant expansion project moves forward, it is important for information relating to government operations or activities involving the project to be made available to the public. This information will facilitate meaningful public participation in the decision making process, therefore fulfilling the requirement that the documents requested be "meaningfully informative" and "likely to contribute" to an understanding of the USDA's decision making process with regard to energy projects.

3.     The disclosure must contribute to the understanding of the public at large, as opposed to the individual understanding of the requester or a narrow segment of interested persons. Under this factor, the identity and qualifications of the requester—i.e., expertise in the subject area of the request and ability and intention to disseminate the information to the public—is examined.

The Sierra Club and its members have a long-standing interest and expertise in the development and use of energy resources and these issues remain at the forefront of the Club's conservation efforts. One of the Sierra Club's priority national conservation campaigns is the campaign to promote smart energy solutions, and in particular to tackle the pressing problems of global warming, air pollution, and our national dependence on dirty, non-renewable energy sources such as nuclear power, oil and coal and to promote the use of clean energy sources. This campaign organizes persons nationwide to work on smart energy issues and educates the public on these issues. A current focal point of the campaign is to ensure that clean, renewable energy sources are developed throughout the nation. Therefore, it is understandable why the Sierra Club has taken an interest in the Holcomb expansion project which would allow at least two 700 megawatt facilities producing energy through the exploitation of coal, the dirtiest of the fuels available.

Sierra Club disseminates the information it receives through FOIA regarding these government operations and activities through a variety of ways, including but not limited to, analysis and distribution to the media, distribution through publication and mailing, posting on the Club's website, emailing and list serve distribution to our members. Every day the Sierra Club website receives approximately 14,500 visits. Sierra Magazine, which is a quarterly magazine published by the Sierra Club, has a circulation of approximately 728,000 and the "Planet," a monthly newsletter published by the Club, has a circulation of between 30,000 and 65,000. In addition, Sierra Club disseminates information obtained through FOIA through comments to administrative agencies, and where necessary, through the judicial system. The Sierra Club has published, posted, and disseminated numerous articles on energy sources and alternatives.

Sierra Club unquestionably has the "specialized knowledge" and "ability and intention" to disseminate the information requested in the broad manner outlined above, and to do so in a manner that contributes to the understanding of the "public-at-large."

4.    The disclosure must contribute "significantly" to public understanding of government operations or activities.  The public's understanding must be likely to be enhanced by the disclosure to a significant extent.

There is currently little or no information publicly available regarding USDA's provision of financial assistance to and role in allowing the Holcomb Expansion Project to move forward. Absent disclosure of the records requested, the public's understanding will be shaped only by what is disclosed by the private interests involved.  The records requested will contribute to the public understanding of the government's role, or their "operations and activities" associated with this expansion project.

The disclosure of the requested records is also essential to public understanding of the impacts this project will have on the environment, including its contribution to global warming and impacts to regional air quality.  After disclosure of these records, the public's understanding of this project will be significantly enhanced.  The requirement that disclosure must contribute "significantly" to the public understanding is therefore met.

5.    Whether the requester has a commercial interest that would be furthered by the requested disclosure.

The Sierra Club has no commercial interest in the requested records.  Nor does the Club have any intention to use these records in any manner that "furthers a commercial, trade, or profit interest" as those terms are commonly understood.  Sierra Club is a tax-exempt organization under section 501(c)(3) and 501(c)(4) of the Internal Revenue Code, and as such has no commercial interest.  The requested records will be used for the furtherance of the Club's educational mission to inform the public on matters of vital importance to the environment, wildlife, and natural resources.

6.    Whether the magnitude of the identified commercial interest of the requester is sufficiently large, in comparison with the public interest in disclosure, that disclosure is "primarily in the commercial interest of the requester."

When a commercial interest is found to exist and that interest would be furthered by the requested disclosure, an agency must assess the magnitude of such interest in order to compare it to the "public interest" in disclosure.  If no commercial interest exists, an assessment of that non-existent interest is not required.

As noted above, the Sierra Club has no commercial interest in the requested records. Disclosure of this information is not "primarily" in the Sierra Club's commercial interest.  On the other hand, it is clear that the disclosure of the information requested is in the public interest.  It will contribute significantly to public understanding of USDA decisions to support certain energy projects. Because the public will be the primary beneficiary of this requested information, please waive processing and copying fees pursuant to 5 U.S.C. § 552(a)(4).

**<u>Record Delivery</u>**

We request USDA, in responding to this request, to comply with all relevant deadlines and other obligations set forth in FOIA and the agency's regulations. 5 U.S.C. § 552, (a)(6)(A)(i); 7 C.F.R. § 1.7. Please produce the records above by sending them to me at the address listed below. Please produce them on a rolling basis; at no point should the search for—or deliberation concerning—certain records delay the production of others that the agency has already retrieved and elected to produce.

<u>Please mail copies of all requested records as soon as possible to:</u>

      Nicholas F. Persampieri
      Earthjustice
      1400 Glenarm Place, Ste. 300
      Denver, CO 80202

If you find that this request is unclear in any way please do not hesitate to call me to see if I can clarify the request or otherwise expedite and simplify your efforts to comply. I can be reached at (303) 996-9617. Thank you.

           Sincerely,


           Nicholas F. Persampieri

# EXHIBIT 7

**USDA**
Rural
Development

**United States Department of Agriculture**
**Rural Development**

January 30, 2008

Nicholas F. Persampieri
EarthJustice/Sierra Club
1400 Glenarm Place, Suite 300
Denver, CO 80202

Re: FOIA Request No. U07-104

Dear Mr. Persampieri:

This is a follow-up to my letter to you of January 4, 2008, concerning your FOIA request submitted on behalf of Earth Justice, dated August 13, 2007, for documents in USDA Rural Development's Utilities Program possession relating to the Holcomb Power Plant Expansion Project. As indicated in my previous correspondence, this is a partial response additional releases will be made in the near future.

Pursuant to USDA-Rural Development FOIA regulations and Executive Order 12600, Sunflower Electric Corporation (Sunflower) was informed of your request and given an opportunity to object to the release of information provided to Rural Utilities by them.

The enclosed binders contain (3,644 pages) materials considered responsive to the following items as listed in your request.

> Item 7 – Page 4.....................Binders 1 through 8
> Item 9A(2) – Page 5...............Binder 1
> Item 9A(3) – Page 5...............Binder 1
> Item 9A(5) – Page 5 ..............Binders 1, 6 and 8
> Item 9A(9) – Page 5 ..............Binder 2
> Item B – Page 5....................Binders 1 – 8
> Item 10 – Page 5...................Binders 7 & 8
> Item 11 – Page 5...................Binder 8

1400 Independence Ave, SW • Washington, DC 20250-0700
Web: http://www.rurdev.usda.gov

Committed to the future of rural communities.

"USDA is an equal opportunity provider, employer and lender."
To file a complaint of discrimination write USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W.,
Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD).

Nicholas F. Persampieri                                          Page 2.
Earth Justice
FOIA Request No: U07-104

Redactions have been made pursuant to FOIA exemption (b)4, which protects
from disclosure confidential, financial and commercial information the release of
which would subject the submitter to competitive harm.

As indicated in my previous letter I am not including appeal rights until a final
decision concerning the remaining documents has been made.  Additional and
final release of materials is anticipated within the next week.

Sincerely,

Adrienne Stinnett
FOIA Specialist
USDA RD Utilities Programs

Enclosures

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB                 Plaintiff,<br><br>             v.<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE, RURAL UTILITIES SERVICE;<br>EDWARD T. SCHAFER, in his official capacity as<br>Secretary of Agriculture; JAMES M. ANDREW, in his<br>official capacity as Administrator, Rural Utilities Service,<br>United States Department of Agriculture<br><br>             Defendants. | )<br>)<br>)<br>)<br>) Case No.07-cv-1860-EGS<br>)<br>) **PLAINTIFF'S PROPOSED**<br>) **ORDER**<br>)<br>)<br>)<br>)<br>)<br>) |

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court having considered

Defendants' Motion, Plaintiff's Response, and Defendant's Reply hereby finds that Plaintiff's

Complaint states a claim upon which relief may be granted, and hereby DENIES Defendants'

Motion to Dismiss.

It is so ORDERED.

Dated:

                                                  _____
                                                  The Honorable Emmet G. Sullivan
                                                  United States District Judge