UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-1860 (EGS) |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| AGRICULTURE, RURAL UTILITIES ) | |
| SERVICE; EDWARD T. SCHAFER,[1] in his ) | |
| official capacity as Secretary of Agriculture; ) | |
| and JAMES ANDREW, in his official capacity ) | |
| as Administrator, Rural Utilities Service, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS**

---

[1]     Edward T. Schafer was confirmed by the Senate and sworn in as Secretary of Agriculture on January 28, 2008, and is automatically substituted for acting Secretary Charles F. Conner pursuant to Fed. R. Civ. P. 25(d).

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    RUS's Administration of its Loan Contracts Is Committed to Agency Discretion
      and Is Not Subject to Judicial Review ................................................................... 2

      A.    Loan Approval Provisions Pursuant to Loan Contracts and Security
            Instruments Do Not Give RUS Authority to Impose Environmental
            Restrictions On the Non-Federally Financed Holcomb Expansion .......... 2

      B.    Neither the Consideration of the Potential Costs of Future Carbon Dioxide
            Regulation Nor National Policy Concerns Provides the Basis for a
            Cognizable Claim ...................................................................................... 5

      C.    Plaintiff Cannot Circumvent the Limitation on Judicial Review of RUS's
            Approvals Pursuant to Its Loan Contracts and Mortgage Agreements With
            a Challenge Under NEPA .......................................................................... 7

II.   The Challenged Approvals Do Not Trigger NEPA ............................................. 11

      A.    The Letters and Agreements That Plaintiff Challenges Are Exempt From
            NEPA Under 7 C.F.R. § 1794.3, Because They Are Approvals Pursuant to
            Loan Contracts and Security Instruments ................................................ 11

      B.    The Challenged Actions are Not "Major Federal Actions" Within the
            Meaning of 42 U.S.C. § 4332(2)(C), Because RUS lacks the Discretion to
            Perform a Meaningful Analysis of Effects or Alternatives to Sunflower's
            Non-Federally Financed Project .............................................................. 16

            1.    The Challenged Consents Allow Different Arrangements for
                  Repayment of Sunflower's Debt But Do Not Constitute
                  "Approvals" of the Holcomb Expansion ...................................... 17

            2.    RUS Does Not Have the Requisite Control Necessary to Give Rise
                  to Major Federal Action in Any Other Way Specified By
                  Plaintiff ...................................................................................... 20

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Alabama Power Co. v. Alabama Elec. Co-op., Inc.*,
394 F.2d 672 (5th Cir. 1968) ....................................................... 10

*Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*,
461 U.S. 375 (1983) ................................................................... 22

*Auer v. Robbins*,
519 U.S. 452 (1997) ................................................................... 14

*Calvert Cliffs Coordinating Comm'n, Inc. v. U.S. Atomic Energy Comm'n*,
449 F.2d 1109 (D.C. Cir. 1971) ................................................. 12

*Citizens Against Rails-to-Trails v. Surface Transp. Bd*,
267 F.3d 1144 (D.C. Cir. 2001) ................................................. 16

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................... 11

*City of Stillwell, Oklahoma v. Ozarks Rural Elec. Coop. Corp.*,
79 F.3d 1038 (10th Cir. 1996) .................................................... 21

*Clinch Coal. v. Damon*,
316 F. Supp. 2d 364 (W.D. Va. 2004) .......................................... 6

*Commercial Drapery Contractors v. United States*,
133 F.3d 1 (D.C. Cir.1998) .......................................................... 2

*Davis v. Morton*,
469 F.2d 593 (10th Cir. 1972) .................................................... 19

*Drake v. Fed. Aviation Admin.*,
291 F.3d 59 (D.C. Cir. 2002) ........................................................ 8

*Envtl. Def. Fund v. Matthews*,
410 F. Supp. 336 (D.D.C. 1976) ................................................. 12

*Envtl. Def. Fund, Inc. v. Costle*,
439 F. Supp. 980 (E.D.N.Y. 1977) ............................................... 6

*Everett v. United States*,
158 F.3d 1364 (D.C. Cir. 1998) .................................................. 14

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*,
    426 U.S. 776 (1976) .................................................................................. 4

*Grand Canyon Trust v. FAA*,
    290 F.3d 339 (D.C. Cir. 2002) .............................................................. 16

*In re Cajun Elec. Power Coop., Inc.*,
    109 F.3d 248 (5th Cir. 1997) ................................................................. 22

*Joans v. Lynn*,
    477 F.2d 885 (1st Cir. 1973) ................................................................... 9

*Karst Environmental Education and Protection, Inc. v. EPA*,
    475 F.3d 1291 (D.C. Cir. 2007) ...................................................... 19, 24

*Macht v. Skinner*,
    916 F.2d 13 (D.C. Cir. 1990) .......................................................... 23, 24

*Messina v. Krakower*,
    439 F.3d 755 (D.C. Cir. 2006) ................................................................ 2

*Mineral Policy Ctr. v. Norton*,
    292 F. Supp. 2d 30 (D.D.C. 2003) ....................................................... 16

*Minnesota Pub. Interest Research Group v. Butz*,
    498 F.2d 1314 (8th Cir. 1974) ............................................................... 23

*Molokai Homesteaders Co-op Ass'n v. Morton*,
    506 F.2d 572 (9th Cir. 1974) ............................................................ 9, 10

*Morgan City v. S. Louisiana Elec. Coop. Ass'n*,
    49 F.3d 1074 (5th Cir.) ........................................................................... 5

*Nat'l Ass'n for Advancement of Colored People v. Med. Ctr.*,
    584 F.2d 619 (2d Cir. 1978) ................................................................. 23

*Natural Resources Defense Council v. S.E.C.*,
    606 F.2d 1031 (D.C. Cir. 1979) ........................................................... 10

*Professional Reactor Operating Society v. U.S. Nuclear Regulatory Commision*,
    939 F.2d 1047 (D.C. Cir. 1991) ...................................................... 15, 16

*Rattlesnake Coal. v. EPA*,
    509 F.3d 1095 (9th Cir. 2007) ........................................................ 18, 20

*Rural Electrification Admin. v. No. States Power Co.*,
　　373 F.2d 686 (8th Cir. 1967) ...................................................... 10

*San Francisco Tomorrow v. Romney*,
　　472 F.2d 1021 (9th Cir. 1973) ...................................................... 9

*Scientists Institute for Public Information, Inc. v. Atomic Energy Commission*,
　　481 F.2d 1079 (D.C. Cir. 1973) ...................................................... 19

*Sierra Club v. Stamm*,
　　507 F.2d 788 (10th Cir. 1974) ...................................................... 5

*Sylvester v. United States Army Corps of Eng'rs*,
　　884 F.2d 394 (9th Cir. 1989) ...................................................... 15

*Trout Unlimited v. Morton*,
　　509 F.2d 1276 (9th Cir. 1974) ...................................................... 5

*United States v. S. Fla. Water Mgmt. Dist.*,
　　28 F.3d 1563 (11th Cir. 1994) ...................................................... 19

*Vill. Of Los Ranchos de Albuquerque v. Barnhart*,
　　906 F.2d 1477 (10th Cir. 1990) ...................................................... 19

*Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*,
　　988 F.2d 1480 (7th Cir. 1993) ...................................................... 5, 7, 18, 22

*Webster v. Doe*,
　　486 U.S. 592 (1988) ...................................................... 8

## FEDERAL STATUTES

7 U.S.C. § 904 ...................................................... 3, 8

7 U.S.C. § 907 ...................................................... 5, 14

7 U.S.C. § 916 ...................................................... 6

7 U.S.C. § 936e ...................................................... 3

7 U.S.C. § 936e(a) ...................................................... 4

7 U.S.C. § 936e(c) ...................................................... 4

7 U.S.C. § 1981(b)(4) ................................................................................................. 25

42 U.S.C. § 4332(2)(C) ............................................................................................... 16

42 U.S.C. § 7609(b) .................................................................................................... 15

107 Stat. 2342 (1992) ................................................................................................... 3

110 Stat. 888 (1996) ................................................................................................... 25

H.R. Rep. No. 103-381 (1993) ...................................................................................... 4

Pub. L. No. 103-201 ...................................................................................................... 3

Pub. L. No. 104-127 .................................................................................................... 25

S. Rep. No. 95-164 (1977) ............................................................................................ 6

## FEDERAL REGULATIONS

7 C.F.R. § 2.17(a)(20)(I) ............................................................................................. 14

7 C.F.R. § 2.47(a)(1) ................................................................................................... 14

7 C.F.R. § 1717.601 ...................................................................................................... 3

7 C.F.R. § 1717.850(d) ............................................................................................... 13

7 C.F.R. § 1780 ........................................................................................................... 13

7 C.F.R. § 1794 ........................................................................................................... 13

7 C.F.R. § 1794.3 ........................................................................... 11, 13, 14, 15, 16

40 C.F.R. § 1504.1 ...................................................................................................... 15

40 C.F.R. § 1504.3 ...................................................................................................... 15

40 C.F.R. § 1507.3(a) ........................................................................................... 13, 15

40 C.F.R. § 1508.18 .................................................................................................... 12

40 C.F.R. § 1508.18(b)(4) ........................................................................................... 17

## TABLE OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| I | Letter from Brian C. Toth, U.S. Department of Justice, to Nicholas Persampieri, Earthjustice (Feb. 8, 2008) |
| J | Letter from Brian C. Toth, U.S. Department of Justice, to Nicholas Persampieri, Earthjustice (Feb. 14, 2008) |

**<u>INTRODUCTION</u>**

As explained in Defendants' opening memorandum, the Rural Utilities Service ("RUS") prepared an environmental impact statement ("EIS") over 25 years ago for loans and guarantees (collectively, "loans") to Sunflower for the construction of the Holcomb power plant.  *See* Defs.' Mem. in Supp. of Mot. to Dism. (Doc. #15) at 5; *see also* Defs.' Exs. C, D (notices of availability of draft and final EIS).  Despite the fact that RUS is not providing any new loans or guarantees to Sunflower for the proposed addition of new coal-fired generating stations ("Holcomb Expansion") at the site of the old power plant, Plaintiff maintains that RUS's ongoing administration of the Sunflower loans is subject to judicial review and the requirements of the National Environmental Policy Act ("NEPA").  As explained in Defendants' opening memorandum and further explained herein, Plaintiff is wrong.

Plaintiff challenges various "consents" that RUS provided pursuant to financial agreements and security instruments that RUS has entered over the course of the more than 25-year history of administering the loans.  RUS provided those consents in an attempt to improve the likelihood of repayment and collection of Sunflower's outstanding debt to the government.  Plaintiff's argument that these consents constitute "approval" of the Holcomb Expansion lacks merit.  RUS is not providing any new loans or loan guarantees for the Holcomb Expansion.  Also, the loan contract at issue in this case does not contemplate that RUS is required to approve the construction plans and specifications for the Holcomb Expansion.  *See* Lunking Decl., Attach. 6 (2003 Loan Contract) at 10 (§ 4.15) (requiring approval of such plans only "if the construction will be financed in whole or in part by a loan made or guaranteed by RUS.").

Although Plaintiff cites various contract provisions to argue that RUS has the ability to exercise control over Sunflower, those provisions deal chiefly with financial requirements that

-1-

are typical concerns in a creditor-debtor relationship and do not show that RUS has the requisite

control or responsibility over the environmental aspects of the Holcomb Expansion to make the

project a major federal action subject to NEPA.  Plaintiff's complaint should be dismissed.[2/]

## ARGUMENT

**PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

I.    **RUS's Administration of its Loan Contracts Is Committed to Agency Discretion and Is Not Subject to Judicial Review**

      A.    **Loan Approval Provisions Pursuant to Loan Contracts and Security Instruments Do Not Give RUS Authority to Impose Environmental Restrictions On the Non-Federally Financed Holcomb Expansion**

Defendants' opening memorandum demonstrated that RUS's decision to consent to a

borrower's action pursuant to a term or condition of a loan contract or security agreement is

committed to agency discretion and does not provide for considerations other than the adequacy

of security for repayment of the loans.  Defs.' Mem. at 13-19.  Plaintiff responds by arguing that

RUS has the authority to consider environmental concerns and to impose environmental

---

[2]    Plaintiff's argument that RUS has "not been forthcoming" in responding to Plaintiff's efforts to obtain documents is without merit. Pl.'s Opp. at 3 n.1.  RUS responded to Plaintiff's August 17, 2006 Freedom of Information Act ("FOIA") request by providing two redacted volumes totaling 886 pages, as well as 63 pages of other materials.  *See* Pl.'s Ex. 5 at 2.  Similarly, RUS provided eight binders totaling 3,644 pages to Plaintiff in response to Plaintiff's August 13, 2007 FOIA request. *See* Pl.'s Ex. 7 at 1.  In addition, after filing the motion to dismiss in this case, Defendants responded to an informal set of requests for document production sent by Plaintiff.  *See* Defs.' Exs. I & J (attached hereto).  Plaintiff has not argued that Defendants' response to Plaintiffs' informal discovery was deficient, nor has Plaintiff identified any specific documents that prevent the Court from ruling on Defendants' motion.  *Cf. Messina v. Krakower*, 439 F.3d 755, 762 (D.C. Cir. 2006) (a stay of dispositive motion pending further discovery need not be granted "where the requesting party has offered only a 'conclusory assertion without any supporting facts' to justify the proposition that the discovery sought will produce the evidence required.") (citation omitted).  In any event, Plaintiff is not entitled to discovery in this case.  *See Commercial Drapery Contractors v. United States,* 133 F.3d 1, 7 (D.C. Cir.1998) (discovery is normally unavailable in an APA case, "except when there has been a strong showing of bad faith or improper behavior or when the administrative record is so bare that it prevents effective judicial review").

restrictions when exercising its approval rights under the Sunflower loan contracts and security instruments because the Rural Electrification Act ("RE Act") does not expressly prohibit RUS from doing so. Pl.'s. Opp. at 22. However, the RE Act indicates that the sole concern in RUS's retaining and exercising its approval rights pursuant to loan contracts and security agreements is to protect the security interest in the loans being repaid.

Section 904 gives the authority to the Secretary of Agriculture to make loans for rural electrification. 7 U.S.C. § 904. It also dictates that loans must be "on such terms and conditions relating to the expenditure of moneys loaned and the security therefor" and that loans "shall not be made unless the Secretary finds and certifies that in his judgment the security therefor is reasonably adequate and such loan will be repaid within the time agreed." *Id.*

A 1993 amendment to the RE Act demonstrates RUS's inability to impose environmental restrictions on a borrower's private business agreements. Prior to 1996, RUS had a historical practice of including standard approval provisions to loan contracts and security instruments as a way to protect the government's financial investment and security of repayment. *See* 7 C.F.R. § 1717.601. These provisions typically required RUS's consent for a substantial portion of operations pertaining to the borrower's electric system.

Recognizing that this type of oversight was no longer necessary for all types of borrowers, Congress amended the RE Act in 1993 to limit further RUS's regulatory authority for borrowers that had a reduced credit risk. *See* Rural Electrification Act of 1936, Amendment, Pub. L. No. 103-201, § 1, Sec. 306E, 107 Stat. 2342 (1992) (codified as amended at 7 U.S.C. § 936e). Subsection (a) of that amendment provides:

> For the purpose of relieving borrowers of unnecessary and burdensome requirements, the Administrator . . . shall issue regulations, applicable to any electric borrower . . . whose net

-3-

> worth exceeds 110 percent of the outstanding principal balance on loans made or guaranteed [by RUS], to minimize those approval rights . . . that the Administrator otherwise may establish with respect to the operations of such a borrower.

7 U.S.C. § 936e(a).  Even for electric borrowers who do not meet the "110 percent" financial criterion in Subsection (a), the 1993 amendment permitted the Secretary to establish requirements "guided by the practices of private lenders," for ensuring the adequacy of security of RUS's loans.  7 U.S.C. § 936e(c).

The House report describes the legislation as stripping RUS's authority to "deny or delay the granting of a lien accommodation" for qualified borrowers.  H.R. Rep. No. 103-381 (1993), at *2.  Even if, as Plaintiff argues, NEPA had applied to approvals issued pursuant to loan contracts, then section 936e, along with stripping RUS's authority to deny lien accommodations for qualified borrowers, would also have eliminated RUS's ability to conduct environment review on the activities being undertaken by such borrowers.  A further implication of Plaintiff's argument is that NEPA would apply to non-federally financed actions of credit risky enterprises, while other borrowers are exempt from review.  Such an outcome would make no sense, because the need for NEPA analysis does not turn upon the financial status of a borrower, but rather upon the nature of the agency's proposed action.  The structure and legislative history of the RE Act, therefore, support the conclusion that judicial review of Plaintiff's challenges to the RUS approvals is not available.

Plaintiff argues that because the RE Act does not impose a statutory deadline to act on a borrower's request for consent under the approval provisions, it is therefore not impossible to comply with NEPA.  Pl.'s Opp. at 26 (discussing *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776 (1976)).  This is not the argument that RUS makes.  As discussed above, the

-4-

statute and legislative history demonstrate that the contract terms do not give RUS the ability to impose environmental restrictions or to undertake a meaningful analysis of environmental impacts in this case. *See Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 988 F.2d 1480, 1490 (7th Cir. 1993) (regarding RUS as "a lending agency administering a federal credit program rather than a regulatory agency"). As RUS has demonstrated, RUS's review of Sunflower's proposed actions that are wholly funded by private non-federal parties is limited to review of whether those actions threaten the security of Sunflower's original loans. *See, e.g.*, e.g., *Morgan City v. S. Louisiana Elec. Coop. Ass'n*, 49 F.3d 1074, 1075 (5th Cir.), *cert. denied*, 516 U.S. 908 (1995) (noting that 7 U.S.C. § 907 reflects "a general federal policy of protecting the integrity of the REA's security interests").

**B.    Neither the Consideration of the Potential Costs of Future Carbon Dioxide Regulation Nor National Policy Concerns Provide the Basis for a Cognizable Claim**

Plaintiff argues that RUS make account for environmental factors by considering the "potential costs of coming into compliance with anticipated regulation" of carbon dioxide emissions, and further argues that an EIS would assist in such considerations. Pl.'s Opp. at 24-25, 25-16, *see also id.* at 2 (asserting that the likely need to comply with "anticipated" federal legislation regarding greenhouse gases poses a financial risk). Plaintiff's argument must be rejected, because a challenge to RUS's consideration of financial risks posed by Sunflower is not a cognizable claim under NEPA. NEPA does not require a calculation or monetization of environmental costs. *See Sierra Club v. Stamm*, 507 F.2d 788, 794 (10th Cir. 1974) ("[NEPA] does not require the fixing of a dollar figure to either environmental losses or benefits.").

Other courts have rejected attempts to require a monetized analysis of costs as part of a NEPA analysis. *See e.g.*, *Trout Unlimited v. Morton*, 509 F.2d 1276, 1286 (9th Cir. 1974)

(NEPA does not require a "formal and mathematically expressed cost-benefit analysis" because such a calculation would be highly subjective and the final decision is not wholly a mathematical determination); *Clinch Coal. v. Damon*, 316 F. Supp. 2d 364 (W.D. Va. 2004) (rejecting the claim that NEPA required the quantification of "non-timber values," such as environmental amenities, in the context of a timber sale); *Envtl. Def. Fund, Inc. v. Costle*, 439 F. Supp. 980, 993 (E.D.N.Y. 1977) ("We find no requirement in NEPA for the placement of dollar values on environmental impacts . . . ."). This court should do the same.

Plaintiff's citation to and quotation from the Senate Report for the Department of Energy ("DOE") Organization Act is irrelevant. Pl.'s Opp. at 9. The quoted passage states that the Secretary of Energy will promulgate guidelines for RUS to follow "in its approval of loans" for electric generation. *Id.* (quoting S. Rep. No. 95-164 (1977)). RUS has not approved any loans for the Holcomb Expansion, and nowhere is that alleged in Plaintiff's Complaint. The rest of the quoted passage is directed at DOE, not RUS. *See id.* (referencing the Senate's "intent" to temper the efforts of the "new Department," e.g., DOE, to manage energy, with consideration of potential impacts upon the environment).

Plaintiff argues that RUS has discretion to impose environmental controls upon the non-federally financed Holcomb Expansion because 7 U.S.C. § 916 requires RUS to coordinate electric generating and transmission financing with the national energy policy. *See* Pl.'s Mem. at 26; *see also id.* at 9 & Ex. 4. Since RUS is not providing new financing for the Holcomb Expansion, 7 U.S.C. § 916 does not apply here. Plaintiff fails to explain how RUS could meaningfully impose environmental restrictions on new plants that Sunflower could build even if RUS had withheld its approvals. *See* Defs.' Mem. at 29 n.18.[3] Further, when it comes to

---

[3]     As Defendants explained in their opening memorandum, RUS would have contractual
(continued...)

national policy, RUS will follow the President's Budget for Fiscal Year 2009, which does not provide RUS any loan funds for constructing new electric generation facilities. *See Budget of the United States Government, Fiscal Year 2009, Appendix,* at 162, *available at* http://www.whitehouse.gov/omb/budget/ fy2009/pdf/appendix.pdf (last visited March 19, 2008) ("[T]he Administration supports using the commercial market for construction of new generation facilities. Due to this, no loan funds are provided for the construction of new electric generation facilities."). In sum, Plaintiff's reference to national policy considerations does not help its case.

### C. Plaintiff Cannot Circumvent the Limitation on Judicial Review of RUS's Approvals Pursuant to Its Loan Contracts and Mortgage Agreements With a Challenge Under NEPA

Defendant's opening memorandum demonstrated that Plaintiff cannot circumvent the limitation on judicial review of RUS's consents by bringing a challenge under NEPA. *See* Defs.' Mem. at 19-20. Because the relief that Plaintiff seeks includes rescission of RUS's consents regarding the Holcomb Expansion and an injunction preventing RUS from providing those consents (Pls.' Compl. at 21), the relief is substantially the same as what Plaintiff would obtain by challenging the consents directly under the RE Act itself. Because such relief is not available in a direct challenge under the RE Act, it should not be available simply because Plaintiff alleges a violation of NEPA.

Plaintiff asserts that because the initial decision to fund a project requires NEPA review, it only makes sense that the terms and conditions of such loans, and RUS's exercise of its rights under the loans, are also subject to NEPA. Pl.'s Opp. at 32. Plaintiff conflates the initial

---

[3]     (...continued)
remedies to pursue to vindicate RUS's interest in repayment. *See Wabash Valley Power Ass'n*, 988 F.2d at 1484 (requiring RUS to rely upon its loan contract and mortgage to ensure adequate likelihood of repayment). The contractual remedies do not include a legal right for RUS to stop the non-federally financed construction.

decision to provide federal funding with the negotiation of the contract terms that determine the parties' rights and obligations during repayment.[4]   Considerations that go into RUS's initial decision of whether the project will be funded (e.g., meeting the RE Act's purpose to provide affordable and reliable electricity to rural areas) and how that project will be carried out (e.g., analyzing the environmental impacts and making a decision on how to carry out the proposed project) are distinct from RUS's setting the terms of the loan in the loan contract and exercising its rights under the loan contract and security agreement to protect repayment.

Negotiation of the loan contract terms is left to the discretion of the Secretary under Section 904, where it gives him authority to "make loans for rural electrification . . . on such terms and conditions relating to . . . the security therefor." 7 U.S.C. § 904. The statute does not provide a standard for judicial review of the Secretary's determination of the adequacy of security for a loan. It provides no factors RUS must consider in either the negotiation of the terms and conditions, nor exercise of its rights under the provisions of the loan contract, and provides no way for a court to review that decision. *See Webster v. Doe*, 486 U.S. 592, 599 (1988); *Drake v. Fed. Aviation Admin.*, 291 F.3d 59, 70 (D.C. Cir. 2002) (stating that section 701(a)(2) of the APA bars judicial review where "statutes are drawn in such broad terms that in a given case there is no law to apply").

---

[4]    For example, Plaintiff asserts that RUS "ignores the primary purpose of the RE Act" and "mischaracterizes its  interest as only protecting its security interest and getting its money back." Pl.'s Opp. at 23 n.5. While Plaintiff is correct that rural electrification is a central purpose of the RE Act, the focus of Plaintiff's case consists of decisions that were being made for many years as RUS has administered the outstanding loans. RUS has a statutory obligation to ensure that if a loan is to be issued, it must be on terms and conditions that provide adequate security that it will be repaid within the time agreed. 7 U.S.C. § 904. At this point in the history of Sunflower's loan, and given Sunflower's history of financial defaults, it would be wholly irresponsible for RUS to ignore the goal of obtaining repayment.  If RUS had wanted to further rural electrification through the Holcomb Expansion, then RUS likely would be financing the proposed project, which it is not.

The continued lender and borrower interactions pursuant to a loan contract and RUS's exercise of its rights under the loan contract do not transform every action that RUS takes pursuant to that loan contract into a major federal action requiring NEPA review. *See Molokai Homesteaders Co-op Ass'n v. Morton*, 506 F.2d 572, 580 (9th Cir. 1974). In *Molokai Homesteaders*, plaintiff asserted that the Department of the Interior ("Interior") was required to do a NEPA analysis before it sanctioned a federally-funded irrigation project to enter into a lease agreement with a corporation to use its facilities.[5] *Id.* at 580. The loan contract contained a provision that required the irrigation project be used primarily to provide irrigation water, while the lease agreement would allow the use of the irrigation project to deliver water to a proposed resort. *See id.* at 577.

The Molokai Homesteaders argued that because there was a loan contract in operation, any decisions that Interior made pursuant to that loan contract (including not objecting to the lease agreement) were major federal actions. *See id.* at 580. The Court rejected this theory, finding that the Secretary's right to object or not to object to violations of the contract could not be classified as major federal action. *Id.* The present case is similar to *Molokai Homesteaders*. Plaintiff is effectively arguing that any right that RUS exercises pursuant to a loan contract

---

[5]    Although Interior provided federal funding to the irrigation project under the Small Reclamations Project Act of 1956 prior to the passage of NEPA, the issue in the case was whether the agency's exercise of its right to take actions pursuant to the loan contract that occurred after NEPA was enacted could be considered major federal actions. *Molokai Homesteaders*, 506 F.2d at 580. In comparison, where additional federal funding is granted after NEPA was enacted to a project that was initially funded prior to NEPA, the additional funding is considered a major federal action requiring environmental review under NEPA. *See Joans v. Lynn*, 477 F.2d 885, 891 (1st Cir. 1973) (holding that NEPA analysis must be done if additional federal funds are provided even though the original funding was approved prior to NEPA's enactment). *But see San Francisco Tomorrow v. Romney*, 472 F.2d 1021, 1025 (9th Cir. 1973) (holding that HUD's additional funding to cover the rising cost of a project, which did not change the nature of the already approved project, involves no further major federal action). Here, because there is no new federal financing for the Holcomb Expansion, there is no major federal action, regardless of the relation to NEPA's enactment date.

-9-

provision becomes a major federal action throughout the term of a loan that extends several decades. As in *Molokai Homesteaders*, the Court should reject that argument.

Plaintiff argues that its challenge to RUS's consents is subject to judicial review because it is not a substantive challenge to the agency's decision, but a procedural one under NEPA. *See* Pl.'s Opp. at 31 (citing *Natural Resources Defense Council v. S.E.C.*, 606 F.2d 1031 (D.C. Cir. 1979)). In *Natural Resources Defense Council*, the plaintiffs challenged the SEC's decision not to prepare a NEPA analysis after the SEC declined to propose rules that would require comprehensive disclosures of corporate environmental and employment policies. The court distinguished between two different types of review: review of the SEC's procedural compliance with NEPA, which provided little difficulty for the court to review; and review of the substantive decision of the SEC not to adopt the rules. *Id.* at 1048-49.

Plaintiff here claims that it is bringing a procedural NEPA challenge to RUS's loan approvals because Plaintiff is challenging the decision not to prepare a NEPA document. Pl.'s Opp. at 31-32. However, when Plaintiff challenges RUS's decision not to include the potential cost of future environmental regulation into the decision of whether there is adequate security for Sunflower to repay the loan--as Plaintiff does in its opposition brief--that becomes a substantive challenge to the consents themselves. *See* Pl.'s Opp. at 24-25, 25-16 ; *see also supra* at Part I.B. The way a court reviews such a challenge "is far more circumscribed in scope." *See Natural Resources Def. Council*, 606 F.2d at 1049.

In sum, both the language and structure of the RE Act as well as the caselaw support the conclusion that judicial review of RUS's consents is not available. *See Alabama Power Co. v. Alabama Elec. Co-op., Inc*., 394 F.2d 672, 674 (5th Cir. 1968); *Rural Electrification Admin. v.*

*No. States Power Co.*, 373 F.2d 686, 700 (8th Cir. 1967). Plaintiff should not be allowed to circumvent the limitation on judicial review of RUS's approvals with a challenge under NEPA.

## II.    THE CHALLENGED APPROVALS DO NOT TRIGGER NEPA

### A.    The Letters and Agreements That Plaintiff Challenges Are Exempt From NEPA Under 7 C.F.R. § 1794.3, Because They Are Approvals Pursuant to Loan Contracts and Security Instruments

In the opening brief in support of this motion to dismiss, Defendants established that RUS has a regulation, 7 C.F.R. § 1794.3, promulgated through rulemaking nearly 10 years ago after notice through publication in the Federal Register and opportunity for comment, which specifies that approvals made "pursuant to" loan contracts or security instruments such as mortgage agreements, are not "actions" triggering RUS's NEPA procedures. Fed. Defs.' Mem. at 21-23. Defendants further established that the approvals that Plaintiff challenges all were made "pursuant to" various provisions of the loan contracts and mortgage agreements between RUS and Sunflower. *Id.* at 23-31.

With several minor exceptions explained below, Plaintiff does not dispute that most of the approvals and consents it challenges fall within the scope of 7 C.F.R. § 1794.3. Rather, although nowhere pled in its Complaint, Plaintiff now challenges the regulation itself as violating NEPA and the regulations issued by the Council on Environmental Quality ("CEQ").[6]

---

[6]    Because Plaintiff's Complaint did not include any reference to 7 C.F.R. § 1794.3--much less a challenge to that regulation as conflicting with NEPA--the Court should require Plaintiff to amend its Complaint before allowing Plaintiff to challenge the regulation. Based upon the Complaint as currently pled, the Court should afford RUS's actions taken in reliance upon the regulation a presumption of regularity and rule in RUS's favor dismissing the Complaint. *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (explaining presumption of regularity). The regulation is 10 years old and has never been subject to judicial challenge. Because RUS routinely relies upon the regulation when making approvals in the course of administering its existing loans, RUS would be prejudiced if the Court were to invalidate the regulation without having the full administrative record in support of the regulation.

Although Plaintiff argues that courts have "not hesitated" to invalidate agencies' NEPA regulations, both of the cases that Plaintiff cites for such a proposition are inapposite. Pl.'s Opp. at 28 (citing *Calvert Cliffs Coordinating Comm'n, Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971), and *Envtl. Def. Fund v. Matthews*, 410 F. Supp. 336 (D.D.C. 1976)). The *Calvert Cliffs* case involved a regulation that prohibited the Atomic Energy Commission's hearing boards from considering environmental issues until 14 months after NEPA's effective date. *Calvert Cliffs*, 449 F.2d at 1119. Given the length of the Commission's hearings, the result was that actions could be going forward without NEPA compliance possibly for more than two years after NEPA came into effect--a time lag that the court considered "shocking." Id. In *Matthews*, the challenged regulation expressly prohibited the Food and Drug Administration from acting on the basis of finding adverse environmental effects unless authorized by other substantive laws. 338.

Section 1794.3 is nothing like the regulations in *Calvert Cliffs* or *Matthews*. It does not expressly prohibit RUS from complying with NEPA or taking environmental impacts into consideration. Rather, it defines the type of "action" subject to NEPA as not including certain routine approvals undertaken pursuant to contracts that have already been negotiated and executed by RUS--in this case, after a full EIS was prepared before entering the original loan contract over 25 years ago.

Plaintiff's argument that an agency cannot pass a regulation that "exempts itself from NEPA where [the agency] takes major federal action," does not help Plaintiff's case. Pl.'s Opp. at 28. The CEQ's definition of "Major Federal action" provides chiefly that such actions are "potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Other than

offering a few broad of examples of categories within which federal actions "tend to fall," the CEQ regulations do not provide any specificity for what constitutes major federal action.

Instead, the CEQ regulations allow and in fact require agencies to promulgate "implementing procedures" that supplement the CEQ's regulations. *See* 40 C.F.R. § 1507.3(a). Agencies are also instructed that they "shall not paraphrase" the CEQ regulations. *Id*. It is not surprising, in light of the vague definition of major federal action in the CEQ regulations, that an agency such as RUS should develop and adopt after public notice and opportunity for comment,[7] a more specific definition of what "actions" within that agency's ordinary operations are those which trigger NEPA at all.[8]

Plaintiff relies upon 7 C.F.R. § 1717.850(d) to argue that compliance with NEPA "may be required" for lien subordination and releases. Pl.'s Opp. at 30. That regulation, however, is equivocal, and only states that RUS's NEPA procedures "may apply" to lien subordinations and releases "[u]nder certain circumstances." 7 C.F.R. § 1717.850(d). Section 1717.850(d) was adopted in October 1993, about five years before Section 1794.3. *See* 58 Fed. Reg. 53843 (Oct. 19, 1993). The provision only points to what "may" be required under RUS's NEPA procedures, and could not have been intended to exclude the possibility that a subsequent regulation, Section 1794.3, might specifically exempt approvals granted pursuant to existing contracts from the set of actions that triggers RUS's NEPA procedures.

---

[7]    RUS's procedures were promulgated nearly 10 years ago after publication in the Federal Register and notice and opportunity for comment. *See* 63 Fed. Reg. 68648 (Dec. 11, 1998) (codified at 7 C.F.R. Pt. 1794 & scattered provisions of 7 C.F.R. Pt. 1780).

[8]    Plaintiff attempts to confuse the issue by arguing that 7 C.F.R. § 1794.3 only affects RUS's implementing procedures and does not affect the CEQ regulations. Pl.'s Opp. at 27 n.7. However, as explained above, the CEQ's definition of "Major Federal action" is extremely general, providing only examples of broad types of major federal action. *See, e.g.*, 40 C.F.R. § 1507.3(a). The application of NEPA and the CEQ regulations to each individual agency is only given meaning through the details of the caselaw, and also through the agencies' supplementary procedures.

Plaintiff also argues that disposition of a borrower's assets is prohibited by 7 U.S.C. § 907.  Pl.'s Opp. at 30.  Section 907, however, only prohibits disposition of a borrower's assets prior to repayment "without the approval of the Secretary."  7 U.S.C. § 907.[9]  As explained in defendants' opening memorandum, the limitations on disposition of the borrower's assets are set forth in the relevant loan contracts and mortgage agreements.  *See* Defs.' Mem. at 26.  Both the 1987 Loan Contract and the 1988 Mortgage Agreement prevented Sunflower from disposing of its assets without notice to the Government.  See Lunking Decl., Attach. 2 (1987 Loan Contract) at 77, 81 (§ 5.02(f)); Lunking Decl., Attach. 3 (1988 Mortgage Agreement) at 17 (§4.05(c)); *see also* Defs.' Mem. at 26 (explaining provisions).[10]

To the extent that RUS was required to approve disposition of assets under 7 U.S.C. § 907, that right was exercised through the provisions of the loan contract and mortgage agreements.   RUS has a security interest in the borrower's assets, and hence, it is this arrangement that provides RUS with a right of approval that was exercised "pursuant to" the contract and mortgage agreement.   Such approvals fall squarely within the ambit of 7 C.F.R. § 1794.3, and this Court should defer to RUS's interpretation.  *See Auer v. Robbins,* 519 U.S. 452, 461 (1997) (an agency's interpretation of its own regulations is entitled to deference "unless plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted); *accord*, *Everett v. United States,* 158 F.3d 1364, 1367 (D.C. Cir. 1998).  Plaintiff's arguments

---

[9]      The Secretary's approval authority has been delegated to the Administrator of RUS.  *See* 7 C.F.R. § 2.17(a)(20)(i) (delegating to Under Secretary for Rural Development authority to administer the relevant provisions of the Rural Electrification Act of 1936); *see also* 7 C.F.R. § 2.47(a)(1) (delegating same to Administrator, RUS).

[10]      Section 4.05(c) of the 1988 Mortgage Agreement also allows the borrower, even without notice to the Government, to transfer assets of less than $50,000 in fair market value, up to $200,000 in the aggregate per year, if the proceeds are immediately applied as prepayment of the loan, or else set aside in a special account until prepayment of the notes is required.  *See* Lunking Decl., Attach. 3 (1988 Mortgage Agreement) at 17 (§4.05(c)).

that RUS approved lien subordinations, releases, or dispositions of assets that fall outside 7 C.F.R. § 1794.3 should therefore be rejected.

Plaintiff cites several cases where courts have given "de novo" review to agency determinations of whether an action constitutes major federal action, arguing that RUS's interpretation of NEPA is not due any deference. Pl.'s Opp. at 6-7, 29-30. None of the cases cited by Plaintiff appears to have involved an agency relying upon a definition of major federal action in a regulation promulgated after notice and opportunity for comment.

As explained in Defendants' opening brief (Defs.' Mem. at 24 n.14), the CEQ regulations provide a unique means by which either the Environmental Protection Agency ("EPA") or CEQ may object if an agency's NEPA procedures are unsatisfactory from the standpoint of environmental quality. *See* 42 U.S.C. § 7609(b); 40 C.F.R. § 1504.1 (discussing EPA's referral authority); 40 C.F.R. § 1504.3 (discussing procedures for resolution of referrals); 40 C.F.R. § 1507.3(a). Given this special arrangement, RUS's regulation stands in a different position than the ordinary case where an agency decides without any regulatory standard that NEPA is not triggered. *See Sylvester v. United States Army Corps of Eng'rs*, 884 F.2d 394, 399 (9th Cir. 1989) (noting that the procedure involving EPA and CEQ review of an agency's NEPA regulations is "not done as an idle exercise. It is to provide guidance to all who may be concerned, including courts.").

None of the cases Plaintiff cites involves an interpretation of NEPA found in a rule that was created through the special procedures discussed in *Sylvester*. In *Professional Reactor Operating Society v. U.S. Nuclear Regulatory Commision*, 939 F.2d 1047 (D.C. Cir. 1991), which did not involve NEPA, the D.C. Circuit declined to give deference to regulation that sequestered witnesses from their attorneys during administrative investigations conducted by the

-15-

Nuclear Regulatory Commission ("NRC"), finding that such rule violated a right to counsel conferred by the Administrative Procedure Act ("APA"). *Id.* at 1051. The court reasoned that the NRC was not owed deference because the NRC did not administer the APA, which is a generic statute providing for judicial review that does not contain any special objection procedures similar to the NEPA regulations. *See id.* While *Citizens Against Rails-to-Trails v. Surface Transp. Bd*, 267 F.3d 1144, 1151 (D.C. Cir. 2001), did involve NEPA, that case does not appear to have involved an agency's reliance upon a regulation promulgated through notice and comment rulemaking or the special provisions available for CEQ and EPA objections. Likewise for the other cases cited by Plaintiff. *See Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002); *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 53 n.26 (D.D.C. 2003).

### B. The Challenged Actions are Not "Major Federal Actions" Within the Meaning of 42 U.S.C. § 4332(2)(C), Because RUS Lacks the Discretion to Perform a Meaningful Analysis of Effects or Alternatives to Sunflower's Non-Federally Financed Project

Defendants demonstrated in their opening memorandum that in addition to being exempt, under 7 C.F.R. § 1794.3, from the definition of "actions" subject to RUS's NEPA procedures, the challenged approvals do not constitute "major Federal actions" within the meaning of the NEPA statute itself, 42 U.S.C. § 4332(2)(C). *See* Defs.' Mem. at 33-37. Defendants demonstrated that the approvals were not major federal actions because RUS, which is situated in a creditor-debtor relationship with Sunflower, lacks the discretion--either through its statute or its contractual authority--to condition the approvals on environmental considerations, in light of the fact that RUS is not providing new federal financing for the Holcomb Expansion. *See id*.

Plaintiff responds by arguing that RUS's actions are major federal actions because they are discretionary approvals of the new power plants (Pl.'s Mem. at 13-16), and that they

demonstrate RUS's "substantial involvement in, control over, financial interest in, and assistance to" the new power plants. *Id.* at 16, 17-22. As explained below, Plaintiff's arguments must fail.

### 1. The Challenged Consents Allow Different Financial Arrangements for Repayment of Sunflower's Debt But Do Not Constitute "Approvals" of the Holcomb Expansion

Plaintiff first argues that the challenged actions are "major Federal actions" because they constitute "[a]pproval[s] of specific projects" within the meaning of 40 C.F.R. § 1508.18(b)(4). *See* Pl.'s Opp. at 13-14. While RUS did provide its consent to several agreements related to the Holcomb Expansion through RUS's July 26, 2007 Letter, and also consented through an agreement dated September 30, 2002, to a corporate restructuring that Sunflower underwent in 2002, neither of those consents constitutes approval of the Holcomb Expansion itself.

According to Plaintiff's Complaint, the Holcomb Expansion could include up to three new 700-MW coal-fired electric generating units, producing an estimated 14 million tons of carbon emissions annually. Pl.'s Compl. ¶ 2. Although RUS provided financing for the original Holcomb Plant over 25 years ago, RUS will not be providing the financing to build the Holcomb Expansion. The other non-federal lenders will decide their own terms and conditions for their loans. Nonetheless, the contracts and mortgage agreements that RUS has negotiated, during the course of administering the more than 25-year-old loans to Sunflower, required RUS to provide approval for arrangements that Sunflower undertakes for development of the site, and for the transfer of assets, e.g., to another corporate entity.

RUS's ongoing administration of its longstanding loans to Sunflower, which began more than 25 years ago after preparation of an EIS, simply does not involve the requisite control over the environmental parameters of the Holcomb Expansion necessary to constitute federal "approval" of that project. The loan contract at issue does not contemplate that Sunflower would

need to seek approval of the construction plans and specifications.  *See*  Lunking Decl., Attach. 6 (2003 Loan Contract) at 10 (§ 4.15) (requiring approval of such plans only "if the construction will be financed in whole or in part by a loan made or guaranteed by RUS.").  Likewise, the sections of the contract marked as "Transmission and Distribution Designs" and "Construction Requirements" have been omitted.  *Id.* at 13 (§§ 4.21, 4.22) (marked as "Reserved").  Because RUS is not providing any new federal financing and, as such, has no ability to impose construction requirements for the Holcomb Expansion, the environmental effects from the Holcomb Expansion may not be attributed to RUS's actions.

Plaintiff also entirely glosses over its allegations against RUS's September 30, 2002 consent to Sunflower's restructuring.  *See* Fed. Defs.' Mem. at 24-27.  Nowhere does Plaintiff establish that the September 30, 2002 consent--or any of the other challenged consents--were legal prerequisites to construction of the Holcomb Expansion.  *See* Pl.'s Opp. at 15 (arguing that the challenged consents are "required for the Holcomb Expansion to proceed").  As explained in Defendants' opening memorandum (Defs.' Mem. at 29 n.18), if Sunflower had not sought and obtained RUS's consent prior to going forward with the Holcomb Expansion, then RUS would have contractual remedies to pursue to vindicate RUS's interest in repayment.  *See  Wabash Valley Power Ass'n*, 988 F.2d at 1484 (requiring RUS to rely upon its loan contract and mortgage to ensure adequate likelihood of repayment).  RUS, however, would not unilaterally have the ability to control the non-federally financed construction.  *See, e.g.*, *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1102 (9th Cir. 2007) ("The United States must maintain *decisionmaking authority* over the local plan in order for it to become a major federal action") (emphasis

added).[11] Plaintiff is therefore wrong that the challenged consents were legal prerequisites to the Holcomb Expansion.

The facts of this case are wholly unlike those in *Scientists Institute for Public Information, Inc. v. Atomic Energy Commission*, 481 F.2d 1079 (D.C. Cir. 1973) ("*SIPI*"), which Plaintiff cites. Pl.'s Opp. at 14. In *SIPI*, the court found that the Atomic Energy Commission had engaged in major federal action by undertaking a "major federal research program" to promote the development of a new fast breeder technology to be used in nuclear reactors. *SIPI*, 481 F.2d at 1091. The court observed that the Commission had identified the technology as a "priority program," had begun to help obtain acceptance for plants using the technology through government-assisted construction of such plants, and had issued a 10-volume plan. *Id.* at 1083. Here, RUS does not have any similar "program" but simply is administering longstanding loans in an attempt to collect repayment from one of RUS's borrowers.

Plaintiff's citation to a Tenth Circuit case, *Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972) (Pl.'s Opp. at 14), is distinguishable since that case, which involved the approval of a lease on Indian land, implicates the special concerns of the United States both in its trust relationship and its relationship as a co-sovereign. Likewise, Plaintiffs' citation to *Karst Environmental Education and Protection, Inc. v. EPA*, 475 F.3d 1291 (D.C. Cir. 2007), does not help its case. Pl.'s Opp. at 14. In *Karst*, the court stated that the D.C. Circuit has not adopted the theory that an otherwise non-federal project may be enjoined under NEPA based upon a theory

---

11    *See also United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994) (citation omitted) ("[T]he federal agency must possess actual power to control the nonfederal activity"); *Vill. of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1480-82 (10th Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991) (finding no major federal action where there was "no evidence that the federal government had the *actual power* to control this project") (emphasis added). In addition, Sunflower could have proceeded without RUS's approvals if Sunflower first repaid in full its debt from the original loan.

of "federalization."    475 F.3d at 1298 ("[W]e have no binding precedent adopting the federalization theory.").

In sum, RUS does not have the requisite level of control or responsibility over the construction and operation of the Holcomb Expansion necessary to constitute "approval" of that project.

### 2.    RUS Does Not Have the Requisite Control Necessary to Give Rise to Major Federal Action in Any Other Way Specified By Plaintiff

Although RUS provided its consent, pursuant to contractual requirements, to various financial arrangements related to the Holcomb Expansion, RUS does not have a sufficient level of control or responsibility over the Holcomb Expansion that would justify attributing to RUS the environmental responsibilities for the new plants.  As explained below, Plaintiff's arguments that RUS has "substantial control" over, financial interest in, and has provided assistance to, the Holcomb Expansion, would risk federalizing the longstanding and ongoing administration of RUS loan contracts, even where RUS has not provided financing for a new project.  Plaintiff's arguments should be rejected.

Plaintiff cites various provisions from the 2003 Loan Contract and Sunflower's mortgage agreements to argue that RUS has imposed "a number of requirements, restrictions, and controls" on Sunflower.  Pl.'s Opp. at 19-20.  Although the loan contracts provide for one-time approval or notice to the government of agreements for financing or development of the Holcomb Expansion, they do not demonstrate any ongoing "decisionmaking authority" over the new power plants themselves.  *See Rattlesnake Coal.*, 509 F.3d at 1102.  Many of the provisions deal with financial management and accounting, which are typical concerns for a lender concerned with repayment of outstanding loans.

For example, the requirement to deliver to RUS a list of contracts for the "Holcomb 2" power plant is in a section entitled, "Financial Statements, Reports, and Budgets," which otherwise requires reports of budget variances, audited balance sheets, earnings statements, cash flow and expenditures, and proposed rates. *See* Lunking Decl., Attach. 6 (2003 Loan Contract) at 11-12 (§ 4.19). These requirements show that RUS's inquiry was focused upon Sunflower's financial status, and they do not demonstrate the type of control necessary for RUS to undertake a meaningful analysis of environmental impacts from the Holcomb Expansion. *Cf. id.* at 10 (§ 4.15) (requiring submission of submit construction plans and specifications only "if the construction will be financed in whole or in part by a loan made or guaranteed by RUS"); *id.* at 13 (§§ 4.21, 4.22) (reserving sections labeled "Transmission and Distribution Designs" and "Construction Requirements").

Even the provisions that require RUS's approval prior to entering any arrangements regarding the development or use of the Holcomb site--which, together with the existing Holcomb Plant, secure the repayment of the outstanding loans--focus upon the financial "agreement or arrangements" for development. *See* Lunking Decl., Attach. 6 (2003 Loan Contract) at 17 (§§ 5.14, 5.15); *see also id.* at 15-16 (§5.4) (providing limitations on certain types of "contracts or arrangements," e.g., for power purchase, sale, delivery, marketing; and those involving options, futures, or hedges, among other things). This focus makes sense, given that RUS's primary concern at this point in the history of the loans is making sure that Sunflower does not enter any financial relationships that would jeopardize its further ability to repay RUS.

Plaintiff cites several older cases for the notion that RUS has "substantial control" over the business of RUS's borrowers. *See* Pl.'s Opp. at 17-18. All the recent cases, however, have demonstrated that RUS does not have authority to regulate its borrowers. *See City of Stillwell,*

*Oklahoma v. Ozarks Rural Elec. Coop. Corp.*, 79 F.3d 1038, 1045 (10th Cir. 1996) ("The RE Act does not purport to regulate the operation of rural electric cooperatives; it merely assists their operation by offering low interest financing."); *Wabash Valley Power Ass'n*, 988 F.2d at 1490 (regarding RUS as "a lending agency administering a federal credit program rather than a regulatory agency").[12]   For example, RUS does not have the ability to regulate the rates that electrical cooperatives charge their customers for the sale of electricity.  *See In re Cajun Elec. Power Coop., Inc.*, 109 F.3d 248, 251 (5th Cir. 1997) (RUS could not pre-empt state regulatory authority and raise power supply borrower's rates in order to raise that would enable borrower to repay its loans); *Wabash Valley Power Ass'n*, 988 F.2d at 1491 (rejecting RUS's attempt to regulate a power supply borrower's rates).

Further, because RUS is a lender rather than a regulator, any authority that RUS may have over its borrowers to seek repayment must be found in RUS's loan documents.  *See Wabash Valley Power Ass'n*, 988 F.2d at 1484 (RUS is "obliged to rely on its financing documents–the wholesale power contract, the loan contract, and the security instrument–to condition repayment and thereby protect itself.").  As previously discussed, the loan documents at issue here impose primarily financial controls and do not provide RUS with control over the Holcomb Expansion itself.  *See* Lunking Decl., Attach. 6 (2003 Loan Contract) at 10 (§ 4.15) (requiring submission of submit construction plans and specifications only "if the construction will be financed in whole or in part by a loan made or guaranteed by RUS").

Plaintiff's argument that the government's "financial interest" in a project is sufficient to federalize the action and subject it to NEPA, is off the mark.  Pl.'s Mem. at 20.  Because RUS is

---

[12]      *See also Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 386 (1983) ("[T]he REA is a lending agency rather than a classic public utility regulatory body in the mold of either FERC or the Arkansas PSC.").

in a long-term lender-borrower relationship with Sunflower, nearly anything that Sunflower does to generate income could possibly be used to make payments toward Sunflower's outstanding debt to the United States.  It simply would not make sense to require RUS, after more than 25 years of administering loans that have a long history including financial defaults and multiple financial restructurings, to sink more time and resources into analyzing the environmental effects of a new project by the borrower that RUS is not financing and for which it does not even have the contractual authority to request the construction plans.[13/] *See, e.g.*, Lunking Decl., Attach. 6 (2003 Loan Contract) at 10 (§ 4.15) (providing that Sunflower only needs to submit construction plans and specifications only "if the construction will be financed in whole or in part by a loan made or guaranteed by RUS."); *see also id.* at 4.22 (reserving the section on construction requirements).

The Eighth Circuit case cited by Plaintiffs regarding financial interest is distinguishable, since the timber sale activities in that case were occurring on federal property.  *See Minnesota Pub. Interest Research Group v. Butz*, 498 F.2d 1314, 1322 (8th Cir. 1974) (noting a "significant effect" on the Boundary Waters Canoe Area from the challenged logging).  In addition, the *Butz* decision is part of an old line of NEPA caselaw that incorrectly merged the issues of "major Federal action" and the significance of the environmental effects of that action.  *See id.* at 1321-22; *see also Nat'l Ass'n for Advancement of Colored People v. Med. Ctr.*, 584 F.2d 619, 627 (2d Cir. 1978) (declining to follow *Butz*).  Although not expressly addressing this issue, the D.C. Circuit has correctly evaluated "major Federal action" as a separate and threshold requirement for triggering NEPA.  *See, e.g.*, *Macht v. Skinner*, 916 F.2d 13, 16 n.4 (D.C. Cir. 1990) ("Unless

---

[13]     A discussion of some of the financial defaults and restructurings--which are described and demonstrated by some of the loan contracts themselves--is contained in Defendants' opening memorandum.  *See* Defs.' Mem. at 5-7.

-23-

a project involves major federal action, NEPA does not apply."), *limited on other grounds by Karst Envtl. Educ. & Prot.*, 475 F.3d at 1298. *Butz* simply does not apply here.

Similarly, the *Macht* case does not support a finding that RUS's involvement with the Holcomb Expansion is a "partnership" or "joint venture" with the government. *See* Pl.'s Opp. at 20. As already discussed *supra*, the D.C. Circuit has recently made clear that the "federalization" theory discussed in *Macht*, by which an otherwise non-federal project could somehow be subject to NEPA, was not adopted by the court and is not binding precedent. *See Karst Envtl. Educ. & Prot.*, 475 F.3d at 1298. In addition, the type of "joint venture" involved in the federalization theory is one that involves "contracting to obtain goods or services from a federal agency." *Macht*, 916 F.2d at 19. To justify federalization, the federal government's involvement must be "substantial." *Id.*; *see also Karst Envtl. Educ. & Prot.*, 475 F.3d at 1297.

Here, there is no allegation that RUS is providing goods or services to Sunflower for construction of the Holcomb Expansion. RUS's approvals are not "substantial" involvement in the Holcomb Expansion. RUS is not financing the new plants and under the loan contract is not required to approve the construction plans and specifications. *See* Lunking Decl., Attach. 6 (2003 Loan Contract) at 10 (§ 4.15). The provisions in the contract regarding transmission and distribution designs and construction requirements were also deliberately omitted. *See id.* at 13 (§§ 4.21, 4.22).

RUS's involvement in reviewing Sunflower's financing arrangements to establish whether the new plants would adversely affect or impair RUS's interest in repayment of the loans simply is too attenuated from the new plants and not "substantial" enough to warrant federalization. RUS is a creditor whose security interest lies with the original Holcomb Plant

-24-

and Sunflower's revenues until the loans mature.  The lenders for the Holcomb Expansion will set the terms and conditions for the new power plants.

The agreements described in Plaintiff's  memorandum involving execution and delivery of promissory notes (Pl.'s Opp. at 20-21), are simply the restructuring of existing, outstanding debt that the United States has been unable to collect in full over the more than 25-year-old history of its loans to Sunflower.  *See* Fed. Defs.' Mem. at 5-7 (describing various debt restructurings for Sunflower); *see also* Fed. Agric. Improvement & Reform Act of 1996, Pub. L. No. 104-127, § 748, 110 Stat. 888, 1128-29 (codified as amended at 7 U.S.C. § 1981(b)(4)) (providing the Secretary of Agriculture with authority to adjust or reduce debt owed to RUS, and to modify, release, or subordinate the terms of security instruments after notifying the Attorney General).  The argument that RUS has somehow entered a new "partnership" or "joint venture" with Sunflower simply because it has restructured existing loans to ensure a greater likelihood of repayment, loses sight of the fact that the agency's involvement with the Holcomb Expansion is due *solely* to RUS's responsibility to administer loans (more than 25 years old) for which RUS long ago prepared an EIS.  *See, e.g.*, Defs.' Ex. D (notice of availability of EIS).

Because the only "action" in this case is the ongoing administration of the Sunflower loans and not some new "partnership" or "joint venture" to support the Holcomb Expansion, Plaintiff has not stated a cause of action, and its Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons and those stated in Defendants' opening memorandum, the Court should dismiss Plaintiff's Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:  March 20, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

_____/s/ Brian C. Toth_____
BRIAN C. TOTH
JULIE S. THROWER
Trial Attorneys
Natural Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone:  202-305-0639
Facsimile:  202-305-0506
Email:  brian.toth@usdoj.gov

*Of counsel*:

TERENCE M. BRADY
Assistant General Counsel
HELEN HARRIS
Attorney
Rural Utilities Division
Office of General Counsel
United States Department of Agriculture

Attorneys for Defendants

-26-

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2008, I electronically filed the foregoing DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS and attached exhibits with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

> David S. Baron
> dbaron@earthjustice.org, zmaxfield@earthjustice.org,
> jjames@earthjustice.org, fsantana@earthjustice.org
>
> Nicholas F. Persampieri
> npersampieri@earthjustice.org

I also certify that the document will be served upon the following non-CM/ECF participants:

> None required.

>      /s/ Brian C. Toth
>   BRIAN C. TOTH
> Trial Attorney
> Natural Resources Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 663
> Washington, D.C. 20044-0663
> Telephone:  202-305-0639
> Facsimile:  202-305-0506
> Email:  brian.toth@usdoj.gov
>
> Attorney for Defendants



**U.S. Department of Justice**

Environment and Natural Resources Division

---

*Natural Resources Section*                                                    *Telephone (202) 305-0437*
*P.O. Box 663*                                                                 *Facsimile (202) 305-0506*
*Ben Franklin Station*
*Washington, DC  20044-0663*

February 8, 2008

Nicholas Persampieri, Esq.
Earthjustice
1400 Glenarm Place, #300
Denver, CO 80202
303-623-9466 (telephone)

      Re:    *Sierra Club v. U.S. Dep't of Agric. Rural Utils. Serv.*,
             Civ. No. 07-1860 (EGS) (D.D.C.)

*via overnight delivery*

Dear Mr. Persampieri:

    In your electronic mail correspondence of Tuesday, February 5, 2008 at 1:20 p.m., you requested several documents related to defendants' motion to dismiss the complaint in the above-referenced case.

    Enclosed please find a copy of the Debt Restructure, Override Agreement and Amended Restated Credit Agreement (June 30, 1987), excerpts from which were included as Attachment 2 to the declaration of Ivor Lunking ("Lunking Declaration") in support of defendants' motion to dismiss.

    You also noted that the Kansas 53-Sunflower, Amended and Restated RUS Loan Contract (No Future Advances) (June 1, 2003) ("2003 Loan Contract"), included as Attachment 6 to the Lunking Declaration, appears to be missing Exhibit D.  I have been in touch with an attorney at the United States Department of Agriculture ("USDA") who has looked at the official copy of the 2003 Loan Contract and has informed me that although the document references Exhibit D in the table of contents, there is not an "Exhibit D" attached to the official copy of the document.

    Finally, as I mentioned today by telephone, USDA currently possesses a loaned, bound hard copy of the draft environmental impact statement ("DEIS") and a loaned microfiche copy of the final environmental impact statement ("FEIS") for the original loan and loan guarantee to Sunflower Electric Cooperative, Inc., for the construction of the 280 MW coal-fired electric generating station near Holcomb, Kansas.  USDA is endeavoring to make arrangements to copy these documents and send them to you.  As I mentioned today by telephone, due to the fact that one of the documents is

on microfiche and the other document is over 25 years old, bound, and cannot be separated, copying will be labor-intensive and time consuming.

USDA is willing to allow you to view and inspect the FEIS and DEIS at USDA's offices in Washington, D.C. during regular business hours, should you choose to do so, if time is of the essence. Otherwise, USDA will continue making arrangements to make copies of the documents and send them to you. The United States would not object in the event that you need additional time to examine the DEIS and FEIS prior to filing your response to defendants' motion to dismiss.

Please do not hesitate to contact me with any questions you might have.

Sincerely,

Brian C. Toth
(202) 305-0639

enclosures (as stated)

- 2 -



**U.S. Department of Justice**

Environment and Natural Resources Division

---

*Natural Resources Section*                                              *Telephone (202) 305-0437*
*P.O. Box 663*                                                           *Facsimile (202) 305-0506*
*Ben Franklin Station*
*Washington, DC  20044-0663*

February 14, 2008

Nicholas Persampieri, Esq.
Earthjustice
1400 Glenarm Place, #300
Denver, CO 80202
303-623-9466 (telephone)

Re:     *Sierra Club v. U.S. Dep't of Agric. Rural Utils. Serv.,*
        Civ. No. 07-1860 (EGS) (D.D.C.)

*via Federal Express*

Dear Mr. Persampieri:

Enclosed please find copies of the following documents:

1.      Draft Environmental Impact Statement #USDA-REA-EIS (ADM)-79-9, REA
        Financing of a Proposed 280 MW Generating Facility at Holcomb, Kansas and
        Associated 345 kV Transmission Facilities Connecting Holcomb, Kansas to
        McCook, Nebraska for Sunflower Electric Cooperative (1 volume);

2.      Final Environmental Impact Statement #USDA-REA-EIS (ADM)-79-9-F, REA
        Financing of a Proposed 280 MW Generating Facility at Holcomb, Kansas and
        Associated 345 kV Transmission Facilities Connecting Holcomb, Kansas to
        McCook, Nebraska for Sunflower Electric Cooperative (2 volumes);

3.      Report on the Environmental Analysis for the Steam Electric Generating Plant for
        Sunflower Electric Cooperative, Kansas 53 Central, Hays, Kansas , #74-047-010
        (1 volume);

4.      Report on the Environmental Analysis for the Holcomb-Red Willow 345 kV
        Transmission Facilities for Sunflower Electric Cooperative, Kansas 53 Central, Hays,
        Kansas, #74-047-013 (1 volume).

//

//

*SCT*

Please do not hesitate to contact me with any questions you might have.

Sincerely,

Brian C. Toth
(202) 305-0639

enclosures (as stated)