## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB | ) | |
| | ) | Case No. 07-cv-01860-EGS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, RURAL UTILITIES SERVICE; | ) | |
| EDWARD T. SCHAFER, in his official capacity as | ) | |
| Secretary of Agriculture; JAMES M. ANDREW, in | ) | |
| his official capacity as Administrator, Rural Utilities | ) | |
| Service, United States Department of Agriculture | ) | |
| | ) | |
| Defendants, and | ) | |

SUNFLOWER ELECTRIC POWER
CORPORATION
P.O. Box 1020
301 West 13th Street
Hays, KS 67601-1020

                 Proposed Intervenor-
                 Defendant.

---

## MOTION TO INTERVENE OF SUNFLOWER ELECTRIC POWER CORPORATION

       Pursuant to Fed R. Civ. P. 24, Sunflower Electric Power Corporation ("Sunflower")

moves to intervene as Defendant in this case. Sunflower has executed certain business

transactions following the approvals of those transactions by the Rural Utilities Services

("RUS"), and Plaintiff seeks an injunction to rescind the RUS approvals in its Complaint, a copy

of which is attached hereto as Exhibit A. Pursuant to Fed. R. Civ. P. 24(a)(2), Sunflower is

entitled to intervene as a matter of right because it has an interest in the transactions to which the approvals relate. Should Plaintiff be granted the injunctions sought, such disposition will impair Sunflower's ability to protect its interest. If this Court determines that Sunflower is not able to intervene as a matter of right, then the Court in the alternative should exercise its discretion to permit Sunflower to intervene pursuant to Fed R. Civ. P. 24(b).

This Motion to Intervene is supported by the accompanying Memorandum of Points and Authorities in Support of Motion to Intervene.

Counsel for Sunflower has contacted counsel both for Plaintiffs and for Defendants regarding this motion. Counsel for Plaintiff opposes this motion to intervene. Counsel for Defendants takes no position regarding this motion to intervene.


Date: April 7, 2008


Respectfully submitted,


/s/   Matthew A. Axtell
MATTHEW A. AXTELL (D.C. Bar # 482349)
Vinson & Elkins LLP
1455 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
202-639-6588 (telephone)
202-639-6604 (facsimile)
maxtell@velaw.com


Of counsel:

CAROL E. DINKINS
SHARON M. MATTOX
Counsel for Sunflower Electric Power Corporation
Vinson & Elkins LLP
1001 Fannin Street, Suite 2500
Houston, Texas 77002

713-758-2528 (telephone)
713-758-4598 (telephone)
cdinkins@velaw.com
smattox@velaw.com


MARK CALCARA
General Counsel
Sunflower Electric Power Corporation
P.O. Box 1020
Hays, KS 67601-1020

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2008, I filed the Motion to Intervene and the Memorandum of Points and Authorities in Support of the Motion to Intervene with the Clerk of the Court though the CM/ECF system, which will send notification of such filing to the following email addresses:

Nicholas F. Persampieri
npersampieri@earthjustice.org

David Baron
dbaron@earthjustice.org

*Counsel for Plaintiff Sierra Club*

Brian C. Toth
brian.toth@usdoj.gov

Julie S. Thrower
julie.thrower@usdoj.gov

*Counsel for Defendants United States Department of Agriculture,*
*Rural Utility Service; Edward T. Schafer; and James M. Andrew*

/s/   Matthew A. Axtell
MATTHEW A. AXTELL (D.C. Bar # 482349)
Vinson & Elkins LLP
1455 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
202-639-6588 (telephone)
202-639-6604 (facsimile)
maxtell@velaw.com

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB | ) | Case No. 07-cv-01860-EGS |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, RURAL UTILITIES SERVICE; EDWARD T. SCHAFER, in his official capacity as Secretary of Agriculture; JAMES M. ANDREW, in his official capacity as Administrator, Rural Utilities Service, United States Department of Agriculture | ) ) ) ) ) ) ) | |
| Defendants, and | ) ) | |
| SUNFLOWER ELECTRIC POWER CORPORATION P.O. Box 1020 301 West 13th Street Hays, KS 67601-1020 | | |
| Proposed Intervenor-Defendant. | | |

---

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION TO INTERVENE OF SUNFLOWER ELECTRIC POWER CORPORATION

Pursuant to Fed. R. Civ. P. 24, Sunflower Electric Power Corporation ("Sunflower"), by and through the undersigned counsel, hereby submits this Memorandum in Support of its Motion to Intervene as a defendant in this case. Sunflower believes that the proper disposition of the Plaintiff's Complaint is dismissal pursuant to Fed. R. Civ. P. 12(b)(6) and that the Court has been thoroughly briefed on that issue. Sunflower files its Motion to Intervene and this memorandum in support of its Motion to secure its right to participate in the case.

The "right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130 (D.C. Cir. 1972). For the reasons cited below, Sunflower has a stake in the outcome of this proceeding and should be entitled to intervene as a matter of right. In the alternative, for the reasons discussed below, Sunflower should be permitted to intervene due to the existence of independent grounds for the Court's jurisdiction and the timeliness of Sunflower's Motion, and because Sunflower has claims and defenses in common with the main action.

## I. BACKGROUND.

Sunflower Electric Power Corporation ("Sunflower") is an electric generation and transmission cooperative headquartered in Hays, Kansas and owned exclusively by six consumer-owned distribution cooperatives. Sunflower is the successor to certain assets and liabilities of Sunflower Electric Cooperative, Inc. ("Old Sunflower"), which was a consumer-owned electric cooperative originally organized in 1957. *See* Complaint ¶¶ 29, 45. Among Sunflower's operating assets is the Holcomb Station in Holcomb, Kansas, a 360-megawatt power plant. *See* Complaint ¶ 2. The Holcomb Station provides a substantial portion of the energy for Sunflower's six distribution cooperative members, which serve retail customers in fifty-five rural Kansas counties.

Acting through the Rural Electrification Administration ("REA"), the predecessor to the Rural Utilities Service ("RUS"), the United States loaned $3,585,000 in August 1980 to Old Sunflower as financing for the Holcomb Station, and guaranteed an additional loan of $539,438,000 to Old Sunflower from a "legally organized and qualified lending agency pursuant to a contract of guarantee, satisfactory to REA." Declaration of Ivor Lunking Supp. Def.'s Mot.

Dismiss ("Lunking Decl."), Attach. 1.  According to the Plaintiff's Complaint, the Holcomb Station eventually cost approximately $465,000,000 to construct, and became operational in 1983.  Complaint ¶ 38.  Since the 1980 loan and loan guarantee, the United States has provided no new loan monies to Old Sunflower or Sunflower for the Holcomb Station or otherwise.  Today, RUS' sole involvement with Old Sunflower and Sunflower is to administer the existing loan agreement and security document in order to monitor Sunflower's ability to satisfy debt obligations to the United States that were incurred almost three decades ago.  *See generally* Complaint ¶ 66-90 (not alleging any new financial contribution of RUS for the Holcomb Station).  Moreover, RUS is but one of many secured noteholders, with the majority of Sunflower's debt now held by private lenders.  Lunking Decl. Attach. 7 at A-2, A-3.

In 2002, Old Sunflower's debt was restructured, whereby Old Sunflower sold substantially all of its assets to a new corporation, Sunflower.  Complaint ¶ 45.  The reorganization required the consent of all secured lenders (including RUS) as well as all unsecured noteholders.  *See* Complaint ¶ 50.  The arrangement did not diminish Old Sunflower's ability to satisfy its debt obligations, and all secured lenders and holders of unsecured indebtedness agreed to this sale, including RUS, which issued its approval and consent as of September 30, 2002.[1]  Lunking Decl. Attach. 4 at 27-32.  When providing its approval and consent, RUS' role was limited to the administration of Old Sunflower's existing loan agreement in order to monitor Old Sunflower's ability to satisfy its debt obligations to RUS.  RUS did not provide new loan monies to Old Sunflower or Sunflower through this approval and consent; rather, it received cash and new notes.  Lunking Decl. Attach. 4 at 14-15.

---

[1] Indeed, the 2002 Restructuring increased the likelihood of RUS repayment, since the alternative was inevitable bankruptcy for Old Sunflower.

In 2006 and 2007, Sunflower negotiated and entered into a series of agreements with Tri-State Generation and Transmission Association, Inc. ("Tri-State"), providing to Tri-State the option to purchase, finance, construct, and own up to two new electric generating units on property adjacent to the Holcomb Station. Lunking Decl. Attach. 8 at 3-4; Attach. 9. In addition, Sunflower negotiated letters of intent with Tri-State, Golden Spread Electric Cooperative, Inc., and Midwest Energy, Inc. regarding the potential development of a third unit at the site. The Tri-State units, along with a potential third unit to be developed by others,[2] have come to be known as the "Holcomb Expansion Project." Complaint ¶ 2. There was and is no plan for Sunflower to seek federal financial assistance for any portion of the Holcomb Expansion Project. Lunking Decl. Attach. 8, 9; see also Complaint ¶¶ 75-77 (alleging that Sunflower would operate the new units but not alleging any federal financial assistance for the new units). Nevertheless, Sunflower was contractually required to obtain consent from all secured lenders, including RUS, prior to entering into various transactions related to the potential project. Lunking Decl. Attach. 8 at 5 ("Sunflower must obtain the consent of RUS to enter into certain agreements and to take certain actions"). Accordingly, in September 2006, Sunflower requested RUS approval of various agreements with Tri-State: a purchase option and development agreement, long-term lease agreements, easements, and a non-disturbance agreement related to the first two potential units.[3] Complaint ¶ 87.

RUS conveyed its approvals on July 26, 2007. *See* Lunking Decl. Attach. 9 (July 26, 2007 RUS letter conveying consent). As with the 2002 restructuring, RUS' approvals evidenced its conclusion that these transactions support Sunflower's (and Old Sunflower's) ability to repay loan obligations to all creditors, including the United States. Lunking Decl. Attach. 9 at 1

---

[2] The first two units have come to be known as "TS-1" and "TS-2," and the third unit has come to be known as the "Eastern Unit." Complaint ¶¶ 75, 76.
[3] Sunflower also requested approval of letters of intent for the Eastern Unit. Complaint ¶ 79.

(Sunflower, Old Sunflower, and their corporate affiliates represent to RUS that "taking any action under the Project Documents will not, either individually or in the aggregate, have a material adverse impact or effect" on Sunflower, Old Sunflower, their corporate affiliates, or the existing Holcomb Station unit).

RUS has promulgated comprehensive NEPA policies and procedures that steer appropriate NEPA analysis and documentation to specific stages of the lending process.[4] *See* 7 C.F.R. § 1794.1 *et seq.* Pursuant to 7 C.F.R. § 1794.3, "[a]pprovals provided by RUS pursuant to loan contracts and security agreements" are excluded from the definition of actions subject to an independent NEPA analysis by RUS. The 2002 and 2007 approvals granted pursuant to the 1980 loan agreement fall squarely within 7 C.F.R. § 1794.3 and, therefore, are not actions subject to independent NEPA review. Nevertheless, on October 16, 2007, Plaintiff brought a single-count Complaint seeking a declaration from the Court that RUS, by issuing its approval of Old Sunflower's 2002 Debt and Corporate Restructuring, and by issuing its July 2007 approval of transactional agreements entered by Sunflower and third parties, violated NEPA by not preparing "an EIS or otherwise conducting adequate environmental analysis." *See* Complaint at 21 ¶ 1. Plaintiff does not recognize RUS' long-standing NEPA regulations in it is complaint, but instead seeks an order to rescind the RUS approvals, and an order for RUS to prepare "an EIS or otherwise analyzing and disclosing to the public all environmental impacts" of the potential Holcomb expansion before undertaking any approval action. *See* Complaint at 21 ¶ 2, 3.

---

[4] The Council on Environmental Quality ("CEQ") has promulgated regulations to implement the National Environmental Policy Act ("NEPA"). *See* 40 C.F.R. § 1500 *et seq.* Among those regulations, the CEQ requires federal agencies to issue their own "implementing procedures" to supplement CEQ's regulations. 40 C.F.R. § 1507.3(a).

## II. DISCUSSION.

Due to the significance of Sunflower's interests in Plaintiff's suit, and the significance of the potential consequences to Sunflower if Plaintiff is successful, Sunflower should be allowed to intervene as a matter of right under Fed. R. Civ. P. 24(a); alternatively, Sunflower should be permitted to intervene under Rule 24(b).

## A.    SUNFLOWER IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

The Federal Rules of Civil Procedure allow for intervention as a matter of right. Under Rule 24(a),

> Upon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a). Interpreting this rule, the D.C. Circuit has held that the qualification for intervention as a matter of right depends upon four factors:  (1) the timeliness of the Motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties. *Fund for Animals v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003) (internal quotations omitted). The D.C. Circuit has further held that, in addition to meeting the four factors, a party must also demonstrate that it has standing under Article III of the Constitution. *Id.* at 732. All of these requirements for intervention are met in this case.

**(1)    Sunflower has standing under Article III.**

Because standing presents a question relating to a court's ability to hear a case, it is addressed first. *See id.* To establish Article III standing generally, a party must show injury-in-fact, causation, and redressability. *Id.* at 732–33. Where a party is moving to intervene as a defendant, the standing inquiry addresses in particular the injury to the intervenor-party should the plaintiff be successful in the lawsuit. *See id.* at 733 (determining that intervenor "would suffer concrete injury if the court were to grant the relief the plaintiffs seek"); *Dimond v. Dist. of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (determining that intervenor had an interest in the suit where the district court's judgment in plaintiff's favor could expose the intervenor to various costs); *see also Glamis Imperial Corp. v. U.S. Dep't. of Interior*, 2001 WL 1704305, at *3 (D.D.C. Nov. 13, 2001) (unpublished). Financial loss that is traceable to the relief sought by a plaintiff is the type of concrete and imminent injury that suffices to create standing. *See, e.g., Fund for Animals*, 322 F.3d at 733; *Dimond*, 792 F.2d at 192.

As further set forth below, Sunflower's potential injury is financial loss, and the loss is threefold: (1) financial loss associated with the rescission of the 2002 and 2007 RUS approvals of Sunflower's business transactions; (2) financial loss associated with increased transaction costs in future business transactions, as Sunflower could no longer rely on RUS' NEPA regulation that excludes approvals "pursuant to loan contracts" from individualized NEPA review, 7 C.F.R. § 1794.3; and (3) financial loss as the legal status of past RUS approvals of Sunflower's transactions is complicated by a ruling in Plaintiff's favor. These financial losses are fairly traceable to and caused by the relief sought by the Plaintiff, the rescission of the 2002 and 2007 RUS approvals and the implicit invalidation of 7 C.F.R. § 1794.3. This injury could be redressed by granting the Defendant's Motion to Dismiss or otherwise rejecting Plaintiff's claims.

Should Plaintiff's claim succeed, the first type of financial loss that Sunflower could suffer is related to the rescission of the 2002 and 2007 RUS approvals of Sunflower's business transactions. The 2002 and 2007 RUS approvals are financially valuable to Sunflower. For example, the 2007 RUS approvals facilitated certain business agreements that Sunflower has executed with third parties. Should the approvals be rescinded, the status of these business transactions could be adversely affected. As stated in the Letter from James Andrew to Earl Watkins dated July 26, 2007, RUS executed an approval for Sunflower to enter into various agreements with Tri-State, and contemporaneous with the agency's delivery of that approval and agreement, Sunflower received $25 million from Tri-State under the purchase option and development agreement. *See* Lunking Decl. Attach. 9 at 2. In other words, a valid RUS consent to the purchase option and development agreement was a condition to Tri-State's obligation to make the option payment. Given the reliance that Sunflower has placed on the 2007 approvals to execute business transactions, such as the one described, if Plaintiff is successful and the 2007 approvals are rescinded, Sunflower could potentially suffer a multi-million dollar financial loss. Moreover, Sunflower has been an operating business since 2002 in reliance on the reorganization. If that reorganization is not valid, untold financial ramification may result.

The second type of financial loss is related to the financial impact on Sunflower's future business transactions should Sunflower no longer be able to rely on 7 C.F.R. § 1794.3. Under the loan agreements, RUS must execute approvals for a wide variety of business transactions. Pursuant to 7 C.F.R. § 1794.3, these approvals are "[a]pprovals provided by RUS pursuant to loan contracts and security agreements" and are not considered "actions" under NEPA, and, therefore, they are not subject to NEPA review. Accordingly, RUS has not conducted any independent environmental reviews of the many approvals it has issued following its 1980 loan

and guarantee, including the 2002 and 2007 approvals. None of those approvals constituted the approval of any additional federal financial assistance to Sunflower. Plaintiff challenges the 2002 and 2007 approvals, but, because RUS executed the 2002 and 2007 approvals in compliance with its own regulations, for Plaintiff's challenge to the approvals to succeed in the instant case, this Court would be required to find that RUS' regulations—which have undergone a full review by CEQ and the public—are themselves invalid under NEPA, at least with respect to these types of approvals.

RUS and Sunflower have relied upon 7 C.F.R. § 1794.3 to allocate NEPA analysis to the appropriate stages of the loan approval and administration process. Due to the reliance on the RUS regulation, the transaction costs associated with the RUS approvals have been predictable and low. Should the Court determine that an EIS or other NEPA documentation is required for actions such as the 2002 and 2007 approvals that fall squarely within 7 C.F.R. § 1794.3, Sunflower's otherwise routine business transactions would be adversely affected through the sudden and costly application of multiple rounds of new NEPA review. Hence, should Plaintiff be successful in its claim, Sunflower could suffer both significant delays and additional and heightened transaction costs due to repetitive rounds of NEPA review throughout the course of otherwise-routine future business transactions.

Third, a ruling in Plaintiff's favor would call into question the legal status of past RUS approvals for other Sunflower transactions at Holcomb in addition to the 2002 and 2007 approvals. RUS has issued multiple approvals of other Sunflower business transactions at the Holcomb Station similar in nature to the 2002 and 2007 approvals, both before and after the 2002 and 2007 approvals at issue in this case.[5] As stated, pursuant to its NEPA regulations, RUS

---

[5] For example, since July 2007, RUS has approved other Sunflower actions, including (i) an action to quiet title in Kansas courts, necessary to correct survey errors in deed and security document descriptions for the Holcomb site;

has not conducted an individualized NEPA review of these approvals, as they are approvals provided by RUS pursuant to loan contracts and security agreements. As further stated, for the Plaintiff to prevail in the instant case, the Court would be required to find that the RUS' regulation is itself invalid under NEPA. A ruling in favor of the Plaintiff would therefore raise the possibility that other such approvals of Sunflower transactions, whether involving Holcomb or other parts of Sunflower's business, and whether issued before or after the 2002 and 2007 approvals, were also executed in compliance and in reliance with invalid RUS regulations. Thus, a ruling in favor of the Plaintiff could adversely impact the finality and legal status of some or all of the approvals similar to the 2002 and 2007 approvals that RUS has already issued for many other Sunflower business transactions, each of which are financially valuable to Sunflower.[6]

### (2)    The Motion is timely.

The determination of the timeliness of a Motion to intervene rests with the sound discretion of the district court, but the district court should be more reluctant to deny the Motion when the intervention is sought as of right. *Williams & Humberts, Ltd. v. W.&H. Trademarks, Ltd.*, 840 F.2d 72, 74–5 (D.C. Cir. 1988). The timeliness of a Motion requires looking at the totality of the circumstances, and the point at which the suit has progressed is among the factors. *Nat'l Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973).

Sunflower filed the instant Motion on April 7, 2008, which is before the Defendant has filed its Answer to the Plaintiff's Complaint, and which is 18 calendar days after the Defendant's

---

and (ii) amendments to a development agreement with a third party independent power developer that clarified the amount and timing of potential development fees owed by Sunflower for the Holcomb Expansion Project.

[6] For example, in March 2007, RUS approved Sunflower's agreement to operate generation and transmission assets that Sunflower's consumer-owned member cooperatives, through Mid-Kansas Electric Company, LLC, purchased from Aquila, Inc., with wholly-private financing. *See Aquila, Inc., Mid-Kansas Electric Company, LLC,* 117 F.E.R.C. ¶ 61,276 (FERC 2006). In reliance on 7 C.F.R. § 1794.3, no environmental review was undertaken by RUS, and in reliance on 18 C.F.R. § 380.4, no environmental review was undertaken by the Federal Energy Regulatory Commission. *See* 18 C.F.R. § 380.4 (setting forth "projects or actions categorically excluded" from the preparation of an environmental assessment or an environmental impact statement); *see also* 52 Fed. Reg. 47987 (Dec. 17, 1987) (adopting this final rule over twenty years ago in 1987).

Reply Memorandum in Support of Motion to Dismiss. The instant Motion has been filed before the Court has ruled on any dispositive Motions. Because the instant Motion has been filed before the resolution of any substantive issues, it should be considered timely. *See, e.g., Mova Pharms. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (determining that the party's Motion to intervene was timely when it was filed before the district court ruled on the preliminary injunction); *Admiral Ins. Co. v. Nat'l Casualty Co.*, 137 F.R.D. 176, 177 (D.D.C. 1991) (determining that the party's intervention was timely when the major substantive issues in the case had not yet been resolved).

### (3)    Sunflower has an interest in the transactions at issue.

The D.C. Circuit has stated that demonstrating constitutional standing is "alone sufficient to establish that the [intervenor-party] has an interest relating to the property or transaction which is the subject of the action." *Fund for Animals*, 322 F.3d at 735 (*citing Mova Pharms.*, 140 F.3d at 1076); *see also Am. Horse Prot. Ass'n, Inc. v. Veneman*, 200 F.R.D. 153, 157 (D.D.C. 2001) (stating that "it is impossible to conjure a case in which an intervenor would have constitutional standing to intervene but not have a sufficient interest in the litigation to justify intervention"). Again, as discussed above, Sunflower has an interest in the RUS approvals that Plaintiff challenges because those approvals relate to Sunflower's ongoing business activities, and these transactions are financially valuable to Sunflower. *See Sierra Club v. Glickman*, 82 F.3d 106, 109 (5th Cir. 1996) (holding that the intervenors had a sufficient interest to justify intervention because the plaintiff's suit threatened the intervenors' contracts). Should an injunction be granted and the approvals be rescinded, then the transactions could be adversely affected, and Sunflower could suffer injury in the form of financial loss.

**(4)    Sunflower's interest may be impaired if Sunflower does not intervene.**

Quoting the Supreme Court, the D.C. Circuit has observed that "intervention aims to protect interests which are 'of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment.'" *United States v. AT&T*, 642 F.2d 1285, 1292 (D.C. Cir. 1980) (*quoting Smith v. Gale*, 144 U.S. 509, 518 (1892)). The D.C. Circuit has described the impairment prong as "looking to the practical consequences of denying intervention." *Fund for Animals*, 322 F.3d at 735.  The practical consequences of denying intervention are apparent from the discussion above: Sunflower stands to lose the approvals by RUS related to past and future business transactions that are financially valuable to Sunflower.

**(5)    Sunflower's Interest May Not Be Adequately Represented by Existing Parties.**

RUS, the federal Defendant, will not adequately represent the interests of Sunflower. The Supreme Court has stated that this "requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).  Even where interests are "similar but not identical," the D.C. Circuit has granted intervention. *AT&T*, 642 F.2d at 1293. The D.C. Circuit has also observed that there is a "relatively large class of cases in this circuit recognizing the inadequacy of governmental representation of the interests of private parties in certain circumstances." *Dimond*, 792 F.2d at 192 (*citing Natural Res. Def. Council v. Costle*, 561 F.2d 904, 912 n.41 (D.C. Cir. 1977); *Nuesse v. Camp*, 385 F.2d 694, 702–04 (D.C. Cir. 1967)).

Sunflower's interests will not be adequately represented by RUS.  Even though Sunflower and RUS both agree that RUS' approvals were lawful and in accordance with NEPA

requirements, Sunflower and RUS represent different types of interests. RUS represents the interests of a federal governmental agency; only Sunflower can represent its own interest as a private party. While both Sunflower and RUS are concerned with the propriety of RUS' approvals under federal law and federal regulations, Sunflower is additionally concerned with protecting its own financial stake in its underlying business transactions. Such divergence of interests leads parties to make different types of legal arguments and qualifies as the type of divergence that meets "a proposed intervenor's 'minimal' burden of showing that representation of its interest by existing parties may be inadequate." *Dimond*, 792 F.2d at 193.

## B.    IN THE ALTERNATIVE, THE COURT SHOULD PERMIT SUNFLOWER TO INTERVENE.

Alternatively, Sunflower should be allowed to intervene pursuant to the discretion granted to the Court under Fed R. Civ. P. 24(b). The objective of Rule 24(b) is to dispose of related controversies together, and thus, courts flexibly apply the rule to meet that goal. *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045–46 (D.C. Cir. 1998). In the D.C. Circuit, permissive intervention is "ordinarily" based upon consideration of the following factors: (1) the existence of an independent ground for the court's jurisdiction; (2) whether the action is timely; and (3) whether the putative intervenor has a claim or defense that has a question of law or fact in common with the main action. *EEOC*, 146 F.3d at 1045–46 (citing *Beckman Industries, Inc. v. International Insurance Co.*, 966 F.2d 470, 473 (9th Cir.1992)). A key inquiry for permissive intervention is the third factor—common questions of law or fact with the main action—as that language tracks the language of Rule 24(b). *See Me-Wuk Indian Community of the Wilton Rancheria v. Kempthorne*, 246 F.R.D. 315, 320 (D.D.C. 2007) (stating that permissive intervention was warranted on the basis of this factor). All of the requirements for permissive intervention are met in the instant case.

-13-

1.      **There are Independent Jurisdictional Grounds for Sunflower to Participate.**

There is little case law that informs how the first factor is applied in the context of a would-be intervening defendant. Notably, at least one panel of the D.C. Circuit has implicitly equated the first factor as essentially being a standing inquiry. *See In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 31 (D.C. Cir. 2000) (stating that "there is uncertainty over whether standing is necessary for permissive intervention" and referencing *EEOC*, which discusses independent jurisdictional grounds). As discussed above, Sunflower has Article III standing to appear in this case. Plaintiff seeks to order the rescission of the 2002 RUS approval of Old Sunflower's corporate restructuring, and of the July 2007 RUS approval of business transactions between Sunflower and third parties. Tri-State purchased an option in July 2007. If it pursues its announced plans, that option can be exercised and Tri-State can, with additional substantial consideration, buy land and an interest in existing common facilities so as to construct and own one or two units at the Holcomb site. Golden Spread, Tri-State and Midwest Energy have agreements to negotiate with Sunflower for development and financing of the potential third unit. No federal financial assistance is planned for any portion of the Holcomb Expansion Project. Moreover, Sunflower negotiated these arrangements relying on long-standing RUS rules that have for decades made it clear that RUS does not consider its loan and mortgage approvals to constitute control sufficient to require environmental review of wholly privately-financed facilities.

If the Plaintiff's requested relief is granted, the ongoing administration of existing loan agreements between Sunflower and the United States would be significantly more costly, time-consuming, and complicated and would, therefore, adversely affect Sunflower's financial and business commitments to other lenders and third parties. This would constitute an injury-in-fact caused by Plaintiff's suit, and would be redressed by a ruling against the Plaintiff. Thus, there is

standing and independent jurisdictional grounds for Sunflower to participate in this action, and Sunflower should be permitted to intervene.

**2.      The Motion is Timely, and Sunflower Will Not Delay or Prejudice Either Plaintiff or Federal Defendants.**

As set forth above, this Motion was filed on April 7, 2008, which is before the Defendant has filed its Answer to the Plaintiff's Complaint, and 18 calendar days after the Defendant's Reply Memorandum in Support of Motion to Dismiss.  Moreover, this Motion has been filed before the district court has ruled on any dispositive Motions.  Because the instant Motion has been filed before the resolution of any substantive issues, it should be considered timely.  *See, e.g., Mova Pharms.*, 140 F.3d at 1076 ; *Admiral Ins. Co.*, 137 F.R.D. at 177.

Sunflower's participation in this case will not prejudice the adjudication of Plaintiff's claims.  Plaintiff will still be allowed to offer the same factual and legal arguments they would advance if Sunflower were not a party to the case.  Moreover, Sunflower's participation will complement the existing litigation because Sunflower is the recipient of the approvals challenged in this case, and thus is a party in interest.  *See Sierra Club,* 82 F.3d at 109 (holding that the intervenors had a sufficient interest to justify intervention because the plaintiff's suit threatened the intervenors' contracts).  Indeed, should this case proceed beyond the Motion to dismiss, many questions may arise about the underlying business transactions associated with the challenged RUS approvals.  Sunflower would be best positioned to answer many of these questions for the benefit of the Court and all parties.  In such a context, Sunflower's participation would not impose any "untoward burden" towards the Plaintiff or Defendants.  *See Natural Res. Def. Council v. Costle*, 561 F.2d at 908.

3.    **Sunflower Has Defenses That Have Questions of Law and Facts in Common with the Main Action.**

Sunflower should also be permitted to intervene because it has defenses that have common questions of law and fact with the main action stemming from the claims of the Plaintiff. The actions challenged by the Plaintiff in this matter are approvals of Old Sunflower and Sunflower business transactions granted by RUS in 2002 and 2007. Plaintiff challenges RUS' decision to grant these approvals without conducting an independent NEPA review. Sunflower would raise defenses against the Plaintiff's claims so that the approvals at issue are not rescinded or altered to the detriment of Sunflower. Sunflower thus not only has common issues of law and fact with the Plaintiff's claims, but seeks to litigate the same legal and factual issues. Such a showing has been held to be sufficient grounds for permissive intervention. *See, e.g., Humane Soc'y of United States v. Clark*, 109 F.R.D. 518, 521 (D.D.C. 1985) (permissive intervention to groups concerned with issues raised in third party environmental lawsuit against governmental agencies); *Huron Envtl. Activist League v. EPA*, 917 F. Supp. 31, 43 (D.D.C. 1996) (industry representatives granted permissive intervention as defendants where they sought to raise defenses to claims brought by plaintiffs). In addition, Sunflower has an economic interest in the outcome of the matter, as the rescission of the RUS approvals would complicate the ongoing administration of existing loan agreements between Sunflower and the United States, and would adversely affect Sunflower's financial and business commitments to other lenders and third parties. Such an economic interest in the outcome has also been seen as grounds for permissive intervention. *See Textile Workers Union of Am. v. Allendale*, 226 F.2d 765, 769 (D.C. Cir. 1955).

## III. CONCLUSION

The "right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson*, 473 F.2d at 130. For the reasons cited above, Sunflower has a stake in the outcome of this proceeding and should be entitled to intervene as a matter of right. In the alternative, Sunflower should be permitted to intervene due to the existence of independent grounds for the Court's subject matter jurisdiction, due to the timeliness of Sunflower's Motion, and because Sunflower has claims and defenses in common with the main action.

Date: April 7, 2008

Respectfully submitted,

/s/   Matthew A. Axtell
MATTHEW A. AXTELL (D.C. Bar # 482349)
Vinson & Elkins LLP
1455 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
202-639-6588 (telephone)
202-639-6604 (facsimile)
maxtell@velaw.com

Of counsel:

CAROL E. DINKINS
SHARON M. MATTOX
Counsel for Sunflower Electric Power Corporation
Vinson & Elkins LLP
1001 Fannin Street, Suite 2500
Houston, Texas 77002
713-758-2528 (telephone)
713-758-4598 (telephone)

-17-

cdinkins@velaw.com
smattox@velaw.com

MARK CALCARA
General Counsel
Sunflower Electric Power Corporation
P.O. Box 1020
Hays, KS 67601-1020

# Motion to Intervene
# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIERRA CLUB<br>85 Second Street, 2nd Floor<br>San Francisco, CA 94105 | ) ) ) ) | |
| Plaintiff, | ) ) | No. _____ |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF<br>AGRICULTURE, RURAL UTILITIES SERVICE<br>1400 Independence Ave., S.W.<br>Washington, D.C. 20250 | ) ) ) ) ) | |
| CHARLES F. CONNER IN HIS OFFICIAL CAPACITY<br>AS ACTING SECRETARY, UNITED STATES<br>DEPARTMENT OF AGRICULTURE<br>1400 Independence Ave., S.W.<br>Washington, DC 20250 | ) ) ) ) ) ) | |
| JAMES M ANDREW, IN HIS OFFICIAL CAPACITY<br>AS ADMINISTRATOR, RURAL UTILITIES SERVICE,<br>UNITED STATES DEPARTMENT OF AGRICULTURE<br>1400 Independence Ave., SW<br>Washington, DC. 20250 | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiff, Sierra Club, challenges Defendant United States Department of

Agriculture, Rural Utility Service's ("RUS"), approval of a massive coal-fired power plant

expansion project in Western Kansas without first complying with the National Environmental

Policy Act, 42 U.S.C. §§ 4321 – 4370f ("NEPA").

1

2.      The proposed project, at the site of Sunflower Electric Power Corporation's
("Sunflower") existing 360 megawatt ("MW") coal-fired power plant in Holcomb, Kansas,
includes up to three new 700 MW coal-fired electric-generating units ("Holcomb Expansion
Project" or "Project").  It would be one of the nation's largest new sources of greenhouse gas
emissions.  If all three units are built, they would emit an estimated 14 million tons of carbon
dioxide into the air each year.  The new units will also emit other pollutants, including fine
particulate matter, sulfur dioxide and nitrogen oxides, all of which the U.S. Environmental
Protection Agency has concluded can cause significant adverse effects on human health and the
environment.  The global warming impacts of the proposed Project are so significant that the
Project has drawn the objections of the Attorneys General of California, Connecticut, Delaware,
Maine, New York, Rhode Island, Vermont and Wisconsin.

3       Despite the Project's significant effects on human health and the environment and
the significant public controversy this project has generated both within and outside of Kansas,
RUS failed to conduct any environmental analysis under NEPA before approving a number of
business agreements that are needed for the Project to be constructed and operated.

4.      The United States Department of Agriculture, initially through the Rural
Electrification Administration ("REA"), and, subsequently through RUS, has, since around the
time of organization of Sunflower's predecessor in the 1950s, provided financing for
Sunflower's electric-generation and transmission facilities.  In providing such financing, the
United States acquired extensive control over Sunflower's business, including the right to
approve any extensions or additions to Sunflower's electric-generation and transmission
facilities.

2

5.     RUS' approval of the Project without first preparing an environmental impact statement or otherwise analyzing the Project's environmental impacts and alternatives to the Project, including clean energy alternatives, violated NEPA.  RUS' violation of NEPA has deprived RUS, the citizens of Kansas, residents of downwind states and the nation with information that is critical to informed decisions on required government approvals for the proposed coal plant expansion project.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706.

7.     Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e) because Defendants reside in the District, and a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PARTIES

8.     Plaintiff, Sierra Club, is the nation's oldest grassroots environmental organization. The Sierra Club files this lawsuit on behalf of itself and its members.  The Sierra Club has more than 750,000 members nationwide, including approximately 4,675 members in Kansas.  It is dedicated to the protection and preservation of the natural and human environment.  One of the Sierra Club's main priorities, both nationwide and in Kansas, is to address the urgent problems of global warming, air pollution and our dependence on dirty, nonrenewable energy sources such as coal.  The Sierra Club and its members have long-standing interest and expertise in these issues.

3

9.      The Sierra Club has been actively involved in the permitting process for the Holcomb Expansion Project, and in promoting clean, efficient, economically beneficial alternatives to the Project.  The Sierra Club's Kansas Chapter has distributed tens of thousands of copies of informational documents regarding energy conservation and the benefits of wind power.  The Sierra Club filed extensive comments on proposed air and solid waste permits required for the Project, dozens of its members testified at state-sponsored hearings on the draft permits, and Sierra Club has a pending lawsuit in Kansas state district court to require an evidentiary hearing on the proposed air permit.

10.     Sierra Club members live and work in communities and on farms in portions of Western Kansas where air quality is likely to be adversely impacted by air pollution from the Holcomb Expansion Project.  They include senior citizens, people with asthma, and other individuals who are especially vulnerable to harm from exposure to very fine particulate matter (PM 2.5), sulfur dioxide, and other harmful air pollutants that will be emitted by the Project's new coal-fired electric-generating units.  Sierra Club members, including farmers who live in Western Kansas and elsewhere, will be adversely affected by drought and extreme weather events that are expected to increase due to global warming, to which the Project's massive carbon dioxide emissions will make a significant contribution. RUS' approval of the Holcomb Expansion Project injures the interests of the Sierra Club and its members in breathing clean air and curbing greenhouse gas emissions that cause global warming.

11.     Sierra Club members in Western Kansas will also be adversely affected by the impacts that the Project will have on development of clean energy alternatives, including wind power, in Western Kansas.  The project will flood the market with coal-generated electric power,

4

substantially impairing opportunities to meet electrical demand with clean energy alternatives, including wind power, which Western Kansas is especially well-suited to develop. The Project will thereby substantially the diminish the opportunity for Sierra Club members in Western Kansas to receive the greater environmental and economic benefits that would result from development of clean energy alternatives, including wind.

12.    The RUS' failure to prepare an environmental impact statement or otherwise comply with NEPA causes procedural injury to Sierra Club and its members by depriving them the protection of NEPA analyses and procedures required to ensure that environmental impacts of, alternatives to, and mitigation measures for the Project are carefully evaluated and considered prior to Project approval.

13.    The RUS' failure to prepare an environmental impact statement or otherwise analyze the Project's environmental impacts and alternatives to the Project also deprives the Sierra Club and its members of the opportunity to participate in the development of such environmental analysis and alternatives, and thereby influence decision-making related to the Project, and further deprives Sierra Club and its members of information about the Project that they would likely use in their advocacy and public education efforts.

14.    The injuries to the Sierra Club and its members resulting from the unlawful and arbitrary actions complained of herein would be redressed by an award of the relief sought in this complaint.

15.    Defendant Rural Utilities Service ("RUS") is a federal agency within the United States Department of Agriculture. The Department of Agriculture established RUS in 1994, in accordance with Congress' mandate set forth in the Federal Crop Insurance Reform and

Department of Agriculture Reorganization Act of 1994, 7 U.S.C. § 6942(a) ("Reorganization Act").

16.    The Reorganization Act charged RUS with carrying out, among other things, an electric loan program under the Rural Electrification Act of 1936, 7 U.S.C. §§ 901 et seq. Under Section 902(a) of the Rural Electrification Act, RUS is authorized to make loans for the purpose of furnishing and improving electric service in rural areas, and for the purpose of assisting electric borrowers to implement demand side management, energy conservation programs, and on-grid and off-grid renewable energy systems." 7 U.S.C. § 902(a).  Section 904 of the Rural Electrification Act authorizes RUS to make loans for rural electrification to corporations organized for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for furnishing and improving of electric service to rural areas, including by assisting borrowers to implement demand side management, energy conservation programs, and on-grid and off-grid renewable energy systems.

17.    Prior to the Reorganization Act, the Rural Electrification Administration ("REA"), an entity created by executive order in 1935 and subsequently made a federal agency within the United States Department of Agriculture by the Rural Electrification Act, was authorized to administer the electric loan program under the Rural Electrification Act.

18.    Defendant Charles F. Conner is Acting U.S. Secretary of Agriculture and in that capacity has final responsibility for actions taken by RUS.  Mr. Conner is sued in his official capacity.

19.    Defendant James M. Andrew is the Administrator of RUS and in that capacity has management responsibility for actions of RUS, including the agency's compliance with NEPA. Mr. Andrew is sued in his official capacity.

## **STATUTORY BACKGROUND**

20.    Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4331.

21.    To fulfill this goal, NEPA requires federal agencies to analyze the environmental impacts of a particular action before proceeding with that action. Id. § 4332(2)(C). In addition, federal agencies must notify the public of their proposed projects and allow the public to comment on the fully-disclosed environmental impacts of those projects. 40 C.F.R. § 1501.2.

22.    The cornerstone of NEPA is the environmental impact statement ("EIS"). An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

23.    "Major federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. 40 C.F.R. § 1508.18.

24.    Federal actions include "new and continuing activities, including projects . . . entirely or partly financed, assisted, conducted, regulated or approved by federal agencies." 40 C.F.R. § 1508.18(a). Federal actions requiring an EIS often occur when a federal agency "[a]pprov[es] . . . specific projects, such as construction or management activities located in a defined geographic area." 40 C.F.R. § 1508.18(b).

25.    In an EIS, the federal agency must (1) explore all reasonable alternatives to an action, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.14, (2) identify and disclose to the public all

impacts of the proposed action and each reasonable alternative, including direct, indirect and

cumulative impacts, 42 U.S.C. § 4332(2)(c), 40 C.F.R. §§ 1502.16, 1508.7 – 1508.8, and (3)

consider possible mitigation measures to reduce such impacts to the environment, 40 C.F.R. §

1502.14(f).

26.    The goals of an EIS are to "provide a full and fair discussion of significant

environmental impacts" associated with a federal decision and to "inform decision-makers and

the public of the reasonable alternatives which would avoid or minimize adverse impacts or

enhance the quality of the human environment."  40 C.F.R. § 1502.1.

27.    A federal agency must prepare a draft EIS and must request comments on the

draft EIS from relevant federal agencies, interested state, local and tribal governments, the

public, and other interested parties.  40 C.F.R. § 1503.1.  The federal agency must assess and

consider any comments in preparing the final EIS.  40 C.F.R. § 1503.4(a).

## FACTUAL BACKGROUND

### RUS' Loans to and Control Over Sunflower's Predecessor

28.    Sunflower Electric Power Corporation is an electric generation and transmission

corporation.  It provides electric power to six electric cooperatives in Western Kansas.

29.    The predecessor to Sunflower Electric Power Corporation was organized as

Sunflower Electric Cooperative, Inc., in 1957, and subsequently changed its name, first to

Sunflower Electric Power Corporation, and later to Sunflower Electric Holdings, Inc. ("Old

Sunflower").

30.    Around the time that it was organized, the United States provided its first loan to

Old Sunflower under the Rural Electrification Act.

31.     Over the years, the United States provided a number of direct loans and loan guarantees to Old Sunflower pursuant to the Rural Electrification Act, first through REA, and subsequently through RUS.

32.     Some of the loans guaranteed by the United States, through REA, were made by the Federal Financing Bank, a government corporation created by Congress that is under the supervision of the U.S. Department of Treasury.

33.     In connection with such loans and loan guarantees, Old Sunflower and the United States, first through REA and later through RUS, executed loan documents, including loan agreements and mortgages.

34.     The loan documents, including mortgages, provided the United States a security interest in Old Sunflower's assets.

35.     The loan documents, including loan agreements and mortgages, provided the United States, first through REA and later through RUS, extensive control over Old Sunflower's business.

36.     Mortgages executed and delivered by Old Sunflower to the United States include the following:

a.     Mortgage dated as of June 5, 1958, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 20, 1970;

b.     Supplemental Mortgage dated as of March 2, 1970, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 20, 1970;

c.     Supplemental Mortgage, dated on or about May 24, 1974, which was filed for record with the Registrar of Deeds, Finney County, Kansas on May 28, 1974;

     d.       Mortgage and Security Agreement dated as of February 9, 1976, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 26, 1976;

     e.       Supplemental Mortgage dated as of July 7, 1976, which was filed for record with the Registrar of Deeds, Finney County, Kansas on July 7, 1976;

     f.       Supplemental Mortgage dated as of January 10, 1978, which was filed for record with the Registrar of Deeds, Finney County, Kansas on January 13, 1978;

     g.       Supplemental Mortgage dated as of November 3, 1980, which was filed for record with the Registrar of Deeds, Finney County, Kansas on November 4, 1980;

     h.       Supplemental Mortgage and Security Agreement, dated as of November 1, 1984, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 21, 1985; and

     i.       Consolidated Mortgage, Security Agreement and Financing Statement, dated as of May 5, 1988, which was filed for record with the Registrar of Deeds, Finney County, Kansas on May 5, 1988.

     37.      Sunflower's primary resource for supplying electric power to the six electric cooperatives it supplies is Holcomb Station, located in Holcomb, Kansas. Holcomb Station includes a 360 MW coal-fired electric-generating facility ("Holcomb I").

     38.      Old Sunflower commenced site preparation for Holcomb I in May 1980, and the plant became operational on August 16, 1983. The total cost of plant construction was approximately $465 million.

     39.      On information and belief, the United States provided Old Sunflower construction financing for Holcomb I.

40.    The United States, through REA, approved the design of Holcomb I.

41.    On information and belief, the United States, through REA, approved the
construction of Holcomb I.

### RUS' Approval of Old Sunflower's Restructuring

42.    In November 2002, Old Sunflower underwent a major restructuring.

43.    As part of the November 2002 restructuring, Old Sunflower changed its name to
Sunflower Electric Holdings, Inc. ("SEHI").

44.    In connection with the November 2002 restructuring, a new corporation, SEP
Corporation was organized.

45.    As part of the November 2002 restructuring, most of the assets of Old Sunflower,
including Holcomb I, were transferred to SEP Corporation.

46.    As part of the November 2002 restructuring, SEP Corporation assumed much of
Old Sunflower's debt to the United States.

47.    In connection with the 2002 restructuring, a new limited liability company was
created named Holcomb Common Facilities, LLC ("HCF").

48.    As part of the 2002 restructuring, Old Sunflower transferred to HCF certain
property, including property slated for use in connection with construction of new coal units at
the site of the existing Holcomb I plant.

49.    The 2002 restructuring was designed to allow for the construction of one or more
additional coal units at the Holcomb site.

50.    RUS participated in and approved the 2002 restructuring.

11

**RUS' Agreements With and Control Over Sunflower After Its Restructuring**

51.    Subsequent to the November 2002 restructuring, SEP Corporation changed its name to Sunflower Electric Power Corporation, effective March 24, 2003.

52.    As part of and subsequent to the November 2002 restructuring, Sunflower (f/k/a SEP Corporation) entered into additional financing agreements with the United States, through RUS, and other creditors.

53.    In connection with such additional financing agreements, Sunflower executed and delivered additional loan documents to the United States, including the following mortgages:

a.    Mortgage, Security Agreement and Financing Statement dated September 30, 2002, which was filed for record with the Registrar of Deeds, Finney County, Kansas on November 25, 2002;

b.    Amended and Restated Mortgage, Security Agreement and Financing Statement, dated June 1, 2003, which was filed for record with the Registrar of Deeds, Finney County, Kansas on July 25, 2003;

c.    Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, which was filed for record with the Registrar of Deeds, Finney County, Kansas on April 23, 2004; and

d.    Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement, dated as of July 26, 2007, which was filed for record with the Registrar of Deeds, Finney County, Kansas on August 22, 2007.

54.    The mortgages executed and delivered to the United States by both Old Sunflower and Sunflower generally provide the United States a first lien on the respective corporation's assets, including electric-generation and transmission facilities.

55.    On information and belief, the Consolidated Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, remains effective and continues to provide the United States a security interest in property involved in the Holcomb Expansion Project.

56.    The Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, and the Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement, dated as of July 26, 2007, remain effective and continue to provide the United States a security interest in Holcomb I and in property involved in the Holcomb Expansion Project.

57.    Mortgages, and, on information and belief, other loan documents, including loan agreements, executed and delivered by Old Sunflower and Sunflower to the United States, provide the United States substantial control over the conduct of Sunflower's business and the use of Sunflower's property.  On information and belief, the documents providing such control include the Consolidated Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, and the Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement dated as of July 26, 2007.

58.    The Security Agreement and Financing Statement dated as of April 22, 2004 requires the United States to provide written consent before Sunflower may:

a.    construct, make, lease, purchase or otherwise acquire any extensions or additions to its electric generation and transmission system, or enter into any contract therefore;

b.    enter into any contract for the operation or maintenance of all or any part of its property;

c.    enter into any contract for the purchase of electric power or energy;

d.    enter into any contract for the sale for resale or sale to the ultimate consumer of electric power and energy;

e.    enter into any contract for any transmission, interconnection or pooling arrangements; or

f.    enter into any contract for the use by others of any of its property.

59.    The Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, imposes requirements that are virtually identical, except that they do not apply to sales of electric power and energy that does not exceed 1,000 kilowatts.

60.    The Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, and the Security Agreement and Financing Statement dated as of April 22, 2004, also provide, among other things:

a.    subject to contingencies beyond its reasonable control, mortgagor shall at all times keep its plant and properties in necessary continuous operating condition and use all reasonable diligence to furnish the customers served by it with an adequate supply of electric energy;

b.    Mortgagor shall not pay its directors any salaries for their services except as approved by the Government;

14

c.    Mortgagor shall not hire a general manager without the approval of the Government;

d.    Mortgagor may not make certain types of investments without the approval of the Government.

61.    Section 907 of the Rural Electrification Act, 7 U.S.C. § 907, prohibits any borrower of funds under Section 904 of the Act, without the approval of the Secretary of Agriculture, from selling or disposing of its property, rights, or franchises, acquired under the provisions of the Act, until any loan from the Rural Electrification Administration, including all interest and charges shall have been repaid.

62.    On information and belief, Sunflower is a borrower of funds under Section 904 of the Rural Electrification Act, due to it being either a direct borrower or due to its assumption of obligations to repay loans made to Old Sunflower.

63.    On information and belief, Old Sunflower is a borrower of funds under Section 904 of the Rural Electrification Act.

64.    On information and belief, loans obtained from the Rural Electrification Administration or RUS to Sunflower have not been fully repaid within the meaning of 7 U.S.C. § 907.

65.    On information and belief, loans from the Rural Electrification Administration or RUS to Old Sunflower have not been fully repaid within the meaning of 7 U.S.C. § 907.

### RUS' Approval of the Holcomb Expansion Project

66.    Sunflower is moving forward to implement the Holcomb Expansion Project, which includes up to three new coal-fired electric-generating units.

67.     The Holcomb Expansion Project also includes the expansion of an existing landfill that would allow for disposal of coal combustion wastes from the new coal-fired electric-generating units.

68.     The coal combustion wastes are to be disposed of in an unlined landfill above the Ogallala aquifer.

69.     The Ogallala aquifer is the region's primary source of water for drinking and other purposes.

70.     Electric power from the new coal-fired electric generating units is to be transmitted to customers by a number of transmission lines, including the proposed Eastern Plains Transmission Project.

71.     Sunflower is moving forward to implement plans for the Holcomb Expansion Project in collaboration with Tri-State Generation & Transmission Association, Inc. ("Tri-State"), Golden Spread Generation & Transmission Association, Inc. ("Golden Spread"), and Midwest Energy, Inc. ("Midwest Energy").

72.     Tri-State is an electric generation and transmission corporation that provides electric power to 44 electric cooperatives located in Colorado, New Mexico, Wyoming and Nebraska.

73.     Golden Spread is an electric generation and transmission corporation that provides electric power to 16 electric cooperatives located in Oklahoma and Texas.

74.     Midwest Energy is an electric and natural gas utility with operations in Western and Central Kansas.

75.    One of the proposed new coal-fired electric-generating units, known as "SF-2" or the "Eastern Unit," would be owned by Sunflower, Golden Spread, and Midwest Energy, and, on information and belief, one or more private investors.

76.    The other two proposed new coal-fired electric-generating units, known as TS-1 and TS-2, would be owned by Tri-State.

77.    Sunflower would operate all of the new units.

78.    Tri-State intends to transmit power from the coal-fired electric generating units that it acquires via the proposed Eastern Plains Transmission Project to Colorado, where connection would be made to Tri-State's existing electric transmission and generating facilities.

79.    On or about September 12, 2006, Sunflower requested the consent of RUS to proceed with execution of a number of business agreements that are required for construction of the Holcomb Expansion Project, including:

a.    A Purchase Option and Development Agreement by and among Sunflower, SEHI, Holcomb 2, LLC, HCF, and Tri-State ("Purchase Option and Development Agreement");

b.    A TS1 Site Lease Agreement by and between HCF and Tri-State;

c.    A TS2 Site Lease Agreement by and between HCF and Tri-State;

d.    An Access Easement Agreement by and among HCF, Sunflower, SEHI, and Tri-State;

e.    A letter of intent between Sunflower and Golden Spread; and

f.    A letter of intent between Sunflower and Midwest Energy.

80.    The Purchase Option and Development Agreement conveys to Tri-State an option to develop, build and own two pulverized coal-fired electric generating units, TS-1 and TS-2, as part of the Holcomb Expansion Project.

81.    The TS1 Site and TS2 Site Lease Agreements lease to Tri-State and convey to Tri-State an option to purchase the sites on which Tri-State proposes to build its coal-fired electric-generating units, TS-1 and TS-2.

82.    The Access Easement Agreement grants Tri-State an access easement over property owned by HCF, Sunflower and SEHI, for use in accessing the properties that are the subject of the TS1 Site and TS-2 Site Lease Agreements.

83.    The Letter of Intent between Sunflower and Golden Spread sets forth the parties' mutual understanding regarding Golden Spread's purchase of a 57.17% interest in the development, construction and operation of the Eastern Unit.

84.    The Letter of Intent between Sunflower and Midwest Energy sets forth the parties' mutual understanding regarding Midwest Energy's purchase of a 10.71% interest in the development, construction and operation of the Eastern Unit.

85.    On or about September 12, 2006, Sunflower also requested RUS's agreement to enter into a Subordination and Non-Disturbance Agreement with Tri-State and other Sunflower lenders, so that if RUS or another Sunflower lender forecloses its security interest, Tri-State's interests in developing TS-1 and TS-2 would not be affected.

86.    On information and belief, the transactions for which Sunflower sought RUS approval in connection with either the Holcomb Expansion Project or the 1982 restructuring, or

both sets of transactions, include the sale or disposition of property, rights or franchises acquired under the provisions of the Rural Electrification Act.

87.    On or about July 26, 2007 RUS provided Sunflower consent to enter into a number of agreements required for construction of the Holcomb Expansion Project to proceed, including the Purchase Option and Development Agreement, TS1 Site and TS2 Site Lease Agreements, Access Easement Agreement, and Subordination, Non-Disturbance and Attornment Agreements for TS1 and TS2.

88.    On information and belief, the Subordination, Non-Disturbance and Attornment Agreements prevent RUS's security interests under its mortgages from attaching to the new coal units to be constructed by Tri-State on the leased sites.

89.    In addition to approving the Project, the United States, through RUS, retains continuing control over the Project.

90.    The United States has a financial interest in the construction and operation of the Project.

### RUS' Failure to Comply With NEPA

91.    RUS did not prepare an environmental impact statement or otherwise comply with NEPA before the July 26, 2007 approvals described above, its agreement to release or modify its security interests, its approval of the 2002 restructuring, and, on information and belief, other approvals related to the Project that it has made, all of which are required for construction of the Holcomb Expansion Project to proceed.

92.    RUS failed to comply with NEPA, which requires, among other things, consideration of alternatives to a proposed project, despite the fact that the Rural Electrification

Act authorizes RUS to provide financing for alternatives to coal plants, including demand-side management, energy conservation programs, and on and off-grid renewable energy systems,

93.    The Holcomb Expansion Project will have significant effects on the quality of the human environment.  The Holcomb Expansion Project is one of the most controversial issues facing Kansas.

94.    The Project's new coal-fired electric-generating units will emit massive amounts of carbon dioxide, contributing to global warming and its devastating consequences, as well as other air pollutants, including fine particulates and sulfur dioxide, which are also harmful to human health and the environment.

95.    The Project's landfill expansion presents the potential for release of toxic metals to the Ogallala aquifer.

96.    The Project will use water from the Ogallala aquifer, contributing to drawdown of the aquifer on which the economy and well-being of the area depend.

97.    The Project's construction will foreclose opportunities to provide Western Kansas the development benefits of clean energy alternatives, including wind power.

## CLAIM FOR RELIEF

98.    The Sierra Club restates and incorporates by reference herein the allegations of Paragraphs 1 - 97, set forth above.

99.    Action undertaken by RUS, which was required for construction of the Holcomb Expansion Project to proceed, including RUS' approval of the agreements relating to the Project described above, its approval of the 1982 restructuring, and its agreement to release or modify security interests in property involved in the Project, is a major federal action significantly

affecting the quality of the human environment within the meaning of NEPA. 42 U.S.C. §

4332(2)(C).

100.    RUS has not prepared an environmental impact statement or other adequate

environmental analysis in accordance with NEPA before undertaking such major federal action.

RUS' undertaking of such action without complying with NEPA is arbitrary and capricious, an

abuse of discretion, not in accordance with law and without observance of law within the

meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). RUS' failure to comply with

NEPA is also agency action unlawfully withheld or unreasonably delayed within the meaning of

the Administrative Procedure Act, 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of

Plaintiff and against all Defendants and provide the following relief:

1.    Declare that Defendants violated NEPA by approving the Holcomb Expansion

Project through undertaking the actions described above without preparing an EIS or otherwise

conducting adequate environmental analysis;

2.    Order, through an injunction, the Defendants to rescind their approvals of

agreements required for construction of the Holcomb Expansion Project to proceed;

3.    Order, through an injunction, the Defendants to comply with NEPA by preparing

an EIS or otherwise analyzing and disclosing to the public all environmental impacts of the

Holcomb Expansion Project and all reasonable alternatives to the Project before undertaking any

action, including the approval of any agreement or the release of any security interest required

for construction of the Project to proceed;

4.    Award Plaintiff its costs and expenses, including reasonable attorneys' fees; and

5.    Award Plaintiff such other and further relief as the Court deems just and proper.

Dated this 16th day of October, 2007.

David S. Baron
DC Bar # 464222
Earthjustice
1625 Massachusetts Ave., NW
Ste. 702
Washington, DC 20036
Tel: (202) 667-4500
Fax: (202) 667-2356
Email: dbaron@earthjustice.org

Nicholas F. Persampieri
NM Bar # 3209
CO Bar # 37802
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
Tel: (303) 623-9466
Fax: (303) 623-8083
Email: npersampieri@earthjustice.org

Attorneys for Plaintiff Sierra Club

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SIERRA CLUB | ) | |
| | ) | Case No. 07-cv-01860-EGS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, RURAL UTILITIES SERVICE; | ) | |
| EDWARD T. SCHAFER, in his official capacity as | ) | |
| Secretary of Agriculture; JAMES M. ANDREW, in | ) | |
| his official capacity as Administrator, Rural Utilities | ) | |
| Service, United States Department of Agriculture | ) | |
| | ) | |
| Defendants, and | ) | |
| | | |
| SUNFLOWER ELECTRIC POWER | | |
| CORPORATION | | |
| | | |
| Intervenor-Defendant. | | |

## ORDER GRANTING MOTION TO INTERVENE BY SUNFLOWER ELECTRIC POWER CORPORATION

Upon consideration of Sunflower Electric Power Corporation's ("Sunflower") motion to intervene as Defendant in this case, and pursuant to Fed. R. Civ. P. 24, it is ordered that Sunflower's motion to intervene is granted.

Dated: _____

_____
The Honorable Emmet G. Sullivan
United States District Judge