**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ─────────────────────────────── ) | |
| SIERRA CLUB, ) | |
| ) | Case No. 07-1860-EGS |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| AGRICULTURE, RURAL UTILITIES ) | |
| SERVICE, <u>et al.</u>, ) | |
| ) | |
| Federal Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| SUNFLOWER ELECTRIC POWER ) | |
| CORPORATION, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ─────────────────────────────── ) | |

**FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND .................................................................................................2

STANDARD OF REVIEW ....................................................................................................2

    I.    Summary Judgment Standard of Review .................................................................2

LEGAL BACKGROUND ......................................................................................................3

    I.    National Environmental Policy Act ........................................................................3

        A.    Overview of the statute ...............................................................................3

        B.    Rural Utilities Service's NEPA implementing procedures.........................4

    II.    Rural Electrification Act .........................................................................................5

ARGUMENT .........................................................................................................................6

    I.    The Holcomb Expansion Project is not a major federal action within the meaning of NEPA...............................................................................................................6

        A.    A non-federal project may be a "major federal action" only when the private project is "subject to federal control and responsibility .................7

            i.    Even where federal agency "affirmative conduct" is required, a non-federal project is not a "major Federal action" where there is insufficient federal control and authority over the environmental aspects of the non-federal project ....................................................8

            ii.    Federal assistance without sufficient federal involvement in the non-federal project, does not turn a non-federal project into a "major Federal action...................................................................12

        B.    RUS did not approve of the Holcomb Expansion Project, and RUS lacks the requisite authority to control the environmental aspects of the Project ......................................................................................................13

            i.    RUS's consent to the 2002 restructuring is not an approval of the Holcomb Expansion Project and RUS lacks discretion to control the environmental aspects of the Project .......................................14

i

    ii.  The 2007 approvals and the existing loan and mortgage documents do not give RUS control over the Holcomb Expansion Project ........................................................................19

  C.  RUS did not substantially assist and is not substantially involved in the Holcomb Expansion Project .....................................................................23

II.  RUS lacks discretion to perform a meaningful analysis of the impacts from or alternatives to the Holcomb Expansion Project ....................................................29

III.  7 C.F.R. § 1794.3 exempts RUS's actions from NEPA review............................33

  A.  The 2002 debt restructuring and the alleged lien subordination were approvals pursuant to a loan contract, were not "financial assistance for new construction" and therefore, fall within the ambit of 7 C.F.R. § 1794.3 ...................................................................................33

  B.  RUS's actions are consistent with CEQ regulations..................................34

IV.  Sierra Club is not entitled to the remedy it seeks...................................................35

  A.  Injunctive relief is an extraordinary remedy.............................................35

  B.  Sierra Club will not suffer irreparable harm in the absence of a permanent injunction ...................................................................................................37

  C.  The balance of hardships between the parties weighs against a permanent injunction ...................................................................................................38

  D.  Even assuming irreparable injury, Sierra Club's request for injunctive relief is overbroad .....................................................................................39

CONCLUSION...........................................................................................................................41

# TABLE OF AUTHORITIES

## CASES

Alaska v. Andrus,
580 F.2d 465 (C.A.D.C. 1978)................................................................36, 37

Alpo Petfoods, Inc. v. Ralston Purina Co.,
913 F.2d 958 (D.C. Cir. 1990) ......................................................................39

Amoco Prod. Co. v. Vill. of Gambell,
480 U.S. 531 (1987)................................................................................35, 36

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)........................................................................................2

Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n,
461 U.S. 375 (1993)......................................................................................30

Auer v. Robbins,
519 U.S. 452 (1997)......................................................................................34

Butler v. Principi,
244 F.3d 1337 (Fed. Cir. 2001)....................................................................40

Califano v. Yamasaki,
442 U.S. 682 (1973) ....................................................................................40

Camp v. Pitts,
411 U.S. 138 (1973)........................................................................................2

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)........................................................................................2

Citizens Against Rails-to-Trails v. Surface Transp. Bd.,
267 F.3d 1144 (D.C. Cir. 2001)...................................................................3, 4

Citizens Alert Regarding the Env't. v. Envtl. Prot. Agency,
259 F. Supp. 2d 9, [] (D.D.C. 2003) ...................................................8, 13, 14

City of Boston v. Volpe,
464 F.2d 254 (1st Cir. 1972) ........................................................................11

City of Stilwell v. Ozarks Rural Elec. Co-op Corp.,
79 F.3d 1038 (10th Cir. 1996) .....................................................................30

Coal. for Underground Expansion v. Mineta,
     333 F.3d 193 (D.C. Cir. 2003) ...........................................................................24, 26

Cuomo v. U.S. Regulatory Comm'n,
     772 F.2d 972 (D.C. Cir. 1985)....................................................................................36

Dalsis v. Hills,
     424 F. Supp. 784 (W.D.N.Y. 1976)............................................................................27

Davis v. Morton,
     469 F.2d 593 (10th Cir. 1972) ....................................................................................27

Dep't of Transp. v. Pub. Citizen,
     541 U.S. 752 (2004)................................................................................................ 3, 29

eBay Inc. v. MercExchange,
     547 U.S. 388 (2006)..............................................................................................36, 38

Envtl. Def. Fund v. Marsh,
     651 F.2d 983 (5th Cir. 1981) .....................................................................................37

Everett v. United States,
     158 F.3d 1364 (D.C. Cir. 1998)..................................................................................34

Florida Audubon Soc'y v. Bentsen,
     94 F.3d 658 (D.C. Cir. 1996).....................................................................................38

Found. on Econ. Trends v. Heckler,
     756 F.2d 143 (D.C. Cir. 1985)...............................................................................10, 17

Foxtrap, Inc. v. Foxtrap, Inc.,
     671 F.2d 636 (D.C. Cir. 1982) ..............................................................................38, 40

Friends of the Earth v. U.S. Army Corps of Eng'rs,
     109 F. Supp. 2d 30 (D.D.C. 2000).........................................................................14, 17

Fund for Animals v. Clark,
     27 F. Supp. 2d 8 (D.D.C. 1998)............................................................................12, 28

Gulf Oil Corp. v. Brock,
     778 F.2d 834 (D.C. Cir. 1985) ...................................................................................40

Jones v. Lynn,
     477 F.2d 885 (1st Cir. 1973).......................................................................................23

Landmark West! v. U.S. Postal Serv.,
    840 F. Supp. 994 (S.D.N.Y. 1993) ............................................................................11

Lands Council v. McNair,
    537 F.3d 981 (Idaho Ct. App. 2008)........................................................................36

Laub v. U.S. Dep't of Interior,
    342 F.3d 1080 (9th Cir. 2003) ..................................................................................28

Lujan v. Nat'l Wildlife Fed'n,
    497 U.S. 871 (1990)....................................................................................................2

Macht v. Skinner,
    916 F.2d 13 (D.C. Cir. 1990) ............................................................................. passim

Marsh v. Or. Natural Res. Council,
    490 U.S. 360 (1989)....................................................................................................3

Md. Conservation Council v. Gilchrist,
    808 F.2d 1039 (4th Cir. 1986) ..................................................................................10

Mineral Policy Ctr. v. Norton,
    292 F. Supp. 2d 30 (D.D.C. 2003) .........................................................................7, 8

Minnesota Pub. Interest Research Group v. Butz,
    498 F.2d 1314 (8th Cir. 1974) ..................................................................................27

Molokai Homesteaders Co-op. Ass'n v. Morton,
    506 F.2d 572 (9th Cir. 1974) .............................................................................11, 12

Morgan City v. S. Louisiana Elec. Coop. Ass'n,
    49 F.3d 1074 (5th Cir.), cert. denied, 516 U.S. 908 (1995)........................................5

Morris County Trust for Historic Pres. v. Pierce,
    714 F.2d 271 (3d Cir. 1983)........................................................................10, 11, 23

Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n,
    606 F.2d 1261 (D.C. Cir. 1979) ................................................................................37

Nat'l Ass'n for the Advancement of Colored People v. Med. Ctr., Inc.,
    584 F.2d 619 (3d Cir. 1978)...................................................................................8, 27

Nat'l Org. for the Reform of Marijuana Laws v. U.S. Drug Enforcement Admin.,
    545 F. Supp. 981 (D.D.C. 1982) ..........................................................................12, 28

Nat'l Wildlife Fed'n v. Burford,
      835 F.2d 305 (D.C. Cir. 1987) ..................................................................36

Norton v. S. Utah Wilderness Alliance,
      542 U.S. 55 (2004) ....................................................................................40

Piedmont Heights Civic Club v. Moreland,
      637 F.2d 430 (5th Cir. 1981) ....................................................................38

Rattlesnake Coal. v. U.S. Envtl. Prot. Agency,
      509 F.3d 1095 (9th Cir. 2007) ...........................................................13, 24

Realty Income Trust v. Eckerd,
      564 F.2d 447 (D.C. Cir. 1977) ..................................................................36

S.W. Williamson County Cmty. Ass'n, Inc. v. Slater,
      243 F.3d 270 (Tenn. 2001) ..............................................................9, 18, 28

Sancho v. U.S. Dep't of Energy,
      578 F. Supp. 2d 1258 (D. Haw. 2008) ......................................................13

Save Barton Creek v. Fed. Hwy. Admin.,
      950 F.2d 1129 (5th Cir. 1992) ....................................................................8

Save the Bay, Inc. v. U.S. Army Corps of Eng'rs,
      610 F.2d 322 (5th Cir. 1980) ......................................................................8

Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n,
      481 F.2d 1079 (D.C. Cir. 1973) ...........................................................10, 17

United States v. Chem. Found., Inc.,
      272 U.S. 1 (1926) ......................................................................................40

United States v. S. Fla. Water Mgmt. Dist.,
      28 F.3d 1563 (11th Cir. 1994) ....................................................................8

Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,
      435 U.S. 519 (1978) ....................................................................................3

Wabash Valley Power Ass'n v. Rural Electrification Admin,
      988 F.2d 1480 (7th Cir. 1993) ...............................................21, 30, 31, 34

Weinberger v. Romero-Barcelo,
      456 U.S. 305 (1982) ............................................................................35, 37

Weiss v. Kempthorne,
    580 F. Supp. 2d 184 (D.D.C. 2008) ....................................................................9, 25

Wilson v. Lynn,
    372 F. Supp. 934 (D.   Mass  1974)...................................................................10, 11

Winnebago Tribe of Nebraska v. Ray,
    621 F.2d 269 (8th Cir. 1980) ...............................................................................10

Yakus v. United States,
    321 U.S. 414 (1944).............................................................................................37

## STATUTES

5 U.S.C. §§ 701-706 ..........................................................................................................2

7 U.S.C. §§ 901-918 ..........................................................................................................5

7 U.S.C. § 902(a) ..............................................................................................................5

7 U.S.C. § 904 ...................................................................................................5, 21, 34

7 U.S.C. § 1981(b)(4) ......................................................................................................18

42 U.S.C. §§ 4321-4370 ....................................................................................................3

42 U.S.C. § 4332(2)(C)..................................................................................................3, 7

42 U.S.C. § 7475.........................................................................................................30, 31

Fed. R. Civ. P. 56(c) .........................................................................................................2

Fed. R. Civ. P. 65.............................................................................................................40

## REGULATIONS

7 C.F.R. § 1717.600(a).....................................................................................................22

7 C.F.R. Part 1794.........................................................................................................4, 5

7 C.F.R. § 1794.3 ...................................................................................................5, 33, 34

40 C.F.R. § 1501.4 .............................................................................................................3

40 C.F.R. § 1502.3 .............................................................................................................3

40 C.F.R. § 1507.3(a) ..................................................................................................4

40 C.F.R. § 1507.3(b)(2) .............................................................................................3

40 C.F.R. § 1508.9 ......................................................................................................3

40 C.F.R. § 1508.18 ...........................................................................................4, 7, 12

43 Fed. Reg. 55,978-56,007 (1978) ............................................................................4

49 Fed. Reg. 9,544 (Mar. 13, 1984) ...........................................................................4

49 Fed. Reg. 48,185 (Dec. 11, 1984) ........................................................................30

62 Fed. Reg. 62,527 (Nov. 24, 1997) ..........................................................................4

63 Fed. Reg. 68,648 (Dec. 11, 1998) ..........................................................................5

Kan. Admin Reg. § 28-19-350 ...................................................................................30

## INTRODUCTION

A non-federal action does not become a "major Federal action" requiring an environmental review under the National Environmental Policy Act ("NEPA") because of some incidental federal involvement. There must also be sufficient federal control and responsibility over the environmental aspects of the non-federal project in order to be able to influence the outcome of the project in a material way.

Sierra Club alleges that the Rural Utilities Service's ("RUS") ongoing administration of loans and loan guarantees executed by Sunflower Electric Power Corporation ("Sunflower") over 25 years ago to construct the original Holcomb Generating Station[1] is approval of the Holcomb Expansion Project (also "Project")—a non-federal project that is not being funded by RUS—and that RUS is thus required to prepare an Environmental Impact Statement ("EIS") on the entire Project pursuant to NEPA. There is, however, no approval of the Holcomb Expansion Project; there is no substantial federal assistance or involvement by RUS in the development of the Holcomb Expansion Project; there is no federal funding for the Project; and there is no control over the environmental aspects of the Project. Thus, the Holcomb Expansion Project is not a "major Federal action." A finding that RUS's loan administration activities federalize the Holcomb Expansion Project would risk federalizing any of RUS's ongoing administration of its loan contracts, and thus any activities of its borrowers. Such a result is untenable and not consistent with the purposes of NEPA. The Court should deny Sierra Club's motion for summary judgment and grant RUS's cross-motion for summary judgment.

---

[1] Prior to making the loan for the construction of the Holcomb Generating Station, RUS prepared an Environmental Impact Statement ("EIS") pursuant to NEPA. AR 3622.

**FACTUAL BACKGROUND**

Pursuant to Local Rule 7(h)(2), Federal Defendants have submitted a separate statement of facts in opposition to Sierra Club's motion for summary judgment and in support of Federal Defendants' cross-motion for summary judgment.

**STANDARD OF REVIEW**

**I.      Summary Judgment Standard of Review.**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247–48.  The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Because the court need not and, indeed may not, "find" underlying facts in a NEPA case reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, there are no material facts essential to the court's resolution of this action that are in dispute.  Id. at 322; Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990).  Because this is an administrative review proceeding, if the court were to conclude from a review of the agency's administrative record that the agency's decision was arbitrary or capricious, the remedy would be to remand the matter for reconsideration.  Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 549 (1978); Camp v. Pitts, 411 U.S. 138, 143 (1973).

# LEGAL BACKGROUND

## I.   National Environmental Policy Act.

### A.   Overview of the statute.

NEPA, 42 U.S.C. §§ 4321-4370, is a procedural statute; it does not mandate a particular substantive result.  Vt. Yankee, 435 U.S. at 558; Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989).  NEPA requires agencies to prepare an environmental impact statement ("EIS") to be included in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); see 40 C.F.R. § 1502.3.  The two main goals of NEPA are to inject environmental considerations into the federal agency's decision-making process and to inform the public that the federal agency has considered environmental concerns.  See Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 768 (2004); Citizens Against Rails-to-Trails v. Surface Transp. Bd., 267 F.3d 1144, 1151 (D.C. Cir. 2001).

The regulations implementing NEPA establish procedures to assist agencies in determining whether an EIS is required.  An agency may conduct a preliminary examination of the proposed action, called an environmental assessment ("EA"), to determine whether a proposed action will have significant environmental impacts such that an EIS is required. 40 C.F.R. §§ 1501.4, 1508.9.  In addition, the NEPA regulations direct agencies to identify classes of actions, referred to as "categorical exclusions" ("CE"), that normally "do not individually or cumulatively have a significant effect on the human environment" and are therefore excluded from the requirement of preparing an EA or an EIS.  Id. at § 1508.4.  See also § 1507.3(b)(2).  The use of CEs avoids unnecessary documentation of minor effects in EAs and

allows agencies to focus their environmental review efforts on major actions that will have significant effects and which are the primary focus of NEPA.  See id. at § 1500.4(p).

Although NEPA itself does not define "major Federal actions," the regulations promulgated by the Council on Environmental Quality ("CEQ")[2] to implement NEPA specify that such actions must be "potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  Where an agency lacks discretion to affect the outcome of its actions, there is no "major Federal action" triggering NEPA.  See Surface Transp. Bd., 267 F.3d at 1151 (stating that NEPA is inapplicable if the information NEPA provides can have no affect on the agency's actions).

### B.    Rural Utilities Service's NEPA implementing procedures.

The Rural Electrification Administration ("REA") first promulgated environmental procedures covering its electric program in March 1984.  See 49 Fed. Reg. 9,544 (Mar. 13, 1984) (codified as amended at 7 C.F.R. Part 1794).  Following the passage of legislation in 1994, under which RUS became the successor to REA, as well as other legislation in 1993, which affected its lending oversight and control, RUS proposed revisions to its NEPA procedures in November 1997.  See 62 Fed. Reg. 62,527 (Nov. 24, 1997).  Public comment was invited for a 60-day period ending in late January 1998.  See id.  After reviewing and considering comments, RUS

---

[2] Congress created CEQ within the Executive Office of the President.  Pursuant to Exec. Order No. 11,991, 42 Fed. Reg. 26,967 (May 24, 1977), CEQ issued regulations implementing NEPA. See 40 C.F.R. Parts 1500-1517; 43 Fed. Reg. 55,978-56,007 (Nov. 29, 1978).  In addition to setting forth detailed requirements on how federal agencies would comply with NEPA, the regulations direct agencies, as necessary, to adopt their own NEPA implementing regulations that would supplement CEQ's regulations.   40 C.F.R. § 1507.3(a).   The regulations direct agencies to consult with CEQ when developing their own NEPA implementing regulations prior to publication in the Federal Register for public comment.  Id.

published a final rule in December 1998.  See 63 Fed. Reg. 68,648 (Dec. 11, 1998) (codified at 7

C.F.R. Part 1794 & scattered provisions of 7 C.F.R. Part 1780).

One of the changes to RUS's procedures that was adopted as part of the December 1998

rule was the revision of 7 C.F.R. § 1794.3, a section entitled, "Actions requiring environmental

review."  The revised version, which is currently in force and effect, reads as follows:

> The provisions of this part apply to actions by RUS including the approval of
> financial assistance pursuant to the Electric, Telecommunications, and Water and
> Waste Programs, the disposal of property held by RUS pursuant to such
> programs, and the issuance of new or revised rules, regulations, and bulletins.
> <u>Approvals provided by RUS pursuant to loan contracts and security instruments,
> including approvals of lien accommodations, are not actions for the purposes of
> this part and the provisions of this part shall not apply to the exercise of such
> approvals</u>.

63 Fed. Reg. at 68,656 (codified at 7 C.F.R. § 1794.3) (emphasis added).

## II.    Rural Electrification Act

The Rural Electrification Act of 1936 ("RE Act"), 7 U.S.C. §§ 901-918, authorizes the

Secretary of Agriculture ("Secretary") to make loans for the purpose of "furnishing and

improving electric . . . service in rural areas," and for the purpose of assisting electric borrowers

to implement demand side management, energy conservation programs, and renewable energy

systems.  7 U.S.C. § 902(a).

Under the RE Act, the Secretary–acting through RUS–is authorized to make loans for

rural electrification for the purpose of "financing the construction and operation of generating

plants, electric transmission and distribution lines or systems for the furnishing and improving of

electric service to persons in rural areas . . . ."  <u>Id.</u> at § 904.  Loans shall not be made unless the

Secretary finds that in his judgment the security for the loan is "reasonably adequate and such

loan will be repaid within the time agreed."  <u>Id.</u>   In addition, the loans must be on such terms

and conditions "relating to the expenditure of the moneys loaned and the security therefor as the Secretary shall determine and may be made payable in whole or part out of the income . . . ." Id.

The RE Act further prohibits a borrower of RUS loans or guarantees from "sell[ing] or dispos[ing] of its property, rights, or franchises, acquired under the provisions of this chapter," without the Secretary's prior approval, until the loan from RUS has been repaid. Id. at § 907. "The language of 7 U.S.C. § 907 reflects Congress' concern that piecemeal disposition of a cooperative's property and service rights might impair the [RUS's] security interest in the cooperative's assets." Morgan City v. S. Louisiana Elec. Coop. Ass'n, 49 F.3d 1074, 1075 (5th Cir. 1995) (denying rehearing en banc), cert. denied, 516 U.S. 908 (1995). The provision thus reflects "a general federal policy of protecting the integrity of the [RUS's] security interests" and maximizing repayment of debt owed to the Government. Id.

## ARGUMENT

**I.     The Holcomb Expansion Project is not a major federal action within the meaning of NEPA.**

Sierra Club alleges that the challenged actions—RUS's consent to the 2002 debt restructuring and to the 2007 approval requests—are "approval" of the Holcomb Expansion Project that either enabled the Project to proceed, or provided substantial assistance to the Project. Pls. SJ Mtn. at 6. Sierra Club also argues that RUS, through these actions, has broad control and authority over the Holcomb Expansion Project such that the entire Project—which is being designed and funded entirely by non-federal sources—is a "major Federal action" and RUS is required to do an environmental analysis of the Project pursuant to NEPA. Id. at 12-15. Neither the consent to the 2002 debt restructuring nor the 2007 approvals were decisions to "approve" the Holcomb Expansion Project. More importantly, because RUS is not funding the Holcomb Expansion Project and RUS does not have the direct authority under its statute or

6

regulations to impose environmental conditions on new power plants, RUS does not have control over the Holcomb Expansion Project and thus lacks the ability to influence the environmentally pertinent aspects of the Project.  In this case, the ability to impose environmental conditions on the Project rests with other federal and state regulatory bodies, not RUS.  RUS should not be required to do an environmental review of the Holcomb Expansion Project pursuant to NEPA.  Sierra Club's argument should be rejected and its motion for summary judgment denied.

A.   **A non-federal project may be a "major federal action" only when the private project is "subject to federal control and responsibility."**

The requirements of NEPA only apply to "major Federal actions."   See 42 U.S.C. § 4332(C).  Although non-federal projects are normally not subject to NEPA, they may be "major Federal actions" if they are "entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies."  40 C.F.R. § 1508.18(a); Macht v. Skinner, 916 F.2d 13, 20 (D.C. Cir. 1990).  CEQ regulations offer a few broad examples of categories within which federal actions "tend to fall," and include "approval of specific projects" and "actions approved by permit or other regulatory decision."  See 40 C.F.R. § 1508.18(b)(4).  Although "[n]o litmus test exists to determine what constitutes 'major Federal action,'" Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 54 (D.D.C. 2003), CEQ regulations require that in order for an action to be a "major Federal action," it must be "potentially subject to federal control and responsibility."  40 C.F.R. § 1508.18.

The District of Columbia Circuit, as well as other Circuits, consider several factors in determining whether a project is a major federal action within the meaning of NEPA: (1) whether the project is federal or non-federal; (2) whether the project receives significant federal funding; (3) whether the agency must take "affirmative conduct" before a non-federal actor may act; and (4) whether there is sufficient federal involvement such that the entire non-

federal project becomes a federal action.  Mineral Policy Ctr., 292 F. Supp. 2d at 54-55; Citizens

Alert Regarding the Envt. v. Envtl. Prot. Agency, 259 F. Supp. 2d 9, 15-17 (D.D.C. 2003).  No

single factor is dispositive.  Mineral Policy Ctr., 292 F. Supp. 2d at 55.  Ultimately, for a non-

federal project to become a major federal action, the federal agency must have some measure of

control over the environmentally pertinent aspects of a non-federal project, some "ability to

influence or control the outcome [of the project] in material respects."  Save Barton Creek v.

Federal Hwy. Admin., 950 F.2d 1129, 1134 (5th Cir. 1992) (citation omitted); see also United

States v. S. Fla. Water Mgmt. Dist., 28 F.3d 1563, 1572 (11th Cir. 1994) ("The touchstone of

major federal activity constitutes a federal agency's authority to influence nonfederal activity.").

> **i.**      **Even where federal agency "affirmative conduct" is required, a non-federal project is not a "major Federal action" where there is insufficient federal control and authority over the environmental aspects of the non-federal project.**

Contrary to Sierra Club's assertion, affirmative conduct taken or approval given by a

federal agency alone is not enough to turn a non-federal project into a major federal action.  See

Pls. SJ Mtn. at 11.  "[A] private project does not become a 'major Federal action' merely because

of some incidental federal involvement."  Save the Bay, Inc. v. U.S. Army Corps of Eng'rs, 610

F.2d 322, 327 (5th Cir. 1980).  There must be sufficient federal control giving the agency legal

authority to control the environmental aspects of the non-federal project.  See Nat'l Ass'n for the

Advancement of Colored People v. Medical Ctr., Inc., 584 F.2d 619, 632 (3d Cir. 1978) ("[T]he

agency's action under the statute must be a legal precondition which authorizes the other party to

proceed with action which will affect the environment.").

Many courts have found that although there is a required federal approval, the federal

agency simply does not have the requisite control over the entire non-federal project to require

the agency to prepare an NEPA analysis.  For example, the District for the District of Columbia

found that the National Park Service  ("NPS") did not need to prepare an EIS on the City's plans

for a 500-acre residential and golf course development plan just because NPS had approved a

lease for 22 acres of park land[3] to allow the City to build three golf holes that would be part of

the larger 500-acre project on private land.[4]  Weiss v. Kempthorne, 580 F. Supp. 2d 184, 189

(D.D.C. 2008).  The court stated that where the agency action "is but a small piece of a larger

project over which the agency has no authority, an agency does not go beyond the scope of its

permitting authority to review the area over which it has no jurisdiction."  Id.; see also Macht,

916 F.2d at 20 (finding that construction of a light rail extension project was not a major federal

action because the federal agency had not committed itself to fund design or construction of the

proposed extensions).

Other circuits have found the same.  In Southwest Williamson County Ass'n, Inc. v.

Slater, the Sixth Circuit found that the Federal Highway Administration was not responsible to

assess all the environmental impacts of the entire state-proposed construction of a highway

corridor just because the Federal Highway Administration was required under the Federal Aid

Highways Act to approve the construction of interchanges that would intersect with federal

highways.   243 F.3d 270, 283 (6th Cir. 2001).   Although according to Federal Highway

Administration regulations, the approval of an interchange is a major federal action, the court

held that this did not make the entire state-proposed highway a major federal action.  Id. at 283-

84.

---

[3] The National Park Service and Department of Interior had acquired an interest in the land
because of a $50,000 grant that was provided to the park for improvements.   Weiss v.
Kempthorne, 580 F. Supp. 2d 184, 185 (D.D.C. 2008).   The grant gave the Government "an
oversight role with respect to any disposition of the property subject to the grant."  Id. at 186.

[4] The National Park Service prepared an EA and issued a FONSI for the approval of the lease on
the 22 acres.  Weiss, 580 F. Supp. 2d at 188.

The Fifth Circuit, stating that it is "not unmindful of the impact that building of this massive [project] will have on the people," similarly concluded that there must be some "greater involvement" than a federal permit for a pipeline construction in order to turn the entire manufacturing plant into a major federal action.  Save the Bay, 610 F.2d at 326, 327; see also Winnebago Tribe of Nebraska v. Ray, 621 F.2d 269, 272 (8th Cir. 1980) (finding that Army Corps' decision to grant a permit for a powerline crossing did not give the Corps legal authority over the entire development of the powerline and therefore was not a major federal action).

In contrast, where there is major ongoing federal investment that enables private parties to go forward,[5] or where approval of a substantial portion of the project is required,[6] courts have found there to be a major federal action and NEPA applies.

Courts have also found NEPA to apply to non-federal projects where agency approval pursuant to a contract is required, and the contract gives the federal agency the authority to either withhold approval based on environmental impacts; Wilson v. Lynn, 372 F. Supp. 934, 936 (D. Mass. 1974), or where the contract directly gives the agency the ability to impose environmental conditions on the approval.  Morris County Trust for Historic Pres. v. Pierce, 714 F.2d 271, 278 (3d Cir. 1983).  In Morris County, the Third Circuit held that NEPA applied to the City's demolition project because the Department of Housing and Urban Development ("HUD") had

---

[5] Scientists' Institute for Publ. Info. v. Atomic Energy Comm'n, 481 F.2d 1079, 1082 (D.C. Cir. 1973) (finding major ongoing federal investment, and thus major federal action, in a program to develop Liquid Metal Fast Breeder Reactor technology to commercial feasibility).

[6] Found. on Econ. Trends v. Heckler, 756 F.2d 143, 153 (D.C. Cir. 1985) (finding National Institutes of Health's approval of experiments releasing genetically modified organisms that were funded with federal money a major federal action); Md. Conservation Council v. Gilchrist, 808 F.2d 1039, 1042 (4th Cir. 1986) (finding entire non-federal highway project was a major federal action because federal approval for a substantial portion of the project that ran through a park was required).

remained meaningfully involved after HUD approved the City of Dover's Urban Renewal Plan and the contract for funding the initial demolition was executed.[7]  Id.  The court found that the contract between the City and HUD gave HUD the continuing authority to alter the Plan because the contract required the City to furnish HUD with data concerning any proposed actions pertaining to the Plan so that HUD can ensure that environmental laws and regulations were being followed, and allowed HUD to withhold payment if the City proceeded without HUD approval.  Id.  In Wilson, the court found that HUD had both regulatory and contractual authority to to "indirectly effect an alteration of plans" by refusing to provide mortgage insurance where the safety and health of prospective tenants might be endangered by environmental circumstances.  372 F. Supp. at 936, 937.  But where a federal agency only has limited power to change the design and construction of a project, there is no major federal action.  Landmark West! v. U.S. Postal Serv., 840 F. Supp. 994, 1007-08 (S.D.N.Y. 1993).

In other situations, courts have flatly refused to "forever federal[ize]" a project because of initial federal involvement in its development.  City of Boston v. Volpe, 254, 258 (1st Cir. 1972). In Molokai Homsteaders Cooperative Association v. Morton, the Ninth Circuit did not find that the Department of Interior's approval pursuant to a loan contract of a federally-funded irrigation project to enter into a lease agreement with a corporation to use its facilities was a major federal action.  506 F.2d 572, 580 (9th Cir. 1972).  The loan contract contained a provision that required the irrigation project to be used primarily to provide irrigation water, while the lease agreement would allow the use of the irrigation project to deliver water to a proposed resort.  Id. at 577. The Molokai Homsteaders argued that because there was a loan contract in operation, any

---

[7] In Morris County, HUD approved the entire Dover Urban Renewal Plan, and the action at issue was a contract that provided the funds necessary to carry out a portion of the HUD-approved Urban Renewal Plan.  714 F.2d at 273.

decision that Interior made pursuant to that loan contract were major federal actions.  Id. at 580.

The court rejected this theory, finding Interior's right to object or not to object to violations of

the contract could not be classified as a major federal action.  Id.

### ii. Federal assistance without sufficient federal involvement in the non-federal project does not turn a non-federal project into a "major Federal action."

Similarly, federal assistance, alone is not enough to turn a non-federal project into a

"major Federal action."  There must also be sufficient federal involvement, thus giving the

federal agency control and responsibility over the non-federal project,  40 C.F.R. § 1508.18;

contra Pls. SJ. Mtn. at 16 (CEQ regulations "defining major federal action to include any activity

that is 'entirely or partly financed, assisted, conducted, regulated, or approved' by a federal

agency") (emphasis added).

For example, the District Court for the District of Columbia found that there was

sufficient federal involvement by the U.S. Fish and Wildlife Service in assisting with a state plan

for a bison hunt to make the hunt a major federal action, Fund for Animals v. Clark, 27 F. Supp.

2d 8, 12-13 (D.D.C. 1998), but "considerable federal-state cooperation" was not enough for the

court to find that a state marijuana herbicidal spraying program was a major federal action.  Nat'l

Org. for the Reform of Marijuana Laws v. U.S. Drug Enforcement Admin., 545 F. Supp. 981,

985 (D.D.C. 1982).  The key difference in the court's determination was the amount of federal

control over the non-federal program.  In Clark, the U.S. Fish and Wildlife Service helped in the

overall management of bison and was "intimately involved in the discussion and planning of the

hunt."  27 F. Supp. 2d at 13.  In contrast, in Marijuana Laws, although the federal agency

provided financial and technical assistance to the state's marijuana enforcement program,

because the federal agency was not involved in and did not conduct the actual herbicide spraying

program, the court did not find sufficient federal control over the program. 545 F. Supp. at 985;

see also Citizens Alert, 259 F. Supp. 2d at 17 (finding a local sewage pipeline project was not a major federal action where the federal agency provided the Township with money but lacked sufficient authority over the project to control or influence its outcome); Save Barton Creek., 950 F.2d at 1139 (finding the entire highway project was not a major federal action because the Federal Highway Administration did not approve of plans or specifications and did not provide federal funds for the project); Rattlesnake Coal. v. U.S. Envtl. Prot. Agency, 509 F.3d 1095, 1102 (9th Cir. 2007) ("NEPA does not apply to an agency's approval of a local government's development program comprised of 'distinct projects' . . . even if some of the constituent projects are entirely funded by the federal government"); Sancho v. U.S. Dep't of Energy, 578 F. Supp. 2d 1258, 1267 (D. Haw. 2008) (holding that there was minimal federal control over a project where the federal agency did not have responsibility over the construction, operation, or management of the project).

As discussed below, RUS lacks the required control and responsibility over the Holcomb Expansion Project to meaningfully alter its environmental impact.  The Holcomb Expansion Project is not a major federal action. Sierra Club's motion for summary judgment should be denied.

### B.    RUS did not approve of the Holcomb Expansion Project, and RUS lacks the requisite authority to control the environmental aspects of the Project.

Sierra Club argues that RUS's consent to the 2002 debt restructuring and the 2007 approval requests are "approval" of the Holcomb Expansion Project such that those actions turn the entire Holcomb Expansion Project into a major federal action and thus requires RUS to conduct an environmental review pursuant to NEPA.[8] See Pls. SJ Mtn. at 1 ("RUS violated

---

[8] The question of whether there is sufficient federal involvement to convert the entire Holcomb Expansion Project into a major federal action that cannot go forward until RUS completes a

NEPA when it approved . . . the Holcomb Expansion Project . . .").  Sierra Club is wrong—the

Holcomb Expansion Project is not a major federal action.  There is no support in the case law in

this or any other Circuit for such a wide and sweeping application of NEPA to federal agency

actions that are extremely incidental to or attenuated from the challenged project.  In this case,

"the agency [is] being asked to consider the impacts of a project over which its authority was

limited to a minor or tangential part of the overall project."  Friends of the Earth v. U.S. Army

Corps of Eng'rs, 109 F. Supp. 2d 30, 40 (D.D.C. 2000).  Granting Sierra Club's summary

judgment motion would risk federalizing RUS's ongoing administration of all of its loan

contracts, and effectively federalize any future business action taken by Sunflower (or any other

borrower) even where RUS has not provided financing for or has not been substantially involved

in the design and construction of a new project.  Sierra Club's argument that RUS violated

NEPA by not preparing an EIS on the Holcomb Expansion Project prior to consenting to the

2002 debt restructuring and to the 2007 approval requests should be rejected and its motion for

summary judgment denied.

> **i.**   **RUS's consent to the 2002 debt restructuring is not an approval of the Holcomb Expansion Project and RUS lacks discretion to control the environmental aspects of the Project.**

Sierra Club argues that the central purpose of the 2002 debt restructuring was to allow the

Holcomb Expansion Project to proceed, Pls. SJ Mtn. at 9, and that under RUS's debt settlement

authority RUS had discretion to impose environmental conditions on the Holcomb Expansion

---

NEPA analysis is "analytically distinct" from the question of whether the actual consent to the 2002 restructuring or the 2007 approval requests are subject to NEPA.  See Citizens Alert, 259 F. Supp. 2d at 16.  In the present case, Sierra Club is concerned with the former question—whether there is sufficient federal control over the Holcomb Expansion Project such that the entire project is a major federal action.  See Pls. SJ Mtn. at 6 ("The central question in this case is whether the Holcomb Expansion Project is a "major federal action" that is subject to NEPA because of RUS's approval of  . . . that project.").

Project.  Id. at 12-14.  Sierra Club not only mischaracterizes the 2002 debt restructuring as an

RUS "approval" of the Holcomb Expansion Project, but its sweeping theory of NEPA's

application would federalize every aspect of Sunflower's business and its business

determinations solely on the basis that it received federal funding decades ago.  Sierra Club's

argument must be rejected.

Sierra Club mischaracterizes the primary purpose of the 2002 debt restructuring.  The

"Administrative Action" sets forth the Government's desire to reduce the risk that Sunflower

would default on its loan obligations.  Pls. SJ Mtn. Exh. 1 at 17 (stating that the debt settlement

"will reduce the risk that [Sunflower] will be unable to meet its obligations," "will result in the

government receiving greater repayment than it would under the current [DRA]," "will

maximize . . . the recovery of debts and claims owed to RUS" and "will contribute to the

enhancement of the government's recovery of its debt").[9]  The 2002 debt restructuring was not

an "approval" of the Holcomb Expansion Project.  The primary purpose of the 2002 debt

restructuring was to provide debt relief to Sunflower, which was in serious risk of defaulting on

its loans under the 1987 Debt Restructure Override Agreement and Amended and Restated

Credit Agreement ("DRA"), and to maximize recovery of the debt owed to the Government.  AR

00068; Pls. SJ Mtn. Exh. 1 at 7.  The 2002 debt restructuring also sought to change the

conditions imposed by the DRA that limited Sunflower's ability to finance needed capital

expenditures on an aging facility, AR 00070, spend money on operating and maintenance

expenses, AR 00072, and use its existing assets.  Pls. SJ Mtn. Exh. 1 at 7-8; AR 00073; AR

8383A.1; AR P04304A.1, A.4-A.5 (discussing options, i.e., feasibility study, for giving

---

[9] The page numbers for citations to Plaintiff's summary judgment motion Exhibits correspond to
the document's ECF-assigned page numbers.

[International Energy Partners] potential access to the use of the Common Facilities).  Although Sunflower had speculative plans to "seek additional value out of existing assets" by constructing an additional generating unit, "Holcomb Unit 2," see AR 00073, RUS did not approve of, nor did it require as part of the 2002 debt restructuring, any specific plans or specifications for, or commitment by Sunflower to build, the Holcomb Unit 2.  See Pls. SJ Mtn. Exh. 1 at 4-5 ("[I]n an effort, to capitalize on potential new markets for energy, SEP and Sunflower will explore participation in the development of a new generation facility . . ."); cf. Friends of the Earth, 109 F. Supp. 2d at 40 (finding Army Corps' must consider upland development in an EIS because the approval of permits for floating casinos "encompasses the heart of the development projects" and "upland development results from and is entirely conditional on the permitted activity").  Such future someday plans for a non-federal project that will not received federal funding, see Pls. SJ Mtn. Exh. 1 at 4-5, and may never be funded or built is not a major federal action within the meaning of NEPA.  See Macht, 916 F.2d at 16 (no major federal action where federal agency has not committed itself to fund design or construction of the proposed [project] and the project may never be funded or completed).

Contrary to Sierra Club's suggestion that the debt restructuring was dependant on construction of new coal-fire power plants, see Pls. SJ Mtn. at 14, nothing in the 2002 debt restructuring agreements requires Sunflower to build additional coal-fired generation.[10]  See Pls.

---

[10]  As part of the 2002 debt restructuring and in an attempt to maximize the repayment of Sunflower's debt to the Government, Sunflower executed the contingent Holcomb 3 note, whose payment is contingent on an additional unit being built at the Holcomb I site.  Pls. SJ Mtn. Exh. 1 at 12.  The Holcomb 3 Note brings additional recovery of their debt to the lenders if there are additional revenues available from any additional units. This note, however, does not obligate Sunflower to construct additional generation units of any kind, and in the event no additional units is placed into commercial operation by December 31, 2012, the Note is cancelled by its

SJ Mtn. Exh. 1.  In 2002, it wasn't even known where one or more units would or could be built, who would fund the putative expansion, or what exactly the expansion would entail.  Although the 2002 debt restructuring may have helped Sunflower "seek additional value out of existing assets," the 2002 debt restructuring was not an RUS "approval" of the Holcomb Expansion Project, a project which was and continues to be entirely developed and funded by non-federal entities.  See Macht, 916 F.2d 16.

The facts of this case are distinguishable from Scientists' Institute, 481 F.2d 1088, which Sierra Club cites.  See Pls. SJ Mtn. at 5, 11.  In Scientists' Institute, the court found that the Atomic Energy Commission had engaged in major federal action by undertaking a "major federal research program" to promote the development of a new fast breeder technology to be used in nuclear reactors. 481 F.2d at 1091. The court observed that the Commission had identified the technology as a "priority program," had begun to help obtain acceptance for plants using the technology through government-assisted construction of such plants, and had issued a 10-volume plan. Id. at 1083. Here, RUS does not have any similar "program" but simply is administering longstanding loans in an attempt to collect repayment from one of RUS's borrowers.

Similarly, the facts are distinguishable from Foundation on Economic Trends. 756 F.2d 143; see Pls. SJ Mtn. at 11.  In Foundation for Economic Trends, the court found that the National Institutes of Health ("NIH") had oversight over federally-funded experiments proposing to release genetically modified organisms into the environment because of regulations

---

own terms.  Id.  The Residual Value Note is a note promised on the residual value to the lenders of the original Holcomb 1.  AR 7, 337-346.

requiring federally-funded experiments to obtain NIH approval.[11]  756 F.2d at 155.  Here, RUS is not funding the Holcomb Expansion Project.

Sierra Club also argues that because the 2002 debt restructuring was approved pursuant to RUS's statutory authority under the Consolidated Farm and Rural Development Act ("Con Act"), 7 U.S.C. § 1981(b)(4), and its implementing regulations, 7 C.F.R. Part 1717 subpart Y, RUS had the discretion and authority to impose environmental conditions on the Holcomb Expansion Project.  Pls. SJ Mtn. at 9, 20.  The Con Act and its implementing regulations confer authority to RUS to approve any debt relief, but no part of the Con Act or its implementing regulations confers RUS with jurisdiction to approve, oversee, and regulate the construction of a future—and highly speculative—non-federal project, simply because a borrower requests and needs debt restructuring.[12]  See S.W. Williamson County, 243 F.3d at 283 (holding that although the Federal Highway Administration was required pursuant to the Federal Aid Highways Act to approve of interchanges intersecting with federal highways, "no part of the statute confers jurisdiction on the [agency] to oversee the construction of the highway corridor . . .unless the state attempts to comply with federal regulations in order to seek federal [funding]").  The "Administrative Action" clearly identifies the benefits to the Government of the debt settlement to maximize the recovery of the debt it is owed.  See Pls. SJ Mtn. Exh. 1 at 17.  Contrary to Sierra Club's claim that "RUS had discretion [to] . . . put [Sunflower] on a track towards more

_____

[11] The issue in Foundation for Economic Trends was not whether NIH's approval was a major federal action—which NIH stipulated to.  756 F.2d at 153.  Rather, the issue was whether adequate environmental consideration was given to, and whether the University could be enjoined from, conducting the experiments.  Id. at 155.

[12] The question here is not whether RUS should have done a NEPA analysis on the debt settlement itself, but whether RUS should have—back in 2002—done a NEPA analysis on the Holcomb Expansion Project.

sustainable practices such as conservation or renewable energy . . .," the Con Act does not confer jurisdiction to RUS to fully take over a private business or substitute its business judgment by virtue of its debt restructuring authority and dictate completely the course of business that Sunflower must take well into its future.[13]  See Pls. SJ Mtn. at 14.  Under Sierra Club's sweeping theory of NEPA, RUS approval of the 2002 debt restructuring effectively federalizes Sunflower and any and all actions taken by Sunflower even where the RUS is neither providing funding for the Project, nor is involved in the planning of the design and construction of the Project.  The Court should reject Sierra Club's argument and find that RUS did not violate NEPA by failing to do an environmental review of the impacts of the Holcomb Expansion Project when it approved of the 2002 debt restructuring.

### ii.   The 2007 approvals and the existing loan and mortgage documents do not give RUS control over the Holcomb Expansion Project.

Sierra Club's NEPA claim is also based upon the fact that the existing loan contract and mortgage agreement require RUS's approval before Sunflower could enter into a variety of private business agreements for the development of the Holcomb Expansion Project.  Pls. SJ Mtn. at 9-11.  Sierra Club claims that these agreements give RUS "comprehensive oversight over virtually every aspect of Sunflower's operations."  Pls. SJ Mtn. at 9.  Sierra Club bases its claim that RUS has approval over the Holcomb Expansion Project on two negative covenants in the 2002 debt restructuring loan contract.  The breach of a negative covenant give the lender the right to specific performance.  AR 2680, 2682.  It does not give RUS unfettered authority.  While

---

[13] Sierra Club's argument that Sunflower's entry into agreements for the construction of additional coal-fired generation during a time that Congress is considering carbon dioxide emissions regulation implicates RUS's interest in maximizing the recovery of its loans is not a NEPA issue.  See Pls. SJ Mtn. at 14.  The determination of whether the agreements threaten the ability of Sunflower to repay its debt in the agreed-upon time is an RE Act issue, and Sierra Club did not bring a claim under the RE Act.  See Pls. Amend. Compl.

RUS did provide its consent to several agreements related to the Holcomb Expansion Project, see AR 4574-75, 4610-11, 4701-02, 7444-46, 8218-24, their consents do not constitute "approval" of the Holcomb Expansion Project itself and do not give RUS control over the Holcomb Expansion Project.

Although the loan contracts provide for one-time approval or notice to the government of agreements for financing or development of the Holcomb Expansion Project, they do not demonstrate any ongoing control over the new power plants themselves. Many of the provisions deal with financial management and accounting, which are typical concerns for a lender concerned with repayment of outstanding loans by a borrower that was previously in the risk of default.

For example, the requirement to deliver to RUS a list of contracts for the "Holcomb 2" power plant is in a section entitled, "Financial Statements, Reports, and Budgets," which otherwise requires reports of budget variances, audited balance sheets, earnings statements, cash flow and expenditures, and proposed rates.  AR 4385-86 (§ 4.19). These requirements show that RUS's inquiry was focused upon Sunflower's financial status, and they do not demonstrate the type of control necessary for RUS to undertake a meaningful analysis of environmental impacts from the Holcomb Expansion. Cf. id. AR 4384 (§ 4.15) (requiring submission of construction plans and specifications only "if the construction will be financed in whole or in part by a loan made or guaranteed by RUS").

Even the provisions that require RUS's approval prior to entering any arrangements regarding the development or use of the Holcomb site--which, together with the existing Holcomb Plant, secure the repayment of the outstanding loans--focus upon the financial "agreement or arrangements" for development. See AR 4391 (§§ 5.14, 5.15); see also id. at

4389-90 (§5.4) (providing limitations on certain types of "contracts or arrangements," e.g., for power purchase, sale, delivery, marketing; and those involving options, futures, or hedges, among other things). This focus makes sense, given that RUS's primary concern at this point in the history of the loans is making sure that Sunflower does not enter any financial relationships that would jeopardize its further and continued ability to repay RUS.

Sierra Club claims that the contracts allow RUS to give approval on whatever "terms and conditions as RUS, in its sole discretion, may require," and thus there are absolutely no boundaries on what RUS can impose as a condition to an approval.  Pls. SJ Mtn. at 15.  But the loan documents at issue here impose primarily financial controls, or negative pledges by Sunflower, and do not provide RUS with control over the Holcomb Expansion itself. See AR 4384 (§ 4.15) (requiring submission of construction plans and specifications only "if the construction will be financed in whole or in part by a loan made or guaranteed by RUS").

Under the RE Act, the Secretary is prohibited from making any loans unless he "finds and certifies that in his judgment the security thererfor is reasonably adequate and such loan will be repaid within the time agreed."  7 U.S.C. § 904.  Likewise, the loans are required to be made upon "such terms and conditions relating to the expenditure of the moneys loaned and the security therefor as the Secretary shall determine."  Id.; see Wabash Valley Power Ass'n v. Rural Electrification Admin., 988 F.2d 1480, 1490 (7th Cir. 1993) ("Being a lending agency administering a federal credit program rather than a regulatory agency, [RUS] has . . . the stick of its authority to lend or not to lend in a particular jurisdiction to protect against defaulting debtors.").  Under these loan documents, RUS has retained the authority to approve certain financial arrangements that Sunflower enters with regard to further development of the Holcomb Expansion Project in order to ensure repayment of its loans and loan guarantees, but the loan

documents do not give RUS unfettered discretion to impose additional conditions on the approvals.

Sierra Club also argues that RUS regulations give RUS the authority to require approval for Sunflower's actions. Pls. SJ Mtn. at 10. However, the regulations that Sierra Club cites, 7 C.F.R. Part 1717, subpart M, are implemented through the loan contracts and security instruments executed between a borrower and RUS. See Pls. SJ Mtn. at 10, 15. The regulations make it clear that RUS's lending authority to require approvals for a borrower's actions is not an independent authority outside of the loan and mortgage documents. See 7 C.F.R. § 1717.600(a) ("The loan contract and mortgage . . . gives RUS . . . the right to approve or disapprove certain actions contemplated by borrowers. . . . The approval authority is granted to RUS by the loan contract or mortgage . . .") (emphasis added). Sierra Club's argument that RUS has the regulatory power to control every aspect of a borrower's actions is wrong. See Pls. SJ Mtn. at 10.

The cases that Sierra Club cites are distinguishable from the present case because the federal agency retained either regulatory or contractual authority to impose environmental conditions on a non-federal project. See Pls. SJ. Mtn. at 12, 17. In Morris County, the court found that HUD remained meaningfully involved in the Urban Renewal Plan because the contract between HUD and the City of Dover required Dover to submit data to HUD regarding proposed projects under the Plan with the purpose of giving HUD the opportunity to alter the project if needed to comply with federal laws and regulations. 714 F.2d at 278. Additionally, HUD was providing federal funding for the project. Id. at 275. Similarly, in Wilson, the court found that HUD regulations required HUD to review each mortgage insurance application if "a particular structure [ ] might jeopardize the safety and health of the eventual tenants of the

rehabilitated structure" and determined that HUD retained the discretion to withhold the mortgage insurance until the building was redesigned to remove the hazard.  372 F. Supp. at 936; see also Jones v. Lynn, 477 F.2d 885, 890 (1st Cir. 1973) (same).  Such situations as described in the case law above more closely resemble RUS's actions when a loan is originally made for the construction of a project—and in such cases RUS prepares an environmental review pursuant to NEPA.

Sierra Club has not demonstrated that RUS retains the any such discretionary authority to impose environmental conditions on the approvals related to the Holcomb Expansion Project either through the contracts or from its regulations.  Furthermore, RUS is not funding the Project. And, because RUS is not funding the Project, and because Sunflower will not own the Project, RUS will not have a lien on the Holcomb Expansion Project itself.   AR 2571-2573. Accordingly, the approvals do not trigger NEPA and Sierra Club's motion for summary judgment should be denied.

## C.   RUS did not substantially assist and is not substantially involved in the Holcomb Expansion Project.

Sierra Club alleges that RUS provided assistance to and is substantially involved in the development of the Holcomb Expansion Project, thus giving RUS sufficient control over the Project.  Pls. SJ Mtn. at 19-23.  However, Sierra Club mischaracterizes RUS's actions and the facts in this case to paint a picture of extensive federal involvement in a non-federal project that is just not present.  RUS did not substantially assist Sunflower, is not substantially involved, and is not in "partnership" with Sunflower to develop the Holcomb Expansion Project.  See Pls. SJ.Mtn. at 22-23.  Sierra Club's argument must fail.

Sierra Club claims that the 2002 debt restructuring was substantial financial assistance "to Sunflower in its effort to develop the project" and that the debt restructuring "wrote off

hundreds of millions of dollars in Sunflower's loans so that the project could proceed." Id. at 19-20.  However, as discussed above, the 2002 debt restructuring was not an approval of the Holcomb Expansion Project.  RUS has not provided any federal funding for the Holcomb Expansion Project, and there is no expectation that it will do so in the near future.[14]  Pls. SJ Mtn. Exh. 5 at 2.  The purpose of the 2002 debt restructuring was to maximize repayment of debt owed to the Government from a company that, at the time, was in serious risk of default on its federal loans.  See Pls. SJ Mtn. Exh. 1 at 17.  Although the 2002 debt restructuring may have provided some financial benefits, such as tax benefits, to Sunflower, see AR P0002A_DOC4.5, Sierra Club has failed to show how that financial assistance was directly related to and for the development of the Holcomb Expansion Project.  If any financial assistance from the 2002 debt restructuring can be imputed at all to the Holcomb Expansion Project, it is too attenuated and not substantial enough to warrant making the entire Holcomb Expansion Project a major federal action. See Macht, 916 F.2d at 18-19; see also Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 197 (D.C. Cir. 2003) (holding that just because "other parts of the system are federally funded does not make the discrete [project] federally funded); Rattlesnake Coal., 509 F.3d at 1102 (holding that agency's approval of and subsequent grant to support a small portion of a project did not elevate the entire project to the status of a major federal action).

Furthermore, the 2002 debt restructuring was not a write-off of Sunflower's debt.  RUS has not written any of Sunflower's debt off to date.  The exact and final amount of the RUS loss will not be known until as late as 2021, when all the notes have matured.

---

[14] In the event that RUS did provide funding for the Holcomb Expansion Project, it would do an environmental analysis pursuant to NEPA.

Sierra Club's next argument is that RUS financially assisted Sunflower by committing to release its lien "on the site to facilitate Expansion." Pls. SJ Mtn. at 21. Sierra Club completely misinterprets the facts.[15] RUS has never committed to release its lien on Holcomb 1. Fed. Defs. Statement of Facts ¶¶18-19. RUS did commit to releasing its lien on the Common Facilities and land footprint (HCP/Unit 2 Site), a very small portion of the total Holcomb site, where a potential new generation facility could be built and share the common facilities. Fed. Defs. Statement of Facts ¶19. However, this was not a give-away of financial assistance, as Sierra Club suggests. See Pls. SJ Mtn. at 21. In exchange for the release of its lien on the Common Facilities and the HCP/Unit 2 Site, RUS will receive a perfected security interest in the membership interest in the HCF, LLC and receive a portion of annual rent payments due to HCH, LLC paid to it for the use of the Common Facilities and the HCP/Unite 2 Site. Fed. Defs. Statement of Facts ¶19. Besides for not being financial assistance to the Holcomb Expansion Project, the potential release of its lien on a very minor of its entire lien on Holcomb 1 is but a minor part of any proposed Holcomb Expansion Project, and does not give RUS the control and authority over facilities that, if built, will be funded, designed, and constructed by third parties. RUS should not shoulder the responsibility of preparing an EIS for a project it simply lacks the ability to influence. See Weiss, 580 F. Supp. 2d at 189.

Similarly, Sierra Club argues that RUS's agreement to enter into the Subordination Non-Disturbance and Attornment Agreement ("SDNA"), AR 8050, 8059, turns the entire Holcomb Expansion Project into a major federal action. Pls. SJ Mtn. at 21. The SDNA is primarily a non-disturbance agreement, more akin to an easement. It is not substantial financial assistance

---

[15] Several places in its brief and in its Statement of Facts, Sierra Club asserts that RUS committed to release its lien "on the site," Pls. SJ Mtn. at 21, or "release its lien on Holcomb 1." Pls. Statement of Facts ¶23. This is factually incorrect.

required for the Holcomb Expansion Project.  The SDNA simply provides some protection to Tri-State in the event of a default by Sunflower.  The SDNA provides that if Sunflower's lenders enforce their rights against Sunflower in the event of a default, Tri-State's right to benefit from their agreements with Sunflower for the Holcomb Expansion Project, if built, will not be disturbed.  AR 8050, 8059.  The SDNA actually subordinates Tri-States interest.  The SDNA is not a critical element, but just a "belt and suspenders" protection for the Tri-State's investment in the Holcomb Expansion Project.

Sierra Club argues that RUS's own regulations recognize that lien subordinations are a form of "financial assistance."  Pls. SJ Mtn. at 21-22.  But the regulations only say that NEPA "may apply to . . . lien accommodations, subordinations, and releases."  7 C.F.R. § 1717.850(d). Most importantly, Sierra Club fails to demonstrate how RUS's commitment to release its lien on the Common Facilities and HCP/Unit 2 Site  for financial value received on its outstanding debt gives RUS the ability to control and influence the environmental aspects of the entire Holcomb Expansion Project.  As discussed above, a non-federal project is not a "major Federal action," even if it receives federal assistance, if federal control is not substantial.  See Macht, 916 F.2d at 16; see also Underground Expansion, 333 F.3d at 197.  Neither RUS's commitment to release its lien on the Common Facilities and the HCP/Unit 2 Site—in exchange for a security interest in a membership interest in an limited liability corporation and annual rent payments, if there are any, for its use, nor the SDNA gives RUS substantial federal control.  Sierra Club's argument should be rejected.

Sierra Club's third theory is that RUS has become a stakeholder in the Holcomb Expansion Project because RUS holds notes that are payable only if the Holcomb Expansion Project is built, thus making it a major federal action.  Pls. SJ Mtn. at 22.  But the case law Sierra

Club cites does not support its theory either.  See Pls. SJ Mtn. at 23-24.  RUS is a lender; there is no support in the case law that holding contingent notes makes one a "stakeholder."  As stated above, because Sunflower is only a developer and operator of the Project, RUS will not have a lien on the Project.  AR 2571-2573.

In Dalsis v. Hills, 424 F. Supp. 784, 787 (W.D.N.Y. 1976), the court found that HUD's approval of an urban renewal plan "with knowledge that a private developer would build a mall," and funding of the initial demolition of substandard buildings was a sufficient nexus between the federal agency and the developer to turn the mall into a major federal action.  In the present case, RUS never approved of the Holcomb Expansion Project and is not and will not provide any funding for the Project.  Nor has Sierra Club alleged that Sunflower "contract[ed] with [RUS] to obtain goods, service, or financing."  See Macht, 916 F.2d at 20.

RUS also is not in partnership with Sunflower to develop the Holcomb Expansion Project because RUS does not have a "financial stake" in the Project.  Sierra Club's reliance on Minnesota Public Interest Research Group v. Butz is misplaced.  498 F.2d 1314, 1322-23 (8th Cir. 1974) (finding that, among other things, the Forest Service's receipt of revenue from a timber sale is a factor to be considered in determining whether the project is a major federal action).[16]  RUS does not have a similar interest in the Holcomb Expansion Project that the Government does in approving a lease on tribal land, see Davis v. Morton, 469 F.2d 593 (10th Cir. 1972), which implicates special concerns of the United States both in its trust relationship and its relationship as a co-sovereign.

---

[16] The Butz decision is part of an old line of NEPA case law that incorrectly merged the issues of "major Federal action" and the significance of the environmental effects of that action and has no continuing viability.  See 498 F.2d at 1321-22; see also Medical Ctr., 584 F.2d at 627 (declining to follow Butz).

The notes negotiated between RUS and Sunflower "in an effort to recoup some of Sunflower's federal debts" do not effectively create a partnership.  See Pls. SJ Mtn. at 22.  There is no cost or revenue sharing; there is no contractual requirement for Sunflower to build the additional units; there is no joint management, and if the units are built, RUS does not profit from the arrangement—it simply recovers some of the money that it is owed from Sunflower's operating fees.  See Marijuana Laws, 545 F. Supp. at 985; S.W. Williamson County, 243 F.3d at 283; cf. Laub v. U.S. Dep't of Interior, 342 F.3d 1080, 1092 (9th Cir. 2003) (finding a likelihood of a "joint federal-state partnership which serves to federalize the entire project" because of "coordination requirements, cost sharing arrangements, and joint management" of the project).

Finally, Sierra Club contends that RUS's involvement in its ongoing loan administration is the "kind of intensive federal involvement" that turns the Holcomb Expansion Project into a major federal action.  Pls. SJ Mtn. at 23.  This argument makes absolutely no sense.  RUS's ongoing loan administration—for Sunflower's loans as well as for any other borrower—is directed at ensuring that the Government maximizes recovery on the debt it is owed.  Sierra Club has not demonstrated how RUS's ongoing loan administration is "intensive federal involvement" directly related to the planning and development of the Holcomb Expansion Project.  This argument only makes sense if RUS was funding the Holcomb Expansion Project.  The only case that Sierra Club cites in support of its argument is Fund for Animals v. Clark.  Pls. SJ Mtn. at 23.  In Clark, the District for the District of Columbia found a state planned bison hunt was a major federal action because the federal agency was "intimately involved in the discussion and planning of the hunt" and involved in "developing the bison management plan that included this hunt."  27 F. Supp. 2d at 12-13.  Although there may be a "nearly 10,000-page record" filed in this case, Sierra Club fails to point to any document that demonstrates RUS is intimately and

directly involved in the planning and developing the Holcomb Expansion Project.  See Pls. SJ

Mtn. at 23.  The argument that RUS has "intensive" involvement in the Holcomb Expansion

project because it has restructured existing loans to ensure a greater likelihood of repayment

loses sight of the fact that the agency's involvement with the Holcomb Expansion is due solely to

RUS's responsibility to administer loans made over 25 years ago.

Because none of RUS's actions are approval of, funding of, or direct involvement in the

planning and construction of the Holcomb Expansion Project, and Sierra Club has failed to

demonstrate that there is a "partnership" or "joint venture" between RUS and Sunflower to

develop the Holcomb Expansion Project, the Holcomb Expansion Project is not a major federal

action.  Sierra Club's motion for summary judgment should be denied.

## II.    RUS lacks discretion to perform a meaningful analysis of the impacts from or alternatives to the Holcomb Expansion Project.

RUS does not have discretion to consider the environmental impacts of the Holcomb

Expansion Project by virtue of its ongoing loan administration authority, and in particular, RUS

does not have the authority to consider those types of impacts about which Sierra Club is

concerned.   As such, there is no major federal action subject to NEPA.  See Pub. Citizen, 541

U.S. at 768 ("Since [the agency] has no ability categorically to prevent the cross-border

operations of Mexican motor carriers, the environmental impact of the cross-border operations

would have no effect on [the agency's] decisionmaking—[the agency] simply lacks the power to

act on whatever information might be contained in the EIS.").

Sierra Club alleges that the Holcomb Expansion Project, if built, "will generate vast

quantities of carbon dioxide," a gas which the U.S. Environmental Protection Agency ("EPA")

recently found "endangers public health and welfare, subjecting it to regulation under the Clean

Air Act."  Pls. SJ Mtn at 34, 35 (emphasis added).  As Sierra Club states, regulation of carbon

dioxide is the province of EPA, not RUS.  See id.  Similarly, the other air pollutants Sierra Club is concerned with—"particulate matter, mercury, and ozone-forming constituents,"  id. at 33,— are all regulated by EPA under the Clean Air Act ("CAA").[17]  See 42 U.S.C. § 7475 (CAA pre-construction requirements); 49 Fed. Reg. 48,185 (Dec. 11, 1984) (Kansas PSD regulations first approved); Kan. Admin. Regs. § 28-19-350 (PSD regulations).  Again, RUS has no discretion to meaningfully consider the alleged impacts from the Holcomb Expansion Project on global warming from carbon dioxide emissions, or on air quality from the emissions of other air pollutants.  This is delegated to the Environmental Protection Agency and the State of Kansas.

RUS's authority over its borrowers is solely as a lender interested in repayment of a borrower's debt to the Government in the agreed-upon time.  As such, several courts have held that RUS's relationship with its borrowers is that of a lender, not a regulator.  See, e.g., Wabash Valley, 988 F.2d at 1490 ("Being a lending agency administering a federal credit program rather than a regulatory agency, the REA has . . . the stick of its authority to lend or not lend in a particular jurisdiction to protect against defaulting debtors."); see also Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n, 461 U.S. 375, 386 (1993) (declining to allow RUS to regulate the borrower's electricity rates, and stating that "[RUS] is a lending agency rather than a classic public utility regulatory body . . ."); City of Stilwell v. Ozarks Rural Elec. Co-op Corp., 79 F.3d 1038, 1044 (10th Cir. 1996) ("The REAct did not  . . . confer regulatory powers upon [RUS]").  To suggest that RUS has the discretion to control non-federal activities by virtue of its ongoing loan administration and its limited authority to determine that a borrower's actions will not threaten repayment in the agreed-upon time is misplaced.  Under its loan documents, RUS

---

[17]  Sunflower is required to obtain CAA permits from the State because Kansas has a permit program authorized by EPA.  Thus, the consideration of the impacts of air emissions are within the purview of the State, not RUS.

retains the ability to approve certain actions taken by a borrower, but only with the eye toward determining whether repayment of the debt is threatened or its security is threatened.  See Wabash Valley, 988 F.2d at 1484 (RUS "is obliged to rely on its financing documents . . . to condition repayment and thereby protect itself.").

RUS lacks discretion to review the impacts of the Holcomb Expansion Project's air emissions on the environment.  It has no statutory authority to impose or enforce emissions caps or controls.  RUS, in fact, does not even have the authority to dictate the number and size of the power plants for the Holcomb Expansion Project, but only whether to finance, what to finance, and the terms and conditions of a loan, which in this case it is not making.  This lack of discretion by RUS is highlighted by the fact that although it consented to the 2002 debt restructuring, and provided the 2007 approvals, the State of Kansas, which is delegated the authority to issue air permits under its State Implementation Plan,[18] rejected Sunflower's application for an air permit for the Holcomb Expansion Project without consent or input from RUS.  Furthermore, although the 2007 approvals gave consent to certain business agreements contemplated when Sunflower was proposing to build two additional 700 megawatt coal-fired power plants, Sunflower and the State of Kansas—again without consultation with RUS— entered into a settlement whereby the State would issue Sunflower an air permit for one 895 MW coal-fired power plant conditioned on, among other things, a host of other compliance measures for nitrogen oxide, sulfur dioxide and mercury emissions.[19]  *See* Settlement Agreement between

---

[18] Under the Clean Air Act, EPA has the authority to approve a State Implementation Plan.  42 U.S.C. § 7475.

[19] RUS has not determined whether the change in the proposed Expansion Project as outlined in the Settlement Agreement, see Exhibit A, will require new approvals under the terms of the existing loan documents.

Sunflower and the State of Kansas ("Settlement Agreement"), attached hereto as Exhibit A; see also July 1, 2009 letter from William Rice, Acting Regional Administrator, U.S. Environmental Protection Agency to Roderick Bremby, Secretary of the Kansas Department of Health and Environment (discussing how Sunflower still needs to apply for an air permit under the CAA despite its agreement with Kansas), attached hereto as Exhibit B.  RUS was neither a party to the negotiations nor the Settlement Agreement, nor was it even consulted about the environmental impacts of building one new power plant.

In short, Sierra Club is after the wrong agency in this case.  RUS is not funding the Holcomb Expansion Project.  It simply does not have the discretion to make meaningful decisions about the impacts from or alternatives to the Holcomb Expansion Project.  It is important to note that Sierra Club will have sufficient ability to voice its concerns over carbon dioxide emissions and the emissions of other air pollutants during the public comment process during Sunflower's application for an air permit under the Clean Air Act.  See Ex. 2 (EPA letter stating that due to anticipated design changes in the Holcomb Expansion Project as a result of Sunflower-Kansas Settlement Agreement, "[t]he public should have an opportunity to provide meaningful comment on any such impacts").

Because RUS's actions in consenting to the 2002 debt restructuring and the 2007 approvals do not give the Agency control over the Holcomb Expansion Project; because the Agency does not have discretion or authority to meaningfully consider the alleged impacts from air emissions from the Holcomb Expansion Project, and because that authority has been statutorily given by Congress to EPA and the States, there is no "major Federal action" within the meaning of NEPA in this case.  The Court should deny Sierra Club's motion for summary judgment and grant RUS's motion.

III.   **7 C.F.R. § 1794.3 exempts RUS's actions from NEPA review.**

A.   **The 2002 debt restructuring and the alleged lien subordination were approvals pursuant to a loan contract, were not "financial assistance for new construction" and therefore, fall within the ambit of 7 C.F.R. § 1794.3.**

Sierra Club argues that "[w]hatever the nuances of § 1794.3's applicability as applied to 'approvals,' it does not exempt financial assistance for new construction from NEPA review." Pls. SJ Mtn. at 26.  Sierra Club's conclusion that 7 C.F.R. § 1794.3 is inapplicable in this case is based on the false premise that the 2002 debt restructuring is "financial assistance" for the construction of the Holcomb Expansion Project, and must be rejected.

As discussed in Federal Defendants' Motion to Dismiss, RUS made the determination that the 2002 debt restructuring and the 2007 approvals were "approvals  . . . pursuant to loan contracts and security instruments," as described in Section 1794.3.   Dkt. No. 12 at 22. Additionally, as discussed above, the 2002 debt restructuring was not financial assistance for the Holcomb Expansion Project.   Although the debt restructuring was taken pursuant to a loan contract or security instrument, see id. at 23-30, the purpose of the 2002 debt restructuring was to restructure the terms and conditions of Sunflower's outstanding debt to RUS in order to maximize recovery of the money owed to the Government in the face of a debtor who was in serious risk of default.   See e.g., AR 4320A.2, 183.  Any incidental "financial" benefit that Sunflower may have received through the debt restructuring that allowed it to prevent defaulting on its loan is not "financial assistance" to the Holcomb Expansion Project within the meaning of Section 1794.3 or NEPA.  Therefore, even if Section 1794.3 required NEPA review for all forms and extents of "approval of financial assistance," RUS's actions here are "approvals pursuant to loan contracts" and not "approval of financial assistance" for the Holcomb Expansion Project and therefore are exempt from the requirements of Section 1794.3 and NEPA.   RUS's

determination that the approvals fall within Section 1794.3 are entitled to deference.  See Auer v.
Robbins, 519 U.S. 452, 461 (1997) (an agency's interpretation of its own regulations is entitled
to deference "unless plainly erroneous or inconsistent with the regulation") (quotation marks and
citation omitted); accord Everett v. United States, 158 F.3d 1364, 1367 (D.C. Cir. 1998).

      Sierra Club also argues that Section 1794.3 does not apply to the 2002 debt restructuring
and the 2007 approvals because they are not "ministerial" actions.  Pls. SJ Mtn. at 26-27.  As
discussed above, although RUS has broad discretion to determine the terms and conditions of a
new loan to ensure that "the security therefor is reasonably adequate and such loan will be repaid
within the time agreed," 7 U.C.S. § 904, its discretion is limited to its authority as a lender, and
not a regulator, under the RE Act.  See Wabash Valley, 988 F.2d at 1490.  The question before
RUS would be whether to finance the Holcomb Expansion Project, and under what terms and
conditions.  RUS lacks the discretion to take into account the effects of or alternatives to the non-
federally funded Holcomb Expansion Project.  Therefore Sierra Club's claim must fail.

      **B.**     **RUS's actions are consistent with CEQ regulations.**

      Finally, Sierra Club alleges that even "section 1794.3 exempts all of RUS's actions . . .
then it should find section 1794.3 invalid as applied here because it conflicts with NEPA and
CEQ regulations.  Pls. SJ Mtn. at 27.  This is a facial challenge to the regulation in sheep's
clothing.  Sierra Club, however, cannot bring a facial challenge to the regulation because it is
barred by the six-year statute of limitations.  Sierra Club fails to demonstrate specifically which
approvals fall within the ambit of 1794.3 but violation NEPA, and how they violate NEPA.
Furthermore, this argument is specious because the central question Sierra Club asks in this case
is whether the Holcomb Expansion Project is a major federal action, Pls. SJ Mtn. at 6, not

whether any specific approval on its own is a major federal action.  Sierra Club's argument should be rejected.

### IV.  The Court should find that RUS complied with NEPA; should the Court conclude a violation has occurred, further proceedings will be appropriate.

As discussed above, RUS has met its obligations under NEPA.  If, however, the Court finds otherwise, further proceedings are appropriate to decide what relief, if any, should be ordered.  It is premature to consider remedies unless and until the extent of any violations is set forth in detail by the Court.[20]

### A.  Injunctive relief is an extraordinary remedy.

An injunction is an "extraordinary remedy" that "should issue only where the intervention of a court of equity is essential in order effectually to protect . . . against injuries otherwise irremediable."  Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982) (internal citations and quotation marks omitted).  The Supreme Court has explained that an injunction "does not issue as of course," Amoco Production Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987), and "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff."  Weinberger, 456 U.S. at 312 (internal citations omitted). "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."  Amoco Prod. Co., 480 U.S. at 542 (quoting Weinberger, 456 U.S. at 313).

---

[20] In this section RUS briefly addresses certain issues related to remedy; however this is not an exhaustive discussion and RUS requests the opportunity to further brief the issue following the Court's decision on the merits, should the Court find a NEPA violation.

To obtain permanent injunctive relief, a plaintiff must show that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  eBay Inc. v. MercExhange, L.L.C., 547 U.S. 388, 391 (2006).

This traditional analysis for assessing injunctive relief is not altered by the fact that Sierra Club has alleged an environmental injury.  Realty Income Trust v. Eckerd, 564 F.2d 447, 457 (D.C. Cir. 1977) (holding that injunctive relief need not be provided for every violation of NEPA); Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 976 (D.C. Cir. 1985) (rejecting the argument that a potential NEPA violation in this case presumptively justifies an injunction); Alaska v. Andrus, 580 F.2d 465, 485-87 (D.C. Cir. 1978) (same).  In fact, the Supreme Court has rejected a presumption of irreparable injury when an agency fails to thoroughly evaluate the environmental impact of a proposed action.  Amoco Prod. Co., 480 U.S. at 545.  See also Nat'l Wildlife Fed'n v. Burford, 835 F.2d 305, 323-24 (D.C. Cir. 1987) (explaining that Amoco prohibits courts from "presum[ing] irreparable injury" and directs them to engage "their traditional equitable discretion") (emphasis added); Lands Council v. McNair, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("our law does not . . . allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue.").[21]   Each

---

[21] While correctly acknowledging that the traditional balancing of harms test applies in NEPA cases, Plaintiff suggests that an injunction is appropriate unless RUS can prove "extraordinary circumstances" weigh against the injunction.  Pls. SJ Mtn.. at 31.  Such an attempt to shift the burden of proof from the proponent of an injunction is contrary to the Supreme Court's clear mandate that harms are to be *balanced* without a presumption in favor of injunctive relief in environmental cases.  Amoco Prod. Co., 480 U.S. at 545.  See also. eBay, 547 U.S. at 391 (rejecting claim in patent case that injunctions should be denied only where "unusual

case requires a "particularized analysis" of the violations that have occurred, and the "countervailing considerations" of the public interest.   Alaska v. Andrus, 580 F.2d at 485. Moreover, an injunctive remedy, if ordered, must not be overly broad:

> When a court has found that a party is in violation of NEPA, the remedy should be shaped so as to fulfill the objectives of the statute as closely as possible, consistent with the broader public interest.... The court should tailor its relief to fit each particular case, balancing the environmental concerns of NEPA against the larger interests of society that might be adversely affected by an overly broad injunction.

Envtl. Def. Fund v. Marsh, 651 F.2d 983, 1005-06 (5th Cir.1981). See also Natural Res. Def. Council, Inc. v. U. S. Nuclear Regulatory Comm'n, 606 F.2d 1261, 1272 (D.C. Cir.1979).  Here, Sierra Club has failed to meet its burden of showing that it is entitled to injunctive relief.

### B. A permanent injunction would harm RUS and is contrary to the public interest because it would slow the administration of an important, Congressionally-mandated program.

In actions implicating government policy or regulation, courts will consider the effect on the public interest of granting an injunction.  Yakus v. United States, 321 U.S. 414, 441 (1944) (holding that courts may go much farther in granting and denying equitable relief in furtherance of public interest than when only private interest is involved).  A party moving for injunctive relief carries a particularly heavy burden where, as here, the result of the injunction is to impede the orderly administration of a governmental responsibility intended to serve the public interest. Id. at 440; Weinberger, 456 U.S. at 312-313 (holding that when injunctive relief would harm the public interest, the Court may withhold the relief, even if doing so would burden the movant). Courts have long considered issues related to major federal actions as fitting within a "public

---

circumstances" are shown, noting that "a major departure from the long tradition of equity practice should not be lightly implied." (quoting Weinberger, 456 U.S. at 320).

interest" inquiry.  See, e.g., Piedmont Heights Civic Club v. Moreland, 637 F.2d 430, 439 (5th Cir. 1981) (refusing to enjoin highway construction for alleged noncompliance with environment laws when plaintiff's harm was outweighed by harm caused to the public by traffic and safety hazards on overcrowded highways).

Here, an injunction will harm the public interest.  By promulgating and enacting RE Act, Congress established a clear intent to provide federal funding to rural utilities to provide reliable electricity to rural America.  See 7 U.S.C. § 904.  The program represents Congress' determination that it is in the public interest to allow RUS to administer its loan program providing federal financing for certain rural electrification projects.  It is also in the public interest for RUS to administer the Sunflower loans pursuant to their contractual terms so that the Government can maximize its repayment of the debt it is owed.  A permanent injunction in this case would thwart Congress' intent.  Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 672 (D.C. Cir. 1996) ("The federal judiciary is not a back-seat Congress nor some sort of super-agency").  Thus, it is in the public interest to allow RUS to follow Congress' mandate and administer the rural electrification program.  The balance of public interest thus favors against the issuance of a permanent injunction.

## C. The balance of hardships between the parties weighs against a permanent injunction.

The balance of harms weighs against granting Sierra Club's requested injunctive relief. In determining whether injunctive relief is appropriate, the Court must look to the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied.  Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 640 (D.C. Cir. 1982).  See also eBay, 547 U.S. at 391.  While Sierra Club ostensibly acknowledges that the traditional balancing of harms applies in environmental

cases, it nonetheless attempts to portray their proposed blanket injunction as compelled by law, asserting that there is a "presumption in favor of injunctive relief" in NEPA cases. Pls. SJ Mtn. at 30. Sierra Club is incorrect.

Here, the balance weighs against the granting of a permanent injunction preventing RUS from administering its loan program. On one side of the balance is the Congressionally-mandated rural electrification program, established to encourage the construction of electric facilities in rural areas. On the other side of the balance is Sierra Club's unquantified claim of harm. See Pls. SJ Mtn. at 33-36. As discussed above, the types of approvals, contracts and provisions which Sierra Club challenges are not unique to Sunflower; in fact, they are commonplace amongst many of RUS's hundreds of rural borrowers. An injunction preventing RUS from carrying out certain loan administration duties would not affect just those duties with regard to Sunflower, but would throw into doubt the administration of an entire federal administrative program.

Therefore, the balance of harms tips against the type of blanket permanent injunctive relief Sierra Club seeks. In sum, Sierra Club has failed to meet its burden of proving that it is entitled to permanent injunctive relief.

### D. Even assuming injunctive relief is appropriate, Sierra Club's request is overbroad.

As set forth above, RUS avers it has complied with its duties under NEPA. However, should the Court determine otherwise, RUS requests an opportunity for further proceedings in order to submit a briefing on remedy after receiving the benefit of the Court's ruling on the merits of Sierra Club's claims. Only then will the proper scope of relief be ascertainable.

It is a well-established principle that relief must be narrowly tailored to give only the relief to which plaintiffs are entitled. Alpo Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958,

972 (D.C. Cir. 1990).  See also Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (holding that an

injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled); Gulf

Oil Corp. v. Brock, 778 F.2d 834, 842 (D.C. Cir. 1985) (same).  While district courts have broad

discretion in weighing equitable factors germane to deciding whether injunctive relief is, or is

not, indicated, relief should be narrowly tailored to remedy the legal violation found and to

balance the hardships between the parties.  Foxtrap, Inc., 671 F.2d at 640 ("[T]he scope of an

injunction should be determined by balancing [the] harm to the plaintiff, other means of avoiding

such harm, and the relative inconvenience to the defendant.").  See also Fed. R. Civ. P. 65(d)

(injunctive orders "shall be specific in terms").

      Here, Sierra Club requests an injunction "preventing RUS and Sunflower from taking

certain steps to advance the Holcomb expansion project until a legally adequate EIS is

complete."  Pls. SJ Mtn. at 29.[22]  Sierra Club does not define what "certain steps" means, and as

such, it is not sufficiently tailored so as to address the alleged violations but not unduly burden

---

[22] Sierra Club also proposes a remedy which requires the Court to retain jurisdiction in this matter.  See Proposed Order, Dkt. No, 88-7.  This suggestion is inappropriate and unnecessary. Should the Court find that RUS has violated NEPA, and that injunctive relief is appropriate, and so orders RUS to complete a NEPA document on the Holcomb Expansion, that order is sufficient to ensure RUS's compliance with the Court's order.   There exists a presumption of administrative regularity.  Butler v. Principi, 244 F.3d 1337, 1340 (Fed. Cir. 2001) ("The 'presumption of regularity' supports official acts of public officers.  In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties.") (internal citations omitted); see also United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926).  That presumption should run to any future NEPA process undertaken by RUS.   Should Sierra Club wish to challenge the Holcomb Expansion project NEPA document, upon its completion Sierra Club will have ample opportunity to challenge that document through the APA's administrative appeal and judicial review process.  See also Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 66-67 (2004) ("the principal purpose of the APA limitations is to protect agencies from undue judicial interference in their lawful discretion and to avoid judicial entanglement in abstract policy disagreement which courts lack both expertise and information to resolve.").

RUS in the administration of its duties.  Sierra Club's suggested remedy is also premature in light of the fact that the Court has not ruled on the merits of Sierra Club's claims.  Thus the scope of the problem to be addressed has not yet been defined.  Sierra Club has failed to carry its burden of demonstrating that it is entitled to any injunctive relief at all.  Should the Court determine that injunctive relief is appropriate, rather than adopting the overbroad injunction urged by Sierra Club, the Court should allow further briefing to define a narrowly tailored remedy, which will address the harm found by the Court, but will not constrain the Agency's day-to-day work in administering its loan portfolio to hundreds of RUS borrowers throughout the United States.

## CONCLUSION

For the foregoing reasons, RUS respectfully request that the Court deny Sierra Club's motion for summary judgment and grant RUS's cross-motion for summary judgment.

Dated: November 20, 2009                    Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

/s/ *Julia Thrower*
JULIE S. THROWER
ALISON D. GARNER
Trial Attorneys
Natural Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0247 (Thrower)
Telephone: (202) 514-2855 (Garner)
Facsimile: (202) 305-0506
Email: julie.thrower@usdoj.gov
alison.garner@usdoj.gov

*Of counsel*:

TERENCE M. BRADY
Assistant General Counsel
HELEN HARRIS
Attorney
Rural Utilities Division
Office of General Counsel
United States Department of Agriculture

*Attorneys for Federal Defendants*