# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, | ) |
| | ) |
| | ) Case No. 07-1860-EGS |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE, RURAL UTILITIES | ) |
| SERVICE, <u>et al.</u>, | ) |
| | ) |
| Federal Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| SUNFLOWER ELECTRIC POWER | ) |
| CORPORATION, | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

## FEDERAL DEFENDANTS REPLY IN SUPPORT
## OF CROSS-MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

ARGUMENT .................................................................................................................1

I.    RUS's actions fall within 7 C.F.R. § 1794.3's exemption from NEPA
Review ...............................................................................................................1

    A.    RUS is entitled to deference in its interpretation and application of its
Regulation ............................................................................................1

    B.    RUS's actions were taken pursuant to the existing loan contract and
mortgage agreement and are thus exempt from NEPA review pursuant to
7 C.F.R. § 1794.3 ..................................................................................4

        i.    The 2002 debt restructuring was an approval pursuant the loan
contract and mortgage agreement and is thus exempt from NEPA
review ...........................................................................................5

        ii.    The 2007 approvals were approvals pursuant to the loan contract
and mortgage agreement and are thus exempt from NEPA review.............7

    C.    Application of 7 C.F.R. § 1794.3 in this case is not in conflict
with CEQ regulations.............................................................................10

II.    RUS's actions do not give the agency sufficient control over the non-federal
Holcomb Expansion Project and therefore it does not have to review the
environmental impacts of the Project pursuant to NEPA ...................................10

    A.    RUS was not "legally required" to take affirmative action, and its actions
did not give it sufficient authority to control environmental aspects
of the Holcomb Expansion Project .......................................................13

    B.    RUS did not provide financial assistance to the Holcomb Expansion Project
and its actions are not sufficient to provide it control over the Project .................16

    C.    RUS does not have sufficient authority to control the environmental aspects
of the Holcomb Expansion Project .......................................................19

III.    The Court should find that RUS complied with NEPA; should the Court conclude a
violation has occurred, further proceedings regarding remedy will be
appropriate ........................................................................................................20

    A.  Sierra Club has not shown it is entitled to injunctive relief.......................................21

i.      A permanent injunction would harm RUS and is contrary to the public interest because it would slow the administration of an important, Congressionally-mandated program ..........................................................21

ii.     The balance of hardships between the parties weighs against a permanent injunction ................................................................................23

iii.    Even assuming injunctive relief is appropriate, Sierra Club's request is overbroad..........................................................................................24

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

## CASES

Alaska Ctr. for the Env't v. U.S. Forest Serv.,
    189 F.3d 851 (9th Cir. 1999) ..................................................................3, 4

ALPO Petfoods, Inc. v. Ralston Purina Co.,
    913 F.2d 958 (D.C. Cir. 1990) .....................................................................21

Amoco Prod. Co. v. Vill. of Gambell,
    480 U.S. 531 (1987)..............................................................................20, 21

Belco Petroleum Corp. v. Fed. Energy Regulatory Comm'n,
    589 F.2d 680 (D.C. Cir. 1978)  ....................................................................2

Butler v. Principi,
    244 F.3d 1337 (Fed. Cir. 2001)....................................................................24

Califano v. Yamasaki,
    442 U.S. 682 (1979)....................................................................................20

Citizens Against Rails to Trails v. Surface Transp. Bd.,
    267 F.3d 1144 (D.C. Cir. 2001) ....................................................................3

Citizens Alert Regarding the Env't v. U.S. Env't Prot. Agency,
    259 F. Supp. 2d 9 (D.D.C. 2003)...............................................................11

Cuomo v. U.S. Nuclear Regulatory Comm'n,
    772 F.2d 972 (D.C. Cir. 1985) .....................................................................21

Davis v. Morton,
    469 F.2d 593 (10th Cir. 1972) ..............................................................14, 18

Dialysis Clinic, Inc. v. Leavitt,
    518 F. Supp. 2d 197 (D.D.C. 2002)..............................................................2

eBay Inc. v. MercExchange, L.L.C.,
    547 U.S. 388 (2006)..............................................................................21, 23

Fla. Audubon Soc'y v. Bentsen,
    94 F.3d 658 (D.C. Cir. 1996).......................................................................24

Found. for Econ. Trends v. Heckler,
    756 F.2d 143 (D.C. Cir. 1985) .....................................................................14

Grand Canyon Trust v. Fed. Aviation Admin.,
   290 F.3d 339 (D.C. Cir. 2002) ...................................................................3

Humane Soc'y of the United States v. Johanns,
   520 F. Supp. 2d 8 (D.D.C. 2007) ..........................................................2, 14

Jones v. Lynn,
   477 F.2d 885 (1st Cir. 1973) ...................................................................15

Landmark West! v. U.S. Postal Serv.,
   840 F. Supp. 994 (S.D.N.Y. 1993) ...........................................................3

Mineral Policy Ctr. v. Norton,
   292 F. Supp. 2d 30 (D.D.C. 2003) .......................................................3, 10

Minn. Pub. Interest Research Group v. Butz,
   498 F.2d 1314 (8th Cir. 1974) .................................................................19

Morris County Trust for Historic Pres. v. Pierce,
   714 F.2d 271 (3d Cir. 1983) ...................................................................15

Nat'l Org. for the Reform of Marijuana Laws v. U.S. Drug Enforcement Admin.,
   545 F. Supp. 981 .................................................................12, 13, 17, 19

Nat'l Wildlife Fed'n v. Brownlee,
   402 F. Supp. 2d 1 (D.D.C. 2005) ..............................................................3

Norton v. S. Utah Wilderness Alliance,
   542 U.S. 55 (2004) .................................................................................24

Realty Income Trust v. Eckerd,
   564 F.2d 447 (D.C. Cir. 1977) ................................................................21

Sancho v. U.S. Dep't of Energy,
   578 F. Supp. 2d 1258 (D. Haw. 2008) ....................................................13

Shalala v. Guernsey Mem'l Hosp.,
   514 U.S. 87 (1995)  ..................................................................................2

Sylvester v. U.S. Army Corps of Eng'rs,
   884 F.2d 394 (9th Cir. 1989) ....................................................................4

Time Warner Entm't Co., L.P. v. Fed. Comm'n Comm.,
   93 F.3d 957 (D.C. Cir. 1996) ..................................................................10

Wabash Valley Power Ass'n v. Rural Electrification Admin.,
    988 F.2d 1480 (7th Cir. 1993) ...................................................................13

Wachtel v. Office of Thrift Supervision,
    982 F.2d 581 (D.C. Cir. 1993) ......................................................................3

Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1982) ....................................................................................22

Weiss v. Kempthorne,
    580 F. Supp. 2d 184 (D.D.C. 2008) ...........................................................12

Winter v. Natural Res. Def. Council, Inc.,
    129 S. Ct. 365 (2008) ..................................................................................20

Yakus v. United States,
    321 U.S. 414 (1944) ....................................................................................22

## STATUTES

5 U.S.C. § 706 ...................................................................................................20

7 U.S.C. § 904 ...................................................................................................22

7 U.S.C. § 1991(a)(12)..........................................................................................5

## REGULATIONS

7 C.F.R. § 1794.20................................................................................................5

7 C.F.R. § 1794.3 .................................................................. 1, 2, 4-7, 9, 10

40 C.F.R. § 1507.3................................................................................................2

## OTHER

62 Fed. Reg. 62,527 (Nov. 24, 1997) ..................................................................2

Sierra Club uses a very wide brush in an attempt to paint a picture of alleged extensive federal support and control for the Holcomb Expansion Project—a project that will be designed and constructed on non-federal land, with non-federal funding, and by non-federal entities. Sierra Club claims that this alleged federal support occurred through the Rural Utilities Service's ("RUS") loan administration activities on loans it issued to Sunflower Electric Power Corporation ("Sunflower") over 25 years ago for the construction of the original Holcomb power generating station.  Sierra Club alleges that through RUS's loan administration activities, RUS provided such extensive support and cooperation that RUS now has the discretion to control and influence the environmental aspects of the Holcomb Expansion Project.  Thus, Sierra Club argues that RUS's actions subject to the National Environmental Policy Act ("NEPA").  Sierra Club fails, however, to demonstrate that RUS has any authority—whether by statute, regulation, or contract—to control the environmental aspects of the Holcomb Expansion Project.  Sierra Club also fails to demonstrate that RUS's actions are sufficient federal support, effectively giving RUS the requisite control to turn the Holcomb Expansion Project into a major federal action.  Even if the Court does find a NEPA violation, Sierra Club has not shown that it is entitled to injunctive relief.  An injunction would harm the public interest and the balance of hardship weighs against and injunction.  The Court should deny Sierra Club's motion for summary judgment and find in favor of Federal Defendants.

## ARGUMENT

I.     **RUS's actions fall within 7 C.F.R. § 1794.3's exemption from further NEPA review.**

A.     **RUS is entitled to deference in its interpretation and application of its regulation.**

Sierra Club argues that the Court owes no deference to RUS's position that the challenged actions fall within 7 C.F.R. § 1794.3, exempting those actions from further NEPA

review.  Pl.'s Summ. J. Opp'n and Reply ("Pl.'s Summ. J. Opp'n") at 25-26 (Docket

Nos. 96, 97).  In doing so, Sierra Club completely ignores the fact that the question of whether

RUS's actions are exempt from further NEPA review pursuant to 7 C.F.R. § 1794.3, is review of

the agency's interpretation and application of its <u>own</u> NEPA regulations,[1] and not of NEPA

itself, or of the NEPA regulations promulgated by the Council on Environmental Quality

("CEQ").  <u>See id.</u> at 25.  Contrary to Sierra Club's position, RUS's interpretation of its regulation

and determination that its actions fall within the exception for NEPA review for "approvals

pursuant to loan contracts" under to 7 C.F.R. § 1794.3, are entitled to substantial deference by

this Court.  <u>See</u> <u>Dialysis Clinic, Inc. v. Leavitt</u>, 518 F. Supp. 2d 197, 201-02 (D.D.C. 2002) ("In

reviewing an agency's interpretation of its own regulations, the Court must defer to that

interpretation as long as it is reasonable.") (citing <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S.

87, 115 (1995).  This is the case even where the regulation involves an agency's NEPA

implementing regulations.  <u>See</u> <u>Humane Soc'y of the United States v. Johanns</u>, 520 F. Supp. 2d

8, 32 (D.D.C. 2007) (stating that, in reviewing agency's invocation of a categorical exclusion

under NEPA, the "courts owe great deference to the interpretation adopted by the agency and

will uphold that interpretation if it is reasonable and consistent with the regulation") (citing

<u>Belco Petroleum Corp. v. Fed. Energy Regulatory Comm'n</u>, 589 F.2d 680, 685 (D.C. Cir.

1978)).

      The cases that Sierra Club cites are not applicable to the situation here, where RUS is

interpreting and applying its own regulations.  <u>See</u> Pl.'s Summ. J. Opp'n at 25.  <u>Citizens Against</u>

---

[1] 7 C.F.R. § 1794.3 is part of RUS's regulations implementing NEPA.  The regulation was promulgated pursuant to 40 C.F.R. § 1507.3, which directs each agency to promulgate their own regulations implementing NEPA.  In accordance with § 1507.3, RUS consulted with the Council on Environmental Quality prior to publication of its notice of intent to revise the regulations in the Federal Register.  <u>See</u> AR S13-14, AR S186.  The regulation was promulgated after public notice and comment procedures.  <u>See</u> 62 Fed. Reg. 62,527 (Nov. 24, 1997).

2

Rails to Trails v. Surface Transportation Board is a case where the agency determined that NEPA did not apply to the National Trails System Act. 267 F.3d 1144, 1150-51 (D.C. Cir. 2001). That case would be applicable here if RUS argued that NEPA never applies to RUS's actions taken pursuant to the Rural Electrification Act—but RUS has not made that argument. In Mineral Policy Center v. Norton, the plaintiffs were mounting a facial challenge to the agency's NEPA implementing regulations. 292 F. Supp. 2d 30, 32 (D.D.C. 2003). There, the court held that the agency's "NEPA determination is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute." Id. at 54 (citations and internal quotations omitted). But that case does not apply here because the Sierra Club has consistently insisted that it is not mounting a facial challenge to RUS's regulation. See Pl.'s Summ. J. Opp'n at 29; see also Grand Canyon Trust v. Fed. Aviation Admin., 290 F.3d 339, 342-43 (D.C. Cir. 2002) (noting in dicta that an agency's interpretation of CEQ's NEPA regulations are not entitled to deference); Landmark West! v. U.S. Postal Serv., 840 F. Supp. 994, 1004 (S.D.N.Y. 1993) (applying a less deferential standard of review where the issue was the agency's interpretation of NEPA but where no agency regulation was at issue). National Wildlife Federation v. Brownlee is inapplicable because it involved the Army Corps of Engineers' statutory interpretation of the Endangered Species Act. 402 F. Supp. 2d 1, 11 (D.D.C. 2005); see also Wachtel v. Office of Thrift Supervision, 982 F.2d 581, 585 (D.C. Cir. 1993) (no deference to agency interpretation of a statute that is also administered by other agencies). Contrary to Sierra Club's position, none of these cases speak to the level of deference a court should accord an agency when it is applying its own NEPA implementing regulations.

Sierra Club also misreads the cases cited by Sunflower. See Pl.'s Summ. J. Opp'n at 26. Sierra Club claims that the Ninth Circuit in Alaska Center for the Environment v. U.S. Forest

Service, 189 F.3d 851 (9th Cir. 1999), gave the agency's determination substantial deference, but that the case is distinguishable because it involved the review of an agency's determination of the significance of the environmental impact.  Pl.'s Summ. J. Opp'n at 26.  But the question here is similar to that in Alaska Center for the Environment—whether the agency's application of its categorical exclusion exempting "minor short-term special uses of National Forest lands" from NEPA review to a one-year helicopter permit was reasonable—and the court gave the "agency's interpretation of the meaning of its own categorical exclusion . . . controlling weight."  Alaska Ctr. for the Env't, 189 F.3d at 854, 857.  Similarly, the Ninth Circuit in Sylvester v. U.S. Army Corps of Engineers held that "the district court should have deferred to the [agency's] regulations as approved by the CEQ" when determining whether the agency followed them in determining the scope of NEPA review required.  884 F.2d 394, 399 (9th Cir. 1989).

The case law clearly demonstrates that when reviewing RUS's determination that its actions were taken pursuant to loan contracts, and those actions are exempt from NEPA review under 7 C.F.R. § 1794.3, the Court should accord the agency's interpretation and application of its regulation substantial deference.

**B.      RUS's actions were taken pursuant to the existing loan contract and mortgage agreement and are thus exempt from further NEPA review pursuant to 7 C.F.R. § 1794.3.**

The plain text of 7 C.F.R. § 1794.3 makes it clear that "[a]pprovals provided by RUS pursuant to loan contracts and security instruments . . . are not actions" for the purposes of NEPA.  7 C.F.R. § 1794.3.  Because the challenged approvals were not financial assistance for the Holcomb Expansion Project, but were granted pursuant to the loan contracts and mortgage agreements, these actions are exempt from further NEPA review.  Sierra Club's claim that these

actions are major federal actions requiring the preparation of an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") must therefore fail.

> **i.      The 2002 debt restructuring was an approval pursuant to the loan contract and mortgage agreement and is thus exempt from NEPA review.**

Sierra Club argues 7 C.F.R. § 1794.3 NEPA exemption does not apply to RUS's actions in the 2002 debt restructuring because RUS used its authority under the Consolidated Farm and Rural Development Act ("Con Act") to settle the debt, so therefore they must not be approvals pursuant to the loan contract or mortgage agreement. Pl.'s Summ. J. Opp'n at 27-28. Sierra Club also argues that the debt restructuring is financial assistance for the Holcomb Expansion Project, and under 7 C.F.R. § 1794.3, NEPA applies to RUS's "approval of financial assistance."[2] Id. Both these arguments should be rejected.

Sierra Club argues because RUS used its authority under the Con Act to approve the 2002 debt restructuring, the restructuring must not have been an approval pursuant to a loan contract or mortgage agreement. But the 2002 Agreement and Consent to Sunflower Restructuring demonstrates that the consents provided by RUS were done pursuant to the 1987 Debt Restructure, Override Agreement and Amended Restated Credit Agreement ("1987 DRA"). For example, the 2002 Agreement and Consent to Sunflower Restructuring identifies the provisions contained in the 1987 DRA that require Sunflower to seek prior written approval from its creditors, identifies the actions Sunflower wishes to take as part of the 2002 restructuring that

---

[2] Sierra Club cites to 7 U.S.C. § 1991(a)(12), suggesting that this section defines "debt forgiveness" as "financial assistance" under NEPA. Pl.'s Summ. J. Opp'n at 27. Section 1991(a)(12) does not even contain the words "financial assistance" or "NEPA." Even though 7 C.F.R. § 1794.3 provides that NEPA applies to RUS approvals of financial assistance, not all financial assistance may be subject to NEPA. See 7 C.F.R. § 1794.20 (excluding NEPA review where an applicant's participation in a project with other parties is insufficient to give the applicant control to alter the project's development).

require consent under the provisions of the 1987 DRA, and lays out the terms and conditions on which Sunflower's creditors, including RUS, will provide consent.   AR 222.   Despite its authority under the Con Act, RUS did not have unilateral authority to approve the consent to the restructuring because the approval operated under the provisions of the DRA, which required approval of the "designated percentage of the Creditors."  AR 222; AR 3952.  Therefore, RUS's approval of the 2002 restructuring was an "approval pursuant to [a] loan[ ] contract or security instrument[ ]" and thus exempt from NEPA review.  7 C.F.R. § 1794.3.

Sierra Club's argument that the 1987 DRA could not exempt the award of a new RUS loan from NEPA review as an "approval under [a] loan contract[ ]" pursuant to 7 C.F.R. § 1794.3 is correct.  See Pl.'s Summ. J. Opp'n at 28.  The 1987 DRA requires RUS's approval for Sunflower to "apply to the [RUS] for any new loan or a guarantee of any new loan."  AR 3954 (emphasis added).  This provision has nothing to do whether or not RUS approved a new loan or not, and says nothing about RUS's obligations under NEPA in the event a new federal loan for Sunflower is being considered.  So even if RUS's approval allowing Sunflower to apply for a new RUS loan would be exempt from NEPA as an approval pursuant to a loan contract, RUS's actual approval of a new loan is not an approval pursuant to the loan contract, and would be subject to NEPA.  In any case, this hypothetical issue is irrelevant to the question of whether the challenged approvals in this case fall within 7 C.F.R. § 1794.3's NEPA exception.

Sierra Club's second argument, that the debt restructuring was financial assistance for the Holcomb Expansion Project and therefore not exempt from NEPA review under 7 C.F.R. § 1794.3, is also fatally flawed.   As previously discussed and discussed below, the debt settlement was not financial assistance to the Holcomb Expansion Project.  See Fed. Defs.' Opp'n and Cross-Mot. Summ J. ("Fed. Defs.' Summ. J. Opp'n") at 23-29 (Docket Nos. 96, 97).

The primary and secondary purposes of the debt restructuring was to maximize the government's recovery on its loans and to protect the rural electricity consumers in Kansas from the financial burden of an ever increasing Sunflower debt, according to RUS's social mission under the RE Act; it was not to support the Holcomb Expansion Project, which at the time was speculative and attenuated to the primary and secondary purposes of the 2002 restructuring.  Sierra Club's claim must fail.

### ii.    The 2007 approvals were approvals pursuant to the loan contract and mortgage agreement and are thus exempt from NEPA review.

Although Sierra Club had consistently argued throughout this litigation that the loan contract and mortgage agreement provide RUS with the control and authority over the Holcomb Expansion Project so that it could have imposed environmental conditions on the 2007 approvals,[3] it now claims—to support its argument that 7 C.F.R. § 1794.3 does not apply here— that the 2007 approvals were not taken pursuant to the loan contract and mortgage agreement, and that "RUS actions . . .  are not even 'approvals' at all."  Pl.'s Summ. J. Opp'n at 28; see also

---

[3] See, e.g., Pl.'s Opp'n to Fed. Defs.' Mot. to Dimiss at 15 (stating that documents such as the 2003 Amended and Restated Loan Contract "confirm that RUS's approval is required for the Holcomb Expansion to proceed"); id. at 18 ("The Complaint alleges that loan documents, including loan agreements and mortgages, provide RUS extensive control over Sunflower's business, and specifies a number of controls and restrictions imposed by loan documents."); Pl.'s Prelim. Inj. Mot. at 4 ("Under the 2002 agreements, virtually any action by Sunflower required prior approval from RUS, and RUS had unfettered discretion over the terms of those approvals."); id. at 16-17 ("Under the restructured loan, RUS obtained comprehensive oversight over the Expansion project . . . Specifically, Sunflower was contractually prohibited from entering into 'any agreement or other arrangement' for the development of the Holcomb site without RUS's prior written approval.") (citing to provisions of the loan contract and mortgage agreement); Pl.'s Prelim. Inj. Reply at 2 ("RUS's approval was a 'legal precondition' to the Expansion project because it was required under the plain language of the contracts."); id. at 16 (arguing that "NEPA's applicability [to the 2007 approvals] generally turns on the extent of the agency's discretion under" the terms of the contract); id. at 17 ("Virtually any action taken by Sunflower in pursuit of the Expansion was subject to RUS prior written approval . . . on whatever 'terms and conditions as RUS, in its sole discretion, may require.'") (citing to the 2003 Amended and Restated Loan Contract) (emphasis in original).

Pl.'s Summ. J. Mot. at 26.  Sierra Club fails, however, to explain why Sunflower would be seeking RUS's approval to enter into the business agreements subject to the 2007 approvals in the first place if not pursuant to the loan contract or mortgage agreement.  Without the loan contract and mortgage agreement in effect Sunflower would have no reason to seek RUS's approval to enter into the various agreements, and RUS has no independent statutory or regulatory basis for requiring a borrower to request RUS's approval to enter into certain business agreements.  See Fed. Defs.' Summ. J. Opp'n at 22.  Furthermore, Sierra Club's argument that RUS's position that the approvals are pursuant to the loan contract or mortgage agreement "appears to be counsel's post hoc rationalization, rather than considered agency judgment" is contrary to the Administrative Record.  See, e.g., AR 8218 (Under the RUS Loan Contract, RUS must give prior written approval for Sunflower . . . to enter into agreements . . .").[4]

Sierra Club's argument that the 2007 approvals are not approvals required under the loan contract and mortgage agreement also directly conflict with its position that the approvals are major federal actions because the contracts required RUS "to take affirmative action . . . before the project could lawfully proceed."  Pl.'s Summ. J. Mot. at 9; see also id. at 10  ("Sunflower was contractually prohibited from entering into 'any agreement or other arrangement' for the development of the Holcomb site without RUS's prior written approval.") (emphasis added); id. at 11 ("RUS's formal written approval . . . was both a contractual and regulatory 'precondition' to the Expansion.").  And its argument that the approvals were not granted pursuant to the loan contract and mortgage agreement also conflicts with the relief it requests.  See Pl.'s Proposed Order (Dkt. No. 88-7) at 2 (requesting that the Court "enjoin[ ] RUS from taking any action,

---

[4] See also AR 8218 (stating that the approvals are governed by Sections 5.14 and 5.15 of the "RUS Loan Contract"); AR 8222 ("Under the RUS Loan Contract and 2004 Mortgage, Sunflower must obtain the consent of RUS to enter into certain agreements and take certain actions.").

including any approval of or consent to Sunflower's actions pursuant to the governing loan contracts" and "enjoin[ ] Sunflower from taking any action . . . that requires RUS approval under the existing loan contracts and agreements").  Sierra Club's argument should be rejected.

Because the approvals that Sierra Club challenges were granted "pursuant to [a] loan contract[ ] and security instrument[ ]" within the meaning of 7 C.F.R. § 1794.3, they are not federal actions that trigger NEPA.  First, some of the approvals were made pursuant to Section 5.14 and 5.15 of the 2003 Amended and Restated Loan Contract ("2003 Amended Loan Contract").  AR 8218 (referencing Section 5.14 and 5.15).  Section 5.14 and 5.15 prohibit Sunflower from entering into agreements for the development of Holcomb Unit 2, or for the "Holcomb Site Development" or other use of the Holcomb Unit 1 site, without prior written approval from RUS.  AR 4391  Some of the approvals that Sierra Club challenges are related to the Holcomb Expansion, or development at the Holcomb Unit 1 site.  See AR 8218-22.

Sierra Club also challenges approvals that were granted pursuant to Section 4.03 of the 2004 Consolidated Mortgage, Security Agreement and financing Statement ("2004 Mortgage Agreement").  This provision prohibits Sunflower, with limited exceptions, from encumbering the Holcomb property without prior written approval from RUS.  AR 4459-60.  The approvals at issue include site lease agreements, AR 4610, an access easement agreement for the use of the common facilities, AR 4610, and the Subordination Non-Disturbance Agreement, where RUS agrees not to disturb Tri-State's interest in the property in the event of a Sunflower default.  AR 8050, 8059.  Because these agreements encumber the property covered by the 2004 Mortgage Agreement, RUS approval was required under Section 4.03.  Sierra Club cannot reasonably dispute that RUS's approval of these agreements was not "pursuant to [a] loan contract[ ] or security instrument[ ]" and thus are not exempt from NEPA review.  Sierra Club's position on

this issue has repeatedly changed throughout this case depending on what argument they are advancing.  Sierra Club's claim should be rejected.

C.     **Application of 7 C.F.R. § 1794.3 in this case is not in conflict with CEQ regulations.**

Sierra Club argues that application of 7 C.F.R. § 1794.3 to the challenged approvals in this case conflicts with CEQ regulations, governing caselaw, and NEPA itself.  Pl.'s Summ. J. Opp'n at 28.  But as RUS has explained, that is not the case.  See Fed. Defs.' Summ. J. Opp'n at 34.  Although Sierra Club claims that it is not mounting a facial challenge, Pl.'s Summ. J. Mot. at 28 n.8, it then claims that because the application of the regulation is in conflict with CEQ regulations and NEPA, "the RUS regulation cannot stand."  Id. at 28.  Because Sierra Club has not demonstrated that the regulation could never be applied in a valid way, this Court should not find that the regulation "cannot stand."[5]  See Time Warner Entertainment Co., L.P. v. Fed. Commc'n Comm., 93 F.3d 957, 967 (D.C. Cir. 1996) ("But to prevail on a facial attack the plaintiff must demonstrate that the challenged law [ ] could never be applied in a valid manner"); see also Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 38 (D.D.C. 2003) (same).

II.     **RUS's actions do not give the agency sufficient control over the non-federal Holcomb Expansion Project and therefore RUS does not have to review the environmental impacts of the Project pursuant to NEPA.**

Consistently through this litigation Sierra Club's concern has been whether the Holcomb Expansion Project is a major federal action within the meaning of NEPA.[6]  It's opposition to

_____

[5]  In fact, Sierra Club explicitly admits that "some of RUS's 2007 consents and approvals would fall under section 1794.3."  Pl. Summ. J. Mot. at 26-27.

[6]  First Amend. Compl. ¶1 ("Plaintiff, Sierra Club, challenges [RUS's] approval of a massive coal-fired power plant expansion project in Western Kansas without first complying with [NEPA]."); Pl.'s Opp'n to Fed. Defs.' Mot. to Dismiss at 1 ("Sierra Club challenges [RUS's] failure to comply with [NEPA] before approving an expansion of [Sunflower's] existing coal-fired power plant . . ."); id. at 2 (discussing the Expansion Project's environmental impacts); Pl.'s Prelim. Inj. Mot. at 1 (alleging that "RUS should have prepared an [EIS] evaluating the impacts

RUS's actions are premised on the attempt to stop the Holcomb Expansion Project.  Now Sierra Club attempts to distance itself from the question by saying that RUS and Sunflower "confuse" the issue because "strictly speaking, the major federal action triggering NEPA review is not the construction of the Expansion itself, but the agency decisions that enabled and allowed the project to proceed."  Pl.'s Summ. J. Opp'n at 2 n.1.

Sierra Club is correct that the two questions are distinct.[7]  This Court could find, for example, that the 2002 restructuring is a federal action and, barring the issue of whether the restructuring is "major" because it has significant environmental impacts (an issue the parties have not briefed), find that RUS must do a NEPA review on the 2002 restructuring.  But this still begs the question—and one that RUS respectfully believe that the Court must answer if the Court were to order RUS to do a NEPA review on the 2002 restructuring or the 2007 approvals—of whether RUS's actions put RUS on the hook for the environmental review of the entire non-federal Holcomb Expansion Project, a project that will be financed and owned by parties other than RUS or Sunflower.  See Pl.'s Summ. J. Mot., Ex. 1 at 5;[8] AR 8219.

This case, from the beginning, has been about whether the Holcomb Expansion Project is a major federal action pursuant to NEPA by virtue of RUS's loan administration activities. Rather than respond to a whole body of case law cited in RUS's brief, see Fed. Defs.' Summ. J.

---

of—and alternatives to—the Expansion"); Pl.'s Summ. J. Mot. at 33 ("Sierra Club is entitled to an injunction because the construction and operation of an 895-MW coal-fired power plant will present serious risk to human health and the environment.").

[7] See Citizens Alert Regarding the Env't v. U.S. Env't Prot. Agency, 259 F. Supp. 2d 9, 16 (D.D.C. 2003) ("[T]he question of whether the actual *granting* of EPA money to the Township is subject to NEPA is analytically distinct from the question the Court faces here, which is whether, at present, the degree of federal involvement in the Moosic Mountain pipeline has been sufficient to convert that entire project into a major federal action that cannot go forward until a federal NEPA analysis is completed.") (emphasis in original).

[8] The page numbers citations to Plaintiff's summary judgment motion Exhibits correspond to the document's ECF-assigned page numbers.

Opp'n at 7-12, Sierra Club calls this a "non-issue" because the question doesn't address "the threshold question of NEPA's applicability" and instead "implicate[s] the agency's factual judgment as to the [environmental] impacts."  Pl.'s Summ. J. Mot. at 3, n.2.  Sierra Club is wrong.  Sierra Club either ignores or misinterprets case law where there was some form of federal involvement or approval, and the question presented to the court was whether it was enough federal involvement to find sufficient federal control over the entire non-federal program such that a NEPA review was required for the entire program.[9]  See Fed. Defs.' Summ. J. Opp'n at 8-13.  For example, in National Organization for the Reform of Marijuana Laws v. U.S. Drug Enforcement Agency, the District Court for the District of Columbia reviewed the question of whether "federal involvement in the [state marijuana spraying] program is sufficient to trigger the NEPA requirements."  545 F. Supp. 981, 984 (D.D.C. 1982).  The court did not need to look at the "threshold question of NEPA's applicability" to every single action by the federal government to determine whether a NEPA review should be prepared for the state program.[10]  See id. 984-85.  Rather, the court simply looked at whether the "considerable federal-state cooperation in [the] effort to control marijuana production" gave the federal government control

---

[9] Sierra Club also, again, misinterprets that case law.  For example, Sierra Club claims that the main issue in Weiss v. Kempthorne, 580 F. Supp. 2d 184 (D.D.C. 2008), was the significance of the environmental impact.  Pl.'s Summ. J. Opp'n at 3.  But the question in that case was whether the National Park Service "should have examined and inventoried the city's proposed development of the entire Park, . . . and considered the impact of the entire 500 acre development on the environment" before it approved (and prepared an Environment Assessment on) a lease on a small parcel of federal land to be used as part of the golf course.  580 F. Supp. 2d 184, 189 (D.D.C. 2008).  The issue was not whether the environmental impact was or was not significant.  Thus, such cases are applicable to the present question—whether RUS must do a NEPA analysis on the entire Holcomb Expansion Project.

[10] The opinion mentions that the federal government "provided financial and technical assistance . . . includ[ing] training in aerial spotting techniques and financial assistance for aerial spotting equipment," that the federal government "shared technical information on herbicides," and provided some funding to the State for marijuana law enforcement.  Marijuana Laws, 545 F. Supp. at 983.

over the state program, and found that it did not and thus a NEPA review was not required.  Id. at 985.  Similar to Marijuana Laws, the court in Sancho v. U.S. Department of Energy did not have to address independently the "threshold question of NEPA applicability" to each and every action by the federal government when it determined that the construction of the Large Hadron Collider, a project involving an international coalition of nations, was not a major federal action pursuant to NEPA.  578 F. Supp. 2d 1258, 1266, 1167-68 (D. Haw. 2008) ("The jurisdiction of the Court to address Plaintiffs' claims depends on whether Federal Defendants have undertaken a 'major Federal action' with respect to the construction of the LHC.") (emphasis added).

Sierra Club's only response is to make the unsupported assertion that RUS "supported the Expansion itself."  Pl.'s Summ. J. Opp'n at 3-4.  As discussed in RUS's opening brief, see Fed. Defs.' Summ. J. Opp'n at 13-29, and as discussed below, RUS involvement in the administration of its loans to Sunflower or its actions to maximize recovery of a 25-year old loan does not provide it with sufficient control over the environmental aspects of the Holcomb Expansion Project, and thus it should not be required to do a NEPA review on the Holcomb Expansion Project.  The Court should deny Sierra Club's motion for summary judgment.

### A.   RUS was not "legally required" to take affirmative action, and its actions did not give it sufficient authority to control the Holcomb Expansion Project.

Sierra Club argues that because RUS had to take affirmative action in order for the Holcomb Expansion Project to proceed, the non-federal Holcomb Expansion Project is subject to NEPA.  Pl.'s Summ. J. Opp'n at 2-3; id. at 3 ("Actions are subject to NEPA where they meet this standard.").  Contrary to Sierra Club's assertions, RUS does not have "influence,"  "control," or "leverage" when it is not financing the Holcomb Expansion Project.[11]  See Pl.'s Summ. J. Opp'n

---

[11] RUS is not a regulator, and its control rests in establishing the terms and conditions for loans or loan guarantees that it issues.  Wabash Valley Power Ass'n v. Rural Electrification Admin.,

at 1, 2.  In all the cases Sierra Club cites, <u>see</u> Pl.'s Summ. J. Opp'n at 2-3, where the courts find that the federal agency's approvals were "required" and thus were major federal actions, the federal agency retained the ability to control the non-federal activities.  In <u>Davis v. Morton</u>, the court held that the Secretary of Interior's approval of a lease on federal land, which the agency had continuing authority over, was a major federal action.  469 F.2d 593, 597 (10th Cir. 1972).  No federal land is involved in the Holcomb Expansion Project.  In <u>Humane Society</u>, the federal agency promulgated regulations providing for a fee-for service ante-mortem horse slaughtering inspections, which without the challenged regulations, the horse slaughter operators could not legally operate.  520 F. Supp. at 26.  The District Court for the District of Columbia distinguished <u>Humane Society</u>—where the agency action at issue was a promulgation of a rule— from one where "a non-federal program is subject to federal funding and/or approval."  <u>Id.</u> at 21.  Here, there is no promulgation of a federal rule.  And in <u>Foundation for Economic Trends v. Heckler</u>, the case involved the federal agency's regulations requiring federal approval of experiments that were <u>federally funded</u> and proposed releasing genetically modified organisms into the environment.  756 F.2d 143, 155-56 (D.C. Cir. 1985).  The federal approval was "required" because the agency's approval of the experiments was "an explicit, regulatorily-created condition to receipt of federal funds for [the] research."  756 F.2d at 155, n.7.  No f3ederal funding is in play in the present case because RUS is not funding the Holcomb Expansion Project.  Unlike these cases, RUS's approvals were not "required" for the Holcomb Expansion Project to proceed.

---

988 F.2d 1480, 1490 (7th Cir. 1993).  Here, RUS is not lending for the Holcomb Expansion Project, and hence, cannot establish terms and conditions for the Holcomb Expansion Project.  That prerogative remains lender or financer of the Holcomb Expansion Project.

Contrary to Sierra Club's assertion, RUS approvals were not "required" for the Holcomb Expansion Project to proceed because RUS does not have the unilateral ability to control the environmental aspects of the Holcomb Expansion Project—it is not on federal land, it is not specifically prohibited by law or regulation, and its construction is not being federally funded. If Sunflower had decided not to seek the approvals as specified in the loan contract and mortgage agreement, RUS's only course of action would be to seek contractual remedies. See AR 4393-94; AR 4470-71. RUS would not be able to stop the Holcomb Expansion Project. Although courts have found that a contract can provide the level of control necessary to turn a non-federal project into a federal action by virtue of the agency's "required" approval, this is not the case here (although it would be if RUS was financing the Project).[12] As stated previously, RUS did not "approve" the Holcomb Expansion Project, Fed. Defs.' Summ. J. Opp'n at 13-18, there is no continued funding of the Holcomb Expansion Project by RUS, Pl.'s Summ. J. Mot., Ex. 1 at 5, and the contracts do not give RUS the authority to impose environmental conditions on the Holcomb Expansion Project. See Fed. Defs.' Summ. J. Opp'n at 19-23. Sierra Club wants to find a federal nexus, where there is none, in order to stop the Holcomb Expansion Project. Sierra Club's argument should be rejected.

---

[12] See Morris County Trust for Historic Pres. v. Pierce, 714 F.2d 271, 273, 278 (3d Cir. 1983) (finding continuing federal control and thus major federal action because the Department of Housing and Urban Development ("HUD") approved the initial Urban Renewal Project, provided continued funding for site-specific actions under the Project, and the existing contract between HUD and the local government required the local agency to submit data to HUD for the purpose of giving HUD the opportunity to approve the proposed step or refuse payment); Jones v. Lynn, 477 F.2d 885, 890 (1st Cir. 1973) (holding that, in finding a major federal action, the district court "should have made detailed findings as to the control possible of HUD to exercise under the contract and as to the nature of federal project aid yet to come").

**B.      RUS did not provide financial assistance to the Holcomb Expansion Project and its actions are not sufficient to provide it control over the Project.**

Sierra Club argues that RUS provided financial assistance through (1) the "debt forgiveness" which occurred during the 2002 corporate and debt restructuring, Pl.'s Summ. J. Opp'n at 4; (2) the link of RUS debt recovery to the construction of the Holcomb Expansion Project, Pl.'s Summ. J. Opp'n at 5, 9; (3) RUS's commitment to release its lien on the Holcomb Expansion Project site, and (4) RUS's agreement to enter into the Subordination Non-Disturbance Agreement ("SDNA").  Pl.'s Summ. J. Opp'n at 7-8.  RUS has not provided any financial assistance to the Holcomb Expansion Project, and more importantly, its actions did not give it sufficient control over the Holcomb Expansion Project.  Sierra Club's arguments should be rejected.

Sierra Club continues to claim that the debt restructuring was "significant" financial assistance for the Holcomb Expansion Project, Pl.'s Summ. J. Opp'n at 5 (comparing debt under old and new notes), but it fails to demonstrate how this is so.  See Pl.'s Summ. J. Mot. at 5.[13] The RUS loans that were restructured were originally used to pay for the construction of the existing Holcomb generating station—none of the money was used for the Holcomb Expansion Project.  If there is any financial assistance by the virtue of "losses" RUS might sustain from the debt restructuring, it would be financial assistance to Sunflower on its outstanding debt, not for the Holcomb Expansion Project.  Even if "RUS's assistance [through the debt restructuring] in support of Sunflower was . . . substantial," see Pl.'s Summ. J. Opp'n at 7, it does not automatically federalize any future projects Sunflower undertakes.  Sierra Club mischaracterizes the 2002 debt restructuring as some grand scheme that was really driven by the corporate

---

[13]   Sierra Club's administrative record citation discusses the "corporate" restructuring, not the "debt" restructuring.  See Pl.'s Summ. J. Opp'n at 5.

restructuring and designed to facilitate the Holcomb Expansion Project.  Pl.'s Summ. J. Opp'n at

6 ("[T]he Expansion drove the configuration of the 2002 restructuring and debt relief").  But the

administrative record is clear that the primary impetus behind the 2002 restructuring was the

inability of Sunflower to remain current on its B Note payments, the continuing capitalization of

the interest due and unpaid, and the financial burden placed on the rural consumers in Kansas to

pay the ever increasing debt.  Pl.'s Summ. J. Mot. Exh. 1 at 7 (Dkt. No. 88-2).  Furthermore,

Sierra Club never shows how the 2002 restructuring ultimately gave RUS control over a non-

federal project that is to be designed and constructed on non-federal land with non-federal money

by an entity other than Sunflower, and which RUS would not ultimately have any interest in.[14]

Even though some of the 2002 corporate restructuring may have helped facilitate Sunflower's

ability to "seek additional value out of its existing assets," Pl.'s Summ. J. Mot. Exh. 1 at 8,

RUS's involvement in the 2002 restructuring simply is not the sort of extensive RUS-Sunflower

cooperation in the Holcomb Expansion Project that is enough to find the Project to be a major

federal action.  See Marijuana Laws, 545 F. Supp. at 985.

    Sierra Club also claims RUS's additional recovery of debt if the Holcomb Expansion

Project is built is also financial assistance and support of the Holcomb Expansion Project.  See

Pl.'s Summ. J. Opp'n at 5.  This argument does not make sense.  Sunflower will not receive new

loans or loan guarantees if and when the Holcomb Expansion Project is built.  In fact, money is

flowing the opposite direction—from Sunflower to RUS—as RUS attempts to maximize the

repayment on Sunflower's original debt in the event Sunflower has additional revenue sources

available to it.  RUS is not receiving more than it is owed from the original debt.  It is

---

[14] Because Sunflower will not own the expansion facility, RUS will not have a lien on it by
virtue of the 2004 Mortgage Agreement's provision pertaining to RUS's rights to after-acquired
property.  See AR 4449-58.

incomprehensible how this could be considered support of the Holcomb Expansion Project when no federal money is being directed toward the Holcomb Expansion Project or to Sunflower itself by Sunflower's execution of the $91 million Holcomb 3 note to RUS in the event the Holcomb Expansion Project is built.

RUS's additional debt recovery if the Holcomb Expansion Project is built also does not make it a "partner" in the Holcomb Expansion Project, as Federal Defendants already previously discussed.  See Fed. Defs.' Summ. J. Opp'n at 27-29.  Sierra Club's use of Davis v. Morton is not applicable here.  See Pl.'s Summ. J. Opp'n at 9.  Davis involved the federal government's approval of a lease on tribal land and the court found that the United States was an "impartial, disinterested party" because it "might be held liable for injury or damages incurred on the Indian land unless the lease provides otherwise."  469 F.2d at 596.  There is no such situation in the present case.

Sierra Club doesn't add anything new to its previous argument that RUS's commitment to release its lien on the Holcomb Unit 2 site[15] or enter into the SDNA is the type of extensive financial assistance and support for the Holcomb Expansion Project that makes the Project a major federal action.  See Pl.'s Summ. J. Opp'n at 7-8.  Sierra Club continues to stretch RUS's rights as a lender under the lien on Sunflower's property to give RUS the unilateral authority to determine what Sunflower should and could do with its property.  As a lien holder, RUS's only rights under the 2004 Mortgage Agreement are to take possession of Sunflower's assets in the event of a default on its payments.  AR 4470-71.  RUS, as a lender, has limited legal rights until there is a default, and this its rights are limited by state law as a lender and mortgagee.  A lien

---

[15]  RUS's commitment to release its lien on the footprint where a new facility would be built, and on the common facilities amounts to a total of 626 acres, AR 1133-34, of the entire 10,000-acre Holcomb site. AR 3414, 3417, 3420, 3440, 3452, 5117.

does not convert the Holcomb site to federal property—RUS's control of Sunflower's property is limited.

Even put together, all the individual elements of the debt and corporate restructuring do not rise to the level of support conferring control to RUS over the Holcomb Expansion Project. See Marijuana Laws, 545 F. Supp. at 985. The fact that the Holcomb Expansion Project is not even being funded or owned by Sunflower, but by other non-federal entities, also creates a gap in RUS's alleged ability to control and influence the Project. Sierra Club's motion for summary judgment should be denied.

**C.      RUS does not have sufficient authority to control the environmental aspects of the Holcomb Expansion Project.**

As discussed previously, see Fed. Defs.' Summ. J. Opp'n at 13-32, and as discussed above, there is no statute, regulation, contract or other authority that gives RUS the ability to control the environmental aspects of this entirely private project. As hard as Sierra Club tries to paint a picture of pervasive federal involvement in the Holcomb Expansion Project, thus giving RUS authority to control the Project such control is simply not present. Compare Marijuana Laws, 545 F. Supp. at 983 (agency's "financial and technical assistance . . . includ[ing] training in aerial spotting techniques and financial assistance for aerial spotting equipment," sharing of "technical information on herbicides" and providing some funding to the State for marijuana law enforcement was not enough federal involvement) with Minn. Publ. Interest Research Group v. Butz, 498 F.2d 1314, 1322 (8th Cir. 1974) (sufficient federal involvement in private timber operations because federal agency approved the location of the timber roads, logging camps, and buildings, marked trees to be cut, and negotiated the payment for the timber cut). Because RUS does not have the requisite control, the Holcomb Expansion Project is not a "major Federal

action" within the meaning of NEPA.  Sierra Club's summary judgment motion should be denied.

## III.   The Court should find that RUS complied with NEPA; should the Court conclude a violation has occurred, further proceedings regarding remedy will be appropriate.

RUS has met its obligations under NEPA, and as discussed above, Sierra Club has failed to establish a NEPA violation.  However, if the Court finds otherwise, further proceedings are appropriate to decide what relief, if any, should be ordered.  It is premature at this stage to consider remedies unless and until the extent of any NEPA violation is set forth in detail by the Court.[16]

Some principles are instructive.  First, if there is harmless error, no remedy is needed. See e.g., Nevada v. Dep't of Energy, 457 F.3d 78, 90 (D.C. Cir. 2006) (finding harmless error for a NEPA violation).  See also 5 U.S.C. § 706 (directing reviewing courts to take "due account" of "the rule of prejudicial error").  Second, the Supreme Court has instructed courts that injunctions may not be issue as a matter of course.  See, e.g., Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987); (holding that a judge "is not mechanically obligated to grant an injunction for every violation of law").  Courts must consider traditional principles of equity in issuing injunctions, and the party requesting the injunction must show that irreparable injury is "likely," as opposed to merely "possible."  Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 375 (2008).  Third, injunctive relief must be narrowly tailored to any alleged harm.  See Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (holding that injunctions must be narrowly tailored to give

---

[16] Sierra Club argues in its brief that further remedy briefing is "unnecessary" because other motions have been briefed in this case, Pl. Summ. J. Opp'n at 30, n.19, and yet later suggests filing additional "motions" as to remedy, id. at 40.  Regardless of Sierra Club's apparently contradictory statements, none of the Parties' previous motions or briefs has discussed the issue of remedy.  Until the Court sets forth, in detail, the extent of any NEPA violation, it is premature to fully brief the issue of remedy, and therefore RUS only briefly responds to certain arguments related to remedy.

only the relief to which plaintiffs are entitled); <u>ALPO Petfoods, Inc. v. Ralston Purina Co.</u>, 913 F.2d 958, 972 (D.C. Cir. 1990) (same).  If the Court were, for example, to take issue with only certain of RUS's approvals, it is obligated to tailor its relief to address only the deficiencies found and not to issue the type of overbroad and vague remedy that Sierra Club proposes. Should this Court reach a remedy stage, additional briefing would be appropriate to address this issue.

**A.  Sierra Club has not shown it is entitled to injunctive relief.**

At this juncture, Sierra Club has failed to show that it is entitled to the extraordinary remedy of injunctive relief.  To obtain permanent injunctive relief, a plaintiff must show that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).  Courts have rejected a presumption of irreparable injury in NEPA cases, despite Sierra Club's arguments to the contrary.  <u>Amoco Prod. Co.</u>, 480 U.S. at 545.  <u>See also</u> <u>Realty Income Trust v. Eckerd</u>, 564 F.2d 447, 457 (D.C. Cir. 1977) (holding that injunctive relief need not be provided for every violation of NEPA); <u>Cuomo v. U.S. Nuclear Regulatory Comm'n</u>, 772 F.2d 972, 976 (D.C. Cir. 1985) (same).  Here, Sierra Club has failed to meet its burden of showing that it is entitled to injunctive relief.

      i.     **A permanent injunction would harm RUS and is contrary to the public interest because it would slow the administration of an important, Congressionally-mandated program.**

An injunction in this case will harm both RUS and the public interest.  In cases where, as here, the result of a proposed injunction would be to impede the orderly administration of a

governmental responsibility intended to serve the public interest, a party moving for injunctive relief carries a particularly heavy burden in showing such relief is appropriate.  Yakus v. United States, 321 U.S. 414, 440 (1944); Weinberger v. Romero-Barcelo, 456 U.S. 305, 312-13 (1982). Sierra Club has not met that burden here.

In promulgating and enacting the RE Act, Congress established a clear intent to provide federal funding to rural utilities to aid in providing reliable and affordable electricity to rural America.  See 7 U.S.C. § 904.  The program represents Congress' determination that it is in the public interest to allow RUS to administer its loan program.  Likewise, it is also in the public interest for RUS to administer the Sunflower loans pursuant to their lawful contractual terms so that the Government can maximize its repayment of the debt it is owed.  A vague and overbroad permanent injunction of the type Sierra Club proposes here would thwart Congress' intent and prevent RUS from carrying out its functions under the RE Act and its regulations.  Thus it is in the public interest to allow RUS to follow Congress' mandate and administer the rural electrification program, and an injunction would harm RUS and the public interest.[17]

Sierra Club fails to meaningfully respond to RUS's argument that it will be harmed by an injunction, summarily dismissing it as a "slippery slope."  Pl.'s Summ. J. Opp'n at 37.  Sierra Club offers no support, except to say that Sierra Club seeks only to enjoin "actions to advance the Expansion project."  Id.  However, as discussed below, without defining which "actions" are prohibited, the vague and overbroad injunction that Sierra Club proposes will hamper RUS's day-to-day administration of its loan portfolio.  Generally speaking, the types of approvals, contracts, provisions and "negotiations" which Sierra Club challenges are not unique to

---

[17] Sierra Club has other avenues available to obtain the relief it seeks.  Prior to construction of the Holcomb Expansion Project, Sunflower must obtain, at a minimum, a prevention of serious deterioration permit from the State of Kansas.  Sierra Club can challenge the issuance of this permit in Kansas state court.

Sunflower; in fact, they are commonplace amongst many of RUS's rural borrowers.   An injunction preventing RUS from carrying out certain loan administration duties would not affect only those duties with regard to Sunflower, but would throw into doubt the administration of an entire federal administrative program, and thus the public interest favors against the issuance of a permanent injunction.

> ii.     **The balance of hardships between the parties weighs against a permanent injunction.**

The balance of harms weighs against granting Sierra Club's requested injunctive relief. In determining whether injunctive relief is appropriate, courts look to the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied.  eBay, 547 U.S. at 391.  Here, the balance weighs against granting Sierra Club's overbroad and vague proposed injunction which would have the effect of hampering RUS's ability to administer its rural electrification loan program.

Sierra Club states that it will be harmed from construction of the Holcomb Expansion Project, Pl.'s Summ. J. Opp'n at 37, 40, and yet at the same time argues that the central question on the merits of this case is not about the construction of the Holcomb Expansion Project.  Id. at 2, n. 1 ("the major federal action triggering NEPA review is not the construction of the [Holcomb] Expansion itself . . . .").  To the extent the construction of the Holcomb Expansion Project is not relevant to the merits of this case, the construction of the Holcomb Expansion Project cannot be a consideration that the Court weighs in determining the balance of harms.  Id. at 37, 40.   Instead, Sierra Club's potential harm is limited to an alleged procedural NEPA violation, id. at 37, which does not tip the balance of harms in Sierra Club's favor against RUS's Congressionally-mandated rural electrification program.  Thus, the balance of harms tips against the type of vague injunctive relief Sierra Club seeks.

### iii.   Even assuming injunctive relief is appropriate, Sierra Club's request is overbroad.

Here, Sierra Club requests an injunction "to prevent RUS and Sunflower from taking actions that foreclose the opportunity for meaningful consideration of alternatives[;]" "only actions to advance the Expansion project . . . ." Id.[18]  Sierra Club does not define "actions," nor suggest what "actions to advance the Expansion project" would and would not be prohibited. Indeed, in its opposition brief, for the first time, Sierra Club states that it is apparently challenging the "negotiation" of the 2002 refinancing.  Id. at 27.  If Sierra Club cannot consistently articulate the actions which it challenges, how is RUS to know, without guidance from the Court's ruling on the merits, which of RUS's day-to-day loan administration activities would be subject to NEPA and which would not?  Clearly Sierra Club's proposed injunction is not sufficiently tailored so as to address the alleged violations but not unduly burden RUS in the administration of its duties.

Sierra Club also argues that an injunction in this case "will not affect RUS's practice of exempting NEPA for loan administration activities that have insignificant environmental impacts

---

[18] Sierra Club also proposes a remedy which requires the Court to retain jurisdiction in this matter.  See Proposed Order (Dkt. No, 88-7).  This suggestion is inappropriate and unnecessary. Should the Court find that RUS has violated NEPA, and that injunctive relief is appropriate, it should, at most, remand the action to the agency without retaining jurisdiction.  See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985) (holding that if the administrative record does not support the challenged agency action, the proper course for the court is to remand to the agency).  That order is sufficient to ensure RUS's compliance with the Court's order because a presumption of administrative regularity should run on any future NEPA process undertaken by RUS.  See e.g., Butler v. Principi, 244 F.3d 1337, 1340 (Fed. Cir. 2001).  In fact, Sierra Club admits as much in their brief: "Indeed, RUS complies with NEPA all the time . . . .")  Pl.'s Summ. J. Opp'n at 38.  Should Sierra Club wish to challenge a future Holcomb Expansion project NEPA document, upon its completion Sierra Club will have ample opportunity to challenge that document through the Administrative Procedure Act's ("APA") administrative appeal and judicial review process.  See also Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 66-67 (2004) ("[T]he principal purpose of the APA limitations . . . is to protect agencies from undue judicial interference in their lawful discretion.")

. . . or loan administration activities that are truly ministerial." Id. at 38.  As discussed above, the activities Sierra Club challenges are precisely that: activities RUS avers are exempted from NEPA under its regulations.  Again, without the benefit of the Court's ruling on the merits as to which, if any, of RUS's challenged approvals were completed in violation of NEPA, the scope of the problem to be addressed has not yet been defined.

In conclusion, Sierra Club has failed to carry its burden of demonstrating that it is entitled to injunctive relief.  Should the Court determine that injunctive relief is appropriate, rather than adopting the overbroad and vague injunction urged by Sierra Club, the Court should allow further briefing to define a narrowly tailored remedy, which will address the harm found by the Court, but will not constrain the Agency's day-to-day work in administering its loan portfolio to its rural electric borrowers throughout the United States.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court deny Sierra Club's motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.


Dated:  January 11, 2010                    Respectfully submitted,

                                            IGNACIA S. MORENO
                                            Assistant Attorney General
                                            Environment and Natural Resources Division

                                            /s/ Julia Thrower
                                            JULIE S. THROWER
                                            ALISON D. GARNER
                                            Trial Attorneys
                                            Natural Resources Section
                                            Environment and Natural Resources Division
                                            U.S. Department of Justice
                                            P.O. Box 663

Washington, D.C. 20044-0663
Telephone: (202) 305-0247 (Thrower)
Telephone: (202) 514-2855 (Garner)
Facsimile: (202) 305-0506
Email: julie.thrower@usdoj.gov
alison.garner@usdoj.gov

*Of counsel*:
TERENCE M. BRADY
Assistant General Counsel
HELEN HARRIS
Attorney
Rural Utilities Division
Office of General Counsel
United States Department of Agriculture

*Attorneys for Federal Defendants*