| | |
|---|---|
| SIERRA CLUB,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE, RURAL UTILITIES<br>SERVICE, *et al.*,<br><br>    Defendants,<br><br>    and<br><br>SUNFLOWER ELECTRIC POWER<br>CORPORATION,<br><br>    Defendant-Intervenor. | Civ. Action No. 07-01860(EGS) |

## MEMORANDUM OPINION

Plaintiff Sierra Club filed this action on October 16, 2007, alleging that the Department of Agriculture's Rural Utilities Service and certain officials in the Department of Agriculture (collectively, "the federal defendants") violated the National Environmental Policy Act of 1969 by failing to produce an environmental impact statement in connection with its involvement in the expansion of Sunflower Electric Power Corporation's ("Sunflower") coal-fired generating plant in Holcomb, Kansas. Sunflower has intervened as a defendant. Pending before the Court are Sunflower's motion to dismiss the complaint as moot, plaintiff's motion for summary judgment (consolidated with its

motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a)(2)), the federal defendants' cross-motion for summary judgment, and Sunflower's cross-motion for summary judgment.

Upon consideration of the motions, the responses and replies thereto, the applicable law, the entire record, and for the reasons set forth below, Sunflower's motion to dismiss the complaint as moot is **DENIED**, plaintiff's motion for summary judgment is **GRANTED**, the federal defendants' cross-motion for summary judgment is **DENIED**, and Sunflower's cross-motion for summary judgment is **DENIED**.

## I.    BACKGROUND

Briefly stated, plaintiff maintains that the Rural Utilities Service ("RUS") should have performed an environmental impact statement ("EIS") in conjunction with RUS's involvement in the project to expand a power plant facility.  As is discussed in more detail below, the National Environmental Policy Act ("NEPA") requires federal agencies to include an EIS "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332.

The Rural Electrification Act of 1936 gives the Secretary of Agriculture authority, which has been delegated to RUS, to "make loans in the several States and Territories of the United States

2

for rural electrification and for the purpose of furnishing and improving electric and telephone service in rural areas, . . . and for the purpose of assisting electric borrowers to implement demand side management, energy efficiency and conservation programs, and on-grid and off-grid renewable energy systems." 7 U.S.C. § 902(a). The Rural Electrification Act further authorizes RUS to make loans for rural electrification to corporations organized "for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing and improving of electric service to persons in rural areas[.]" 7 U.S.C. § 904(a). (RUS's predecessor was the Rural Electrification Administration ("REA").)

According to plaintiff, RUS's involvement in the expansion of the Holcomb power plant in connection with certain loans and loan guarantees to Sunflower, amounted to a "major federal action" within the meaning of NEPA such that an EIS was required. In particular, plaintiff argues that RUS's approvals relating to the expansion of the power plant, as well as the financial assistance provided by RUS, in the form of debt forgiveness and consent to a lien subordination, qualified RUS's involvement as a major federal action.

### A. 1980 Approval of Loan and Loan Guarantee

In 1980, after preparing an EIS, the REA approved a loan and loan guarantees to Sunflower Electric Cooperative, Inc. ("Old Sunflower"). The loan and loan guarantees, totaling approximately $543 million, were provided to Old Sunflower for the construction of a coal-fired generating station ("Holcomb Unit 1") to be located near Holcomb, Kansas. Administrative Record ("AR") 03866.

### B. 1987 Restructuring and Issuance of Promissory Notes

Soon after the construction of Holcomb Unit 1, Old Sunflower became unable to meet its debt repayment obligations to REA and other creditors. AR 04546. Accordingly, in 1987 Old Sunflower entered into an agreement, the 1987 Debt Restructure Override Agreement and Amended and Restated Credit Agreement (the "1987 DRA"), with REA and its other creditors to restructure its debt. AR 03871-3975. Under the 1987 DRA, Old Sunflower issued three classes of promissory notes, referred to as the A Notes, B Notes, and C Notes. AR 00149. REA's share of the principal balance on the A Notes was $294.5 million; on the B Notes it was $98.3 million; on the C Notes it was $61.4 million. Fed. Defs.' Statement of Facts Supp. Cross-Mot. Summ. J. ("Fed. Defs.' Statement of Facts") ¶¶ 5-7. The A Notes required regularly scheduled payments, but payment on the B Notes was required only when Old Sunflower had excess cash, as defined by the 1987 DRA.

AR 00168-169. Each year, any unpaid interest on the B Notes was capitalized and added to the outstanding principal balance. As for the C Notes, payments were to begin only after the B Notes were fully repaid, and any remaining balance on the C Notes would expire in December 2019. AR 00169. Furthermore, in order to secure the notes it issued under the 1987 DRA, Sunflower granted a lien to REA and its other secured creditors on substantially all of its assets. AR 00276.

### C. The 2002 Corporate and Debt Restructuring

After the 1987 restructuring, Old Sunflower was able to remain current on the A Notes, but it made no payments on the B Notes or C Notes. Because the interest was capitalized on the B Notes, the principal owed to RUS on these notes had increased from the $98.3 million owed in 1987 to $413.9 million in 2002. Because Old Sunflower was at risk of defaulting, Old Sunflower and its creditors elected to negotiate another restructuring. AR 00004-11.

The 2002 corporate and debt restructuring (the "2002 Restructuring") divided Old Sunflower's assets between two new corporations, Sunflower Electric Power Corporation ("New Sunflower" or "Sunflower") and the Holcomb Common Facilities ("HCF"). New Sunflower, the defendant-intervenor in this action, purchased Old Sunflower's assets with certain exceptions. AR

00216-247.[1]  In particular, New Sunflower did <u>not</u> purchase a segment of land on the Holcomb site that the parties recognized could be used by a potential additional generating facility ("Holcomb Unit 2").  In addition to this land footprint that could be used by a second generating unit, New Sunflower also did not purchase certain "Common Facilities" such as coal handling and storage facilities, a solid waste landfill, and a sewage treatment plant.  The Common Facilities support the operation of Holcomb Unit 1, but they could also support the operation of additional generating units.  These leftover assets not purchased by New Sunflower, namely the land footprint for a potential Holcomb Unit 2 and the Common Facilities, were acquired by HCF.  HCF is a wholly owned subsidiary of Old Sunflower.

Significantly for purposes of the instant action, New Sunflower purchased Old Sunflower's assets by issuing an entirely new set of notes to the holders of the old A, B and C Notes discussed above.  AR 00173-175.  The new classes of notes issued to RUS can be categorized as the new A Notes, the new B notes, the Residual Value Notes, and the Holcomb 3 Notes.  New Sunflower's payments on the new A Notes, identical in amount to the old A Notes, were credited against Old Sunflower's A Notes.  AR 00173.  The new A Notes have since been paid in full.

---

[1] New Sunflower was initially named SEP Corporation.

With respect to the remaining classes of new notes, including new B Notes, the Residual Value Notes, as well as the Holcomb 3 Notes, any payments made by Sunflower are all credited against Old Sunflower's debt under the old B Notes. AR 00174. However, the monetary value of the old B Notes issued pursuant to the 1987 DRA was substantially different than the value of these new notes. The new B Notes are non-interest bearing notes with a fixed payment schedule, issued in the total amount of $88.4 million. (However, for every payment that Sunflower makes on time on the new B Notes, the principal balance is reduced such that if Sunflower makes all its payments in a timely fashion, it will only pay a total of $44.2 million. AR 00174.) On the Residual Value Notes, New Sunflower is not required to make any regularly scheduled payments. Instead, the Residual Value Notes are redeemable in December 2016 for the greater of either $125 million or 43% of the fair market value of Holcomb Unit 1. AR 00175. Finally, the Holcomb 3 Notes issued by Sunflower are interest-bearing notes, but they are payable only if and when Sunflower builds or becomes the operator of a third generating plant at the Holcomb Site. AR 00175. RUS's share of the Holcomb 3 Notes was $1.8 million. If a third plant is not built or operated by Sunflower by December 2021, the Holcomb 3 notes are cancelled. AR 00175.

Unlike New Sunflower, HCF (the other new entity formed in

conjunction with the 2002 Restructuring) did not issue new promissory notes. Instead, for the purchase of the Holcomb Unit 2 land footprint and the Common Facilities, RUS and the other creditors received a security interest in HCF and an assignment of annual rent payments from the use of the Holcomb Unit 2 site and Common Facilities. AR 00190.

The 2002 Restructuring also affected the lien held by RUS on Old Sunflower's assets. As mentioned above, prior to the 2002 Restructuring, RUS held a first priority lien on the Holcomb site. RUS has not yet released this lien. However, pursuant to the 2002 Restructuring, RUS agreed that it will, in the future, release the portion of its lien covering the Holcomb Unit 2 site and the Common Facilities, if and when the Holcomb Unit 2 generating plant is developed. In exchange, Sunflower agreed to grant to RUS a security interest in the rent paid for the use of the Common Facilities and the Holcomb Unit 2 site.[2]

Old Sunflower, RUS, and other creditors executed an Agreement and Consent to Sunflower Restructuring on September 30, 2002. AR 00216-247. In connection with the 2002 Restructuring, in particular as outlined in the amended loan contract and mortgage agreement, Sunflower also agreed to obtain approval from RUS before undertaking a variety of activities or entering

---

[2] As discussed below, this final aspect of the agreement was later modified.

8

certain types of contracts. Among others, Sunflower agreed:
(i) that it would not "enter into any agreement or other
arrangements . . . for the development of Holcomb Unit 2 without
the prior written approval of RUS" and "[a]ny RUS approval will
be on such terms and conditions as RUS, in its sole discretion,
may require at such time" (AR 04391); (ii) that it would not
"enter into any agreement or arrangement . . . for Holcomb Site
Development . . . or for other use of the Holcomb Unit 1 site,
the fair market value of which would exceed $1 million
annually[,] without the prior written approval of RUS" and "[a]ny
RUS approval will be on such terms and conditions as RUS, in its
sole discretion, may require at such time" (AR 04391); (iii) that
it will not "[c]onstruct, make, lease, purchase or otherwise
acquire any extensions or additions to its system or enter into
any contract therefore" without the prior written approval of RUS
(AR 04389); (iv) that it will not "[p]urchase, lease or otherwise
acquire any parcel or parcels of land or enter into any contract
therefore" without the prior written approval of RUS (AR 04389);
(v) that it will not enter into any contracts or arrangements
regarding power purchase or sale arrangements, power supply and
delivery arrangements, power marketing contracts, system
management and maintenance contracts, or any contracts relating
to financial products such as options, futures or hedges without
the prior written approval of RUS (AR 04389-04390); (vi) that it

would not "charge, assign, pledge, mortgage or otherwise encumber any of its property" without prior written approval from RUS (AR 04459); and (vii) Sunflower agreed to limitations on mergers, sale of its business or assets, leases and transfers of its capital assets in the absence of prior approval from RUS (AR 04467-04468).

### D.   The 2007 Agreements

Since the 2002 Restructuring, Sunflower has sought approval from RUS on a number of occasions in accordance with the conditions outlined above.  Most relevant to this action, on several occasions Sunflower sought approvals relating to the development of new generating plants at the Holcomb Unit 2 site. As noted above, the 2002 Debt Restructuring agreements required Sunflower to seek approval from RUS before "enter[ing] into any agreement or other arrangements . . . for the development of Holcomb Unit 2 without the prior written approval of RUS."  AR 04391.[3]

In October of 2005, RUS granted conditional approval of Sunflower's execution of a Memorandum of Agreement ("MOA") with Tri-State Generation and Transmission Association, Inc. ("Tri-State") regarding the proposed development of two new generating units at the Holcomb site.  AR 04574.  Subsequently, in September

---

[3] The parties have referred to the plans involving the development of additional generating units at the Holcomb site as the "Holcomb Expansion Project," and the Court will do the same.

of 2006, RUS granted conditional approval for Sunflower to enter into a Purchase Option and Development Agreement ("PODA") with Tri-State, as well as various other related agreements, again for the proposed development of two new generating units at the Holcomb site. AR 04610-4611.

As a condition of its approval of all of these agreements, RUS initially demanded that Sunflower deposit all funds it received pursuant to the agreements into an escrow account until "RUS and Sunflower have reached a definitive agreement on the amount of additional consideration due to RUS for Holcomb Site Development." AR 04574; AR 004610. Because Sunflower objected to the use of an escrow account in its dealings with Tri-State, further negotiations between RUS and Sunflower took place in early 2007. Ultimately, RUS agreed that the funds could be placed in a "Development Account" rather than an escrow account. Accordingly, in a July 26, 2007 letter, RUS approved Sunflower's execution of an updated PODA with Tri-State and several related agreements. AR 07444. In addition to the development of Holcomb Unit 2, the agreements provided for the potential construction of a Holcomb Unit 3 and a Holcomb Unit 4.

In addition, also on July 26, 2007, RUS also provided Sunflower with a separate letter, referred to by the parties as the "Additional Consideration Letter." AR 08218-8216. As mentioned above, in connection with the 2002 Restructuring, RUS

11

and the other creditors had received a security interest in HCF and an assignment of annual rent payments for the use of the Holcomb Unit 2 site and Common Facilities. However, the terms of the Additional Consideration Letter modified this arrangement. Instead, for each additional power plant being considered for the Holcomb site, RUS received yet another set of promissory notes. With respect to Holcomb Unit 2, Sunflower issued promissory notes (the "2007 Holcomb 2 Notes") in the amount of $52 million; with respect to the 2007 Holcomb 3 Notes, the amount was $23 million; and with respect to the 2007 Holcomb 4 Notes, the amount was $16 million. AR 08228, 08239, 08244. These notes are interest bearing, but payment is due only if and when the respective generating unit is placed into commercial operation. Furthermore, each of these 2007 promissory notes, totaling $91 million, will be cancelled on December 31, 2021 if the respective generating unit has not been placed into commercial operation.

## II. Mootness

As a threshold matter, the Court must consider Sunflower's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1), on the ground that the Court lacks subject-matter jurisdiction because plaintiff's Amended Complaint is moot.[4] As

---

[4] In addition to its assertion that the case is moot on constitutional grounds, Sunflower argues that the case should be dismissed on the grounds of prudential mootness. Prudential mootness allows the court to exercise its discretion and dismiss a case that, although not actually moot, "is so attenuated that

discussed in more detail below, the Court concludes that, because Sunflower has failed to demonstrate that no effective relief is available, the case is not moot.

## A.    Legal Framework

The purpose of the mootness doctrine is to "ensure[] that federal courts only decide ongoing cases and controversies." *Cody v. Cox*, 509 F.3d 606, 608 (D.C. Cir. 2007) (citing *Clarke v. United States*, 915 F.2d 699, 700-701 (D.C. Cir. 1990). "A case is moot when 'the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated' in circumstances where 'it becomes impossible for the court to grant any effectual relief whatever to the prevailing party.'" *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *see also Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) ("A case becomes moot when 'intervening events make it impossible to grant the prevailing party effective relief.'") (quoting *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996)). "The burden of demonstrating mootness is a heavy one." *Daingerfield Island Protective Soc'y*

---

considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Chamber of Commerce v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980). In the instant case, the Court concludes that it would be inappropriate to exercise its discretion in this manner.

*v. Lujan*, 920 F.2d 32, 35 (D.C. Cir. 1990) (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "[E]ven the availability of a partial remedy is sufficient to prevent a case from being moot." *Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) (quoting *Calderon v. Moore*, 518 U.S. 149, 150 (1996)); *see also FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1034 (D.C. Cir. 2008).

Sunflower argues that plaintiff's claims are constitutionally moot for two reasons. First, Sunflower argues that the transactions and approvals at issue, namely the 2002 Restructuring and the 2007 approvals, have been completed and are therefore no longer subject to judicial review. Second, Sunflower argues that no effective relief is available to plaintiff to address RUS's completed approvals. Each of these arguments is addressed below in turn.

**B.    Judicial Review of Completed Transactions and Approvals**

Sunflower first argues that, because the transactions and approvals at issue in this case have already been completed by RUS, plaintiff's claims are no longer subject to judicial review and are therefore moot.[5] This analysis misstates the applicable

---

[5] Sunflower goes so far as to assert that plaintiff may not have ever had an opportunity to challenge RUS's actions in connection with the 2002 Debt Restructuring. According to Sunflower, "[b]ecause the RUS approval and the closing of the transactions occurred on the same day, under the analytical framework applied when the focus is on the object of the federal agency action, there was a short or non-existent window between

standard.  In fact, contrary to Sunflower's assertion, this

Circuit has held that effective relief is available to

plaintiffs, under certain circumstances, when NEPA has been

violated *even if* the transaction at issue has been completed.

For example, in *Lemon*, the court concluded that the case was not

moot despite the fact that the land transfer at issue had already

been completed because "[i]f unraveling the transfer is necessary

after the district court decides the merits, it will be within

the court's power to do so."  514 F.3d at 1316;[6] *see also*

*Muckleshoot Indian Tribe v. Forest Serv.*, 177 F.3d 800, 815 (9th

Cir. 1999) (rejecting mootness argument despite completion of

property transfer because "[c]onveyance of a property to another

does not moot a case").[7]

---

the point in time when a challenge to the 2002 restructuring
became ripe and the point in time when the challenge became
moot."  Sunflower Mot. to Dismiss at 15.

[6] While the holding in *Lemon* rested at least in part on the
court's conclusion that all the parties to the transaction were
before the court, 514 F.3d at 1316, this Court notes that RUS and
Sunflower were the only two parties to at least some of the
transactions and approvals at issue in the instant action.  Thus,
if anything, this may affect the scope of the remedy available to
the plaintiff, but it does not indicate that relief is
unavailable.

[7] As is evident in the cases cited by Sunflower itself,
completion is a potentially relevant factor in the mootness
analysis when it relates, not merely to the agency's action, but
rather to the actual project at issue.  For example, in *Fund for
Animals, Inc. v. Bureau of Land Management*, 460 F.3d 13 (D.C.
Cir. 2006), plaintiff's case challenging the federal agency's
plan relating to gathers of wild horses and burros was held to be
moot because the gathers had already occurred and could not be

## C. Availability of Effective Relief

Second, Sunflower argues that effective relief is not available to plaintiff, (i) because NEPA is a procedural statute with no ability to provide retroactive relief, and (ii) because RUS has no authority to impose ongoing environmental mitigation measures on Sunflower in a manner that would offer prospective relief to plaintiff.

Sunflower's argument that NEPA is a procedural statute with no ability to provide retroactive relief, has been contradicted by this Circuit. *See, e.g.*, *Lemon,* 514 F.3d at 1315. Sunflower is correct that NEPA guarantees a process, rather than a particular result. *See, e.g.*, *DOT v. Public Citizen*, 541 U.S. 752, 756-757 (2004) ("NEPA itself does not mandate particular results . . . . Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions.") (internal quotation marks omitted). Such a conclusion does not, however, preclude the availability of

---

undone; therefore, "it was impossible for the court to grant any effectual relief whatever." *Id.* at 22; *see also Feldman v. Bomar*, 518 F.3d 637, 643 (9th Cir. 2008) (holding that a challenged action relating to the killing of feral pigs was moot because, by the time the court heard the case, the pigs had already been killed and plaintiffs had already "suffered whatever harm could conceivably result from the challenged agency action.") The instant case, however, differs substantially from these two cases in an obvious way. Here, as far as the Court has been made aware, the Holcomb Expansion Project has not yet resulted in the construction of an actual power plant.

retroactive relief when the federal agency has failed to provide that process in accordance with NEPA.[8] This Circuit has, for example, enjoined a construction project when the approval process associated with that construction process failed to comply with NEPA. In *Reality Income Trust v. Eckerd*, 564 F.2d 447 (D.C. Cir. 1977), the court held that:

> Ordinarily when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance. The fact that the present project is currently under construction by no means insulates it from the equity power of a court: The substantial additional costs which would be caused by court-ordered delay may well be justified by the compelling public interest in the enforcement of NEPA.

*Id.* at 456 (internal quotation marks omitted).

Sunflower's remaining argument is that RUS lacks the authority to impose ongoing environmental mitigation measures on Sunflower and, therefore, there can be no effective relief for

---

[8] Sunflower cites the Supreme Court decision in *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174 n.18 (1978), for the proposition that NEPA is not "intended . . . to afford retroactive relief." Sunflower Mot. to Dismiss at 12. However, this reading of *Hill* is erroneous. The decision in *Hill* addressed the scope of a particular provision of the Endangered Species Act, and the footnote cited by Sunflower merely states that "the dissent's position logically means that an agency would be obligated to comply with § 7 [of the Endangered Species Act] only when a project is in the planning stage. But if Congress had meant to so limit the [Endangered Species] Act, it surely would have used words to that effect, as it did in the National Environmental Policy Act, 42 U.S.C. §§ 4332 (2)(A),(C)." *Hill*, 437 U.S. at 174 n.18.

plaintiff.[9]  In particular, Sunflower argues that RUS has "no
statutory or regulatory authority to modify its past approvals in
an environmentally mitigating manner" and, furthermore, that
"none of the contracts between RUS and Sunflower provide RUS
ongoing environmental mitigation authority over Sunflower."
Sunflower Mot. to Dismiss at 21, 22.

Sunflower is correct that the ability of a court to grant
effective relief in the context of a NEPA action involving a non-
federal party can depend on whether the agency has maintained
authority to impose mitigation measures.  *Karst Envtl. Educ. &
Prot., Inc. v. EPA*, 475 F.3d 1291, 1298-1299 (D.C. Cir. 2007)
(plaintiff's claims against one of the federal agency defendants
were moot because the plaintiff failed to allege that the federal
agency had authority to impose mitigation measures upon the [non-
federal party).  Here, however, plaintiff has sufficiently
alleged that RUS has maintained authority over Sunflower.  The
authority of a federal agency to impose mitigation measures need
not be a statutory authority; a contractual agreement may also
create the authority. *See Karst*, 475 F.3d at 1298 ("if [the

---

[9] Sunflower also claims that the approvals granted by RUS
were "ministerial approvals," and therefore RUS lacked the
ability, even at the time the approvals were issued, to impose
environmental conditions.  Sunflower Mot. to Dismiss at 23.
However, this argument essentially asserts that NEPA is wholly
inapplicable to these approvals, an issue more appropriately
addressed as part of the merits determination.  (Sunflower has
also made this argument in their cross-motion for summary
judgment, and the Court therefore addresses this argument below.)

federal agency] actually has authority – whether by statute, regulation, contract, or otherwise – to impose mitigation measures upon [the non-federal party], [plaintiff's] claim might well remain justiciable.") (citing *Vieux Carre Prop. Owners, Residents, & Assocs. v. Brown*, 948 F.2d 1436, 1446 (5th Cir. 1991).

The Amended Complaint cites to the terms of the loan contract signed as part of the 2002 Debt Restructuring which require, in part, that Sunflower seek approval from RUS before it "enter[s] into any agreement or other arrangements . . . for the development of Holcomb Unit 2 without the prior written approval of RUS." AR 04391. Plaintiff has also alleged that "the parties contemplate that RUS will provide lien releases and/or subordinations, and authorizations for releases of funds from the Holcomb Development Account in the future. Further, Sunflower is to operate all of the new coal-fired electric generating units, and RUS's extensive control over Sunflower's business will remain in place at least until such time as all loans to the United States are repaid." Am. Compl. ¶ 137. Therefore, the Court finds plaintiff has also adequately alleged that RUS maintains the same level of authority over Sunflower as existed in 2007 when it granted the approvals challenged by plaintiff.

The Court concludes that, while fashioning a remedy may be difficult under the complicated circumstances that exist in the

instant action, the practical difficulties identified by
Sunflower both with respect to prospective and retroactive relief
"are more appropriately considered when weighing the equities of
any particular remedy." *Tinoqui-Chalola Council v. Dep't of
Energy*, 232 F.3d 1300, 1305 (9th Cir. 2000). Accordingly,
Sunflower's motion to dismiss the action as moot is hereby
**DENIED**.

## III. Plaintiff's Claims Under NEPA

### A. Legal Standards

#### i. Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), a reviewing
court may set aside agency actions, findings or conclusions that
are "arbitrary, capricious, an abuse of discretion, or otherwise
not in accordance with law." 5 U.S.C. § 706(2)(A). Courts thus
typically review an agency action to determine whether the agency
has "relied upon factors which Congress has not intended it to
consider, entirely failed to consider an important aspect of the
problem, offered an explanation for its decision that runs
counter to the evidence before the agency, or is so implausible
that it could not be ascribed to a difference in view or the
product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State
Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983). However, a federal
agency's determination that NEPA is wholly inapplicable to its
actions, as defendants argue in the instant case, is "'not

entitled to the deference that courts must accord to an agency's interpretation of its governing statute' and is instead 'a question of law, subject to de novo review.'" *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 54-55 (D.D.C. 2003) (quoting *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150-51 (D.C. Cir. 2001)).

### ii. National Environmental Policy Act

In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances[.]" 42 U.S.C. § 4331. The goals of NEPA reflect "the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." *Id.* "Two fundamental principles underlie NEPA's requirements: federal agencies have the responsibility to consider the environmental effects of major actions significantly

affecting [the] environment, and the public has the right to review that consideration." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 147 (D.C. Cir. 1985) (citing *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87 (1983).

NEPA requires federal agencies to prepare an environmental impact statement ("EIS") under certain circumstances. In particular, NEPA mandates that:

> [A]ll agencies of the Federal Government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332.

Although the REA prepared an EIS before approving the original loan and loan guarantees to Old Sunflower in 1980, it is the defendants' position that NEPA does not apply to the agency's subsequent involvement in Sunflower. Accordingly, no EIS was prepared in connection with any of RUS' actions related to the Holcomb Expansion Project. Plaintiff claims that the federal defendants violated NEPA by failing to do so.

In response to plaintiff's assertion that NEPA applies,

Sunflower and the federal defendants have made several arguments. First, Sunflower argues that there has never been a "proposal" within the meaning of § 4332 and, therefore, the statute does not apply. Second, the defendants argue that RUS has not taken a "major federal action" within the meaning of § 4332 and the accompanying regulations. Third, Sunflower argues that RUS was contractually prohibited from imposing environmental standards as a condition of its approvals. Fourth, Sunflower argues that RUS lacked the requisite discretion to impose environmental conditions. Finally, the defendants argue that RUS regulation 7 C.F.R. § 1794.3 exempts its actions related to the Holcomb Expansion Project from NEPA.

For the reasons discussed below, the Court agrees with the plaintiff that NEPA does apply to RUS's actions in connection with both the 2002 Restructuring, as well as the approvals granted in 2007.

### B.    Whether a "Proposal" Occurred Sufficient to Trigger NEPA Requirements

In its cross-motion for summary judgment, Sunflower first argues that no EIS was necessary in connection with the Holcomb Expansion Project because NEPA requires an EIS only when an agency has made "*proposals* for legislation and other major Federal actions significantly affecting the quality of the human environment[.]"    42 U.S.C. § 4332.    According to Sunflower, no "proposal" was ever made.

The Council on Environmental Quality ("CEQ"), established by NEPA and charged with "formulat[ing] and recommend[ing] national policies to promote the improvement of the quality of the environment," 42 U.S.C. § 4342, has promulgated a regulation explaining the "proposal" requirement in § 4332. It states:

> 'Proposal' exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed . . . so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

40 C.F.R § 1508.23.

Sunflower, relying heavily on the Supreme Court's decision in *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), asserts that "[f]or the 'proposal' element to be satisfied, a 'coherent plan' must exist, and it must be 'specific.'" Sunflower Opp'n Summ. J. at 5-6 (citing *Kleppe*, 427 U.S. at 401 n.12). According to Sunflower, no specific plans yet exist with respect to the Holcomb Expansion Project, such as the exact number and size of potential new generating units, and an EIS is therefore not yet required.

The Court does not find Sunflower's reliance on *Kleppe* persuasive. In *Kleppe* plaintiffs sought a "comprehensive environmental impact statement under [NEPA] on the entire

[Northern Great Plains Region]" in connection with various coal-related operations. *Kleppe*, 427 U.S. at 395. However, the *Kleppe* court concluded that "there is no evidence in the record of an action or a proposal *for an action of regional scope*," *Id.* at 400 (emphasis added). Instead, all of the proposals were "for actions of either local or national scope." *Id.* at 399. Although the court in *Kleppe* concluded that no proposal for a regional plan existed, the court nonetheless stated that for "both an individual coal-related action and the new national coal-leasing program, an agency deals with specific action of known dimensions. With appropriate allowances for the inexactness of all predictive ventures, the agency can analyze the environmental consequences and describe alternatives as envisioned by [NEPA]." *Id.* at 402 n.14.

In contrast to *Kleppe*, there is a sufficiently defined proposal in the instant case. As plaintiff points out, the major federal action taken by RUS is not the Holcomb Expansion Project itself; rather, the major federal action at issue is the agency's decision to maintain federal control over, provide assistance to, and grant approvals for an otherwise non-federal project. These actions have not only been sufficiently defined, they have already been executed. Furthermore, to the extent that more than one option for the Holcomb Expansion Project existed, this does not excuse RUS from complying with NEPA. On the contrary,

CEQ regulations instruct the federal agency to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2. By doing so, an agency is able to "[s]tudy, develop, and describe *appropriate alternatives* to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources[.]" 40 C.F.R. §1501.2(c)(emphasis added).

Accordingly, this Court concludes that a "proposal" within the meaning of 42 U.S.C. § 4332 and CEQ regulation 40 C.F.R § 1508.23 did exist with respect to the agency's involvement in the Holcomb Expansion Project.

### C.    **Whether a Major Federal Action Took Place**

One of the main disputes between the parties is whether RUS's involvement in the Holcomb Expansion Project has risen to the level of a "major federal action." As explained above, NEPA requires that an EIS be prepared in connection with any "recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332. The Court concludes that RUS's involvement in the Holcomb Expansion Project constituted a major federal action, both in connection with the 2002 Restructuring and in connection with the approvals granted in

2007, for the reasons discussed in more detail below.

### i. Regulatory Framework

The CEQ has issued regulations further defining the term

"major federal action."  In particular, 40 C.F.R. § 1508.18

provides, in relevant part, that:

> 'Major Federal action' includes actions with effects
> that may be major and which are potentially subject to
> Federal control and responsibility . . . . Actions
> include the circumstance where the responsible
> officials fail to act and that failure to act is
> reviewable by courts or administrative tribunals under
> the Administrative Procedure Act or other applicable
> law as agency action.
>
> (a) Actions include new and continuing activities,
> including projects and programs entirely or partly
> financed, assisted, conducted, regulated, or approved
> by federal agencies; new or revised agency rules,
> regulations, plans, policies, or procedures; and
> legislative proposals. . . .
>
> (b) Federal actions tend to fall within one of the
> following categories:
>
>      * * *
>
> > (4) Approval of specific projects, such as
> > construction or management activities located
> > in a defined geographic area. Projects
> > include actions approved by permit or other
> > regulatory decision as well as federal and
> > federally assisted activities.

40 C.F.R. § 1508.18.

Plaintiff, conceding that the Holcomb Expansion Project is

itself a non-federal action, has sought to demonstrate that RUS's

actions fall within the scope of § 1508.18 on two primary

grounds.  First, plaintiff argues that RUS's actions with respect

to Sunflower amounted to approvals of the Holcomb Expansion Project such that the project was "potentially subject to Federal control and responsibility" within the meaning of § 1508.18. Second, plaintiff argues that RUS provided sufficient financial and other assistance to the Holcomb Expansion Project to make its involvement a major federal action under NEPA. As discussed below, the Court concludes plaintiff has demonstrated that RUS's involvement in the Holcomb Expansion Project amounted to major federal action under either analysis.

### ii.   Federal Approvals

As noted above, CEQ regulation § 1508.18 provides that actions by a federal agency "with effects that may be major and which are potentially subject to Federal control and responsibility" are major federal actions such that the requirements of NEPA apply. 40 C.F.R. § 1508.18. Furthermore, "[a]ctions include new and continuing activities, including projects and programs . . . approved by federal agencies." 40 C.F.R. § 1508.18(a). In addition, § 1508.18(b)(4) states in its non-exhaustive list of major federal actions that actions include "[a]pproval of specific projects," such as "actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. § 1508.18(b)(4). Although defendants concede that a federal agency's involvement in a non-federal project may in some instances constitute a major

federal action, they argue that "affirmative conduct taken or approval given by a federal agency alone is not enough to turn a non-federal project into a major federal action." Fed. Defs.' Opp'n Summ. J. at 8.

This Circuit has addressed this issue in *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, in which the court affirmed a preliminary injunction enjoining the National Institutes of Health, a federal agency, from approving an experiment that would release genetically engineered organisms into the open environment until an appropriate environmental assessment was complete. *Id.* Federal regulations require that any entity seeking to deliberately release such organisms obtain approval from the NIH before doing so. *Id.* at 149. The court concluded that the approval granted by the agency amounted to a major federal action such that NEPA applied. *Id.; see also Citizens Alert Regarding Env't v. EPA*, 259 F. Supp. 2d 9, 20 (D.D.C. 2003) ("[A] project may be deemed a major federal action even where federal money has not actually been provided. This happens most often in circumstances where federal entities have sufficient authority over the local project so as to control or influence its outcome.")[10]

_____

[10] Other Circuits have reached the same conclusion. *See, e.g., Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986) ("A non-federal project is considered a 'federal action' if it cannot 'begin or continue without prior approval of a federal agency.'") (quoting *Biderman v. Morton*, 497

Furthermore, an otherwise non-federal project can be "potentially subject to Federal control and responsibility" within the meaning of 40 C.F.R. § 1508.18 as a result of contractual terms agreed upon between the federal agency and the non-federal parties involved in the project. For example, in *Morris Cnty. Trust for Historic Pres. v. Pierce*, 714 F.2d 271 (3rd Cir. 1983), the court concluded that the terms of the contract between a federal agency, the Department of Housing and Urban Development ("HUD") and the non-federal party "provided HUD with sufficient authority over the [project] to constitute major federal action." *Id.* at 278.

Turning now to the instant case, it is apparent that, throughout the long history of RUS's involvement in Sunflower, the federal agency retained substantial control over the Holcomb site, particularly as it related to the potential development of additional power plants, such as the Holcomb Expansion Project. As described in detail above, Sunflower's debt to RUS was restructured twice, first in 1987 and then again in 2002. In each instance, RUS conditioned its approval of the restructuring on its continued control over Sunflower.

Crucially, one of the ways in which RUS elected to maintain

---

F.2d 1141, 1147 (2d Cir. 1974)); *NAACP v. Med. Ctr., Inc.*, 584 F.2d 619, 633 (3d Cir. 1978) ("[W]hen a federal agency gives a legally necessary discretionary approval enabling another significantly to impact on the environment, the agency may be required to file an EIS.").

control over Sunflower was to require Sunflower, by the terms of the 2002 Restructuring, to agree that it would not "enter into any agreement or other arrangements . . . for the development of Holcomb Unit 2 without the prior written approval of RUS." AR 04391. Furthermore, Sunflower agreed that "[a]ny RUS approval will be on such terms and conditions as RUS, *in its sole discretion*, may require at such time." AR 04391 (emphasis added). By this agreement, and in a myriad of other ways described above, RUS ensured that Sunflower would be unable to proceed with the development of a second power plant without the approval of RUS.[11] The approvals granted by RUS to Sunflower in 2007 reflect the intention of the parties, made explicit during the 2002 Debt Restructuring, that RUS would maintain the ability

---

[11] In addition to the relevant contractual provisions, plaintiff identifies a series of RUS regulations which, according to plaintiff, "dictate that RUS approval for Sunflower's actions was required." Pl.'s Mem. Supp. Summ. J. at 10. The regulations cited include 7 C.F.R. § 1717.1202(b), as well as 7 C.F.R. § 1717.608, 7 C.F.R. § 1717.616, 7 C.F.R. § 1717.657, 7 C.F.R. § 1717.853, 7 C.F.R. § 1717 subpart M, and 7 C.F.R. § 1717 subpart R. Section 1717.1202(b), for example, is a provision in the subpart of RUS regulations dealing with the policies and standards of RUS with respect to the settlement of debts. It states that "modifications regarding the debt owed by a borrower may be granted under the authority of the Administrator only by means of the explicit written approval of the Administrator in each case." 7 C.F.R. § 1717.1202(b). However, while § 1717.1202(b) and the other cited regulations perhaps prevent Sunflower from proceeding with the plans for the Holcomb Expansion Project in the *manner* the company desired without RUS approval, plaintiff has not persuaded this Court that the provisions generally prevent a borrower from undertaking this type of project without RUS approval.

to influence the Holcomb Expansion Project.   Simply put, Sunflower, without the prior approval of RUS, would not have been able to enter into the agreements with Tri-State relating to the Holcomb Expansion Project.

The federal defendants do concede that if "approval of a substantial portion of the project is required," a non-federal project becomes a major federal action.   Fed. Defs.' Opp'n Summ. J. at 10.   However, they argue that a major federal action only exists if the federal agency has "control over the *entire* non-federal project[.]"   Fed. Defs.' Opp'n Summ. J. at 8 (emphasis added).   Defendants' argument relies largely on cases in which the involvement of the federal agency was limited to a discrete segment of a larger project.   In those cases, the courts generally find that, while the federal agency might be expected to prepare an EIS with respect to the small segment in which they are involved, the federal agency was not required to prepare and EIS with respect to the entire project.[12]   The instant case,

---

[12] This is commonly seen in the cases involving the construction of a highway, a rail line or a power line.   In these instances, courts have repeatedly held that, while the federal agency might be expected to consider environmental impacts with respect to the small segment in which it was involved, the agency was not required to consider the environmental impact of the entire project if it had no involvement in the remaining portions of the project.   *See, e.g., Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (holding that although "other parts of the [rail transit] system are federally funded, [this] does not make the discrete Clayton-Shrewsbury Extension federally funded."); *Weiss v. Kempthorne*, 580 F. Supp. 2d 184, 189 (D.D.C. 2008) (concluding that the consent by the National

however, does not involve a federal agency that gave an approval for a small, segmented portion of a larger project. The Holcomb Expansion Project, in its entirety, required approvals from RUS to proceed. Defendants' reliance on case law involving this type of segmented construction projects is thus unpersuasive.

Defendants also argue that the control maintained by RUS is irrelevant because the control reflected RUS's financial concerns, rather than environmental concerns. According to defendants, the restructuring agreements reflected "RUS's primary concern . . . [to] mak[e] sure that Sunflower does not enter any financial relationships that would jeopardize its further and continued ability to repay RUS. . . . Under these loan documents, RUS has retained the authority to approve certain financial arrangements that Sunflower enters with regard to further development of the Holcomb Expansion Project in order to ensure repayment of its loans and loan guarantees." Fed. Defs.' Opp'n Summ. J. at 21. Even assuming that RUS's primary objective in 2002 and afterward has been to maximize federal debt recovery, the fact remains that in 2002 RUS elected to retain authority over the Holcomb Expansion Project and later, in 2007, gave necessary approvals which allowed the project to proceed. As

---

Park Service to lease 22 acres of a public park as part of a 500 acre development project did not make the entire, otherwise non-federal, development a major federal action).

such, RUS's actions became major federal actions within the
meaning of NEPA.

### iii. Federal Assistance

Actions which are "approved by federal agencies" are only
one type of major federal action.  CEQ regulations also define
"major federal action" to include non-federal projects "entirely
or partly financed . . . by federal agencies."  40 C.F.R.
§ 1508.18(a).  Accordingly, "federal funding is a significant
indication that a project constitutes a major federal action[.]"
*Sw. Williamson Cnty. Cmty Ass'n v. Slater*, 243 F.3d 270, 279 (6th
Cir. 2001); *see also Citizens Alert*, 259 F. Supp. 2d at 19.[13]

---

[13] Regarding the lien subordination at issue in the instant
case, the Court notes that federal assistance need not come in
the form of monetary assistance to qualify as a major federal
action.  For example, in *Fund for Animals v. Clark*, 27 F. Supp.
2d 8, 13 (D.D.C. 1998), the court concluded that the federal
agency was "so intimately involved in the discussion and planning
of the [bison] hunt, the federal defendants cannot now claim to
have no responsibility under NEPA with respect to the hunt or the
supplemental feeding programs." *Id.; see also Fund For Animals v.
Mainella*, 283 F. Supp. 2d 418, 432 (D. Mass. 2003) ("The
administrative record reveals that [the federal agency] makes a
substantial contribution of personnel and equipment to the
management of the Seashore's hunting program. . . . Accordingly,
there is sufficient federal participation to make [the program] a
'major Federal action.'").  In *Scottsdale Mall v. Indiana*, 549
F.2d 484 (7th Cir. 1977), the state defendants even attempted to
avoid compliance with NEPA by returning federal funds and
withdrawing a state highway project from a federal aid highway
program.  *Id.* at 485.  The Seventh Circuit nonetheless held that
NEPA applied.  *Id.* at 489 ("Our review of the record indicates
federal participation in the programming, location, design,
preliminary engineering, and right of way acquisition stages [of
the highway by-pass project].  Hence, we have no difficulty
concluding on the basis of the record before us that the entire
by-pass project is a 'major federal action' within the meaning of

Furthermore, if the level of federal involvement in the non-federal project amounts to the creation of a joint venture or partnership between the federal agency and a non-federal entity, federal courts have considered the arrangement to be a major federal action such that even the non-federal entity may be enjoined from violating NEPA. *See, e.g.*, *Fund for Animals v. Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992) ("[A] nonfederal actor that enters into a partnership or joint venture whereby the federal government provides goods, services, or financing may be enjoined from violating NEPA."); *Landmark West! v. USPS*, 840 F. Supp. 994, 1000 (S.D.N.Y. 1993); *Dalsis v. Hills*, 424 F. Supp. 784 (W.D.N.Y. 1976).

Federal funding provided solely for the purpose of conducting an EIS or other type of preliminary appraisal, prior to other involvement in the project, is generally considered insufficient to constitute a major federal action. In *Macht v. Skinner*, 916 F.2d 13 (D.C. Cir. 1990), for example, the D.C. Circuit declined to apply NEPA to a non-federal project for the construction of a light rail system, in part, because, although the relevant federal agency granted the state $2.5 million, the funding was for the purpose of performing an EIS for possible extensions to the light rail system. The court stated that because "the Light Rail Project does not yet involve major

---

42 U.S.C. § 4332(C) and that an EIS is required[.]").

federal action, we do not decide whether NEPA may require an environmental analysis if [the federal agency] ultimately decides to fund construction of the extensions. . . . If such an eventuality occurs, appellants may renew their claim that an EIS is required prior to the disbursement of federal funds or question the scope of the EIS[.]" *Id.* at 17; *see also Citizens Alert*, 259 F. Supp. 2d at 17 ("[B]ecause 'federal financial assistance to the planning process in no way implies a commitment by the federal agency to . . . undertake, fund, or approve any action that directly affects the human environment,' such funding does not render an otherwise state or local project sufficiently federal to make NEPA applicable.") (quoting *Atlanta Coal. Transp. Crisis v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979)).[14]

In situations in which a project is only partially funded by the federal agency, federal courts have in some instances looked to the proportion of federal funding to non-federal funding to determine whether there is a major federal action. If the amount of federal funding is insignificant or only provided with respect

---

[14] In *Ka Makani*, 295 F.3d 955, the Ninth Circuit came to a similar conclusion as the court in *Macht*. Addressing the question of whether federal funding for the development of a water resource system constituted a major federal action, the court concluded that NEPA did not apply, in part, because the federal funding was "clearly designated for use in the preparation of an EIS, and at most, other preliminary activities that would have no real impact on the physical environment[.]" *Ka Makani*, 295 F.3d at 962.

to a small segment of the project, the involvement of the federal agency may not constitute a "major federal action." *See, e.g.,* *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1101 (9th Cir. 2007) ("While significant federal funding can turn what would otherwise be a state or local project into a major federal action, consideration must be given to a great disparity in the expenditures forecast for the local and federal portions of the entire program.") (internal quotation marks omitted); *Ka Makani*, 295 F.3d at 960 (same); *Sancho v. Dep't of Energy*, 578 F. Supp. 2d 1258, 1267 (D. Haw. 2008) (holding that the contribution by a federal agency of $531 million toward a project did not constitute a major federal action because the funding represented less than 10% of the $5.84 billion project cost); *but cf. Sierra Club v. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109 (D. Or. 2002) ("Given the overwhelming percentage of federal dollars involved, and the fact that the amount itself, regardless of the percentage it represents, is more than $3 million, the federal funding contribution alone is probably sufficient to 'federalize' the project.").

Finally, "where the federal government has not made a 'firm commitment' to fund the project, the non-federal actor's mere anticipation of that money does not convert an otherwise local project into a federal one." *Citizens Alert*, 259 F. Supp. 2d at 24 (citing *Macht*, 916 F.2d at 17); *see also Los Ranchos de*

*Albuquerque v. Barnhart*, 906 F.2d 1477, 1481 (10th Cir. 1990)
("[B]ecause [the non-federal parties] are only eligible for
federal assistance, that eligibility in itself is not sufficient
to establish a major federal action requiring the [federal
agency] to comply with the requirements of NEPA.").

In the instant case, plaintiff argues that RUS gave
sufficient financial assistance to Sunflower to qualify as a
major federal action.  In particular, plaintiff asserts that RUS
gave substantial financial assistance to Sunflower in connection
with the 2002 Restructuring, during which RUS "effectively wrote
off hundreds of millions of dollars in Sunflower's loans so that
the project could proceed."  Pl.'s Mem. Supp. Summ. J. at 19-20.
Defendants, on the other hand, assert that "not a single cent of
Old Sunflower's debt was written off as a result of the
restructuring."  Sunflower's Opp'n Summ. J. at 18.

The Court agrees with the plaintiff that, while defendants
may be correct that Old Sunflower's debts were not explicitly
written off, the consequence of the restructuring was to leave
Old Sunflower with no assets or ability to pay its own debts off.
As discussed in detail above, under the terms of the 1987 DRA,
Old Sunflower issued three classes of promissory notes, the A
Notes, B Notes, and C Notes.  REA's share of the principal
balance on the A Notes was $294.5 million; on the B Notes it was
$98.3 million; on the C Notes it was $61.4 million.  With respect

to the B Notes in particular, Old Sunflower was at risk of defaulting by 2002. With the capitalized interest, the principal owed to RUS on these notes had risen to $413.9 million. When New Sunflower purchased most of Old Sunflower's assets during the 2002 Debt Restructuring, it issued new promissory notes to RUS. While it may be true that RUS has a chance of recovering more money as a result of the 2002 Restructuring than it would have if it had *not* approved the restructuring and Old Sunflower had defaulted, the new set of promissory notes nonetheless amounted to substantially less debt for New Sunflower than Old Sunflower had been burdened with.[15] As a consequence, RUS effectively provided financing to Sunflower for the Holcomb Expansion Project.

The federal defendants themselves seem to concede that RUS will, in the future, write some portion of Sunflower's debt off; they merely deny that the amount is known. *See, e.g.*, Fed. Defs.' Opp'n Summ. J. at 24 ("RUS has not written any of [Old] Sunflower's debt off to date. The exact and final amount of the RUS loss will not be known until as late as 2021, when all the notes have matured.").

Defendants' arguments that any financial assistance provided to Sunflower was not substantial enough to be considered a major

---

[15] See discussion, *supra*, of the new B Notes, the Residual Value Notes, and the Holcomb 3 Notes issued in connection with the 2002 Debt Restructuring.

federal action are unpersuasive. Neither party offers a definitive estimate of how much Sunflower's debt was reduced overall, but a comparison of the notes issued under the 1987 DRA and those issued under the 2002 Debt Restructuring convinces this Court that it is indeed substantial. Furthermore, the Court notes that the administrative record reflects, and the parties agree, that Sunflower realized a tax benefit as a result of the 2002 Debt Restructuring in the amount of ████████. AR ████.

Defendants assert that, even assuming Sunflower obtained financial assistance from RUS in connection with the 2002 Restructuring, such assistance was unrelated to the Holcomb Expansion Project specifically. However, the record reflects otherwise. Crucially, the agency provided this assistance to Sunflower in conjunction with the 2002 Restructuring - the direct, intended consequence of which was to divide Old Sunflower's assets such that Holcomb Unit 1 and most other assets were acquired by New Sunflower (the entity now burdened with the debt to RUS), whereas the land and common facilities necessary for the Holcomb Expansion Project were acquired by a separate entity, namely HCF. Additionally, RUS agreed to release its lien on the Holcomb Unit 2 site. RUS's actions reflect the agency's intention to make the Holcomb Expansion Project possible through the assistance provided in 2002.

Federal defendants repeatedly cite to *National Organization for Reform of Marijuana Laws v. Drug Enforcement Administration*, 545 F. Supp. 981 (D.D.C. 1982), in support of their argument on this point. However, the Court finds this comparison flawed. In *Marijuana Laws*, although the Drug Enforcement Agency ("DEA") provided financial and other support to the state of Florida for marijuana law enforcement generally, the specific project at issue the *Marijuana Laws* case was the plan to eradicate marijuana plants through an herbicidal spraying program. *Id.* With respect to the spraying program in particular, the court concluded that "federal funding, federal control, and federal 'go-ahead' actions are lacking." *Id.* at 984.[16] In contrast to *Marijuana Laws*, RUS provided significant federal assistance to enable the Holcomb Expansion Project.

In addition to the financial benefits granted to Sunflower through the debt restructuring, RUS provided additional

---

[16] Similarly, defendants' reliance on *Citizens Alert,* 259 F. Supp. 2d 9, is misplaced. The construction of the pipeline at issue in *Citizens Alert* was largely funded under an indirect EPA program whereby the EPA granted sums of money to states, who in turn "disperse[d] this money for projects of their [the states'] choosing[.]" *Id.* at 13-14. In contrast to RUS's decision to provide direct assistance to Sunflower, the EPA regulations at issue in *Citizen Alert* explicitly delegated the environmental review process to the state. *Id.* at 14 n.2. It is also significant that the court in *Citizens Alert* noted that the EPA was considering *directly* funding a small portion of the project. The court stated that it assumed for the purposes of the dispute before it, that "if EPA actually provides the $1.7 million appropriated by Congress . . . that funding decision would itself be a 'major federal action.'" *Id.* at 16.

assistance to Sunflower when it committed to releasing its lien on the Holcomb Unit 2 site and the Common Facilities, if and when the Holcomb Unit 2 generating plant is developed. Defendants argue that the release relates only to "a very small portion of the total Holcomb site." Fed. Defs.' Opp'n Summ. J. at 25. However, the portions of the Holcomb site containing the Holcomb Unit 2 site and the Common Facilities contain *all* the necessary properties for the development of the Holcomb Expansion Project. At issue in this action is the assistance provided by RUS in support of the Holcomb Expansion Project, not the entire Holcomb site.

Accordingly, the Court finds that the involvement of RUS in Sunflower amounted to a project "entirely or partly financed" by a federal agency. 40 C.F.R. § 1508.18(a). Contrary to defendants' arguments, RUS did not merely provide assistance to some discrete aspect of the Holcomb Expansion Project, nor was its contribution insignificant. Accordingly, its actions were subject to the requirements of NEPA.

In sum, the Court concludes that, both because RUS gave necessary approvals for the Holcomb Expansion Project and because RUS provided financial assistance to the project, the Holcomb Expansion Project was subject to "Federal control and responsibility", 40 C.F.R. § 1508.18, and therefore RUS's

involvement amounted to a major federal action within the meaning of NEPA.

### D. Whether RUS was Contractually Prevented from Exercising Control Over the Holcomb Expansion Project

Sunflower makes the additional argument that, although some provisions of the loan contracts between Sunflower and RUS require Sunflower to seek approval from RUS before engaging in certain activities, an attempt by RUS to impose environmental standards as a condition of its approval would have been a breach of the agreements between the parties. Citing *Centex Corporation v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005), Sunflower argues that, as a matter of federal common law governing the interpretation of contracts to which the United States is a party, each party is under an obligation "not to act so as to destroy the reasonable expectations of the other party." Sunflower Opp'n Summ. J. 13-14 (quoting *Centex*, 395 F.3d at 1304).

According to Sunflower, "RUS was created by Congress to serve as a lender, not a regulator," and it "was with RUS's statutorily defined role as a lender, and only a lender, in mind that Sunflower agreed to the terms of the contracts." Sunflower Opp'n Summ. J. at 14. Therefore, Sunflower "could not reasonably have expected that RUS could review or impose conditions on the design details of any new generating units," and "nothing in the contract provisions . . . gives RUS the authority to alter plans

or withhold its approval or consent for a particular project for environmental reasons." Sunflower Opp'n Summ. J. at 15, 17. In light of Sunflower's expectations at the time the contracts were signed, Sunflower now argues that "RUS would have been acting in bad faith and in an objectively unreasonable manner had it attempted to impose environmental standards as a condition of its consents." Sunflower Opp'n Summ. J. at 16.

The Court disagrees with Sunflower's position. First, the terms of the 2002 Restructuring explicitly gave RUS broad authority to place conditions on any approvals it granted in connection with the Holcomb Expansion Project. AR 04391. Sunflower has not pointed to any restriction, explicit or otherwise, in the agreements between RUS and Sunflower that would bar RUS from considering the environmental impacts of the Holcomb Expansion Project or conditioning its approval on a reduction of the environmental impact of the Holcomb Expansion Project. Furthermore, while it is undeniable that the focus of the Rural Electrification Act of 1936, 7 U.S.C. §§ 901-918, was indeed to give the Secretary of Agriculture the authority to make loans for rural electrification projects, Congress no less clearly intended the provisions of NEPA to apply to *all* federal agencies. 42 U.S.C. § 4332. The agency may not contractually or otherwise avoid those statutorily defined obligations.

### E.    Whether RUS Had the Requisite Discretion

In support of their assertion that NEPA does not apply to RUS's involvement in the Holcomb Expansion Project, defendants also argue that they lack the discretion to review the environmental impacts of the Holcomb Expansion Project.  In the words of the federal defendants:

> RUS has no discretion to meaningfully consider the alleged impacts from the Holcomb Expansion Project on global warming from carbon dioxide emissions, or on air quality from the emissions of other air pollutants. This is delegated to the Environmental Protection Agency and the State of Kansas. . . . RUS's authority over its borrowers is solely as a lender interested in repayment of a borrower's debt to the Government in the agreed-upon time.

Fed. Defs.' Opp'n Summ. J. at 30.

This argument is wholly unpersuasive.  NEPA not only explicitly gives all federal agencies the authority to consider environmental impacts, it *compels* them to do so.  *See* 42 U.S.C. §4332; *Found. on Econ. Trends*, 756 F.2d at 147; *Clark*, 27 F. Supp. 2d at 12 ("NEPA requires that all federal agencies prepare a detailed statement with respect to any major federal action significantly affecting the quality of the human environment.").

NEPA plainly applies to all federal agencies, irrespective of their primary functions.  The defendants themselves concede that, not only did RUS conduct an EIS before granting Old Sunflower the loan in 1980, but also that "RUS's actual approval

of a new loan . . . would be subject to NEPA." Fed. Defs.' Reply at 6. Nor does defendants' argument that the State of Kansas and the EPA also have regulatory authority over the Holcomb Expansion Project persuade the Court that RUS may ignore its responsibilities under NEPA.

Defendants' reliance on the Supreme Court's decision in *DOT v. Public Citizen*, 541 U.S. 752 (2004), is similarly unpersuasive. In *Public Citizen*, a federal agency within the Department of Transportation proposed rules relating to safety regulations of Mexican motor carriers operating within the United States. *Public Citizen*, 541 U.S. 752. The regulations were promulgated in accordance with an executive order lifting the moratorium on Mexican motor carriers pursuant to the North American Free Trade Agreement ("NAFTA"). The federal agency prepared an environmental assessment ("EA"), a more limited document than the EIS, in which it evaluated a variety of environmental impacts in different scenarios. However, the EA did not evaluate the environmental effects that would result from the actual increase in cross-border operations of Mexican motor carriers; instead it focused on other effects, such as an increase in the number of roadside inspections. Plaintiffs challenged this omission, arguing that the agency violated NEPA by failing to consider the environmental impact of the increase in Mexican motor carriers in the EA. The Supreme Court ruled in

favor of the federal agency, concluding that the federal agency properly omitted this issue from consideration because the federal agency "has no ability to countermand the President's lifting of the moratorium or otherwise categorically to exclude Mexican motor carriers from operating within the United States," and holding that "it would not . . . satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform." *Id.* at 766, 769.

In contrast to *Public Citizen*, defendants in the instant action can point to no authority, executive or otherwise, that prohibits RUS from imposing conditions on Sunflower related to any identified environmental impacts of the Holcomb Expansion Project, nor have they cited any authority preventing RUS from modifying its course of action based on those environmental impacts. On the contrary, NEPA and the accompanying regulations explicitly grant RUS the requisite discretion. There is no material difference between the discretion RUS had in 1980, when it granted Old Sunflower the initial loan after preparing an EIS, and the discretion the agency has in connection with its more recent involvement in Sunflower.

Sunflower's argument, in particular, that RUS lacks discretion ignores a fundamental feature of prior case law on this subject, namely that an agency's role must be considered

"merely ministerial" to avoid the application of NEPA. As this Circuit has explained, "[i]f . . . the agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no effect on the agency's actions, and therefore NEPA is inapplicable." *Citizens Against Rails-to-Trails*, 267 F.3d at 1151; *see also Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 513 (4th Cir. 1992) (addressing the role of a federal agency in granting certifications to certain types of power production facilities, and holding that the federal agency "does not have discretion to deny certification to any facility which meets the enumerated criteria and that its certification of this project was therefore merely a ministerial act.").

RUS's role in the Holcomb Expansion Project has not been "merely ministerial." The complex new arrangements negotiated in 2002 and then in 2007 evidence a significant amount of authority and discretion entrusted to this agency. As noted above, Sunflower agreed in 2002 that it would not "enter into any agreement or other arrangements . . . for the development of Holcomb Unit 2 without the prior written approval of RUS" and "*[a]ny RUS approval will be on such terms and conditions as RUS, in its sole discretion, may require at such time[.]*" AR 04391 (emphasis added). The federal defendants themselves acknowledge that RUS has the authority to decide "whether to finance, what to

finance, and the terms and conditions of a loan[.]" Fed. Defs.'
Opp'n Summ. J. at 31.[17]  This discretion gives the agency
sufficient leverage to take the environmental impacts of its
actions into account when making decisions.

F.    **Whether RUS Regulations at 7 C.F.R. Pt. 1794 Exempt the Holcomb Expansion Project From NEPA Review**

Finally, defendants argue that RUS's actions are exempt from
NEPA pursuant to environmental policy and procedure regulations
implemented by RUS.  These regulations, set forth in 7 C.F.R.
Part 1794, "contain[] the policies and procedures of [RUS] for
implementing the requirements of [NEPA]."  17 C.F.R. § 1794.1.
They are "intended to help RUS officials make decisions that are
based on an understanding of environmental consequences, and take
actions that protect, restore, and enhance the environment."  7
C.F.R. § 1794.1(b).  Defendants point specifically to 7 C.F.R.
§ 1794.3 which states:

> The provisions of [7 C.F.R. Part 1794] apply to actions
> by RUS including the approval of financial assistance
> pursuant to the Electric, Telecommunications, and Water
> and Waste Programs, the disposal of property held by
> RUS pursuant to such programs, and the issuance of new
> or revised rules, regulations, and bulletins.
> *Approvals provided by RUS pursuant to loan contracts*
> *and security instruments, including approvals of lien*
> *accommodations, are not actions for the purposes of*

---

[17] The Court notes that the federal defendants have stated
that they "do not entirely agree with Sunflower's
characterization of the consents and approvals as 'ministerial.'
Although some of the consents were ministerial, others are
not[.]" Fed. Defs.' Resp. to Sunflower's Mot. Dismiss at 7 n.4.

> *this part and the provisions of this part shall not*
> *apply to the exercise of such approvals.*

7 C.F.R. § 1794.3 (emphasis added). Defendants argue that RUS'
approvals amounted to no more than "[a]pprovals provided by RUS
pursuant to loan contracts" and, accordingly, are exempt from
NEPA under § 1794.3.

As a threshold matter, the Court must determine whether
defendants' interpretation of § 1794.3 is entitled to deference.
Although ordinarily "an agency's construction of its own
regulations is entitled to substantial deference," *Martin v.*
*Occupational Safety and Health Review Commission*, 499 U.S. 144,
150 (1991), an agency's "litigating positions are not entitled to
deference when they are merely appellate counsel's post hoc
rationalizations for agency action, advanced for the first time
in the reviewing court." *Id.* at 156; *see also Bowen v.*
*Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1998)("[W]e have
declined to give deference to an agency counsel's interpretation
of a statute where the agency itself has articulated no position
on the question, on the ground that 'Congress has delegated to
the administrative official and not to appellate counsel the
responsibility for elaborating and enforcing statutory
commands.'") (quoting *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 628
(1971)).

An agency's litigation position is nevertheless given deference in certain limited circumstances, as stated in *Auer v. Robbins*, 519 U.S. 452 (1997). As this Circuit has explained:

> There are at least three preconditions for applying this so-called *Auer* deference. First, the language of the regulation in question must be ambiguous, lest a substantively new rule be promulgated under the guise of interpretation. Second, there must be 'no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.' Finally, the agency's reading of its regulation must be fairly supported by the text of the regulation itself, so as to ensure that adequate notice of that interpretation is contained within the rule itself.

*Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002) (citing *Auer*, 519 U.S. at 461-462).

In the instant case, the Court concludes that the defendants' position with respect to § 1794.3 is not entitled to substantial deference. First, at least with respect to RUS's commitment to release the lien on the Holcomb 2 site and the Common Facilities, § 1794.3 is ambiguous in light of conflicting language in another RUS regulation, namely 7 C.F.R. § 1717.850. Section 1717.850 states that "[u]nder certain circumstances, such as when the project does not qualify for a categorical exclusion, *the environmental requirements of 7 CFR part 1794 may apply to applications for lien accommodations, subordinations, and releases.*" *Id.* (emphasis added). Second, defendants point to no evidence in the record that the agency itself evaluated whether NEPA applied to its actions during the 2002 Restructuring or the

51

subsequent approvals in 2007. Finally, for the reasons that follow, the Court cannot conclude that the agency's reading of the regulation is "fairly supported by the text of the regulation itself." *Drake*, 291 F.3d at 68. Specifically, the Court does not find the agency's actions can be fairly stated to amount to mere "approvals provided by RUS pursuant to loan contracts." 7 C.F.R. § 1794.3.

With respect to the 2002 Restructuring, the federal defendants argue that the approvals provided by RUS were granted pursuant to the 1987 DRA. In support of their argument, the federal defendants point to text in the 2002 agreements that identifies provisions in the 1987 DRA requiring Sunflower to seek written approval from RUS before it undertook specified actions. *See* Fed. Defs.' Reply at 5-6 (citing AR 222, AR 3952).

However, Sunflower did more than simply request approval from RUS pursuant to these old loan contracts, and RUS did more than simply grant the approval. Instead, entirely new agreements were drafted, entirely new and different obligations were created, including new promissory notes, and entirely new parties were subject to those obligations. With respect to the RUS's release of the lien on the Holcomb 2 site, RUS also did not approve the lien subordination as an approval pursuant the then-existing 1987 DRA. Instead, the lien subordination was part of the new arrangements created in 2002.

Although it is perhaps a closer call with respect to the approvals granted in 2007, ultimately the Court concludes that here too, the agency did not simply grant approvals pursuant to pre-existing loan contracts. Once again, new promissory notes were issued and entirely new agreements between RUS and Sunflower were created, such as the Additional Consideration Letter.

The Court also finds that, even assuming RUS's actions were consistent with its own regulation § 1794.3, such an interpretation would be invalid as applied in the instant case because it would conflict with NEPA and the implementing regulations promulgated by the CEQ. The agency is not entitled to substantial deference with respect to the interpretation of the CEQ regulations, including § 1508.18 defining "major federal action." *See, e.g.*, *Grand Canyon Trust v. FAA*, 209 F.3d 339, 342 (6th Cir. 2002) ("Although federal agencies have discretion to decide whether a proposed action is significant enough to warrant preparation of an EIS, the court owes no deference to the [Federal Aviation Administration's] interpretation of NEPA or the CEQ regulations because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to the [Federal Aviation Administration] alone.")(internal quotation marks omitted); *see also* (*Citizens Against Rails-to-Trails*, 267 F.2d at 1150 ("Because NEPA's mandate is addressed to all federal agencies, the [Surface Transportation Board's] determination that

NEPA is inapplicable . . . is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute."); *Morris Cnty.*, 714 F.2d at 276 ("CEQ guidelines are entitled to substantial deference in interpreting the meaning of NEPA provisions, even when CEQ regulations are in conflict with an interpretation of NEPA adopted by one of the Federal agencies.") (citing *Andrus v. Sierra Club*, 442 U.S. 347, 358(1979)).

Accordingly, under NEPA and the relevant CEQ regulations, RUS's actions taken with respect to Sunflower and the Holcomb Expansion Project are properly considered major federal actions and are therefore subject to the requirements of NEPA, in particular 42 U.S.C. § 4332.

## IV. CONCLUSION

For the foregoing reasons, Sunflower's motion to dismiss the complaint as moot is **DENIED**, plaintiff's motion for summary judgment is **GRANTED**, federal defendants' cross-motion for summary judgment is **DENIED**, and Sunflower's cross-motion for summary judgment is **DENIED**. Furthermore, defendants' request for an additional opportunity to brief the issues relating to the appropriate remedy is hereby **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

SIGNED:     **Emmet G. Sullivan**
            **United States District Court Judge**
            **March 29, 2011**