UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
SIERRA CLUB,                       )
                                   )
          Plaintiff,               )
                                   )
     v.                            )
                                   )
UNITED STATES DEPARTMENT OF        )
AGRICULTURE, RURAL UTILITIES       )
SERVICE, *et al.*,                 )   Civ. Action No. 07-1860(EGS)
                                   )
          Defendants,              )
                                   )
     and                           )
                                   )
SUNFLOWER ELECTRIC POWER           )
CORPORATION,                       )
                                   )
          Defendant-Intervenor.    )
                                   )
_____)

**MEMORANDUM OPINION**

     Plaintiff Sierra Club brought this action alleging that the
Department of Agriculture's Rural Utilities Service ("RUS") and
certain officials in the Department of Agriculture
(collectively, "the federal defendants") violated the National
Environmental Policy Act of 1969 ("NEPA") by failing to produce
an environmental impact statement in connection with its
involvement in the expansion of Sunflower Electric Power
Corporation's ("Sunflower") coal-fired generating plant in
Holcomb, Kansas.  Sunflower intervened as a defendant.

     On March 29, 2011, the Court granted plaintiff's motion for

summary judgment, concluding that the federal defendants had violated NEPA.  NEPA requires federal agencies to include an environmental impact statement ("EIS") "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(C).  "If any significant environmental impacts might result from the proposed agency action then an EIS must be prepared before the [agency] action is taken."  *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1153 (D.C. Cir. 2011) (internal quotations omitted).  The Court found that the financial assistance given to Sunflower by RUS in the form of debt forgiveness and consent to a lien subordination, as well as RUS's approvals relating to the expansion of the power plant, amounted to a "major federal action" within the meaning of NEPA such that an EIS was required.  Mem. Op. at 26, Mar. 29, 2011.

The Court ordered the parties to submit supplemental briefing on the appropriate remedy.  That issue is now before the Court.  Upon consideration of the supplemental briefs, the responses and replies thereto, the applicable law, the entire record, and for the reasons set forth below, the Court will grant declaratory and limited injunctive relief and remand to the agency for any necessary further proceedings.

## I.   BACKGROUND

The factual background of this case is set forth in detail
in the Court's March 29, 2011 Memorandum Opinion.  Briefly
stated, the Rural Electrification Administration (the
predecessor agency to RUS) approved a loan and loan guarantees
to Sunflower's predecessor in 1980 after an EIS was completed.[1]
The loan and loan guarantees, totaling approximately $543
million, were provided for the construction of a coal-fired
generating station ("Holcomb Unit 1") to be located near
Holcomb, Kansas.   Administrative Record ("AR") 03866.   However,
soon after the construction of Holcomb Unit 1, the company
became unable to meet its debt repayment obligations to RUS and
other creditors.   AR 04546.   Accordingly, in 1987, the parties
entered into new agreements.   Under the terms of these new
agreements, Sunflower's predecessor issued three new classes of

---

[1]    The Rural Electrification Act of 1936 gave the Secretary of
Agriculture authority, which has been delegated to RUS, to "make
loans in the several States and Territories of the United States
for rural electrification and for the purpose of furnishing and
improving electric and telephone service in rural areas, . . .
and for the purpose of assisting electric borrowers to implement
demand side management, energy efficiency and conservation
programs, and on-grid and off-grid renewable energy systems."
*Id.* § 902(a).   The Rural Electrification Act further authorizes
RUS to make loans for rural electrification to corporations
organized "for the purpose of financing the construction and
operation of generating plants, electric transmission and
distribution lines or systems for the furnishing and improving
of electric service to persons in rural areas[.]"   7 U.S.C.
§ 904(a).

promissory notes, AR 00149.[2]  Furthermore, in order to secure the notes, Sunflower granted a lien to RUS and its other secured creditors on substantially all of its assets.  AR 00276.

After the 1987 restructuring, the company was again unable to make payments on all of the promissory notes.  Of particular concern, because the interest was capitalized on one class of notes, the principal owed to RUS on these notes had increased from the $98.3 million owed in 1987 to $413.9 million in 2002.  Because the company was at risk of defaulting, Sunflower and its creditors elected to negotiate another restructuring.  AR 00004-11.  The 2002 corporate and debt restructuring (the "2002 Restructuring") divided the assets owned by Sunflower's predecessor between two new corporations, Sunflower Electric Power Corporation (the party to this action, "Sunflower") and the Holcomb Common Facilities ("HCF").  Significantly, Sunflower purchased the predecessor company's assets by issuing an entirely new set of notes to the holders of the old promissory notes.  AR 00173-175.  Although HCF did not issue new promissory notes, in exchange for the assets it received, RUS and the other creditors received a security interest in HCF and an assignment

---

[2]     The three classes of notes were referred to as the A Notes, B Notes, and C Notes.  RUS's share of the principal balance on the A Notes was $294.5 million; on the B Notes it was $98.3 million; on the C Notes it was $61.4 million.  Fed. Defs.' Statement of Facts Supp. Cross-Mot. Summ. J. ("Fed. Defs.' Statement of Facts") ¶¶ 5-7.

of annual rent payments from the use of certain related facilities.  AR 00190.  The 2002 Restructuring also affected the lien held by RUS.  The agency agreed that it will, in the future, release portions of its lien, if and when a second generating plant ("Holcomb Unit 2") is developed.  In exchange, Sunflower agreed to grant to RUS a security interest in the rent paid for the use of the relevant facilities.

In connection with the 2002 Restructuring, Sunflower also agreed to obtain approval from RUS before undertaking a variety of activities or entering certain types of contracts.  Of particular significance to the issue presently before the Court, Sunflower agreed: (i) that it would not "enter into any agreement or other arrangements . . . for the development of Holcomb Unit 2 without the prior written approval of RUS," and "[a]ny RUS approval will be on such terms and conditions as RUS, in its sole discretion, may require at such time" (AR 04391); and (ii) that it would not "enter into any agreement or arrangement . . . for Holcomb Site Development . . . or for other use of the Holcomb Unit 1 site, the fair market value of which would exceed $1 million annually[,] without the prior written approval of RUS," and "[a]ny RUS approval will be on

such terms and conditions as RUS, in its sole discretion, may require at such time" (AR 04391).[3]

Since the 2002 Restructuring, Sunflower has sought approval from RUS on a number of occasions in accordance with the conditions outlined above.  Most relevant to this action, on several occasions Sunflower sought approvals relating to the development of new generating plants at the Holcomb site.  In October of 2005, RUS granted conditional approval of Sunflower's execution of a Memorandum of Agreement with Tri-State Generation and Transmission Association, Inc. ("Tri-State") regarding the proposed development of two new generating units at the Holcomb site.  AR 04574.  Subsequently, in September of 2006, RUS granted conditional approval for Sunflower to enter into a

---

[3]     In addition, and even more comprehensively, Sunflower also agreed (i) that it will not "[c]onstruct, make, lease, purchase or otherwise acquire any extensions or additions to its system or enter into any contract therefore" without the prior written approval of RUS (AR 04389); (ii) that it will not "[p]urchase, lease or otherwise acquire any parcel or parcels of land or enter into any contract therefore" without the prior written approval of RUS (AR 04389); (iii) that it will not enter into any contracts or arrangements regarding power purchase or sale arrangements, power supply and delivery arrangements, power marketing contracts, system management and maintenance contracts, or any contracts relating to financial products such as options, futures or hedges without the prior written approval of RUS (AR 04389-04390); (iv) that it would not "charge, assign, pledge, mortgage or otherwise encumber any of its property" without prior written approval from RUS (AR 04459); and (v) Sunflower agreed to limitations on mergers, sale of its business or assets, leases and transfers of its capital assets in the absence of prior approval from RUS (AR 04467-04468).

Purchase Option and Development Agreement with Tri-State, as well as various other related agreements, again for the proposed development of two new generating units at the Holcomb site.  AR 04610-4611.  In addition to the development of Holcomb Unit 2, the agreements provided for the potential construction of a "Holcomb Unit 3" and a "Holcomb Unit 4."

In addition, on July 26, 2007, RUS also provided Sunflower with a separate letter, referred to by the parties as the "Additional Consideration Letter."  AR 08218-8216.  The terms of the Additional Consideration Letter modified the earlier arrangement from 2002 whereby RUS and the other creditors had received a security interest in HCF and an assignment of annual rent payments for the use of certain facilities.  Under the new terms, for each additional power plant being considered for the Holcomb site, RUS received an entirely new set of promissory notes.[4]  These notes are interest bearing, but payment is due only if and when the respective generating unit is placed into commercial operation.  Furthermore, each of these 2007 promissory notes, totaling $91 million, will be cancelled on

---

[4]    With respect to Holcomb Unit 2, Sunflower issued promissory notes (the "2007 Holcomb 2 Notes") in the amount of $52 million; with respect to the 2007 Holcomb 3 Notes, the amount was $23 million; and with respect to the 2007 Holcomb 4 Notes, the amount was $16 million.  AR 08228, 08239, 08244.

December 31, 2021 if the respective generating unit has not been placed into commercial operation.

The principal question before the Court in its March 29, 2011 Memorandum Opinion was whether NEPA applied to the actions taken by RUS in connection with the Holcomb Expansion Project.[5] Because NEPA requires that an EIS be prepared in connection with any "recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), the Court had to determine whether a "major federal action" had taken place.

For the reasons detailed in the Court's Memorandum Opinion, the Court concluded that RUS's involvement in the Holcomb Expansion Project constituted a major federal action, both in connection with the 2002 Restructuring and in connection with the approvals granted in 2007.  In short, the Court held that, because RUS gave necessary approvals for the Holcomb Expansion Project and because RUS provided financial assistance to the project, the Holcomb Expansion Project was subject to "Federal control and responsibility," 40 C.F.R. § 1508.18, and therefore RUS's involvement amounted to a major federal action within the

---

[5]    The parties have referred to the plans involving the development of additional generating units at the Holcomb site as the "Holcomb Expansion Project," and the Court will do the same.

meaning of NEPA.  Accordingly, by failing to prepare an EIS, the agency violated NEPA.

## II.  ANALYSIS

The sole remaining issue before the Court is the appropriate remedy.  At the outset, the Court notes that the plaintiff and the federal defendants are largely in agreement regarding the appropriate remedy.  Specifically, both maintain that declaratory relief and prospective injunctive relief would be sufficient to remedy the NEPA violation.  Their agreement is premised on the assumption that the approvals awarded by RUS in 2007 are no longer valid because Sunflower has significantly altered the configuration of the proposed expansion of the Holcomb site.

According to plaintiff and the federal defendants, at the time of the 2007 approvals, the plans for the Holcomb Expansion Project called for three coal-fired electric generating units, each with a generating capacity of approximately 600-750 megawatts.  Since then, however, Sunflower has revised the configuration and now has plans to construct only a single generating unit with a capacity of 875 megawatts.  Accordingly, plaintiff and the federal defendants argue that – in light of the contractual arrangements between Sunflower and RUS that obligate Sunflower to seek approval from RUS for plans and agreements relating to the Holcomb expansion – Sunflower is

obligated to seek new approvals in light of these drastic changes.  The federal defendants, for example, assert that "[d]ue to the material changes in the development of the Holcomb Expansion Project . . . RUS has concluded that its approvals and implementing documents require Sunflower to seek new approvals from RUS for the drastic changes to the Holcomb Expansion Project from the proposal RUS previously reviewed and approved in 2007."  Fed. Defs.' Supp. Br. at 8.  Similarly, Sierra Club asserts that "RUS has an affirmative role going forward because RUS will have to grant additional consents and approvals before the Expansion can lawfully proceed."  Pl.'s Supp. Br. at 6.  Accordingly, rather than asking the Court to vacate the 2002 restructuring or the 2007 approvals given by RUS in connection with the Holcomb Expansion Project, the plaintiff and the federal defendants ask that the Court simply order RUS to prepare an EIS on the Holcomb Expansion Project.[6]

Sunflower, on the other hand, asserts that the 2007 approvals that it obtained from RUS are still valid, and it need

---

[6]     Plaintiff argues in the alternative that, if the Court concludes that the 2007 approvals are still valid and Sunflower need *not* return to RUS for additional approvals before proceeding with the Holcomb Expansion Project, the Court should vacate the 2007 approvals.  Specifically, Sierra Club proposes that the Court vacate two consents issued by RUS in 2007, namely the July 26, 2007 "Additional Consideration Letter" mentioned above, AR 08218-8216, and the letter approving Sunflower's execution of the effective date and purchase date documents with Tri-State, AR 7444.  Pl.'s Supp. Reply Br. at 25-26.

not seek additional approvals before proceeding with the construction of an additional power plant.  In particular, Sunflower argues that the relevant agreements "clearly provide for the possibility that anywhere from zero to three new [generating] units could be constructed at Holcomb, and that new generating units could be smaller or larger than 700 MW." Sunflower's Supp. Br. at 7.  According to Sunflower, "nothing has occurred to invalidate the 2007 RUS Approvals."  Sunflower's Supp. Br. at 9.  Sunflower takes the position that "[t]he only appropriate relief in this case is to enter a declaratory judgment setting forth how RUS violated NEPA and to remand to RUS to determine what further action, if any, is appropriate[.]" Sunflower's Supp. Br. at 3.

## A.   Appropriate Injunctive Relief Against RUS

The Court has authority to grant an injunction to remedy a NEPA violation.  However, "a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010)(quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  In particular, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

11

remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

In the instant case, the plaintiff and the federal defendants essentially agree upon two proposals for injunctive relief against RUS.  First, the parties ask that the Court order RUS to immediately conduct a review of the Holcomb Expansion Project, including the preparation of an EIS.  Specifically, the plaintiff asks that the Court order RUS "to commence forthwith preparation of a legally valid environmental impact statement . . . evaluating the impacts of, and alternatives to, further approval or support for the Holcomb Expansion Project."  Pl.'s Proposed Order.  Similarly, the federal defendants propose that the Court enter an order first directing Sunflower "to seek approval from RUS for the newly proposed 895 MW Holcomb Expansion Project" and then order RUS "to conduct its review of the changes to the configuration of the Holcomb Expansion Project as a 'major federal action' within the meaning of 40 C.F.R. § 1508.18 and, for purposes of NEPA and RUS's implementing regulations, to conduct its review of the revised Holcomb Expansion Project as a generation project receiving federal financial assistance from RUS[.]"  Fed. Defs.' Proposed Order.

Second, the parties request that the Court enter a prospective injunction that would direct RUS to perform an EIS

before proceeding with any future actions in connection with the Holcomb Expansion Project.  The language proposed by plaintiff would enjoin RUS "from taking any action, including any approval of or consent to Sunflower's actions pursuant to the governing loan contracts, in support of the Holcomb Expansion Project" until after an EIS is completed.  Pl.'s Proposed Order.  The federal defendants propose similar language, suggesting that the Court order RUS "not to issue any approvals or consents for agreements or arrangements directly related to the Holcomb Expansion Project" until RUS conducted its review of the project.  Fed. Defs.' Proposed Order.

> ### i.    Proposed Order Directing the Agency to Immediately Perform an EIS for the Holcomb Expansion Project

With respect to the first of the parties' proposals, namely one that would essentially order an immediate EIS, the Court finds that such an injunction is not appropriate for the following reasons.  First, the Court is not aware of any proposals for any type of major federal action related to the Holcomb Expansion Project presently being considered by RUS. The Court, in its March 29, 2011 Memorandum Opinion concluded that "RUS's involvement in the Holcomb Expansion Project constituted a major federal action, both in connection with the 2002 Restructuring and in connection with the approvals granted in 2007[.]"  Mem. Op. at 26-27, Mar. 29, 2011.  However, the

record does not reflect that the agency is *presently* considering a similar major federal action.  Plaintiff and the federal defendants both propose that the Court enter an injunction that would require the agency to perform an EIS for the "newly proposed 895 MW Holcomb Expansion Project."  However, although NEPA would require an EIS if RUS were considering an approval, financial assistance for the project, or some other major federal action, the Court has not been made aware of any such action.  42 U.S.C. § 4332.

Plaintiff and the federal defendants request that the Court remedy this problem by simply entering an order requiring Sunflower to seek additional approval from RUS.  Then RUS would have a "major federal action" for which an EIS would be necessary.  The plaintiff proposes that the Court "declare[] that previous consents and approvals that specifically reference one or more 600 to 700 MW coal-fired generation facilities do not constitute approval for the current configuration of the Holcomb Expansion Project, and that Sunflower will need additional approval from RUS before taking any additional action with respect to the Project."  Pl.'s Proposed Order.  The federal defendants similarly propose that the Court order Sunflower "to seek approval from RUS for the newly proposed 895 MW Holcomb Expansion Project."  Fed. Defs.' Proposed Order. However, although the federal defendants have made it clear that

they consider the 2007 approvals to be insufficient in light of subsequent changes to the scope of the proposed Project, and have taken the position that Sunflower will need to seek additional approvals before proceeding with the Holcomb Expansion Project, the continuing validity of the 2007 approvals is simply not before the Court in this action.

The federal defendants' primary argument in this respect is that Sunflower signed a settlement agreement in May 2009 with the State of Kansas that drastically altered the plans for the Holcomb Expansion Project.  (For example, as noted above, instead of three 700 MW generating units, the settlement calls for the construction of a single 895 MW generating unit.)  The federal defendants assert that Sunflower failed to consult with or seek approval from RUS before signing the settlement agreement with the State of Kansas and argue that Sunflower should now be ordered to seek such approval.  The plaintiff similarly reasons that the existing agreements between RUS and Sunflower will require Sunflower to seek approvals from RUS in the future, and the failure by Sunflower to obtain RUS approval before entering into the settlement with the State of Kansas constituted a breach of their existing contractual obligations.

The plaintiff and the federal defendants would have the Court, at this late stage in the proceedings, delve into the question of whether Sunflower is presently in breach of its

contractual obligations toward RUS, based largely on Sunflower's actions in 2009, a full two years after this action was commenced.  While RUS has clearly taken the position that Sunflower is, or will be, in breach of its contractual obligation to seek approvals from RUS for certain actions, that question is not properly before this Court.  Accordingly, an injunction directing Sunflower to immediately seek approval from RUS is inappropriate at this juncture.

### ii. Proposed Order Directing RUS to Perform an EIS for Any Future Actions Related to the Holcomb Expansion Project

This brings the Court to the next proposal, again supported by both the plaintiff and the federal defendants, for an injunction that would essentially direct RUS to refrain from granting any approvals, financial support or take any other major federal action in connection with the Holcomb Expansion Project without performing an EIS.  While this proposal does not suffer from the same flaws as the one previously discussed, the Court must still consider whether plaintiff has satisfied the four-factor test.  The four factors, as noted above, are "(1) that [plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

16

would not be disserved by a permanent injunction." *Monsanto*, 130 S. Ct. at 2756 (internal quotations omitted).

The Court concludes that plaintiff has met its burden. First, plaintiff has sufficiently demonstrated irreparable harm. Plaintiff argues that "the Holcomb Expansion will emit substantial quantities of air pollutants that endanger human health and the environment" and thereby cause irreparable harm. Pl.'s Supp. Reply Br. at 14.   In support of its position, plaintiff relies upon the affidavits submitted in support of its motion for a preliminary injunction, particularly that of Dr. Jonathan Levy, an Associate Professor of Environmental Health and Risk Assessment at the Harvard School of Public Health.

Dr. Levy begins broadly with the assertion that "[c]oal-fired power plants emit a number of pollutants of potential concern for public health, including fine and coarse particulate matter, sulfur dioxide, nitrogen oxides, volatile organic compounds, mercury, and other hazardous air toxics."  Levy Decl. ¶ 4.  He then discusses certain pollutants in detail.  For example, Dr. Levy considers particulate matter pollution, defined as "a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a range of sizes."  Levy Decl. ¶ 5.  Particulate matter pollution can be classified by particle size, and Dr. Levy explains that "$PM_{2.5}$" (particulates less than 2.5

17

micrometers in aerodynamic diameter) "pose[] a greater risk of severe health problems (including premature death), given their ability to penetrate deeper into the lungs. . . . [and] can remain suspended for longer periods of time in the atmosphere and can travel much greater distances."  Levy Decl. ¶ 7. Relying upon various assumptions, Dr. Levy calculates the expected quantities of $PM_{2.5}$ from the Holcomb site and comes to the conclusion that "construction and operation of the proposed unit at the Holcomb site in Kansas would contribute to particulate matter concentrations in the vicinity of the plant and in downwind areas, increasing the health risks . . . to individuals in those areas."  Levy Decl. ¶ 15.  According to Dr. Levy, "[e]xposure to airborne PM is associated with a number of serious health problems, such as premature death, cardiovascular and respiratory hospitalizations, and other forms of respiratory and cardiovascular morbidity.  These health problems are particularly likely to occur in sensitive populations, including the elderly, children, and individuals with diabetes or cardiopulmonary disease."  Levy Decl. ¶ 6.

Similarly, Dr. Levy states that coal-burning power plants are the "largest human-cause source of mercury emissions to the air in the United States," and that "[i]t is my opinion that construction and operation of the proposed unit at the Holcomb site in Kansas would increase concentrations of mercury in the

air, which may then be deposited locally or carried great distances. Once this mercury enters the water, it will pose health risks to persons exposed to it[.]" Levy Decl. ¶¶ 29-30. Plaintiff also relies upon the declaration of Dr. Johannes Feddema, a climate researcher, for an analysis of the increased carbon dioxide emissions associated with new coal-fired power plants. Feddema Decl. ¶¶ 4-27.

Sunflower's main argument in opposition appears to be that emissions from the planned 894 MW generating unit "will be significantly below those of the average U.S. coal facility[.]" Sunflower's Supp. Br. at 20. In support of this assertion, Sunflower has submitted an affidavit of Scott Bloomberg, a consultant with expertise in "the electric sector, including new investment options (generation choice), environmental risk and compliance, climate policy, transmission, renewable portfolio standards and fuel markets." Bloomberg Aff. ¶ 2. Sunflower also asserts that the Holcomb Expansion Project "has already undergone, and continues to undergo, extensive environmental review of its impact on the air, water, land, endangered species, and human health in order to obtain the various permits and approvals required to operate," and that the Kansas Department of Health and Environment has already evaluated the potential hazardous air pollutant output for the plant. Sunflower's Supp. Br. at 20.

Even assuming Sunflower's assertions to be true, neither adequately counters the declaration of Dr. Levy, which contains specific, detailed estimates of various pollutants that would be emitted by the Holcomb site and the resulting harms.  Whether or not some other coal facility emits *greater quantities* of particulate matter or mercury, for example, has no bearing on whether or not there will be irreparable harm here.  Although Sunflower does dispute plaintiff's assertion that one coal facility will create a sufficient quantity of carbon dioxide emissions to have a measurable impact on the climate, Sunflower fails to offer any persuasive evidence that would counter plaintiff's detailed submissions on other pollutants.[7]  Upon consideration of these submissions, as well as the other affidavits and arguments put forward by the parties, the Court concludes that the plaintiff has demonstrated irreparable injury.

---

[7]   Sunflower has also submitted the affidavit of L. Earl Watkins, Sunflower's President and Chief Executive Officer. Sunflower cites specifically to Mr. Watkins' assertions that he "disagree[s] with Plaintiff's assertion that somehow the construction of [the single 895 MW coal-fired unit] will endanger the health of Kansans[.]"  Watkins Aff. ¶ 9.  Mr. Watkins asserts that the Kansas Department of Health and Environment "found that [the single 895 MW coal-fired unit] will conform to the obligations under the [Clean Air Act] related to impacts on National Ambient Air Quality Standards ("NAAQS") for sulfur dioxide ("SO2"), nitrogen oxides ("NOX"), particulate matter less than 10 microns ("PM10"), particulate matter less than 2.5 microns ("PM2.5") and carbon monoxide ("CO")."  Watkins Aff. ¶9.

With respect to the second factor, neither Sunflower nor defendant disputes "that remedies available at law, such as monetary damages, are inadequate to compensate for th[e] injury," *Monsanto*, 130 S. Ct. at 2756, and the Court concurs that such a remedy is not available.  As the Supreme Court has explained, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages[.]"  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

This brings the Court to the third and fourth factors, which consider the balance of hardships and the public interest. Here, in light of the limited injunction being considered, namely a prospective injunction that would require RUS to perform an EIS before granting approvals or giving financial assistance to Sunflower in connection with the Holcomb Expansion Project, the balance of equities tips in plaintiff's favor.

Regarding the balancing of the harms to the parties, the federal defendants themselves have proposed a limited injunction of this type and do not suggest any harm that would befall them if it were granted.  Moreover, although Sunflower details harms that it might suffer if injunctive relief is awarded, its recitation of harms appears to stem from the inaccurate assumption that the injunction would permanently bar it from proceeding with the Holcomb Expansion Project.  *See, e.g.*, Sunflower Supp. Br. at 22 ("Enjoining RUS approvals would shut

down Sunflower's ability to function by preventing it from complying with its obligations to meet reliability needs in western Kansas and maintain and operate over 2,215 miles of transmission lines, 76 substations, and 1,199 MW of existing generation." (citing Watkins Aff. ¶¶ 46, 54-56)).  Similarly, Sunflower asserts that injunctive relief would "erode Sunflower's liquidity and cash position" and potentially prevent Sunflower from meeting its obligations to third parties. However, Sunflower has failed to identify how mere delays caused by RUS undertaking an EIS, rather than a complete bar, would cause these or any other harms.  Plaintiff, on the other, hand has identified substantial and irreparable harm that would occur if no injunctive relief is awarded.

Finally, Sunflower argues that the public interest is best served by rejecting injunctive relief, citing to the interests of RUS in carrying out its duties and the interests of energy consumers, particularly rural consumers.  Sunflower's Supp. Br. at 23-24.  However, once again Sunflower's arguments do not address how a delay in the construction of the Holcomb Expansion Project that may be necessary to allow the agency to conduct an EIS will prejudice these interests.  On the other hand, the public has an interest in ensuring that federal agency actions taken in connection with the building of coal-fired power plants comply with the requirements of NEPA.

Accordingly, the Court concludes that limited injunctive relief is warranted.  Specifically, an order directing RUS not to issue any approvals or consents for agreements or arrangements directly related to the Holcomb Expansion Project, or to take any other major federal actions in connection with the Holcomb Expansion Project, until an EIS is complete, is appropriate.[8]

**B.   Appropriate Injunctive Relief Against Sunflower**

In addition to an injunction against RUS, plaintiff requests an injunction against Sunflower.  Plaintiff has proposed a broadly worded injunction that would bar Sunflower

---

[8]    Both the plaintiff and the federal defendants have proposed an injunction for this purpose, and there are only minor differences between the parties' proposed language.  Plaintiff's request is a broader one, asking the Court to enjoin "any actions" in support of the Project, rather than just "consents and approvals."  Furthermore, RUS has added the word "directly" to their proposal.  Plaintiff argues that "the word 'directly' does not appear in the governing loan documents . . . nor is it otherwise defined," and that it is "appropriate for the Court's injunction to track the language that RUS and Sunflower negotiated in the loan documentation[.]"  Pl.'s Supp. Reply Br. at 4.  The federal defendants, on the other hand, assert that their version is the appropriate one because plaintiff's version "is ambiguous and could be read as proposing the broadest possible injunction, which may have the effect of preventing RUS from administering the complex contractual terms governing Sunflower's outstanding debt owed to the Agency."  Fed. Defs.' Br. at 12-13.  In addition, the federal defendants argue that plaintiff's proposed injunction "is not sufficiently tailored so as to address the procedural violations the Court found and yet not unduly burden RUS in the administration of its duties and its mission[.]"  Fed. Defs.' Br. at 13.  The Court concludes that the federal defendants have the better argument here.

from: "a) commencing construction of the expansion of the Holcomb 1 coal-fired generation facility; and b) entering into any agreement or other arrangements for the development of the Holcomb Expansion Project."   Pl.'s Proposed Order.

Plaintiff argues that an injunction against Sunflower is necessary for two reasons.   First, plaintiff asserts that if Sunflower were to initiate any construction activity, it would "significantly undermine" the NEPA process and would violate 40 C.F.R. § 1506.1.[9]   Second, plaintiff asserts that "[i]f the Court were to only enjoin RUS from taking action . . . Sierra Club is concerned that Sunflower would forego requesting required RUS approvals and move ahead with the Project while the EIS is being prepared."   Pl.'s Supp. Br. at 15.   According to plaintiff, "an injunction against Sunflower is necessary to preserve a meaningful opportunity for RUS's consideration of impacts and alternatives in a full EIS."   Pl.'s Supp. Br. at 15.

In support of its position, plaintiff relies on *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 155 (D.C. Cir.

---

[9]     Section 1506.1 provides:   "(a) Until an agency issues a record of decision . . . no action concerning the proposal shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives. . . . If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved."   40 C.F.R. § 1506.1

1985), in which the D.C. Circuit held that "it is well established that judicial power to enforce NEPA extends to private parties where non-federal action cannot lawfully begin or continue without the prior approval of a federal agency. Were such non-federal entities to act without the necessary federal approval, they obviously would be acting unlawfully and subject to injunction." *Id.* (internal citations and quotation marks omitted).

The problem with plaintiff's position is that, particularly given the breadth of plaintiff's proposed injunction against Sunflower, plaintiff has not shown that all of the non-federal action it seeks to enjoin "*cannot* lawfully begin or continue without the prior approval of a federal agency." *Id.* (emphasis added). In *Foundation on Economic Trends*, the court affirmed a preliminary injunction enjoining the National Institutes of Health ("NIH"), a federal agency, from approving an experiment that would release genetically engineered organisms into the open environment until an appropriate environmental assessment was complete. *Id.* In so doing, the Circuit explained that, because federal regulations *required* that any entity seeking to deliberately release such organisms obtain approval from the NIH before doing so, "the [non-federal party] cannot lawfully go forward with its experiment, and it can thus be enjoined by the court." *Id.*

25

Here, however, unlike the plaintiff in *Economic Trends*, plaintiff has failed to demonstrate that all of the "non-federal action" envisioned by such a broad injunction "cannot lawfully begin or continue without the prior approval of a federal agency." *Found. on Econ. Trends*, 756 F.2d at 155.  This proposed injunction is flawed for the same reasons that the proposed injunction ordering RUS to immediately begin an EIS is flawed.  In order for such an injunction to be appropriate, the Court would need to determine that the previous consents and approvals granted by RUS do not constitute approval for the current configuration of the Holcomb Expansion Project, and that Sunflower could not lawfully take any additional action with respect to the Holcomb Expansion Project until such approvals are sought.  As explained above, however, the continuing validity of the 2007 approvals is simply not before the Court in this action.  Accordingly, plaintiff's request for an injunction against Sunflower, the non-federal party in this action, is denied.

### C.    Whether Vacatur is Appropriate

The final question before the Court is whether the agency action, specifically the 2002 restructuring and the 2007 approvals, must be vacated.  The Administrative Procedure Act ("APA") provides that the reviewing court "shall . . . hold unlawful and set aside agency action . . . found to be . . .

arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law[.]"  5 U.S.C. § 706.  While vacatur may be the default remedy for a NEPA violation, the Court is not without discretion.  "The decision whether to remand or vacate 'depends on [1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed.'"  *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 755-756 (D.C. Cir. 2002) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

In *Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002), for example, this Circuit held that the Department of Agriculture failed to comply with certain provisions of the APA when it implemented a "payment-in-kind" program for sugar, essentially offering sugar beet farmers an incentive to destroy a certain amount of their crops.  Rather than vacate the agency action, however, the court ordered a remand to the agency, explaining that:

> Normally when an agency so clearly violates the APA we
> would vacate its action . . . and simply remand for
> the agency to start again.  Unfortunately, because we
> denied preliminary relief in this case, the 2001
> program was launched and crops were plowed under.  The
> egg has been scrambled and there is no apparent way to
> restore the status quo ante. . . . Appellants insist
> that we have no discretion in the matter; if the
> Department violated the APA - which it did - its

actions must be vacated.  But that is simply not the
law.

*Id.* at 97-98 (internal citations and quotation marks omitted).

Similarly, in *Milk Train, Inc. v. Veneman*, milk producers
challenged a subsidy program implemented by the Department of
Agriculture.  Although the court found flaws in the subsidy
program, the court concluded that "there is at least 'a serious
possibility' that the Secretary on remand could explain [the
subsidy program] in a manner that is consistent with the statute
or choose an allocation method to correct the problem, a factor
that favors remanding rather than vacating."  310 F.3d at 756.

In the instant case, the Court is persuaded that injunctive
relief requiring RUS to perform an EIS before any future
approvals or consents are given or any other major federal
action taken related to the Holcomb Expansion Project, coupled
with the federal defendants' own emphatic conclusion that
Sunflower must seek additional approvals from RUS before the
Holcomb Expansion Project can proceed, create more than "a
serious possibility" that RUS will be able to correct the
problem caused by the earlier failure to comply with NEPA.[10]

---

[10]    As mentioned above, the federal defendants and plaintiff
are in agreement that the 2007 approvals "are no longer
effective in light of significant changes to the configuration
of this [Holcomb Expansion] Project."  Fed. Defs.' Supp. Br. at
6; Pl.'s Supp. Br. at 1.  The federal defendants have stated in
no uncertain terms that, "due to the significant changes
Sunflower made to the configuration of the Holcomb Expansion

That is to say, an EIS will be completed before the construction
of the Holcomb Expansion Project can proceed.  *See, e.g.*,
*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety
Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (concluding vacatur
was not appropriate in part because the plaintiff conceded that
leaving the rule in place would "do no affirmative harm").

Next, the Court must consider the "the disruptive
consequences of an interim change that may itself be changed[.]"
*Milk Train, Inc.*, 310 F.3d at 756.  Even plaintiff states that
"[o]n the complicated facts of this case . . . the 'default
remedy' of vacatur of the 2002 and 2007 decisions is
unnecessary" Pl.'s Supp. Br. at 5.[11]  Sunflower also provided a
detailed description of the disruptive impact that vacating the
2007 approvals would have.  In particular, Sunflower asserts
that after the 2007 approvals were granted by RUS "a series of
transactions was promptly consummated in reliance on the 2007
RUS Approvals."  Sunflower Supp. Br. at 33-34.  Sunflower

---

Project subsequent to the Agency's approvals in 2007, the
Holcomb Expansion Project requires new RUS approvals."  Fed.
Defs.' Supp. Br. at 1.  Specifically they explain that "[d]ue to
material changes in the development of the Holcomb Expansion
Project . . . RUS has concluded that its approvals and
implementing documents *require* Sunflower to seek new approvals
from RUS for the drastic changes to the Holcomb Expansion
Project from the proposal RUS previously reviewed and approved
in 2007."  Fed. Defs.' Supp. Br. at 8 (emphasis added).

[11]   Plaintiff only asks for vacatur in the alternative to the
other relief it requests.

identifies Tri-State as "an express third-party beneficiary of
the 2007 RUS Approvals" and also asserts that "RUS and
Sunflower's other secured creditors entered into agreements with
Tri-State."   As noted above, Sunflower also issued promissory
notes, to RUS and other creditors, in conjunction with the 2007
approvals.   Furthermore, Sunflower points out that bills of sale
were executed among Sunflower, HCF and the predecessor company,
also in conjunction with the 2007 approvals.   None of these
other parties are before this Court.   Sunflower also describes
various ways in which it, as well as other parties, would suffer
substantial financial loss if the Court were to vacate the 2007
approvals.   The federal defendants agree that "vacatur would
involve unwinding complex financial instruments and would affect
third parties not party to this lawsuit."   Fed. Defs.' Supp. Br.
at 6.

The Court need not reach the question of whether, standing
alone, the disruption described by Sunflower is enough to
counsel against vacatur.   However, in combination with RUS's
stated position that Sunflower will need to seek additional
approvals from RUS (subject to an EIS), the Court concludes that
vacating the 2007 approvals is not warranted in the instant
case.

## III. CONCLUSION

For the foregoing reasons, the Court hereby **DECLARES** that RUS violated NEPA by failing to prepare an EIS prior to providing approvals and financial support for the Holcomb Expansion Project.  It is **FURTHER ORDERED** that RUS shall not issue any approvals or consents for agreements or arrangements directly related to the Holcomb Expansion Project, or take any other major federal actions in connection with the Holcomb Expansion Project, until an EIS is complete.  It is **FURTHER ORDERED** that this matter is **REMANDED** to RUS to determine what further action, if any, is necessary or appropriate in light of the Court's opinion.  An appropriate Order accompanies this Memorandum Opinion.

**SIGNED:**    **Emmet G. Sullivan**
          **United States District Court Judge**
          **January 30, 2012**